Lionel Z. Glancy (Bar No. 134180)
Peter A. Binkow (Bar No. 173848)
Neal A. Dublinsky (Bar No. 135712)
GLANCY BINKOW & GOLDBERG LLP
1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067
Tel: (310) 201-9150
Fax: (310) 201-9160
Emails: lglancy@glancylaw.com

*Liaison Counsel for Plaintiffs*

Katharine M. Ryan (Pro Hac Vice)
Christopher L. Nelson (Pro Hac Vice)
John J. Gross (Pro Hac Vice)
SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056
Emails: kryan@sbtklaw.com
         cnelson@sbtklaw.com
         jgross@sbtklaw.com

*Lead Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WAYMAN TRIPP and SVEN MOSSBERG, Individually and on Behalf of all Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> INDYMAC BANCORP, INC.; MICHAEL W. PERRY; and SCOTT KEYS, <br><br> Defendants. | Case No. 07-CV-1635-GW (VBK) <br><br> **SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 10(b) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** <br><br> JURY TRIAL DEMANDED |

# TABLE OF CONTENTS

NATURE OF THE ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

    Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

    Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

    An Inflated Real Estate Market Helped IndyMac Deal
    in Riskier Loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    IndyMac Continued to Tout its Growth Despite a
    Downturn in the Real Estate Market . . . . . . . . . . . . . . . . . . . . . . 14

DEFENDANTS' CONDUCT DURING THE CLASS PERIOD . . . . . . . 17

    IndyMac's Dramatic Growth Was Accomplished By
    Producing High-Risk Loans Combined With
    Intentionally Deficient Underwriting Standards . . . . . . . . . . . . .17

    IndyMac's Purportedly Strict Underwriting
    Procedures And Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

    Confidential Witnesses Confirm that IndyMac
    Regularly Overrode its Stated Underwriting Practices
    on a Companywide Basis During the Class Period . . . . . . . . . . . 21

    IndyMac's Failure to Hedge Loans and Securities Held
    for Sale and Investment Was Contrary to Statements
    Made During the Class Period . . . . . . . . . . . . . . . . . . . . . . . . . .32

DEFENDANTS' FALSE AND MISLEADING STATEMENTS . . . . . . .36

    January 26, 2006: Earnings Conference Call . . . . . . . . . . . . . . . . . 36

    March 1, 2006: Filing of IndyMac's 2005 10-K . . . . . . . . . . . . . .37

    April 25, 2006: Filing of 1Q 2006 10-Q and
    Press Release . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .43

    July 27, 2006: IndyMac's Press Release, Filing
    of Its 2Q 2006 10-Q, and Earnings Conference Call . . . . . . . . . . .47

    November 2, 2006: Press Release, 3Q 2006 10-Q
    and Earnings Conference Call . . . . . . . . . . . . . . . . . . . . . . . . . . .52

    Defendants Begin To Disclose The Truth . . . . . . . . . . . . . . . . . . .54

    Market Reaction to IndyMac's Jan 16th Announcement . . . . . . . . 57

    Defendants' Class Period Ending Disclosures . . . . . . . . . . . . . . .58

    Market Reaction to IndyMac's Jan 25th Announcement . . . . . . . .62

    Defendants' Post Class Period Disclosures . . . . . . . . . . . . . . . . .64

ADDITIONAL SCIENTER ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . .68

    The Distressed Silver State Loan Pool . . . . . . . . . . . . . . . . . . . . . 68

    The Distressed Lancaster Loan Pool . . . . . . . . . . . . . . . . . . . . . . 70

    The Distressed Geneva Loan Pool . . . . . . . . . . . . . . . . . . . . . . . .71

    IndyMac's Rampant "Push Through" of Loans
    Systematically Predicated on Falsely Inflated
    Property Appraisals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .73

Defendant Perry's Additional Financial Incentive
to Foster the Scheme . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .75

The Company's Class Period Financial Statements
Violated the Following GAAP Principles, Among
Others: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .75

LOSS CAUSATION/ECONOMIC LOSS . . . . . . . . . . . . . . . . . . . . . . . . 79

APPLICABILITY OF THE PRESUMPTION OF RELIANCE: . . . . . . .81

FRAUD-ON-THE-MARKET DOCTRINE . . . . . . . . . . . . . . . . . . . . . . . 81

NO STATUTORY SAFE HARBOR EXISTS
FOR DEFENDANTS' STATEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . .82

CLASS ACTION ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

FIRST CLAIM
Violations of Section 10(b) of the Exchange Act
And Rule 10b-5 Promulgated Thereunder
Against All Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .84

SECOND CLAIM
Violations of Section 20(a) of the Exchange Act
Against the Individual Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . 85

PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

JURY TRIAL DEMANDED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .86

Lead Plaintiffs, Wayman Tripp and Sven Mossberg (collectively, "Plaintiffs" or "Lead Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following based upon personal knowledge as to themselves, and information and belief as to all other matters, including an investigation conducted on behalf of Plaintiffs' counsel. This investigation included a review and analysis of all filings made with the Securities and Exchange Commission ("SEC") by IndyMac Bancorp, Inc. ("IndyMac" or the "Company") during the relevant time period, as well as securities analyst reports, press releases, media reports and other publications issued by and through the Company, interviews with numerous former employees of IndyMac, and consultation with a financial services industry hedging expert.

## NATURE OF THE ACTION

1.     This is a class action brought by Lead Plaintiffs on behalf of all persons and entities who purchased and/or otherwise acquired common stock of IndyMac (the "Class") from January 26, 2006 through January 25, 2007, inclusive (the "Class Period") and were damaged thereby. Lead Plaintiffs seek to pursue remedies under the Securities Exchange Act of 1934, 15 U.S.C.S. § 78 *et seq.* (the "Exchange Act").

2.     Defendant IndyMac is the holding company for IndyMac Bank F.S.B., which operates as a hybrid thrift/mortgage banker (collectively, "IndyMac" or the "Company"). IndyMac's Chief Executive Officer, Michael Perry, was focused on driving IndyMac's growth at all costs. During the Class Period, IndyMac's loan production grew from approximately $16 billion worth of loans sold in the first quarter of 2006 to approximately $24 billion worth of loans sold during the fourth quarter of 2006. IndyMac was only able to achieve this growth in market share by engaging in knowingly reckless mortgage production.

3.     The booming real estate market opened up new opportunities for the Company to deal in higher-risk loans. IndyMac's mortgage production during

this time was focused on the ARMs[1] and 80/20 piggyback[2] product mix.  Indeed, during the fourth quarter of 2006, IndyMac produced approximately **$5 billion** of 80/20 piggyback loans, despite the fact that these loans were becoming increasingly risky during this time period.[3] IndyMac was also generating a significant percentage of its loan production from low/no documentation loans (stated income Alt-A loans) now generically referred to as "liar's loans" because they were subject to wide-spread fraud during the real estate boom of 2005 and 2006.

4.     Throughout the Class Period, Defendants portrayed IndyMac as a company that was, and would continue to be, financially stable despite industry-wide downturns, and that this stability was a result of, *inter alia*, the quality and success of the Company's strong internal controls, underwriting and hedging practices.

5.     In reality, however, IndyMac's internal controls were grossly deficient.  According to several former IndyMac employees, the Company's management, including CEO Michael Perry, exploited internal control weaknesses or simply overrode controls to drive loan originations and sales growth.  For example, a former IndyMac vice-president states Perry sought to make his/her short term goals for the Company "at all costs."  To this end, Perry put immense pressure on subordinates to "push loans through," even if it meant

---

[1] ARMs, Alternative-A, or "Alt-A" loans are mortgage loans that have prime credit characteristics, but do not meet the Government Sponsored Enterprises (Fannie Mae/Freddie Mac) underwriting guidelines, often because of undocumented or non-traditional sources of income.  These loans are considered an intermediate type of loan between Prime and Subprime, and typically carry an interest rate about a quarter percentage point higher than a comparable Prime loan.  Alt-A loans have also been referred to as "liar's loans" because of the low documentation recquired to receive these loans. *See infra* ¶¶ 38-41.

[2] Piggyback mortgages are second mortgages that close simultaneously with the first mortgage providing extended financing behind a first mortgage lien.  Typically, this is effectuated with an 80/20 split:  80% financing through a first mortgage and 20% financing through a second mortgage.  The piggyback, or second, mortgage represents the higher risk portion of a combo loan or combined loan to value ("CLTV") loan.  Piggyback loans are extremely high risk because they are the last to be repaid in the event of a foreclosure. *See infra* ¶ 42.

[3] Indeed by the first quarter of 2007, IndyMac effectively began the process of abandoning the first and second piggyback loan market.  Almost 60% of IndyMac's "held for sale" credit losses in 4Q06 were related to these exotic mortgages, as the secondary market for re-selling these loans became increasingly illiquid. *See infra* ¶¶176, 183-186 for a further discussion.

consistently making "exceptions" to the Company's guidelines and policies (at the expense of the Company's future).  At one point, this witness and his/her subordinates were instructed to abandon approval guidelines and "push all loans through for approval which came in the door."  This former vice-president also states "obvious" fraud and lying were rampant in the Company's underwriting department, and that he/she knows upper management, including Perry, were aware of it because he/she "repeatedly reported it" to upper management.  As is more fully described below, this sentiment was echoed by several former IndyMac employees.

6.     Other confidential witnesses – former employees of IndyMac before and during the Class Period – report an atmosphere of "organized chaos" at the Company where loan closings were done on an "anything goes" basis. According to these witnesses, the following practices, which were contrary to stated Company policies, were employed to close loans:  (a) intentionally manipulating software used to compute loan eligibility; (b) violating stated rate lock protocols[4] and controls; and (c) disregarding underwriting guidelines generally. Instead, the focus was on growing loans without the required documentation. Moreover, growing loans was encouraged, while reporting fraud or concerns with transactions was *discouraged*.  These witnesses, whose statements are detailed below, state that all this occurred with the knowledge and direction of senior management.

7.     Indeed, according to former IndyMac employees, the poor quality of the loans IndyMac issued was widely known within the Company.  In fact, it became a running joke among employees. However, IndyMac and its senior management were more than willing to look the other way and originate these

---

[4] Rate lock protocols are the processes mortgage lenders use to fix an interest rate. "The longer the length of the lock, the higher the points or the interest rate," because longer locks pose greater risk to lenders. *See generally* "What is a Rate Lock?" available at www.mtg-net.com/sfaq/faq/ratelock.htm.

loans because it believed it could sell the loans off as securitizations to other investors.

8.     For a period of time, the Company was able to play "hot potato" with these poor quality loans, selling them off quickly through the securitization market before the borrowers defaulted. However, IndyMac's ability to pass off these "hot potato" loans began to dramatically decline near the end of the Class Period as the secondary market became less liquid and information about IndyMac's lax credit quality practices began to seep into the marketplace. Many of the companies IndyMac sold these loans to promptly returned them to IndyMac pursuant to warranty provisions contained in the respective sale contracts. Thus, IndyMac was stuck with a substantial portion of loans that defaulted quickly and which IndyMac was unable to resell to the secondary market.

9.     Rather than admit to investors the poor quality of these loans, and the losses incurred as a result, IndyMac misleadingly classified these loans in its balance sheet as loans held-for-sale ("LHFS") at inflated values. To make these poor quality loans appear more desirable to the secondary market, IndyMac also instituted a "special project." According to former employees involved in this "special project," they were required to come in on weekends and aggressively rewrite the rejected loans in order to "make them work" – *e.g.,* falsifying salary information for no documentation loans based on industry-wide average salaries found on www.salary.com.

10.    In addition to IndyMac's lax internal controls over its underwriting process, the Company also recklessly violated its stated interest-rate hedging procedures. Normally, firms engaged in the origination, servicing, and investment in residential home mortgages (like IndyMac) intentionally incur expenses that reduce profitability in order to avoid risks that, if incurred, would have an even greater adverse impact on profitability. This practice is referred to as "hedging."

According to an individual with knowledge of IndyMac's interest risk hedging practices, Defendants "had no idea how to hedge." The veracity of this statement is apparent since, despite having an Interest Rate Risk Committee, an Enterprise Risk Management Group, a Chief Risk Officer, and a Chief Interest Risk Officer, IndyMac's 4Q06 projections did not include the economic impact of a $1.5 billion hedge expiring in the fourth quarter of 2006. Senior management knowingly and recklessly allowed the hedge to expire despite touting IndyMac's successful hedging techniques.

11. Despite Defendants' actions, they repeatedly made false and misleading statements regarding the Company's (a) underwriting and credit quality control practices; (b) hedging; and, (c) loan loss reserves.

12. The falsity of Defendants' Class Period statements was revealed on January 25, 2007, the last day of the Class Period, when Defendants issued a press release (the "January 25, 2007 Press Release"), which informed the market not only that the Company would not meet its forecasted results for the fourth quarter of 2006, but also that several of the business areas Defendants had touted as its strongest virtues were, in actuality, profoundly weakened and impaired.

13. Specifically, in the January 25, 2007 Press Release, Defendants revealed the Company's quarterly earnings per share would be $0.97, rather than the previously forecasted $1.35. Perry, and other IndyMac executives, stated in the January 25, 2007 Press Release that it "missed its earning forecasts" primarily because: (a) the Company doubled its credit reserves from the previous quarter, and (b) the lack of hedging over areas that the Company previously reported were hedged.

14. Perry further discussed IndyMac's shortfall during an earnings conference call IndyMac held on the same day, January 25, 2007 (the "January 25, 2007 Earnings Conference Call") explaining that the Company missed its forecasted results "so badly" because of market forces and "a little hubris in terms

of our forecasting process." Perry also admitted "[w]e should be doing a much more detailed bottom's up forecasting in all our business units. . . and I take responsibility for that."

15.     Perry added that IndyMac's supposedly superior internal controls and forecasting models were insufficient to cope with the changing credit market. For example, Perry admitted that despite the Company's best efforts, "[o]ur provision for loan losses is increasing. . . Credit quality generally is deteriorating so I would say that's something we have to do a better job forecasting, and clearly we want to be a little more conservative as it relates to that... This is something we should have done a better job forecasting on.  This is something that we probably could have seen better if we had more precise models . . ." Defendant Perry also revealed that, contrary to Class Period representations, the Company was still involved in risky mortgage loans such as 80/20 piggyback loans.

16.     Finally, Perry discussed the Company's misrepresentations concerning the Company's hedging practices, admitting that "we don't hedge as we talk many times, the loans for sale net interest margin. . . " and further disclosing that the Company had intentionally allowed hedges on $1.5 billion worth of liabilities to expire.

17.     IndyMac made several more incriminating statements in the weeks that followed the January 25, 2007 disclosures.  For example, on March 1, 2007, IndyMac issued a press release (the "March 1, 2007 Press Release") in which Perry revisited the problems now publicly plaguing IndyMac.  Perry stated that as a result of the Company's recent experiences, IndyMac would begin managing its credit risks, fixing its underwriting policies ("being smart and prudent in adjusting our mortgage underwriting guidelines") and its hedging activities (improving "decisions as to what assets go into our investment portfolio and/or distributing our risk in the secondary market").

18.     Thus, post-Class Period revelations confirmed that Perry and IndyMac senior management deserve an F for failing IndyMac's shareholders. The subsequent increased credit losses, lawsuits demonstrating IndyMac's recklessness and complicity with wrongdoing in the mortgage market, and IndyMac's complete reversal of its business model demonstrate the reckless and/or knowing misconduct engaged in by senior management during the Class Period.

19.     As a result of Defendants' false and misleading statements, IndyMac's stock traded at inflated levels during the Class Period.  Only weeks after IndyMac touted its forecasted results for 2006, IndyMac stunned the market by dramatically revising its forecast downward on January 16, 2007. Subsequently thereto, on January 25, 2007, when IndyMac confirmed in detail the reasons for its problematic fourth quarter, the price of IndyMac's stock tumbled to $37.71 on January 25, 2007, down from $40.70 on January 24, 2007 and a far cry from the Class Period high of $50.11 on May 8, 2006.

20.     As of the filing of this Second Amended Complaint, IndyMac's stock price trades around $4.50 per share.

## JURISDICTION AND VENUE

21.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78(j)(b) and 78(t)), and Rule 10b-5 promulgated there-under (17 C.F.R. § 240.10b-5).

22.     This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331(b).

23.     Venue is proper in this Judicial District pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this

Judicial District. Additionally, the Company maintains its principal executive office in this Judicial District.

24.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

### Plaintiffs

25.     Lead Plaintiffs, as set forth in their certifications previously filed with the Court and incorporated by reference herein, purchased IndyMac stock at artificially inflated prices during the Class Period and have suffered damages as a result of the wrongful acts of Defendants as alleged herein.

### Defendants

26.     IndyMac operates as a hybrid thrift/mortgage banker. IndyMac's thrift banking segment invests in loans originated by various product lines, including single-family residential mortgage loans, home construction financing, builder construction financing facilities and mortgage backed securities. The thrift segment consists of the following divisions: mortgage backed securities, prime single family residential mortgage loans, home equity, consumer construction and lot loans, builder construction, warehouse lending and discontinued products. The IndyMac mortgage banking segment originates loans through multiple channels, including mortgage brokers and bankers, financial institutions, realtors and homebuilders. This segment also provides commercial loans to homebuilders for the construction of new single-family residences and generates reverse mortgage products for seniors. The mortgage banking segment consists of the following divisions: mortgage professionals, consumer direct, financial freedom, retained assets, and servicing. Through the thrift and

mortgage banking segments, IndyMac offers the following products: investment portfolios, internet based underwriting and risk based pricing system, retail banking products, commercial lending, servicing of loans, remitting loan payments and residential construction loan programs.

27.    IndyMac is the seventh largest savings and loan and the second largest independent mortgage lender in the nation. As of December 31, 2006, IndyMac reported total assets of over $29 billion and a market capitalization of $3.2 billion. As of the time of the filing of this Second Amended Class Action Complaint, IndyMac's stock has freefallen to around $4.50 per share and it has a market capitalization of around $350 million.

28.    IndyMac maintains its principal executive offices at 888 East Walnut Street, Pasadena, California, 91101.

29.    Perry is Chairman of IndyMac's Board of Directors and Chief Executive Officer of IndyMac. Perry is a Master Certified Mortgage Banker, as designated by the Mortgage Bankers Association, and is a Certified Public Accountant. Prior to working in the mortgage industry, Perry spent four years as an auditor with KPMG Peat Marwick. Perry beneficially owned more IndyMac stock than any other director (2.7 million shares or 3.7%) and has been with the Company since 1993.

30.    Perry reviewed, approved and signed IndyMac's false and misleading SEC filings, including the 2005 Form 10-K and all 2006 Form 10-Qs, and issued numerous other false and misleading public statements during the Class Period.

31.    Keys is Executive Vice President and Chief Financial Officer of IndyMac. Keys is responsible for IndyMac's financial and managerial accounting, financial reporting, financial planning, investor relations and tax operations. Keys is a certified public accountant, and was a partner with Ernst & Young LLP prior to joining IndyMac in March 2002.

32.     Keys reviewed, approved and signed IndyMac's false and misleading SEC filings, including the 2005 Form 10-K and all 2006 Form 10-Qs, and issued numerous other false and misleading public statements during the Class Period.

33.     The Individual Defendants were privy to adverse non-public information concerning IndyMac's business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

34.     By virtue of their high-level positions with the Company, the Individual Defendants directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein.  The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

35.     As officers and/or directors as well as controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the New York Stock Exchange ("NYSE") and governed by the provisions of the federal securities

laws, the Individual Defendants had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially false and/or misleading, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

36.    The Individual Defendants, because of their positions of control and authority were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  The Individual Defendants were provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, the Individual Defendants are responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

37.    Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of IndyMac common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (i) deceived the investing public regarding IndyMac's business, operations, management and the intrinsic value of IndyMac common stock; (ii) caused Plaintiffs and other members of the Class to purchase IndyMac common stock at artificially inflated prices; and (iii) when disclosed, caused the price of IndyMac common stock to plummet, damaging Plaintiffs and the Class.

1

## DEFINITIONS

2      38.    Alternative-A, or "Alt-A" loans are mortgage loans that have prime

3   credit characteristics, but do not meet the Government Sponsored Enterprises

4   (Fannie Mae/Freddie Mac) underwriting guidelines.  These loans are considered

5   an intermediate type of loan between Prime and Subprime, and typically carry an

6   interest rate about a quarter percentage point higher than a comparable Prime

7   loan.

8      39.    Alt-A loans are also aptly known as "Reduced Documentation

9   Loans" or "Liar's Loans" because they require less documentation than Prime

10   loans to obtain.  At one time, Alt-A loans were primarily taken by wealthy buyers

11   with large down payments and excellent credit.  However, in recent years most

12   Alt-A borrowers' credit scores were closer to those of Subprime borrowers.  In

13   fact, Moody's Investors Service recently announced it will begin modeling Alt-A

14   loans as Subprime loans absent strong compensating factors, after finding

15   "[a]ctual performance of weaker Alt-A loans has in many cases been comparable

16   to stronger subprime performance, signaling that underwriting standards were

17   likely closer to subprime guidelines."  *Moody's Says Some 'Alt A' Mortgages Are*

18   *Like Subprime*, Bloomberg News, July 31, 2007.

19      40.    "Prime" loans are conventional loans offered to borrowers with high

20   credit scores.  The interest on Prime loans is lower than other types of loans,

21   reflecting the lower chance of borrower default.

22      41.    "Subprime" loans are typically made available to borrowers with

23   weakened credit histories that include payment delinquencies, and possibly more

24   severe problems such as charge-offs, judgments, and bankruptcies.  They may

25   also display reduced repayment capacity as measured by credit scores, debt-to-

26   income ratios, or other criteria that may encompass borrowers with incomplete

27   credit histories, i.e. Alt-A borrowers.  Subprime borrowers generally have limited

28   income or have FICO credit scores below 620.  Subprime mortgage loans have a

much higher rate of default than Prime mortgage loans and are priced based on the risk assumed by the lender.

42.     Piggyback mortgages are second mortgages that close simultaneously with the first mortgage and provide extended financing behind a first mortgage lien. Typically, this is effectuated with an 80/20 split:  80% financing through a first mortgage and 20% financing through a second mortgage. The piggyback, or second mortgage, represents the higher risk portion of a combo loan or combined loan to value CLTV loan. Piggyback loans are extremely high risk because they are the last to be repaid in the event of a foreclosure. *See* Piggybacking Onto Trouble, *The Washington Post*, July 8, 2006 (discussing higher default rates for piggybacks and additional problems and costs relating to piggyback loans).

## BACKGROUND

## An Inflated Real Estate Market Helped IndyMac Deal in Riskier Loans.

43.     From 2001 until 2006, the United States experienced a bubble in the housing market resulting in inflated home valuations and a related refinancing boom.

44.     This booming real estate market opened up new opportunities for mortgage lenders like IndyMac to deal in new types of higher-risk loans. IndyMac's growth was propelled by its utilization of Alt-A stated income high CLTV/piggyback and negative/interest only amortizing loans. By the third quarter of 2006, IndyMac was the top Alt-A lender with over approximately $49 billion in Alt-A production which represented 77.5% of IndyMac's total origination volume.  *See* Zelman Credit Suisse Analyst Report, "Mortgage Liquidity du Jour: Underestimated No More," March 12, 2007.

45.     In contrast to a traditional bank or mortgage broker who would be focused on prime 30 or fixed mortgages, IndyMac reported that the primary

products sold during the Class Period were high quality loans and option ARMs.[5] However, this description of IndyMac's mortgage production was misleading. Only after the Class Period, and only in 2007, did IndyMac first separate out its loan production to include a delineation of piggyback loans, which showed that at least 25% of IndyMac's production in the fourth quarter of 2006, alone, was risky 80/20 piggyback mortgage loans.

**IndyMac Continued to Tout its Growth Despite a Downturn in the Real Estate Market.**

46.     By August, 2006, the median price of new homes had dropped by almost 3%, existing home inventories were 39% higher than one year before and sales were down by 10% from the prior year. *See The No Money Down Disaster*, Barron's, August 21, 2006.  In addition, a significant number of subprime lenders began to close shop during 2006, causing dislocation in the housing market.

47.     Notwithstanding the downturn in the real estate market, Defendants portrayed IndyMac as a stable and growing company that would not only weather the bad times facing the mortgage industry, but would emerge from troubling times even stronger.  Indeed, even given the negative news hammering the rest of the mortgage industry, IndyMac boldly touted its operating performance, and, as a result, projected *increased* earnings per share for IndyMac during 2006 (at the same time other like companies were wisely cutting earnings estimates). *Id.* (projecting EPS for 2006 as high as $5.20, well in excess of the $4.54 EPS in 2005).

48.     Indeed, whenever he could, defendant Perry touted growth at IndyMac:

---

[5] Option ARMs are loans where the borrower has the option of making either a specified minimum payment, an interest-only payment, or a 15-year or 30-year fixed rate payment in a given month.  When a borrower makes a payment that is less than the interest payment, there is negative amortization, where the unpaid interest is added back onto the principal balance, which is usually the difference between the interest-only payment and the minimum payment.

"We reached [in 2005], in particular, a big milestone of having revenues grow to over $1 billion a year. They were 1.1 billion in 2005, up 35% year over year. . . Turning to page six, my line here when I saw this page is we are now one of the big boys; we are a top 10 originator.  We moved from 2004, we were the 15[th] largest mortgage originator in the country.  I said in the shareholders' meeting in April of 2005 that I thought we would crack the top 10 in one of the quarters before the end of the year, and we did it in the third quarter."

Jan. 26, 2006 IndyMac Earnings Conference Call at 2.

49.    However, defendant Perry recognized that in order for IndyMac to continue to grow in difficult times (which he thought 2006 would be), the Company would have to loosen underwriting standards and quickly dispose of the resulting "Hot Potato" mortgage loans before borrowers defaulted, by selling them outright or securitizing them and selling them.  [Defendant Perry]: "And generally what we try to do, when the [interest-rate] spreads are very tight, is we try to play Hot Potato and sell even our rate locks forward into a securitization." January 26, 2006, IndyMac Earnings Conference Call at 19 [Thomson StreetEvents].

50.    Recently, members of Congress voiced their disapproval of the "Hot Potato" game played by financial institutions such as IndyMac: "[I] have heard all the players duck their responsibility and point the finger at anyone but themselves.  This has become a game of hot potato – and it has to stop. If you ask me, everyone is responsible and should be held accountable."  Hon. Senator Robert Menendez, New Jersey, Committee Statement on The Roe of Credit Rating Agencies on the Subprime Credit Markets, September 26, 2007, at http://menendez.senate.gov/newsroom.  See also Congressman Kanjorski's statement: "To me, it appears that none of the parties that put together or purchased these faulty home loans, packaged them into mortgage-backed securities, and then divided these securities into tranches and repackaged them

1   into CDOs, CDOs-squared, and CDOs-cubed had any skin in the game. In the

2   end, it was the final investor left with this hot potato of subprime debt and

3   significant losses."  Opening Statement of Congressman Paul Kanjorski,

4   Subcommittee on Capital Markets, Insurance, and Government Sponsored

5   Enterprises, Hearing on the Role of Credit Rating Agencies in the Structured

6   Finance Market, September 27, 2007 at 2.

7       51.    Perry and IndyMac's senior management were driven to increase

8   IndyMac's market share.  In connection with IndyMac's fourth quarter 2005

9   earnings review contained in a January 26, 2006 SEC filing, IndyMac bragged

10  about how it had reached a new market share high of 2.5% in Q405.  IndyMac, in

11  press releases and conference calls, further proclaimed how its compound annual

12  growth in mortgage production since the first quarter of 1999 was an astounding

13  44% compared to a mortgage industry average of 8% and 16% for the top five

14  mortgage loan lenders. Additionally, IndyMac stated its goal of becoming a top

15  ten mortgage originator in Q306 and wanting to be on track to become the 8th

16  largest mortgage originator by 2008. [Q4 2005 Slide Presentation at 6].

17  / / /

IndyMac's staggering growth is evident by its increasing volume of loans held for sale over the past several years:



## DEFENDANTS' CONDUCT DURING THE CLASS PERIOD

**IndyMac's Dramatic Growth Was Accomplished By Producing High-Risk Loans Combined With Intentionally Deficient Underwriting Standards.**

52.     The numerous problems facing the Company, and known to Defendants, can be divided into two key areas, discussed in greater detail below. Specifically, during the Class Period: (i) the Company's underwriting controls were ineffective and, as such, the Company was effectively unable to underwrite and value loans issued and sold by the Company, resulting in the issuance of millions of dollars worth of loans for which it would never be repaid; and (ii) the

Company, contrary to its public representations, was not hedging major categories of risk – loans held for investment and loans held for sale. As a result of the foregoing problems, the Company's Class Period statements regarding hedging (and internal controls over underwriting) were false when made, and the Company's projections lacked *any* reasonable basis.

**IndyMac's Purportedly Strict Underwriting Procedures And Standards.**

53.     Underwriting in the context of mortgage lending should consist of a detailed analysis of a borrower's creditworthiness. When underwriting a mortgage loan, an issuer should analyze credit information furnished by the potential borrower (such as employment and salary information) in conjunction with information provided from outside sources (such as agency credit reports and scores). IndyMac uses a software program called "e-MITS" to assist in this process, which computes interest rates based on information such as the above (as entered).

54.     Accurate underwriting is essential to the success of any business extending loans, including mortgage companies such as IndyMac because, without accurate underwriting, a company cannot (i) evaluate how likely a loan is to be repaid; (ii) attach a particular interest rate to a loan based on creditworthiness; or (iii) accurately price the loan for sale in the secondary market. Unfortunately for IndyMac and its investors, the underwriting operations and controls at IndyMac were deliberately circumvented to increase loan production. These events are discussed in great detail below through the words of the Company's former employees, each of whom was directly involved with the Company's underwriting, and many of whom were among the Company's most senior executives and managers.

55.     IndyMac acquired mortgages principally through four channels: mortgage professionals, consumer direct, correspondents and conduits.

        (a)     Mortgage professionals include mortgage brokers, mortgage

1    bankers, financial institutions, and homebuilders who have taken applications

2    from prospective borrowers and submitted them to IndyMac. Eighty-six percent

3    of IndyMac's loans were derived from mortgage professionals in 2006. 2006 10-

4    K at 7.

5            (b)     Correspondent channel loans are obtained through mortgage

6    brokers, mortgage bankers, financial institutions, and homebuilders who sell

7    previously funded mortgage loans to IndyMac. They are a sub-section of the

8    mortgage professional channel of loans, as disclosed in IndyMac's 2006 10-K.

9    Thirty-three percent of IndyMac's mortgage loan business came from this

10   channel. Derived from 2006 10-K at 40.

11           (c)     Conduit procurement is where IndyMac acquires pools of

12   mortgage loans in negotiated transactions either with the original mortgagee or an

13   intermediate owner of mortgage loans.[6] They are a sub-section of the mortgage

14   professional channel of loans, as disclosed in IndyMac's 2006 10-K. Eleven

15   percent of IndyMac's mortgage loan business came from this channel. Derived

16   from 2006 10-K at 40.

17           (d) Consumer direct involves mortgage loans initiated through direct

18   contact with the borrower.  This contact may arise from Internet advertising and

19   IndyMac web site traffic, affinity relationships, company referral programs,

20   realtors and retail banking branches, located mostly in Southern California. Only

21   2% of IndyMac's mortgage loan business was derived from this channel. Derived

22   from 2006 10-K at 40.

23           56.     Mortgage loans that are acquired by IndyMac are allegedly

24   underwritten by IndyMac according to IndyMac's underwriting guidelines or

25

26

27   ─────────────────────────

28   [6] IndyMac approved each of the above-described mortgage loan sellers prior to the initial
     transaction on the basis of the seller's financial and management strength, reputation and prior
     experience. According to IndyMac, sellers were periodically reviewed and if their performance,
     as measured by compliance with the applicable loan sale agreement, is unsatisfactory, IndyMac
     would cease doing business with them.

pursuant to an exception to those guidelines based on IndyMac's procedures for approving such exceptions.

57.    IndyMac has two principal underwriting methods: "traditional underwriting" and e-MITS (Electronic Mortgage Information and Transaction System) underwriting.

58.    e-MITs is self-described as an automated, Internet-based underwriting and risk based pricing system, which purportedly estimates expected credit loss, interest rate risk and prepayment risk. "IndyMac has procedures to override an e-MITS decision to allow for compensating factors."

59.    IndyMac's underwriting criteria for traditionally underwritten mortgage loans supposedly includes an analysis of the borrower's credit history, ability to repay the mortgage loan and the adequacy of the mortgaged property as collateral. "Traditional underwriting decisions are made by individuals authorized to consider compensating factors that would allow mortgage loans not otherwise meeting IndyMac's guidelines."

60.    IndyMac was subject to a "put" pursuant to the mortgage loan securitization process whereby in the event of a breach of any representation or warranty in respect of a mortgage loan sold or securitized by IndyMac that materially and adversely affected the interests of the certificate or security holder IndyMac would be obligated in accordance with the pooling and servicing agreement with the trust to cure the breach, repurchase the mortgage loans at the original sale price or to substitute a qualified mortgage loan for the subject mortgage loan.

61.    As described more fully below, IndyMac's reported warranty and other credit reserves during the Class Period for such events were grossly inadequate.

**Confidential Witnesses Confirm that IndyMac Regularly Overrode its Stated Underwriting Practices on a Companywide Basis During the Class Period.**

62.     Confidential Witness Number 1 ("CW 1") is a former Vice President of the Company's Central Banking Group.  CW 1 reported directly to Ashwin Adarkar ("Adarkar"), Executive Vice President, Chief Executive Officer, New Business Incubation, Organizational Effectiveness and Mergers and Acquisitions. As such, Adarkar's duties included "operating new or underperforming businesses."  March 23, 2007 Proxy at 6.  Adarkar reported directly to Defendant Perry.  CW 1 was employed at IndyMac from October, 2004 through March, 2006.  CW 1 was directly involved in supervising many aspects of the Company's underwriting activities, and had regular contact with the most senior managers and officers of the Company.  CW 1 described in detail the many problems in the Company's underwriting guidelines, policies, and controls.

63.     According to CW 1, Adarkar was directly pressured by his/her superiors, including Perry, to "push loans through" regardless of whether they satisfied the Company's underwriting guidelines.  Adarkar passed on these orders to CW 1, and his/her subordinates, who were actually instructed to abandon approval guidelines and "push all loans through for approval which came in the door."

64.     CW 1 explained that in pushing the loans through, the Company did not officially "change" the Company's underwriting guidelines and policies, but rather, institutionalized "exceptions to the rules" that allowed the Company to approve loans that should have been denied under the actual guidelines. According to CW 1, the exceptions were made across the board, for all classes of loans (prime, Alt-A, and sub-prime, as discussed in detail, below).  CW 1 stated that most of the exceptions were made in reporting the borrower's stated income/assets.

65.     Confirming the statements of other CW's, CW 1 explained that many of the exceptions occurred despite the Company's much vaunted e-MITS system, which was supposed to prevent gaming of the Company's underwriting guidelines.  The problem, however, was that e-MITS was a "junk-in, junk-out" system that was only as good as the information it was provided.  That is, if underwriters wanted approval for a loan that did not satisfy the Company's underwriting guidelines, they would simply need to input information that was not reflective of the borrower's true characteristics and e-MITS would provide approval based on the false information entered by the underwriter.  As noted, above, this conduct was engaged in at the direction of Adarkar, who passed along the orders of Defendant Perry and other senior managers.

66.     In addition to violating the Company's underwriting guidelines, CW 1 stated that the Company's Central Banking Group regularly and as a matter of course violated the Company's controls over loan production by prematurely (and improperly) funding loans to meet production and revenue goals.  CW 1 raised this issue with Adarkar, and the Central Banking Group was "written up" by the Company's Compliance Department, to no avail.

67.     Similarly, according to CW 1, Defendant Perry directed Adarkar (and thus, the Central Banking Group) to engage in violations of the Company's "rate lock" protocols and controls.  Essentially, a rate-lock is a commitment by a lender guaranteeing a specified interest rate for a specified period of time.  Here, once a rate-lock expired rather than re-pricing the terms of a loan to account for fluctuations in the credit market, the Company allowed the loans to proceed on the now-expired prior terms.  As a result, the customer was able to capture the gains associated with the prior (lower) rate to the detriment of the Company.  This was a problem because it drastically impacted the profitability of loans on the back-end *but appeared to have no impact on the front end*.  Thus, the Company was able to achieve revenue and volume targets in the short-run, while

exposing itself to tremendous losses on the back end of the loan.

68.     According to CW 1, the Company engaged in these practices at the express behest of Defendant Perry (again through Adarkar) so that the Company could make its short term goals "at all costs."

69.     Finally, CW 1 stated that direct fraud and "lying" by loan sales representatives was rampant at IndyMac. Specifically, loan sales representatives solicited "fraudulent" letters from CPAs in connection with the purported verification of customer income. CW 1 stated that it was obvious that the letters were fraudulent, and that he/she repeatedly reported the fraud to Adarkar and that though upper management, including Defendant Perry, were aware of this fraud (and the other underwriting fraud), they nonetheless continued to pressure employees to "close loans at all costs."

70.     According to CW 1, every time he/she complained about the fraud, or attempted to institute a review committee to control the fraud, his/ her efforts were rebuffed by upper management.

71.     Confidential Witness Two ("CW 2") was an underwriter for IndyMac from March, 2005 until June 30, 2007. In this position, CW 2 was responsible for writing and reviewing loan applications.

72.     According to CW 2, loan originations increased significantly during his/her tenure at the Company. CW 2 directly attributed this increase to relaxed underwriting guidelines and the closing of "questionable deals."

73.     CW 2 stated that when he/she first started at IndyMac, there was a very strict environment regarding loan originations; however, toward the end of his/her employment, this had evolved into "organized chaos" that was little more than a "free for all" where "anything goes" to get a loan closed.

74.     These changes were expressly mandated by IndyMac's senior management to drive loan origination volume. CW 2 stated underwriters were encouraged by management to "push through loans" that normally would not be

closed.  During the origination process, all loans that were not closed and processed because of borrower qualification issues had to be reported to management.  Management was consistently giving the "green light" on loans that CW 2 would not have closed.  For example, if a loan was submitted based on income, and income could not be verified, managers would look to verify bank account balances.  Even if the source of funding for the balance in the bank account could not be verified, managers would try to use unsubstantiated bank account balances as verification of income.  CW 2 also noted that appraisal values were adjusted in order to "make the loan work."[7]

75.   CW 2 stated that, in several instances, management overturned his/her decision to not approve a loan, which CW 2 documented in his/her "working notepad field" in e-MITS.

76.   According to CW 2, as a result of lax underwriting guidelines and bad loan push-throughs, loan delinquencies had increased significantly at IndyMac by mid-2006.

77.   Further according to CW 2, the increases in bad loans and push throughs is not surprising, as the Company directly rewarded underwriters and managers with bonuses for reaching loan origination targets.  That is, underwriters were issued bonuses one month after loan targets were reached without regard to whether the loans ultimately ended in default.  This Company policy incentivized the issuance of loans without regard to quality or the creditworthiness and encouraged "making deals work" that should not have worked, according to CW 5.

---

[7] That is, an appraisal value would be moved up to justify issuing a loan of a particular amount.  Essentially, the greater the appraisal value, the greater value the property (which secures the loan) appears to have.  This means that if the loan defaults, the Company could sell the property for more money to recover its loan.  The problem arises, however, when a loan defaults, and the Company discovers that the "adjusted" value of the property is inflated, and it is not able to recover the full amount of the loan, much less the expected profit that would have been realized if the property had actually been worth its appraisal value.

78.     Confidential Witness Number Three ("CW 3") is a former Vice President and Director of Financial Institutions, Correspondent Lending, in IndyMac's Mortgage Banking Segment.  CW 3 was employed by IndyMac from July, 2003 until January, 2006, and was directly responsible for (i) designing and implementing sales and marketing for IndyMac's business loan division; and (ii) overseeing loan production and acquisition for the Company's Correspondent Lending Department.  Although CW 3 left IndyMac at or about the beginning of the Class Period, his/her statements are particularly germane, in that they detail the many problems that were, by the beginning of the Class Period, already impairing the Company's ability to underwrite its loans effectively.

79.     According to CW 3, by the beginning of the Class Period, due to its desire to keep up with the rest of the players in the industry, IndyMac had been forced to become extremely aggressive with its underwriting guidelines.  Specifically, to keep pace with competitors in terms of loan origination volume, by the time CW 3 left IndyMac in January 2006, the Company had greatly loosened its underwriting guidelines in order to drive volume and bring in more loan sales (as noted by the other CWs).

80.     Additional witnesses confirm the change in the Company's focus, explain how the Company "loosened" its underwriting quality guidelines, and expound on the impact thereof.

81.     Confidential Witness Four ("CW 4") is a former IndyMac Senior Auditor, Post Purchase Quality Control, Central Mortgage Operations, who worked for the Company from December 1, 2003, through July 19, 2007.  CW 4 was responsible for reviewing loan delinquencies for fraud or misrepresentations in the documents, and determining whether the loan's underwriting comported with IndyMac's guidelines, policies and procedures.  Prior to being promoted to Senior Auditor, CW 4 was a Senior Underwriter with IndyMac, and is intimately familiar with all aspects of the Company's loan underwriting.

82.     According to CW 4, throughout the Class Period, CW 4 saw an increasing number of loans that appeared to have been issued only through fraudulent or misrepresented documentation.  He/she also saw a substantial increase in the number of loan delinquencies.  CW 4 stated that this increase represented an increase in the number of defaults attributable to misrepresentations and fraud in the loan applications, not in the number of "straight default" cases (which are typically caused by a change in circumstance, such as divorce or change in employment status).  CW 4 stated that the increase of loans in default because of misrepresentations in the origination process was due to relaxed underwriting guidelines, and approvals of borderline loans on the front end.  That is, loans were being approved to individuals with insufficient or false documentation for the loans that they were seeking *because* the underwriting guidelines had been relaxed.

83.     This is confirmed by Confidential Witness Five ("CW 5"), who was an Investigator, Fraud Investigation Department, Post Purchase Quality Control, Central Mortgage Operations, at IndyMac from December 2004 until July 17, 2007.  In this position, CW 5 investigated loans suspected of being delinquent due to fraud and reported his/her findings to management.

84.     According to CW 5, during the Class Period, the quality of the loans originated became a running joke within the Company. In particular, certain loans with deficient documentation or that were issued to borrowers unable to pay them back became known as "Disneyland Loans." These loans were called Disneyland Loans, referring to a loan issued to a **Disneyland *cashier* who claimed in his/her application that he/she earned $90,000 per year** – a proposition that, on its face, belies logic and even common sense given prevailing wage rates for retail cashier operators.  As another example of a particularly egregious "Disneyland Loan," CW 5 related the story of a $500,000 loan that was issued for "swamp lands" in Florida, to a 26 year old first time home buyer with a reported income

of $26,000 per year and $15.00 in a bank account.

85.     An example of IndyMac's willfully engaging in fraudulent conduct to meet its aggressive underwriting growth goals is set forth in an August 20, 2007 *BusinessWeek* article entitled, "Did Big Lenders Cross the Line?  Lawsuits Assert Some Firms Doctored Loan Documents."  The article discusses the sad tale of Elouise Manuel, whose stated-income loan was directed by an IndyMac underwriter to black-out certain income documentation in order for approval of that loan.  The conditional approval letter from IndyMac notes, "Need [Social Security] benefit letters for last two years with income blacked out."  Ultimately, Ms. Manuel was unable to pay the loan, and subsequently lost her home.  Although in the BusinessWeek article, Grove Nichols, an IndyMac spokesman, stated that this was an action by an individual, and not company-wide practice, this type of misconduct was widespread at IndyMac, as corroborated by the CWs' testimony.

86.     These types of stated income loans were the easiest to manipulate, and the easiest for IndyMac to follow through on due diligence had the Company so desired.  IndyMac could have insisted on double-checking a client's stated income by utilizing IRS Form 4506.  When asked by analysts during the November 2, 2006 Conference Call, as to what percentage of IndyMac's Alt-A customers provided the Company with IRS Form 4506, Perry was evasive and non-responsive. Indeed, studies have confirmed that upwards of 90% of stated income loan buyers inflated their purported income by 5% or more, and as much as 60% of stated income buyers exaggerated their stated income by over 50%. "Eighth Periodic Mortgage Fraud Case Report to Mortgage Bankers' Association," produced by Mortgage Asset Research Institute, Inc., April, 2006.

87.     As a result of the loosened underwriting guidelines, the Company's default rates skyrocketed during the Class Period.  Confidential Witness Six ("CW 6"), was a Senior Loan Processor, Investigation Unit, Post Purchase

Quality Control, Central Mortgage Operations at IndyMac from August 10, 2003 until October, 2006, and responsible for researching loan transactions.

88.   According to CW 6, the number of loans being examined by the Company **increased by 1500% from 2003 to mid-2006**. Specifically, according to CW 6, his/her department was responsible for reviewing 10% of the loans originated by IndyMac each month. In 2003, this translated to approximately 60 loans per month. By October, 2006, CW 6's department was reviewing approximately 900 loans per month.

89.   The drastic increase in defaulted loans was at its worst during the Class Period. CW 6 stated the number of delinquent loans at IndyMac tripled by October, 2006. According to CW 6, this increase was the result of misrepresentations and fraud that were occurring at the "front end" of the loan originations. Thus, had the Company's underwriting guidelines been stricter, this drastic increase would not have occurred.

90.   The above problems were exacerbated by IndyMac management. In particular, the number of unqualified loans increased so drastically (as a direct result of management's direction) that underwriters began "pushing through" unqualified loans to maintain origination volume. The Company's policy of "pushing through" unqualified loans evidences a Company-wide knowledge of IndyMac's underwriting problems. *See supra* ¶¶ 64-65, 75.

91.   In addition to the above direct evidence of the origination of bad loans and loose underwriting guidelines, and Defendant Perry's actual knowledge thereof, IndyMac (as discussed below) was forced, under warranty agreements, to repurchase substantially increased numbers of loans (now in default) that it had previously sold on the secondary market. This further evidences the Defendants' knowledge of the lack of any reasonable basis for their projections because the repurchases resulted in a corresponding decrease in net income as the Company was, in effect, giving back revenue.

92.     By way of background, according to CW 4, once a loan was originated, it was immediately packaged with other loans and sold on the secondary market. For example, during the second quarter of 2006, IndyMac sold 97% of the mortgage loans it produced.  During that quarter, IndyMac had mortgage production of $20.06 billion and sold off $19.415 billion of those loans. By contrast, in the third quarter of 2006, IndyMac was suddenly only able to sell 81% of its mortgage production.  During that quarter, IndyMac had mortgage production of $23.968 billion and sold $19.508 billion of those loans. According to Perry, IndyMac makes representations and warranties on all sold sold into the secondary market, "just like a manufacturer of an automobile would make warranty reps on a car," *See* April 25, 2006 Conference Call at 11.  When a loan that it has sold is deficient, IndyMac repurchases it.  These repurchases are called "kickbacks."

93.     According to CW 2, during his/her employment, the number of "kickbacks" from the secondary market increased drastically.  In an effort to "cushion the blow" of these kickbacks, IndyMac initiated a "special project" on the weekends in 2006.  According to CW 2, underwriters would receive a list of loans that IndyMac had to repurchase after the loan had been previously sold on the secondary market. Underwriters would then have to rework the loan and "make it work" so that it could be bundled and sold again in the secondary market.  The underwriters involved in the "special project" aggressively did what they could to make the loans "work," according to CW 2.   For example, in instances where the loan had defaulted and been kicked back because of lack of income verification, underwriters would go to a website provided by IndyMac, such as www.salary.com, and try to obtain a more favorable "average national salary" for the borrower based on the data found on such websites for those positions.

94.     Further, underwriters were receiving loans that already had been

closed by other underwriters at the Company; therefore, the underwriter trying to fix particular loans was not familiar with their details. Additionally, when underwriters received loan data, they did not receive the entire loan application; only the portions that were deficient. Therefore, there was no documentation pertaining to the other data provided by the borrower – eliminating underwriters' ability to cross-check borrower reported information.

95.    CW 5 confirms the Company's "special projects." According to CW 5, some of the loans rewritten by the underwriters were resold, and the remaining loans were channeled to his/her department, so those employees could also try to "make [them] work."

96.    Defendants knew or were deliberately reckless in not knowing about these problems. The implications on the company were devastating. During 2005, IndyMac was forced to repurchase $106 million worth of kicked-back deficient loans from the secondary market. In 2006, the value of kicked-back loans climbed to $167 million – an increase of over 50% in less than a year. Most striking, however, is that during the **first quarter** of 2007 IndyMac repurchased $224 million worth of loans from the secondary market – clear evidence that the loans issued during the Class Period were grossly deficient as a result of the Company's decision to grossly loosen its underwriting guidelines and controls.

97.    In addition to the problems with the Company's underwriting controls, the Company's controls over the accuracy of financial reporting were also deeply flawed because senior officers went unchecked in their ability to override the Company's official internal forecasts.

98.    Confidential Witness Seven ("CW 7") is a former Senior Analyst in the Servicing and Investment Portfolio who was employed by IndyMac from January, 2006 until February, 2007. In this role, CW 7 was primarily responsible for compiling data and creating reports for senior management based on investment portfolio statistics, models and data.

99.     According to CW 7, forecasts were given to defendant Keys, and "if Keys had a number in mind, and the forecasts did not reflect that number, Keys had the authority to change it."

100.    Defendant Keys' authority to *sua sponte* change the Company's forecasts is well in line with the culture at IndyMac, which actively discouraged detecting and/or reporting fraud.  According to CW 5, he/she would have to be prepared to "drop gloves and go to war" when he/she wanted to report findings of fraud due to underwriter and seller negligence.  There was constant push back by management as to the legitimate fraudulent findings he/she reported.

101.    Indeed, this pressure went all the way up the management ladder. For example, CW 5 states that even the Company's former Vice President of the Fraud Investigation Department, Michelle Leigh, was pressured by upper management not to report fraud.  According to CW 5, Leigh's superior, Michelle Minier, in one case, expressly requested that Leigh make changes to a monthly report that Leigh felt did not accurately depict the loan pipeline.  Despite Leigh's protest, the report was subsequently sanitized. Michelle Minier is Executive Vice President, Chief Executive Officer and Vice Chairman of Financial Freedom, wholly-owned by IndyMac.  As such, she reports to Defendant Perry.  Mrs. Minier has been with IndyMac since 1995.  In addition, Mrs. Minier's husband, Frank M. Sillman, also is an Executive Vice President, IndyMac Bank, and Chief Executive Officer of IndyMac Mortgage Bank.  Mr. Sillman has been with IndyMac since 1997. March 23, 2007 Proxy at 5, 8 and 29.

102.    As was the case with the bonus structure for managers and underwriting, IndyMac's auditors' bonus structure also dissuaded the detection of fraud.  Auditor bonuses were based on the number of loans reviewed, not the number of fraudulent findings found.  Thus, according to CW 5, IndyMac rewarded more work, but not the detection of fraud.  This, of course, encouraged workers to simply review, in a cursory fashion, potentially fraudulent loans.

103.   Notwithstanding the reckless and willful disregard of due diligence detailed above, IndyMac publicly assured investors that the Company had tight internal controls and strong management oversight.  For example, IndyMac falsely assured investors that there were redundant oversight protections in place – specifically an "Enterprise Risk Management Committee" – in its March 14, 2006 Form DEF 14A, stating:

> The primary purpose of this Committee is to ensure the establishment of company-wide risk management policies and strategies governing key risk factors related to capital adequacy, asset quality, management, earnings, liquidity, and sensitivity to market risk. The Committee also oversees certain regulatory matters. The Committee held four meetings in 2005.

March 14, 2006 Form DEF 14A at 39.

104.   Further, SEC filings made throughout the Class Period stated that IndyMac had in addition to the Enterprise Risk Management Committee ("ERM"), a "management-level Interest Rate Committee ("IRRC"), and Variable Cash Flow Instruments Committee ("VCI").

**IndyMac's Failure to Hedge Loans and Securities Held for Sale and Investment Was Contrary to Statements Made During the Class Period.**

105.   Firms engaged in the origination, servicing, and investment in residential home mortgages hedge often interest rate increases in corporate liabilities (or decreases in corporate assets) that unless hedged could adversely impact the targeted "margin" by more than the cost of the hedging instrument.

106.   Most approaches to hedging mortgage risks involve intentionally incurring expenses that reduce profitability in order to avoid risks that, if incurred, would have a greater adverse impact on profitability.

107.   Prudent mortgage companies hedged against unforeseen interest rate changes, including:

*"Pipeline" risk* after the mortgage is created and before it is sold by

the originator to an investor either in a pool of loans or to a securitization vehicle that pools mortgages into collateral for debt investments in a process termed "securitization." Some mortgage companies refer to mortgages in this stage as "held for sale" or "HFS."

***Investment period risk*** after the investor has agreed to a cost of funds to be supplied to purchase, and mortgages are then "held for investment" or "HFI." With securitization, some mortgage companies also own certain tranches of securities created in the securitization process.

108.   A frequent business-level decision may be to hedge interest-rate sensitivity.   Derivative or "swap" instruments such as floating rate-to-fixed-rate swaps generally are employed for this purpose.

109.   According to Perry, one of the reasons IndyMac was able to maintain stable interest margins and profits was the Company's successful hedging activities. *See, e.g.,* January 26, 2006 Conference Call at 5 (quote). *See also Forbes,* November 12, 2007, at 99-102 "Beyond the Balance Sheet, Bank on It, What should you look at before buying a bank's stock? Things like its skill in landing new deposits and the conservatism in its loan-loss cushion," reporting that "Banks with a high dose of loans held for sale are vulnerable to weakness in the market for asset-backed securities" and that IndyMac Bancorp has the highest percentage ratio of "Hot-Loans [to] Safe Loans" 136% (i.e, loans held for sale as percentage of loans held for investment) of nine competitors, where the next two highest reported ratios were 66.8% for Flagstar Bancorp and 45.7% for Countrywide Financial.

110.   Defendants repeatedly assured the public that the Company's interest rate risk was hedged during the Class Period.   For example, during the Company's January 26, 2006 earnings conference call, Perry stated that IndyMac was hedged out to "a 95% confidence factor."

111.   Similarly, each of the Company's filings with the SEC on Forms 10-

K and 10-Q during the Class Period expressly represented that the "Company hedges the interest rate risk inherent in its pipeline of mortgage loans held for sale to protect its margin on sale of loans."

112.   Finally, each of the Company's filings with the SEC on Form 10-Q during the Class Period expressly represented that:

> Typically we hedge the risk of overall changes in fair value of loans held for sale by either entering into forward loan sale agreements, selling forward Fannie Mae or Freddie Mac MBS or using other derivative instruments to hedge loan commitments and to create fair value hedges against the funded loan portfolios.

113.   On January 25, 2007, the Company disclosed that its failure to hedge the loans held for sale, alone, resulted in "a 13% decline from forecast." January 25, 2007 Conference Call at 2.

114.   Specifically, Defendant Perry explained IndyMac's hedging failures at the Company's Analyst Conference Call, admitting that "*we don't hedge as we talk many times*, the loans for sale net interest margin. . ." *and* the Company had intentionally allowed hedges on $1.5 billion worth of derivative liabilities to expire in the fourth quarter without replacing them or considering them in the Company's forecasted results:

> PAUL MILLER:  So let me get this straight.  You pulled off some hedges because you didn't like the accounting of it?
>
> PERRY:  No, they were expiring, they were expiring their period.  Paul, I don't want to get in to this more than this right here.  We can talk about it off-line.

*Id.* at 14.

115.   Confidential Witness Number Eight ("CW 8") is an individual with knowledge of IndyMac's risk practices.  CW 8 has decades of experience with mortgage companies including risk assessment, mortgage servicing right performance measurement, valuation, hedge activities, pricing/valuation model

validation, secondary marketing evaluation, foreclosure/default compliance, due diligence audit, derivative valuation, securitization comfort level support and internal audit outsourcing.  CW 8 indicated that he/she was "speaking out because the Company misled the public."

116.   Notably, according to CW 8, and in contrast to the Company's public statements, "IndyMac only hedged on the interest rate spread."  CW 8 further stated that the Defendants "had no idea how to hedge."  Furthermore, CW 8 stated that "Perry did not understand credit risk" and that Defendant Perry once fired IndyMac's head hedge modeler for pointing out his/her lack of understanding of hedging.

117.   This is well in line with Defendant Perry's overall business strategy.  According to CW 8, Defendant Perry once stated to him that "business guys rule and [expletive deleted] you to compliance guys."  As a result of Defendant Perry's conduct and statements the Company focused on "production and nothing else."

118.   While CW 8 left IndyMac in late 2005, several months before the Class Period begins, his/her statements are probative in that: (i) they detail material problems with the Company's hedging that were already in existence at the start of the Class Period; (ii) CW 8 was expressly involved in all aspects of the Company's hedging; and (iii) CW 8 interacted with other Chief Officers of the Company, such as Defendant Perry, on a regular basis.

119.   Defendants' decision not to "hedge as [they] talk many times," and to allow $1.5 billion worth of hedges to expire resulted in a greater than $10 million loss for the quarter ended December 31, 2006, or $0.12 of the Company's earnings per share miss.  *See* January 25, 2007 Earnings Conference Call Tr. At 2; DRJN at Exhibit E, page 132 [$ 0.04 (loans held for sale net interest margin) plus $0.08 expiration of derivative liabilities)].

## **DEFENDANTS' FALSE AND MISLEADING STATEMENTS**

### **January 26, 2006: Earnings Conference Call**

120.   On January 26, 2006, Defendants held the "Q4 2005 IndyMac Bancorp, Inc. Earnings Conference Call." Perry and Keys spoke at this conference and answered questions from several analysts.

121.   During the call, Defendants touted the Company's hedging, stating:

> PERRY: But I think clearly one of the reasons *we have been able to maintain our Thrift* **net interest margin** *at very stable levels* and manage our Mortgage Banking margins and our profits well in more difficult environments is our *enterprise risk management*, both on the credit and the interest rate risk side.

> * * *

> *And if we were not hedging our Thrift net interest margin properly, you would see a dramatic decline in our net interest margin, and you see very little change.* [Emphasis added].

122.   The foregoing statements in paragraphs 121-123 were materially false and misleading because of weaknesses in IndyMac's (a) risk management, which enabled Defendants *inter alia*, improperly to manipulate underwriting protocols (*see supra* ¶¶ 65-67, 85-87), direct that unqualified loans be approved (*see supra* ¶¶ 73-76, 80-81, 83) violate rate lock protocols and controls (*see supra* ¶ 68), direct that loans returned from the secondary market be rewritten to "work" (*see supra* ¶ 94-95), and stifle/ignore reports of internal fraud (*see supra* ¶¶ 70-71, 78, 101-103); and (b) hedging activities, including failing to hedge against risk to billions of dollars in assets, despite affirmative assurances to the contrary (*see supra* ¶¶105-119).

123.   During the January 26, 2006 earnings conference call, Defendants boasted of their forecasts for 2006 despite a "difficult environment":

> PERRY: And I think that's clearly the $64 question, is where is the mortgage market going in 2006? Where are interest rates going to 2006? And how is IndyMac going

to perform in that environment? . . . Now, you would
expect, if that was the only thing that changed [*i.e.*, the
2004 and 2005 mortgage market was flat], that ***IndyMac
would do very well in a flat market because we tend to
do well when the market is flat and also when the
market is declining***. . . And what we've said is that
IndyMac's hybrid thrift mortgage banking model – we
are not immune to industry volumes and industry
problems, but think our business model and ***our superior
execution will result in us performing better than most.***
[Tr. at 2-3] [emphasis added]

124. The foregoing statements in paragraph 123 were materially false
and misleading because of weaknesses in IndyMac's (a) risk management, which
enabled Defendants *inter alia*, improperly to manipulate underwriting protocols
(*see supra* ¶¶ 65-67, 85-87), direct that unqualified loans be approved (*see supra*
¶¶ 73-76, 80-81, 83) violate rate lock protocols and controls (*see supra* ¶ 68),
direct that loans returned from the secondary market be rewritten to "work" (*see
supra* ¶ 94-95), and stifle/ignore reports of internal fraud (*see supra* ¶¶ 70-71, 78,
101-103); and (b) hedging activities, including failing to hedge against risk to
billions of dollars in assets, despite affirmative assurances to the contrary (*see
supra* ¶¶105-119).

**March 1, 2006: Filing of IndyMac's 2005 10-K**

125. On March 1, 2006, Defendants filed on Form 10-K IndyMac's
Annual Report for the year ended December 31, 2005 (the "2005 10-K").
Defendants Perry and Keys signed the 2005 10-K.

126. The 2005 10-K stated: "The Company hedges the interest rate risk
inherent in its pipeline of mortgage loans held for sale to protect its margin on
sale of loans." [2005 10-K at p. 41].[8]  Indeed, the 2005 10-K at 41-42 then
elaborates on the methodologies the Company employs to achieve such hedging:

---

[8] *Cf.* 2005 10-K at 41, where the Company earlier on the same page states that it does not
hedge "net interest income on loans held for sale." This statement stands in stark contrast to the

The Company hedges the interest rate risk inherent in its pipeline of mortgage loans held for sale to protect its margin on sale of loans. IndyMac focuses on trying to maintain stable profit margins with an emphasis on forecasting expected fallout to more precisely estimate our required hedge coverage ratio and minimize hedge costs. *By closely monitoring key factors such* as product type, origination channels, progress or "status" of transactions, as well *as changes in market interest rates* since IndyMac committed a rate to the borrower ("rate lock commitments"), the Company seeks to quantify the optional component of each rate lock, and in turn, the aggregate rate lock pipeline. By accurately evaluating these factors, the Company has been able to minimize the purchase of options and also stabilize gain on sale margins over different rate environments.

127.   On page 62 of the 2005 10-K the Company again touts its interest rate hedging to "mitigate interest rate risk in our pipeline of mortgage loans held for sale":

### INTEREST RATE SENSITIVITY

*In addition to our hedging activities to mitigate the interest rate risk in our pipeline of mortgage loans held for sale,* rate locks and our investment in servicing-related assets, we perform extensive, company-wide interest rate risk analyses. Our primary measurement tool used to evaluate interest rate risk over the comprehensive balance sheet is net portfolio value ("NPV") analysis. The NPV analysis estimates the exposure of the fair value of net assets attributable to shareholders' equity to changes in interest rates.

[Emphasis added].

Company's Class Period ending disclosures, in which Perry stated that "we don't hedge as we talk many times, the loans for sale net interest margin. . ." If in this statement Perry was referring to the same category of risk against which the Company disclosed it did not purportedly hedge – then he would have had no need to inform the public (at the end of the Class Period) that the Company did not hedge as it talked, because by not hedging the first category of risk *it would have been hedging* (or not hedging) as it talked. Thus, it is clear that the Class Period ending statement of Perry was an admission that the Company had not hedged as it talked with respect to *some other* category of risk. In addition, the 2006 Form 10-K *does not state* that the Company does not hedge net interest income on loans held for sale anywhere in that filing.

128.   Once again under the "Risk Factor" section of the 2005 10-K defendants state that the Company hedges the interest rate risk inherent in loans held for sale:

**RISK FACTORS THAT MAY AFFECT FUTURE RESULTS**

\*          \*          \*

*Mortgage Loans Held for Sale*

*We hedge the risks associated with* our mortgage commitments to purchase mortgage loans ("rate locks") and *funded mortgage loans that will be sold in the secondary market. The risk associated with* the rate locks and *funded mortgage loans is that interest rates will fluctuate between the time we commit to purchase a loan at a pre-determined price, or the customer locks in the interest rate on a loan, and the time we sell or commit to sell the mortgage loan.* These commitments are recorded net of the anticipated loan funding probability or fallout factor. Generally speaking, if interest rates increase, the value of an unhedged mortgage pipeline decreases, and gain on sale margins are adversely impacted. Typically, we hedge the risk of overall changes in fair value of loans held for sale by either entering into forward loan sale agreements or selling forward Fannie Mae or Freddie Mac MBS to hedge loan commitments and to create fair value hedges against the funded loan portfolios.

[2005 10-K at 78] [Emphasis added].

129.   Defendants' own admissions confirm that the foregoing statements in paragraphs 126-128 were knowingly false.  For example, Perry, during the January 25, 2007 Analyst Conference Call, admitted that: "In mortgage production, this is – we had a 13% decline from forecast.  You can see that spread income, you know, *we don't hedge as we talk many times*, the loans for sale net interest margin. . . " [emphasis added].

130.   Similarly, the foregoing statements in paragraphs 126-128 were false and misleading. On January 25, 2007, Perry explained IndyMac's hedging

failures on the Company's Analyst Conference Call and admitted that the Company had intentionally allowed hedges on $1.5 billion worth of derivative liabilities to expire – leaving the Company naked and wholly unprotected:

> PAUL MILLER [ANALYST, FRIEDMAN BILLINGS RAMSEY]: So let me get this straight. You pulled off some hedges because you didn't like the accounting of it?
>
> [DEFENDANT] PERRY: No, they were expiring, they were expiring their period. Paul, I don't want to get in to this more than this right here. We can talk about it off-line.

*          *          *

> MICHAEL VINCIQUERRA [ANALYST, RAYMOND JAMES & ASSOCIATES]: Thank you. Good morning. I don't want to get back into Paul's issue too deeply, but one simple question that I think he was getting at: Are there economic returns that will come back to you, because you said there was a difference between economic and GAAP accounting, and they were hedging on an economic basis. Will you actually receive those benefits on an economic basis in future periods?
>
> [DEFENDANT] PERRY: No. I think that what it was that we were looking at it and saying our economic returns were lower but still acceptable. ***So the real issue is we didn't warn on the timing of when this was going to fall off a cliff,*** and I think that's something that our forecasting system wasn't focused on, and I think that it didn't have the rigor that it should have had there.

[Emphasis added].

131. Defendants' decision to allow these hedges to expire, and not to "*hedge as we talk many times*" according to Defendants themselves, *see* January 25, 2007 Earnings Conference Call Tr. at 2, resulted in a combined earnings per share miss of at least $0.12 per share.

132. Also materially false and misleading, and attached to the 2005 10-K,

as Exhibits 31.1, 31.2, 32.1, and 32.2, were the CEO and CFO certifications required by SOX executed by Perry and Keys.

133. Perry and Keys, pursuant to Exhibits 31.1 and 31.2, each separately certified that:

> I have reviewed this annual report on Form 10-K of IndyMac Bancorp;
>
> Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;
>
> Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;
>
> The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and we have:
>
> > (a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;
> >
> > *(b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our*

*supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;*

(c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the fourth fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

The registrant's other certifying officer and *I have disclosed, based on our most recent evaluation of internal control over financial reporting*, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) *all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information;* and

(b) *any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.*

SECOND AMENDED CLASS ACTION COMPLAINT - 42

[emphasis added][9]

134.   The foregoing statements referenced in paragraphs 132-133 were materially false and misleading because of weaknesses in IndyMac's (a) risk management, which enabled Defendants *inter alia*, improperly to manipulate underwriting protocols (*see supra* ¶¶ 65-67, 85-87), direct that unqualified loans be approved (*see supra* ¶¶ 73-76, 80-81, 83) violate rate lock protocols and controls (*see supra* ¶ 68), direct that loans returned from the secondary market be rewritten to "work" (*see supra* ¶ 94-95), and stifle/ignore reports of internal fraud (*see supra* ¶¶ 70-71, 78, 101-103); and (b) hedging activities, including failing to hedge against risk to billions of dollars in assets, despite affirmative assurances to the contrary (*see supra* ¶¶105-119).

**April 25, 2006: Filing of 1Q 2006 10-Q and Press Release**

135.   On April 25, 2006, the Company filed its Form 10-Q for the quarter ended March 31, 2006.  The Form 10-Q was signed by Perry and Keys (the 2006 First Quarter 10Q").

136.   The 2006 First Quarter 10Q stated: "The Company hedges the interest rate risk inherent in its pipeline of mortgage loans held for sale to protect its margin on sale of loans." *Id.* at 27-28. This statement was knowingly false because, as Defendants admitted at the end of the Class Period, they were not hedging "loans for sale net interest margin" as they "talk."

137.   The 2006 First Quarter 10Q further stated: "Typically we hedge the risk of overall changes in fair value of loans held for sale by either entering into forward loan sale agreements, selling forward Fannie Mae or Freddie Mac MBS or using other derivative instruments to hedge loan commitments and to create fair value hedges against the funded loan portfolios." *Id.* at 73. This statement was knowingly or recklessly false and misleading because, as Defendants

---

[9] Identical certifications were attached to each of the Company's Forms 10-Q filed during the Class Period and are materially false and misleading for the same reasons.

admitted at the end of the Class Period, they were not hedging "loans for sale net interest margin" as they "talk."

138. IndyMac announced its guidance for the upcoming year in the Company's April 25, 2006 Press Release, which stated in relevant part that "we are raising our earnings guidance for the year to a range between $5.00 and $5.40 per share, up from our prior range of $4.50 to $5.20."

139. The foregoing statements made in paragraph 138 was materially false and misleading when made because there was no good faith or reasonable basis to increase expected 2006 EPS to a range of $5.00 to $5.40 per share from $4.50 to $5.20 per share, as IndyMac was either not hedging or factoring into the revised forecast the expiration of hedges on at least $1.5 billion of liabilities that were due to mature in the fourth quarter of 2006. The EPS forecast was further without reasonable basis as the Company's loan underwriting guidelines and internal controls were manipulated by Defendants. This resulted in the issuance of millions of dollars of bad loans to unqualified borrowers, for which the Company would never be paid back or be able to sell on the secondary market. *See supra* ¶¶ 93-94, 97. Additionally, as a result of Defendants' manipulation of the underwriting guidelines and controls, the Company was forced to purchase back, from the secondary loan market, many of these "bad" or "uncollectible" loans, at a substantial loss to the Company, which further undermined any reasonable basis for the Company's projections. *Id.*

140. The April 26, 2006 First Quarter 10Q and Earnings Release also reported an approximate $3.8 million increase to loan loss provisions, and $1.7 million of loan charge-offs, net of recoveries, *Id.*, at 47. The 2006 First Quarter Q also stated the following in regard to the allowance for loan loss reserves at March 31, 2006:

> Our determination of the level of the allowance for loan losses and, correspondingly, the provision for loan losses, is based on management's judgments and assumptions regarding various matters, including general economic conditions, loan portfolio composition,

loan demand, delinquency trends and prior loan loss experience. In assessing the adequacy of the allowance for loan losses in its entirety, management reviews the performance in the portfolios of loans held for investment and the non-core portfolio of discontinued product lines, which consists of manufactured housing and home improvement loans. *A component of the overall allowance for loan losses is not specifically allocated to the loan portfolios ("unallocated component"). The unallocated component reflects management's assessment of various factors that create inherent imprecision in the methods used to determine the specific portfolio allocations.* Those factors include, but are not limited to levels of and trends in delinquencies and impaired loans, charge-offs and recoveries, volume and terms of the loans, effects of any changes in risk selection and underwriting standards, other changes in lending policies, procedures, and practices, and national and local economic trends and conditions. *As of March 31, 2006, the unallocated component of the total allowance for loan losses was $18.7 million, unchanged from the unallocated allowance at December 31, 2005.*

141.    The immediately preceding statements were materially false and misleading when made as IndyMac's loan loss reserves did not consider the "effects of any changes in risk selection and underwriting standards, other changes in lending policies, procedures, and practices, and national and local economic trends and conditions." Defendants had directed and/or approved of violations of the Company's own underwriting standards, in order to push mortgage loans through at any cost (*see supra* ¶¶ 73-76, 80-81, 83). In addition, IndyMac and/or its affiliates were now involved in litigation with borrowers, mortgage bankers and appraisers all of which involved loan origination improprieties. *See infra* ¶¶ 189-209.

142.    Further, Defendants themselves admitted that they were aware of unfavorable market conditions affecting the creditworthiness of borrowers. For example, at the April 25, 2006 earnings conference call, Defendants Perry and Keys spoke and answered questions from several analysts and recognized that the interest yield curve between short-term and long-term rates had gone to "a

negative 5 basis point spread today" and "mortgage market year-over-year industry volumes declined from 620 billion in the first quarter of 2005 to 514 billion this year," [Tr. at 2]

143.   Finally, Defendants misrepresented the status of IndyMac's involvement in "piggyback" and subprime loans and thus, the Company's increased exposure to credit risks.  At the April 26, 2006 Conference Call defendant Perry made the following remarks:

> The bottom line though, if you look at it, the positives that could be taken away from this page is that $0.26 of the spread widening that occurred, primarily as I said because subprime spread widening and the $0.35 of credit costs are both -- while they are not nonrecurring, in my opinion, they both can correct very quickly one -- *the credit one will correct relatively quickly in a few quarters because we cut out the products that were causing these problems. Primarily piggybacks and higher LTV subprime products.* And the spread widening, while it -- you know, it in theory can continue to curve, typically spreads abruptly wide and then they stabilize for longer periods of time. So those things going forward could rapidly correct themselves.

[Tr. at 3; emphasis added].

144.   The preceding statements were knowingly or recklessly false and misleading when made, as defendants, not until the end of the Class Period, admitted that IndyMac did not "cut out the products that were causing these problems," and indeed at least 20% (or $5.0 billion out of $25.9 billion) of IndyMac's loan production for the 2006 fourth quarter alone was accounted for by "80/20 Piggybacks." [Mar. 15, 2007 8-K at 11].

145.   The 2006 First Quarter 10Q also stated that IndyMac "currently expect[s] 2006 EPS to range from $5.00 to $5.40 per share." This statement was materially false and misleading for the same reasons stated in connection with the Company's April 25, 2006 Press Release.

146.   Also on April 25, 2006, Defendants held the "Q1 2006 IndyMac Bancorp, Inc. Earnings Conference Call." Perry and Keys spoke at this

conference and answered questions from several analysts.  Specifically, during the call, they reiterated the increase in projected EPS for 2006, and continued to trumpet the Company's hedging activities, stating that:

> Another key was that our loan servicing portfolio, as interest rates have risen, and as we've improved our hedging activities, our servicing portfolio has performed much better.

*   *   *

> We've improved our hedging strategies, implemented value at risk analysis which has helped us tremendously in hedging this asset.

147.   The foregoing statements regarding hedging referenced in paragraph 146 were knowingly or recklessly false and misleading because, as Defendants admitted at the end of the Class Period, they were not hedging "loans for sale net interest margin" as they "talk."

**July 27, 2006: IndyMac's Press Release, Filing of Its 2Q 2006 10-Q, and Earnings Conference Call**

148.   On July 27, 2006, the Company issued a press release in which it reiterated the Company's previously announced earnings guidance (the "July 27, 2006 Press Release"). The July 27, 2006 Press Release stated in relevant part that "we are reiterating our previously issued forecast of earnings of $5.00 to $5.40 per share, although we feel more confident that we will finish the year above the mid-point of this range."

149.   The foregoing statements made in paragraph 148 were materially false and misleading when made because there was no good faith or reasonable basis to reiterate expected 2006 EPS within the range of $5.00 to $5.40 per share, as IndyMac's hedging activities were deficient in that they failed to hedge against risk to billions of dollars in assets despite assurances to the contrary (*see*

*supra* ¶¶ 121, 126-128) or consider the expiration of hedges on at least $1.5 billion of liabilities due to mature in the fourth quarter of 2006 (*see supra* ¶¶ 130-131). The EPS forecast was further without reasonable basis as the Company's internal controls were manipulated by Defendants, which enabled Defendants, *inter alia*, improperly to manipulate underwriting protocols (*see supra* ¶¶ 65-67, 85-87), direct that unqualified loans be approved (*see supra* ¶¶ 73-76, 80-81, 83), violate rate lock protocols (*see supra* ¶ 68), direct that loans returned from the secondary market be rewritten to "work" (*see supra* ¶ 94-95), and stifle/ignore reports of internal fraud (*see supra* ¶¶ 70-71, 78, 101-103).

150. This resulted in the issuance of millions of dollars of bad loans to unqualified borrowers, for which the Company would never be paid back or be able to sell on the secondary market. *See supra* ¶¶ 93-94, 97. Additionally, as a result of Defendants' manipulation of the underwriting guidelines and controls, the Company was forced to purchase back, many of these "bad" or "uncollectible" loans from the secondary loan market at a substantial loss to the Company, which further undermined any reasonable basis for the Company's projections. *Id.*

151. Also on July 27, 2006, the Company filed its Form 10-Q for the quarter ended June 30, 2006. The Form 10-Q was signed by Perry and Keys (the 2006 Second Quarter 10Q").

152. The 2006 Second Quarter 10Q stated: "The Company hedges the interest rate risk inherent in its pipeline of mortgage loans held for sale to protect its margin on sale of loans." *Id.* at 24. This statement was knowingly false because, as Defendants admitted at the end of the Class Period, they were not hedging "loans for sale net interest margin" as they "talk."

153. The 2006 Second Quarter Q and earnings release also reported an approximate $6.1 million increase to loan loss provisions and $3.3 million of loan charge-offs, net of recoveries from December 31, 2005 and an approximate

comparative $1 million increase in the provision for the same six-month period for 2005 and a decrease of charge-offs of $ 0.4 million as compared to the same six-month period for 2005. *Id.*, at 44. It also stated the following in regard to the allowance for loan loss reserves at June 30, 2006:

> Our determination of the level of the allowance for loan losses and, correspondingly, the provision for loan losses, is based on management's judgments and assumptions regarding various matters, including general economic conditions, loan portfolio composition, loan demand, delinquency trends and prior loan loss experience. In assessing the adequacy of the allowance for loan losses in its entirety, management reviews the performance in the portfolios of loans held for investment and the non-core portfolio of discontinued product lines, which consists of manufactured housing and home improvement loans. ***A component of the overall allowance for loan losses is not specifically allocated to the loan portfolios ("unallocated component"). The unallocated component reflects management's assessment of various factors that create inherent imprecision in the methods used to determine the specific portfolio allocations.*** Those factors include, but are not limited to levels of and trends in delinquencies and impaired loans, charge-offs and recoveries, volume and terms of the loans, effects of any changes in risk selection and underwriting standards, other changes in lending policies, procedures, and practices, and national and local economic trends and conditions. ***As of June 30, 2006, the unallocated component of the total allowance for loan losses was $19.3 million, comparable to $18.7 million of unallocated allowance at December 31, 2005.***

[2006 Second Quarter Q at 45].

154.   The immediately preceding statements were materially false and misleading when made as IndyMac's loan loss reserves did not consider the "effects of any changes in risk selection and underwriting standards, other changes in lending policies, procedures, and practices, and national and local economic trends and conditions." Defendants had directed and/or approved of violations of the Company's own underwriting standards, in order to push mortgage loans through at any cost (*see supra* ¶¶ 73-76, 80-81, 83). In addition,

IndyMac and/or its affiliates were now involved in litigation with borrowers, mortgage bankers and appraisers all of which involved loan origination improprieties.   *See infra* ¶¶ 189-209.

155.   Further, Defendants themselves were aware of unfavorable market conditions effecting the creditworthiness of borrowers.  For example, at the July 27, 2006 earnings conference call where Defendants Perry and Keys spoke and answered questions from several analysts, several analysts pointed out the weakness in the housing market.

> ED GOSHANS [ANALYST]: Any way, just – I will start – Sort of on that last question there. IndyMac has a history of growing share in, I guess, weaker origination markets. And the originations [are] supposed to be down 20% this year and expectations for IndyMac's take share.  And then looking forward it looks like everyone is expecting originations to be down somewhere in the order of anywhere from 3 to 10% next year also.  Would you expect that IndyMac continues to plow through those scenarios and takes that share again[?]
>
> [DEFENDANT] PERRY: I do. . .

[Tr. at 10-11] .

156.   Finally, Defendants misrepresented the status of IndyMac's involvement in "piggyback" and subprime loans and thus, the Company's increased exposure to credit risks.  At the July 27, 2006 Conference Call defendant Perry made the following remarks:

> [Perry:] The bottom line though is that our margins actually are up in the second quarter from the first and would have been up even more, but for some unusual fraud losses that we suffered in our lot loan portfolio and some rep and warranty costs on some second trust deeds where *we were doing some piggyback loans in the subprime sector and we've eliminated that product and don't expect to have those losses going forward.*

[Tr. at 3; emphasis added].

157.  The preceding statements were knowingly or recklessly false and misleading when made, as defendants, not until the end of the Class Period, admitted that IndyMac did not "cut out the products that were causing these problems," and indeed approximately 20% (or $5.0 billion out of $25.9 billion) of IndyMac's loan production for the 2006 fourth quarter alone was accounted for by "80/20 Piggybacks." [Mar. 15, 2007 8-K at 11].

158.  The 2006 Second Quarter Q reiterated the Company's EPS forecast of $5.00 to $5.40 per share for 2006, which was materially false and misleading for the same reasons stated in connection with the Company's July 27, 2006 Press Release.

159.  Also on July 27, 2006, Defendants held the "Q2 2006 IndyMac Bancorp, Inc. Earnings Conference Call." Perry and Keys spoke at this conference and continued to laud the Company's hedging, stating:

> PERRY: I mean, it really should be volumes and more, and really more and more banking margins should be the concern. That's what -- if you look at our economic model of driving our earnings. More banking revenue margins isn't job one. And that really drives our earnings. ***You could double, triple, quadruple our credit losses and it has a very minimal impact in terms of our earnings.***

[Tr. at 13; Emphasis added]

160.  The bolded portion of the foregoing statement in paragraph 159 was materially false and misleading because IndyMac's hedging activities were deficient in that they failed to hedge against risk to billions of dollars in assets despite assurances to the contrary (*see supra* ¶¶ 121, 126-128, 130-131), and as such, the impact on the Company's bottom line from increasing credit losses was anything but "minimal."

**November 2, 2006: Press Release, 3Q 2006 10-Q and Earnings Conference Call**

161.   On November 2, 2006, the Company issued a press release in which it updated the Company's earnings guidance (the "November 2, 2006 Press Release"). The November 2, 2006 Press Release stated in relevant part that "We now expect full year 2006 earnings per share in an approximate range of $5.16 to $5.26, reflecting continued strength in our production operations and the growth and stable returns in our thrift and servicing segments."

162.   The foregoing statements made in paragraph 161 was materially false and misleading when because there was no good faith or reasonable basis to reiterate expected 2006 EPS within the range of $5.16 to $5.26 per share, as IndyMac's hedging activities were deficient in that they failed to hedge against risk to billions of dollars in assets despite assurances to the contrary (*see supra* ¶¶ 121, 126-128) or consider the expiration of hedges on at least $1.5 billion of liabilities due to mature in the fourth quarter of 2006 (*see supra* ¶¶ 130-131).  The EPS forecast was further without reasonable basis as the Company's internal controls were manipulated by Defendants, which enabled Defendants, *inter alia*, improperly to manipulate underwriting protocols (*see supra* ¶¶ 65-67, 85-87), direct that unqualified loans be approved (*see supra* ¶¶ 73-76, 80-81, 83), violate rate lock protocols (*see supra* ¶ 68), direct that loans returned from the secondary market be rewritten to "work" (*see supra* ¶ 94-95), and stifle/ignore reports of internal fraud (*see supra* ¶¶ 70-71, 78, 101-103).

163.   On November 2, 2006, the Company filed its Form 10-Q for the quarter ending on September 30, 2006, which included the Company's above reported financial results. The Form 10-Q was signed by Perry and Keys (the 2006 Third Quarter Q").

164.   The 2006 Third Quarter 10Q stated: "The Company hedges the interest rate risk inherent in its pipeline of mortgage loans held for sale to protect

its margin on sale of loans." *Id.* at 29.   This statement was knowingly false because, as Defendants admitted at the end of the Class Period, they were not hedging "loans for sale net interest margin" as they "talk."

165.   The 2006 Third Quarter Q also reported an approximate $11.0 million increase to loan loss provisions and $5.2 million of loan charge-offs, net of recoveries from December 31, 2005 and an approximate comparative $2.5 million increase in the provision for the same nine month period for 2005 and a decrease of charge-offs of $ 0.6 million as compared to the same nine-month period for 2005. *Id.*, at 51. It also stated the following in regard to the allowance for loan loss reserves at September 30, 2006:

> Our determination of the level of the allowance for loan losses and, correspondingly, the provision for loan losses, is based on management's judgments and assumptions regarding various matters, including general economic conditions, loan portfolio composition, loan demand, delinquency trends and prior loan loss experience. In assessing the adequacy of the allowance for loan losses in its entirety, management reviews the performance in the portfolios of loans held for investment and the non-core portfolio of discontinued product lines, which consists of manufactured housing and home improvement loans. ***A component of the overall allowance for loan losses is not specifically allocated to the loan portfolios ("unallocated component"). The unallocated component reflects management's assessment of various factors that create inherent imprecision in the methods used to determine the specific portfolio allocations.*** Those factors include, but are not limited to levels of and trends in delinquencies and impaired loans, charge-offs and recoveries, volume and terms of the loans, effects of any changes in risk selection and underwriting standards, other changes in lending policies, procedures, and practices, and national and local economic trends and conditions. ***As of September 30, 2006, the unallocated component of the total allowance for loan losses was $19.4 million, comparable to $18.7 million of unallocated allowance at December 31, 2005.***

[2006 Third Quarter Q at 52].

166.   The statements made in paragraph 166 were materially false and

misleading when made as IndyMac's loan loss reserves did not consider the "effects of any changes in risk selection and underwriting standards, other changes in lending policies, procedures, and practices, and national and local economic trends and conditions." Defendants had directed and/or approved of violations of the Company's own underwriting standards, in order to push mortgage loans through at any cost (*see supra* ¶¶ 73-76, 80-81, 83). In addition, IndyMac and/or its affiliates were now involved in litigation with borrowers, mortgage bankers and appraisers all of which involved loan origination improprieties. *See infra* ¶¶ 189-209.

167. Finally, Defendants themselves were aware of unfavorable market conditions affecting the creditworthiness of borrowers. For example, at the November 2, 2006 earnings conference call where Defendants Perry and Keys spoke and answered questions from several analysts:

> [DEFENDANT] PERRY: . . . On the negative side, you know, there are clearly negatives in every period and every business. You know credit is deteriorating you can see that our NPAs [non-performing loans] are --- when it was initially shown to me in the IR presentation, it was a little soft pedaled. I think credit, NPAs are moving back to normal levels and moving at a pretty good clip, and we'll talk about that. It's nothing that we don't feel we can manage in terms of our earnings, but certainly credit is deteriorating. And I think it's been unrealistically low for a long, long time. And I think with the housing market stabilizing and in some markets declining, you're going to see credit losses move up.

[Tr. at 2-3].

### Defendants Begin To Disclose The Truth.

168. On January 16, 2007, the Company issued a press release entitled "IndyMac Provides Update on 2006 Results" (the "January 16, 2007 Press Release"). The January 16, 2007 Press Release stated in part:

> PASADENA, Calif.--(BUSINESS WIRE)--Jan. 16, 2007--The following is a letter to shareholders of IndyMac and other

IndyMac stakeholders from Michael W. Perry, Chairman and Chief Executive Officer:

Dear Shareholders and other IndyMac Stakeholders:

Unfortunately, we are starting the year off with some bad news.

Based on the earnings forecast we provided after the end of last quarter, we anticipated that our EPS for the fourth quarter would be $1.35 (in a range of $1.30 to $1.40). However, last week, as we began to complete our quarterly accounting "roll-up," it became clear that our Q4 earnings would be substantially below our forecast. While our internal quarterly accounting certification process is not yet complete and adjustments could still be made as we finalize our accounting, we now expect to report approximately $0.97 EPS for the quarter when we release earnings as scheduled on January 25th.

…While we have not yet completed our detailed analysis of all of the variances, our assessment as of today is that the main differences between our prior forecast of $1.35 and what looks to be our earnings of $0.97 are the following:

*1. An increase in credit costs related to the loan loss provision, secondary market reserve, and marking-to-market delinquent loans held-for-sale and residuals and non-investment grade securities;*

*2. A reduction in net interest margin related to loans held-for-sale and the thrift investment portfolio due to yield curve inversion and the fact that our loan production mix shifted more toward fixed rate and intermediate term fixed rate loans;*

3. A decline of the servicing/interest-only securities portfolio return on equity (ROE) from a high level of 30 percent last quarter to a more normalized level, in addition to a forecasted sale of some securities (at a gain) that did not occur; and

4. As an offset to the above shortfalls, a tax benefit, reflecting the reduction of our annual effective tax rate from 39.5 percent to 39.1 percent. The effective rate declined as a result of doing more business in lower tax-rate states than in California.

\*              \*              \*

Despite our solid performance in a tough market, I understand that IndyMac's reputation has been hurt by this earnings miss, and I take full responsibility for this situation. While our internal forecasting processes have been generally predictive of actual earnings in the past and we have had few earnings surprises prior to this quarter, as we have stated in past press releases, in our industry - which has significant operating leverage - actual earnings and future prospects can change rapidly, making it a challenge to forecast future earnings.

\*              \*              \*

Very truly yours,

Michael W. Perry
Chairman and Chief Executive Officer

169.    The foregoing statements in paragraph 168, while revealing some portion of the relevant truth concealed during the Class Period, were still materially false and misleading because they failed to fully disclose weaknesses in IndyMac's (a) risk management, which enabled Defendants *inter alia*, improperly to manipulate underwriting protocols (*see supra* ¶¶ 65-67, 85-87), direct that unqualified loans be approved (*see supra* ¶¶ 73-76, 80-81, 83), violate rate lock protocols (*see supra* ¶ 68), direct that loans returned from the secondary market be rewritten to "work" (*see supra* ¶ 94-95), and stifle/ignore reports of internal fraud (*see supra* ¶¶ 70-71, 78, 101-103).

**Market Reaction to IndyMac's Jan 16th Announcement.**

170.   The market reacted negatively to news of this shortfall, blaming the EPS miss partly on margin pressure from IndyMac's non-investment grade residual assets. FBR Research analysts pointed to IndyMac's residual assets as "the smoking gun" that led to its earnings miss, noting that servicing/interest-only securities generated a lower return on equity ("ROE") than expected. FBR speculated that this lower ROE was attributable to the fact that IndyMac was unable to sell off its underperforming assets as projected, due to the difficult credit environment. FBR also noted that while it had "anticipated that 4Q06 would be a difficult credit period for the mortgage names," it had also "anticipated that a deteriorating credit environment would have been factored into guidance" from IndyMac regarding projected earnings.

171.   RBC Capital's analysts also noted that IndyMac's stock had been "beaten down" by the miss and had a negative outlook for the Company's potential to increase its volume in 2007, stating that "growth comes at a cost." Specifically, RBC pointed to the increasing gain-on-sale margin pressure for loans sold into the secondary market due to "increasing competition for a piece of the shrinking pie" as a potential source of growth problems for IndyMac.

172.   Lower loan servicing revenue was also blamed for the EPS miss. Analysts at FBK predicted the 4Q06 net servicing margins to be -3 bps, down from 1 bps just a quarter before, partially because of impairments on the company's non-investment grade residual assets. FBK also pointed to the ongoing substitution of higher-yielding short ARM products with lower-yielding hybrids as the "main culprit of the margin erosion."

173.   The market also blamed IndyMac's EPS shortfall on its higher credit expenses from deteriorating credit quality. Roth Capital speculated that "credit quality will deteriorate further, increasing credit costs and diminishing second market execution," causing it to put a "hold" on IndyMac stock. FPK expected

credit expenses to erode the MBR margin 10-20 bps, up from only 6 bps in 3Q06. The erosion was expected to continue through 2007, with FBK forecasting a full year MBR in the 1.01% range, down 11 bps from their prior estimate of 1.12%. FBK expected that credit expenses would "negatively impact earnings through residual write-downs and increases related to the on-balance sheet portfolio." Moreover, although impairments are typically non-recurring items, FBK predicted "a high likelihood of additional impairment given [their] expectation for credit weakness in 2007."

**Defendants' Class Period Ending Disclosures.**

174. Approximately one week after the January 16, 2007 release, IndyMac released the January 25, 2007 Press Release, announcing the Company's results of operations and financial condition for fourth quarter 2006. The January 25, 2007 Press Release stated in part:

> PASADENA, Calif.--(BUSINESS WIRE)--Jan. 25, 2007--IndyMac Bancorp, Inc. (NYSE:NDE) ("IndyMac(R)" or the "Company"), the holding company for IndyMac Bank, F.S.B. ("IndyMac Bank(R)"), today reported net earnings of $72 million, or $0.97 per share, for the fourth quarter of 2006, compared with net earnings of $70 million, or $1.06 per share, in the fourth quarter of 2005, representing a 3 percent increase in net earnings and an 8 percent decrease in earnings per share (EPS). . .
>
> *          *          *
>
> "However, I and the rest of IndyMac's management team are clearly disappointed with these results because they were considerably below our normal earnings growth and ROE levels and fell far short of what we had forecasted for the quarter. In response, I want to assure our shareholders that we are redoubling our efforts to both improve our earnings and tighten up our forecasting processes.

\* \* \*

"Tough times, like what we are now facing, are when companies like IndyMac can gain ground on the competition - and that is exactly what we are doing. We had a strong quarter for loan production, with $26 billion in total loans produced, up 8 percent over the prior quarter and 44 percent over Q4-05. With these production gains, we grew our estimated market share(1) to 4.51 percent in the fourth quarter versus 3.83 percent in the third quarter and 2.51 percent one year ago.

\* \* \*

Mortgage Production

"While we achieved records for loan production and market share, we are not happy with the fact that earnings from the mortgage production segment did not grow this quarter versus last," commented Richard Wohl, IndyMac Bank's President. "Our mortgage banking revenue margin declined to 91 basis points during the fourth quarter from 103 basis points in the prior quarter and 110 basis points in Q4-05. Market conditions contributed to the margin erosion in the form of a shift in our production mix from higher margin ARM loans to lower margin fixed rate loans and increased credit costs related to marking-to-market delinquent loans held for sale and increasing our secondary marketing loan repurchase reserve.

\* \* \*

Looking ahead, there will likely be further erosion in mortgage banking revenue margins and overall profitability before the current down cycle eventually turns up."

\* \* \*

Residuals and Non-Investment Grade Securities

"We are clearly not satisfied with the performance of these portfolios during the quarter, but we feel that this quarter's performance was an aberration that will likely not recur in the future," continued Olinski. "Two main factors drove the earnings decline. First, we implemented a new, more refined prepayment model for our residual securities that resulted in a one-time downward valuation adjustment of $5 million. Going forward the new model will enable us to hedge these assets more effectively, improving our performance. Second, HELOC residual securities from 2004 incurred a $6.5 million write-down for credit impairment required by GAAP accounting that we feel does not reflect the true economics of these securities. These securities are callable over the next 4-24 months, and, accordingly, we expect to book gains during this time period more than offsetting the fourth quarter write-downs, such that we expect strong overall returns on our 2004 HELOC residual securities over their lives.

*   *   *

Thrift Portfolio

Net earnings for the thrift portfolio, which consists of single-family residential mortgage loans (whole loans), consumer and subdivision construction loans, and mortgage backed securities (MBS), were $25 million, down 30 percent from the third quarter and 23 percent from one year ago. "Even though we increased our average earning assets in the thrift investment portfolio, our net interest margin declined substantially to 1.64 percent in the fourth quarter from 2.02 percent both in the third quarter and one year ago," noted Blair Abernathy, IndyMac's Chief Investment Officer. "The compression in net interest margin was due primarily to an increased cost of funds for our whole loan and MBS portfolios. Longer term, fixed-rate funding for these portfolios of approximately $1.5 billion at roughly a 2.95 percent cost of funds matured during the quarter and was replaced at a

significantly higher funding cost. This has resulted in a more permanent shift in our net interest margin, such that the 1.64 percent margin realized during the quarter is likely what we can expect going forward. In retrospect, we should have more properly planned for this happening.

"Net earnings for the fourth quarter were also negatively impacted by a GAAP $6.5 million credit-related valuation write-down on HELOC residual securities (noted above) and an increase in the loan loss provision to $9 million from $5 million in the prior quarter and $1.6 million in Q4-05. As a result of the earnings decline, the thrift portfolio produced an ROE of 14 percent, below our expectations, versus 20 percent in the prior quarter and 22 percent one year ago. Going forward, we believe the ROE for this portfolio should be in a range of 15 percent to 20 percent. We are clearly not happy about the fact that the fourth quarter's performance fell below this range, and we will provide updates on steps we are taking to improve performance as the year progresses."

Non-performing Assets and Charge-offs Increase from Historic Low Levels

Non-performing assets to total assets increased to 63 basis points during the quarter from 51 basis points in the third quarter and 34 basis points in Q4-05. Net charge-offs increased to $7.6 million during the quarter from $1.9 million both in the prior quarter and one year ago. "We have previously noted that the historically low NPAs and charge-offs we have experienced over the last few years were unsustainable, and, indeed, we saw erosion in our credit metrics during the fourth quarter. In light of this, we are increasing our provision for loan losses," commented Scott Keys, IndyMac's Chief Financial Officer. "We expect current credit conditions to worsen further in 2007 in connection with the housing market cycle and therefore are planning for significant increases in loan loss provisions and charge-offs in 2007

versus 2006.

175.   Perry further discussed IndyMac's forecasting problems during an earnings conference call IndyMac held on the same day,  January 25, 2007 (the "January 25, 2007 Earnings Conference Call") explaining the Company missed its forecasted results "so badly" because of market forces and "a little hubris in terms of our forecasting process."  Perry also admitted "[w]e should be doing a much more detailed bottom's up forecasting in all our business units... and I take responsibility for that."

176.   Perry also discussed the fact that IndyMac's supposedly superior internal controls and forecasting models were insufficient to cope with the changing credit market.  For example, Perry admitted that, despite the Company's best efforts, "[o]ur provision for loan losses is increasing. . . Credit quality generally is deteriorating so I would say that's something we have to do a better job forecasting, and clearly we want to be a little more conservative as it relates to that... This is something we should have done a better job forecasting on.  This is something that we probably could have seen better if we had more precise models . . ." Relatedly, defendant Perry revealed that "[t]he increase [in credit losses] from the third to fourth quarter, we are seeing some problems in certain pieces of 80/20 piggyback programs." [Tr. at 7].

**Market Reaction to IndyMac's Jan 25th Announcement.**

177.   Analysts at FBR downgraded IndyMac, noting that "the margin contraction is worse than forecasted." Thrift net-interest-margin dropped to 164 bps from 202 bps, "primarily due to the higher cost of funds as $1.5B of fixed rate funding matured and was replaced at a significantly higher cost." FBR also pointed out that credit "weighed on the quarter more than forecast," again noting that while 4Q06 was expected to be a difficult credit market, they had expected IndyMac to take that into account when making earnings projections.

178.   Analysts at FPK pointed to credit as "the main cause" of IndyMac's

1  shortfall, noting that "credit deterioration was prevalent in each business

2  segment." However, FPK forecasted that "margins [would be] the headwind in

3  '07," predicting that "the thrift margin compression would cost $0.40 to $0.45 per

4  share in 2007."

5      179.   Wachovia blamed IndyMac's lowered EPS on net interest margin,

6  gain-on-sale, and credit, noting that "[i]nvestor expectations have been reset a lot

7  lower and management has lost some credibility in our eyes." Wachovia stated

8  that IndyMac's "profitability was challenged by higher conduit channel

9  originations and increased productions in lower margin products, such as prime

10 fixed rate mortgages." Wachovia also noted that IndyMac's gain-on-sale margin

11 "declined to 70 bps in our model, from 82 bps in the linked quarter and 88 bps in

12 the year-ago period." Wachovia stated that "production is an element of the

13 [IndyMac] story that is working," noting that IndyMac had record mortgage

14 production of $26B.  However, Wachovia predicted that CEO Mike Perry's

15 optimistic statement that IndyMac was on track to become the 8th largest

16 mortgage originator by 2008, *see supra* ¶ 51, "will certainly prove to be a

17 mirage."

18     180.   Like Wachovia, RBC Capital also cited IndyMac's record mortgage

19 production of $26B approvingly, suggesting that IndyMac was close to achieving

20 5% market share. However, RBC noted that "the most surprising part of the

21 [fourth] quarter was the severity of the contraction in IndyMac's net interest

22 margin," which was the primary driver behind their 2007 EPS reduction.

23 Moreover, because IndyMac must compete on rates to attract deposits, RBC

24 predicted that the company's margin "is unlikely to rebound anytime soon." RBC

25 also noted that IndyMac's credit quality deteriorated materially in 2007, as net

26 charge-offs jumped from 4 bps in the previous quarter to 13 bps. RBC predicted

27 that the expected net charge-offs in 2007 would lead to "a significant increase in

28 loan loss provisions."

181.   IndyMac's January 25, 2007 disclosures drove its share price downward, to close that same day at $37.71, or 7.35% below the previous day's closing price of $40.70 per share.

**Defendants' Post Class Period Disclosures**

182.   On March 1, 2007, the Company issued a press release entitled "IndyMac Issues 2006 Annual Shareholder Letter, Updating 2007 Forecast" (the "March 1, 2007 Press Release").   In the March 1, 2007 Press Release, Defendants admitted they knew that the steadily worsening conditions of the housing market and yield curve during 2006, was not properly considered in IndyMac's financial reporting – both forecasting and historical accounting:

> PASADENA, Calif.--(BUSINESS WIRE)--March 1, 2007--
> IndyMac Bancorp, Inc. (NYSE: NDE) ("IndyMac(R)" or the
> "Company"), the holding company for IndyMac Bank, F.S.B.
> ("IndyMac Bank(R)"), today released its annual letter to
> shareholders from Chairman and CEO Michael W. Perry, that
> will be contained in the Company's annual report, which will be
> issued as scheduled at the end of March. . .
>
> Dear Shareholders:
>
> 2006 was a challenging year in the mortgage banking industry.
> Industry loan volumes of $2.5 trillion were 34 percent below
> 2003's historic high level and 17 percent lower than in 2005.
>
>     *        *        *
>
> Given that reality, here is what we will do to improve
> performance for our shareholders right now:
>
> *1.  Manage our credit risks by being smart and prudent in
> adjusting our mortgage underwriting guidelines, setting our
> risk-based pricing, making decisions as to what assets go into
> our investment portfolio and/or distributing our risk into the
> secondary market, and executing on best in class loss
> prevention and loss mitigation practices.* [Emphasis added.]
>
>     *        *        *

> *Given the robust housing market and highly liquid secondary markets (for even the "riskiest loans") - both of which persisted for years longer than anticipated - and given strong competition in a declining overall mortgage market, IndyMac, in order to compete and grow, also loosened its lending standards, though in a much more responsible way.* That we did not do this to the same extent as many other lenders is evidenced by the fact that our mortgage production in 2006 had an average FICO of 701 and average combined loan-to-value (CLTV) ratio of 80 percent as compared to an average FICO of 702 and average CLTV of 76 percent in 2005. *Though we suffered increased credit losses in the fourth quarter even after we began tightening our lending standards early in 2006, these losses in no way threaten the viability of our company.* With the benefit of hindsight, if I had to do it over again, I would not do anything materially different for two important reasons: (1) IndyMac's competitive position in the industry has been significantly enhanced for the long-term by the market share we have gained and will hold and grow as a result of our product innovation and reasonable risk-taking, and (2) you don't just lose short-term profits if you do not meet the competitive tactics of your major long-term competitors ... you lose customers and you lose your sales force (to your competitors) ... which would, in my view, have impaired IndyMac more than the credit losses we will suffer over the next few years. [Emphasis added.]

*          *          *

Michael W. Perry
Chairman and Chief Executive Officer

183.    Shortly thereafter, IndyMac issued a press release on March 15, 2007, attempting to bolster the credibility of its Alt-A portfolio and other loan performance.  However, IndyMac's release revealed its increased reliance upon 80/20 piggyback loans - $4.990 billion of its mortgage production for the fourth quarter of 2006 - and the significant credit losses on loans held for sale ("LHFS")

of $10.27 million or nearly 60% of its entire LHFS credit losses.

Appendix A
Recent Guideline Cutbacks(a)

| Product Group ($ in millions) | 4th Quarter Production | Production Eliminated | Percent of 4th Quarter Production Eliminated |
|---|---|---|---|
| 80/20 Piggybacks | $ 4,990 | $ 2,689.5 | 53.9% |
| Subprime | $ 1,155 | $ 444.7 | 38.5% |
| Alt-A and Prime | $ 11,205 | $ 586.5 | 5.2% |
| Option ARM | $ 5,201 | $ 211.3 | 4.1% |
| Second Liens (CES and HELOCs) | $ 1,169 | $ 201.7 | 17.3% |
| Consumer Construction | $ 785 | $ 1.2 | 0.2 % |
| Reverse Mortgages | $ 1,441 | $ - | - % |
| Total | $ 25,946 | $ 4,134.9 | 15.9% |

| Product Group ($ in millions) | 4th Quarter Credit Losses on Loans Held for Sale (LHFS) | 4th Quarter Credit Losses on LHFS Related To Eliminated Production | Percent of 4th Quarter Credit Losses on LHFS Eliminated |
|---|---|---|---|
| 80/20 Piggybacks | $ 10.27 | $ 9.06 | 88.2% |
| Subprime | $ 3.12 | $ 2.64 | 84.4% |
| Alt-A and Prime | $ 2.10 | $ 0.01 | 0.3 % |
| Option ARM | $ 1.42 | $ 0.02 | 1.7% |
| Second Liens (CES and HELOCs) | $ 0.41 | $ 0.40 | 96.8% |
| Consumer Construction | $ 0.34 | $ - | - % |
| Reverse Mortgages | $ - | $ - | - % |
| Total | $ 17.66 | $ 12.12 | 68.6% |

(a) Includes some guideline cutbacks that are scheduled to take place on March 19, 2007.

184.    IndyMac's first quarter results similarly attributed a significant portion of its losses in the LHFS to 80/20 piggybacks. For instance, $11 million of IndyMac's $24.1 million in loans held for sale in the first quarter were attributable to first and second piggybacks. For the second quarter, the net loans held for sale credit losses attributable to 80/20 piggybacks were a shocking $25.2 million out of total net held for sale credit losses of $41 million.

185.    IndyMac's huge credit losses were reported by the *Los Angeles Times* on November 7, 2007:

> IndyMac Bancorp Inc. joined the ranks of mortgage lenders reporting huge third-quarter losses, saying Tuesday that real estate speculators were defaulting on its 100% financing packages and that Wall Street investors were wary of buying its nontraditional loans.
>
> The Pasadena-based lender racked up more than $200 million in losses during the third quarter, five times as much as it had predicted in September. It was the company's first quarterly loss in nearly a decade.
>
> IndyMac Chief Executive Michael Perry blamed house flippers for most of the losses. Many of these speculators bought properties with little or no money down, often using a "piggyback" loan to cover the down payment, Perry said.
>
> Now with home values falling and with little or no money at stake, these borrowers are defaulting on their mortgages, Perry said. "A lot of speculators crept into the market -- people who lied about their intent to live in their homes," he said.

*Compare with* IndyMac's April 27, 2005 Conference Call (quoting Perry responding to a question about the number of Alt-A mortgages: "And I would say there is [sic] more investor properties today, absolutely more second homes, more investor properties. That is the market we're in right now.").[10]

---

[10] At least $18.4 million of IndyMac's $193.9 million losses attributable to net held for sale credit costs for the third quarter were attributable to piggyback first liens. Moreover, IndyMac changed its methodology during the third quarter to separate out second liens which contributed

186.   IndyMac "racked up more than $200 million in losses during the third quarter, five times as much as it had predicted in September." *Los Angeles Times*, November 7, 2007, "IndyMac Reports Huge Loss." It was the company's first quarterly loss in nearly a decade. *Id.* Defendant Perry blamed "speculators" for most of these losses. *Id.* "Many of these speculators bought properties with little or no money down, often using a 'piggyback' loan to cover the down payment, Perry said, . . . [a] lot of speculators crept into the market -- people who lied about their intent to live in their homes."

187.   Recently, *The New York Times* reported that banks which underwrote mortgage loans (such as IndyMac) "did not disclose how many exception loans were backing the securities they sold," but merely reported in "their securities filings" risks that were "overbroad" and "useless." NYT, January 12, 2008, "Inquiry Focuses on Withholding Data on Loans" (quoting Richard Blumenthal, Connecticut's Attorney General).

## ADDITIONAL SCIENTER ALLEGATIONS

188.   Shortly before, during and after the Class Period, IndyMac was involved in litigation with mortgage bankers, appraisers, and others that alerted Defendants to the weaknesses in the Company's loan underwriting practices and internal controls.  This litigation and/or the underlying facts thereto were red flags to defendants of IndyMac's vulnerability to widespread loan origination and appraisal fraud, as well as strong warnings that IndyMac needed to tighten its credit quality control practices. Defendants' response to these warnings was to simply pretend that the rampant problems did not exist and to keep up the illusion of continuous and sustained loan production growth.

### The Distressed Silver State Loan Pool

189.   As one dramatic example, IndyMac Bank sued a mortgage broker, Silver State Mortgage ("Silver State") alleging that Silver State breached its

---

$110.1 million of IndyMac's credit losses. A substantial portion had to be attributable to piggyback second lien products.

warranties and obligations to IndyMac concerning 35 out of a pool of 36 loans sold to IndyMac in 2005 and 2006.  This action is styled *IndyMac Bank, F.S.B. v. Silver State Mortgage,* No. 07-CV-00405 (D. Nev. Mar. 29, 2007)(complaint filed).

190.    Pursuant to the *Silver State* complaint, as alleged by IndyMac, thirty-five (35) of those borrowers either "failed to make their first payment after IndyMac's purchase of the loan or failed to make a timely payment as to any one of the first three months after" such purchase (the "early defaulting Silver State loans").  *Id.*, at ¶12 (emphasis added).  As such, Silver State was obligated under its  agreement with IndyMac to repurchase each such distressed loan within thirty (30) days of receiving IndyMac's notice of default.  *Id.*

191.    According to the *Silver State* complaint, it was not until August 30, 2006 – *i.e.*, well into Q3 2006 –  that IndyMac first demanded that Silver State make good on its repurchase obligations.  *Id.*, at ¶16.  Silver State, however, breached its obligations and refused to repurchase the early defaulting Silver State loans.  *Id.*, at ¶14.

192.    The available public data surrounding the early defaulting Silver State loans (the "Silver State public data") reflects that certain of these loans originated no later than November 2005.  Yet, IndyMac turned a "blind eye" to these "red flags" and, per the *Silver State* complaint, waited as much as one year, *i.e.*, until August 2006, till it posed its repurchase demand to Silver State (*id.*, at ¶16) and even longer, until late March 2007 until it commenced its lawsuit.

193.    Indeed, the Silver State public data reflects that a substantial number of other early defaulting loans originated in the months preceding August 30, 2006 – by which time IndyMac, upon its own judicial admission, had certainly become aware of the collectability problems besetting the distressed Silver State loan pool. As such, IndyMac was or, in the absence of deliberate recklessness, should have been aware before the close of Q3 2006 -- or, at the latest, shortly

thereafter -- that the Silver State loan pool was of dubious value.

194.    At the same time, the Silver State public data reflect that in the aftermath of IndyMac's August 2006 demand and despite its bad loss experience with Silver State, the Company continued to purchase a significant amount of the early defaulting loans from Silver State.

195.    Accentuating the riskiness and dubious quality of the Silver State loan pool, the Silver State public data further reflects that, unbeknownst to IndyMac's shareholders, many of those loans were extended as part of either a risky 80/20, 80/15 or 80/10 piggyback package.

**The Distressed Lancaster Loan Pool.**

196.    Confirmation of this *modus operandi* emerges from IndyMac's lawsuit against another mortgage broker, Lancaster Mortgage Bankers, LLC ("Lancaster"), alleging that Lancaster breached its warranties and obligations to IndyMac concerning a pool of forty-nine (49) loans.  This action is styled *IndyMac Bank, F.S.B. v. Lancaster Mortgage Bankers, LLC,* No. CV07-00270-DDP (C.D. Ca. January 10, 2007)(complaint filed).

197.    Pursuant to the *Lancaster* complaint, as alleged by IndyMac, forty-four (44) of the borrowers on the distressed Lancaster loans either "did not make their first payment after IndyMac's purchase of the loan or failed to make a timely payment as to anyone of the first three months after" such purchase  (the "early defaulting Lancaster loans").  *Id.,* at ¶11 (emphasis added).

198.    Each of these borrower failures amounted to an "Early Payment Default" as defined by the Purchase Agreement governing the subject loans which had been entered into by the parties, on or about June 24, 2004.  *Id.,* at ¶¶5, 6.  As such, Lancaster was obligated under its agreement with IndyMac to repurchase each such distressed loan within <u>thirty</u> (30) days of receiving IndyMac's notice of default.  *Id.,* at ¶6.

199.    According to the *Lancaster* complaint, IndyMac first demanded that

Lancaster make good on its repurchase obligations on some unspecified date in 2005. *Id.*, at ¶17. Lancaster, however, breached its obligations and refused to repurchase the early defaulting Lancaster loans. *Id.*

200.    The available public data surrounding the early defaulting Lancaster loans (the "Lancaster public data") reflects that a substantial portion of the early defaulting Lancaster loans originated in 2005 and that certain others originated in the first third of the year 2006. Yet, despite the "red flags," IndyMac held off on commencing litigation against Lancaster until January 2007 – *i.e.*, at least one year after it had made its year 2005 demand against Lancaster and well after the close of its Q3 2006 reporting period.

201.    As was the case with Silver State, IndyMac's lengthy delay in pursuing its rights against Lancaster with respect to these numerous distressed loans bespeak IndyMac's knowing or, at least, deliberately reckless desperation to maintain the facade of ever-increasing loan production growth during the Class Period.

202.    Again, as was the case with Silver State, accentuating the dubious quality of the Lancaster loan pool, the Lancaster public data further reflects that, unbeknownst to IndyMac's shareholders, many of those loans were extended as part of either a risky 80/20 or 80/15 piggyback, or some other form of two loan *tandem* package.

**The Distressed Geneva Loan Pool**

203.    Further confirmation of this *modus operandi* emerges from IndyMac's lawsuit against yet another mortgage broker, Geneva Mortgage Corp. ("Geneva"), alleging that Geneva breached its warranties and obligations to IndyMac concerning a pool of eighteen (18) loans. This action is styled *IndyMac Bank, F.S.B. v. Geneva Mortgage Bankers, LLC,* No. CV07-01914-ER (C.D. Ca., March 22, 2007)(complaint filed).

204.    Pursuant to the *Geneva* complaint, as alleged by IndyMac, sixteen

(16) of the borrowers on these Geneva loans either "<u>did not make their first payment</u> after IndyMac's purchase of the loan, or failed to make a timely payment as to anyone of the first three months after" such purchase (the "early defaulting Geneva loans"). *Id.*, at ¶12 (emphasis added).

205. Each of these borrower failures amounted to an "Early Payment Default" as defined by the Purchase Agreement governing the subject loans which had been entered into by the parties, on or about April 9, 2003. *Id.*, at ¶¶5, 6. As such, Geneva was obligated under that agreement to repurchase each such distressed loan within <u>thirty</u> (30) days of receiving IndyMac's notice of default. *Id.*, at ¶6.

206. According to the *Geneva* complaint, "on or about December 2003," IndyMac first demanded that Geneva make good on its repurchase obligations as to two (2) of the early defaulting Geneva loans but to no avail. *Id.*, at ¶18. "Commencing on or about 2006," IndyMac made such demand on Geneva as to the remaining such loans. *Id.* Geneva, however, breached its obligations and refused to repurchase the early defaulting loans. *Id.*

207. The available public data surrounding the early defaulting Geneva loans (the "Geneva public data") reflects that two of those loans originated in the year 2003, more than half originated in the year 2005 and the remaining ones originated in the year 2006. Yet, despite these "red flags," IndyMac held off on commencing litigation against Geneva until late March 2007 – *i.e.*, no earlier than approximately fifteen (15) months from the cutoff point by which the majority of the early defaulting Geneva loans had already originated.

208. As was the case with Silver State and Lancaster, IndyMac's lengthy delay in pursuing its rights against Geneva with respect to these numerous distressed loans bespeak IndyMac's knowing or, at least, deliberately reckless desperation to maintain the facade of ever-growing loan production growth during the Class Period.

209.   Again, as was the case with Silver State and Lancaster, accentuating the dubious quality of the Geneva loan pool is the fact that the Geneva public data further reflects that, unbeknownst to IndyMac's shareholders, almost all of the early defaulting Geneva loans were extended as part of either a highly risky 80/20 piggyback, or some other two loan *tandem* package.   In fact, the *Geneva* complaint expressly recites six (6) borrowers who had taken out two (2) piggyback loans apiece from Geneva.   *Id.*, at ¶13(a)-(d); (f)-(g); (j)-(m); (o)-(p). All of these borrowers' piggyback loans are subsumed within the early defaulting Geneva loans.

## IndyMac's Rampant "Push Through" of Loans Systematically Predicated on Falsely Inflated Property Appraisals.

210.   IndyMac deceptively pumped up its reported loan volumes and trampled over the application of proper underwriting criteria by also creating and fostering a milieu where loans would be extended aggressively based on falsely inflated property appraisal reports.

211.   This strategy is spelled out in a Federal class action instituted on or about August 25, 2006 in the Southern District of New York.   The plaintiff there, a residential home mortgage borrower, sued IndyMac and alleged that it had improperly and systematically selected and coerced various appraisal professionals so as to generate greater loan volumes.   These appraisers would perform faulty and defective appraisal services which inflated the value of residential properties and thereby allowed Defendants to complete more real estate transactions and obtain greater profits.   This action is styled *Cedeno v. IndyMac Bancorp, Inc., et al.*, No. 06-CV-6438 (JGK)(S.D.N.Y.).

212.   Cendano, in her Amended Class Action Complaint (filed on July 20, 2007), alleged, based on confidential witnesses, that "IndyMac threatened and retaliated against appraisers and management firms that failed to give in to pressure to meet the target appraisal values by IndyMac and to inflate the

appraisal values." *Id.*, at ¶12.

213.   The practice of encouraging inflated appraisal values resulted in borrowers incurring more mortgage debt than necessary and/or more mortgage debt than the borrower could afford. *Id.*, at ¶5.   All this was to meet loan origination targets set by IndyMac's senior management.

214.   In order to accomplish this subterfuge, IndyMac had to override stated lending practices and internal controls:

> . . . Specifically, Defendants allowed Production Personnel to improperly influence Credit\Valuation Personnel.   Production Personnel threatened and intimidated Credit\Valuation Personnel to approve inflated appraisals received from outside appraisal companies or appraisal management firms.   Contrary to Defendants' representations to Plaintiff and members of the Class, Defendants failed to provide the necessary insulation and separation between Production Personnel and Credit/Valuation Personnel.   [*Id.*, at ¶28];

> According to a confidential witness, IndyMac executives, including the Chief Appraiser, were aware and allowed the improper influence Production Personnel placed on their own Credit\Valuation Personnel to choose appraisers and to approve appraisers obtained from third party appraisal companies or appraisal management firms willing to supply IndyMac with inflated appraisals. [*Id.*, at ¶29];

> Indeed according to this confidential witness, Credit/Valuation Personnel at IndyMac were told not to reject inflated or otherwise improper appraisals and were threatened or told by Production Personnel that they would be terminated if they failed to do so. [*Id.*, at ¶30];

> According to another confidential witness, IndyMac was in fact operating its appraisal review department under pressure to make the values that IndyMac's loan officers and processing department were pushing.   This confidential witness further stated that employees of IndyMac

exerted pressure to make sure loans would be approved regardless of accurate appraisal values. [*Id.*, at ¶31].

## Defendant Perry's Additional Financial Incentive to Foster the Scheme.

215. Finally, defendant "Perry's 2006 Short-Term Cash Incentive was entirely performance based, determined by IndyMac's 2006 EPS and ROE." 2006 Proxy at 39. The Proxy continued:

> Thresholds of 2005's EPS and a 14 percent ROE were specified on an award matrix, growing to a $1 million award when EPS grew 15 percent and ROE exceeded 19 percent. Based on IndyMac's 2006 EPS of $4.82, and 8.8 percent growth, and a 19.1 percent ROE, the award matrix yielded a $791,300 payout. The MDC ["IndyMac's Management Development and Compensation Committee"] retained the right to make a potential downward adjustment to this amount if regulatory ratings worsened or if certain strategic criteria were not met. Based on 2006 results, the MDC made no adjustments.

216. Thus, defendant Perry had motive to inflate loan production during the Class Period by directing that of internal controls be overridden.

## The Company's Class Period Financial Statements Violated the Following GAAP Principles, Among Others:

217. Statements of Financial Accounting Standards No. 5, Accounting for Contingencies ("SFAS 5"), states that:

> An estimated loss from a loss contingency. . . shall be accrued by a charge to income if both of the following conditions are met:
>
> (a) Information available prior to issuance of the financial statements indicates that an asset had been impaired or that a liability had been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events

will occur confirming the fact of the loss, and;

(b) The amount of the loss can be reasonably estimated.

\*　　　　\*　　　　\*

Disclosure of the nature of the accrual made . . . and the amount accrued may be necessary for the financial statements not to be misleading.

SFAS 5, ¶¶ 8,9.

218.　SFAS 5 requires the following disclosures if no loss accrual is made in the financial statements:

If no accrual is made for a loss contingency because one or both of the conditions in paragraph 8 are not met, or if an exposure to a loss exists in excess of the amount accrued pursuant to the provisions of paragraph 8, disclosure of the contingency shall be made when there is at least a reasonable possibility that a loss or an additional loss may have been incurred. The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made.

\*　　　\*　　　\*

Disclosure is also required of some loss contingencies that do not meet the condition in paragraph 8(a) – namely, those contingencies for which there is a reasonable possibility that a loss may have been incurred even though information may not indicate that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements.

219.　Defendants violated SFAS No. 5 in that during the Class Period IndyMac's Form 10-K, and Forms 10-Q failed to accrue for and/or disclose credit losses that were at least "probable" and/or "reasonably possible."

220.    Defendants violated SFAS No. 5 for failing to provide for probable loan losses during the Class Period.  Not until the end of the Class Period did Defendants admit that although they knew of the likelihood of losses on Alt-A and other subprime mortgage loans, they failed to increase their credit reserves and enhance a known improvement to the monitoring thereof until the fourth quarter of 2006.

221.    By the end of the year 2006, IndyMac's total allowance for loan losses was reported as $62.4 million. In the fourth quarter of 2006, Defendants increased the provision for loan losses by almost twice that of the entire year by almost $20 million from the third quarter ended September 30, 2006 nine month cumulative increase of only $11 million.  [2006 Third Quarter 10-Q at 51; 2006 10-K at F-21].

222.    In addition, IndyMac reported "charge-offs, net of recoveries" for the first nine months of 2006 of only $5.2 million, whereas it increased its "charge-offs, net of recoveries" to $12.8 million by year ended December 31, 2006 or by $7.6 million in the fourth quarter of 2006, more than twice the amount for the nine months ended September 30, 2006. [2006 Third Quarter Form 10-Q at 51; 2006 Form 10-K at F-21].

223.    Throughout the Class Period, as in prior years, IndyMac increased its market share.  However, this time, it was by substantially relaxing the Company's loan origination credit practices, in violation of IndyMac policies and controls.

224.    Defendants painted a picture of IndyMac being able to weather any downturn in originations or uptick in mortgage lending credit weaknesses, purportedly because IndyMac originated and\or packaged "Alt-A" mortgage loans -- not the riskier subprime mortgage loans.  However, unbeknownst to investors, at least 20% of IndyMac's loan production during the Class Period was comprised of risky "piggyback" mortgages.

A piggyback mortgage is a second mortgage that closes

simultaneously with the first," explains Chris Larson, chief executive officer with E-Loan, an online provider of consumer loans based in Dublin, Calif. Often, the first loan is for 80 percent of the value of the home, and the second is for 10 percent. The buyer has to come up with remaining as down payment. (Another name for piggybacks is 80-10-10s). A few lenders also allow second loans up to 15 percent or even 20 percent of the value of the home. The interest rate on the second loan is often one to two percentage points higher than the first because few lenders are willing to carry the loans, and in the event of default, second mortgages get paid back second, making them riskier to lenders.

Bankrate.com, July 25, 2002, Karen M. Kroll, "Should you jump on a piggyback mortgage?" Available at http://www.bankrate.com/brm/news/mtg/20020725a.asp

225.    Here, IndyMac engaged in "80/20 piggyback" mortgages that involved extending 100% financing to the borrower, by providing 80% of the funding on the first mortgage, while also providing the remaining 20% of funding on the second mortgage. IndyMac also revealed that during the Class Period it provided "100 percent financing for subprime borrowers. . ." Ex. 99.1 to Form 8-K filed on March 15, 2007 (the Mar. 15, 2007 8-K"). The March 15, 2007 8-K was signed by defendant Perry. The 8-K reported that "two categories" of mortgage loans, "80/20 piggybacks" and "subprime' caused "our greatest credit losses" in 2006.

226.    The March 15, 2007 8-K also revealed the extent to which IndyMac was involved in 80/20 piggyback lending and the extent to which both 80/20 piggyback lending and subprime loans caused credit losses in 2006.

> **Applying these guideline cutbacks** (and other products as noted in Appendix A) **to our loan production in the fourth quarter of 2006, we would have** eliminated 51 percent of our 80/20 piggyback and subprime production, reduced our overall production by 15.9 percent and **eliminated $12.1 million in credit losses on mortgage loans held for sale, or 69 percent of the credit losses**.

Mar. 15, 2007 8-K at 6 (emphasis added).

227.   Thus, at the end of the Class Period, defendant Perry admitted that the Company was still engaged in 80/20 piggyback lending and that such accounted for increased "credit mark-to-market" on loans held for sale and reserves in the fourth quarter of 2006.

> One of the other things that affected us in the fourth quarter is we sold more whole loan in the fourth quarter. And in whole loan we assume a higher warranty reserve, because we make greater reps and warranties on those but we don't end up owning on the whole loans any credit risk after we sold the loans on a whole loan basis. Those to a great extent offset each other. In the fourth quarter, on our credit mark-to-market, it did pop up, if you look at it, 7.5 BPS in the fourth quarter, if you go back to Page 14, versus 3.5, the only other time it was higher was in the second quarter where we had that lot loan fraud. We also had an outsized mortgage banking revenue margin that covered that. The mortgage banking revenue margin in that period was outsized.

> *The increase from the third to the fourth quarter, we are seeing some problems in certain pieces of 80/20 piggyback programs.* We are seeing some problems in some of the home equity product and some of the second product and we're using that information and prudently cutting back our guidelines. I think you'll see that 7.5 bps, while it may not come down in the first quarter, will start to come down throughout next year. But I do see our warranty reserve continuing to move up modestly and that's what we're factoring in going forward.

> So moving on, so that's the story on mortgage production. Which I think is a normal good story, pretty strong management of this area. We certainly are not mistake-free and we're certainly adjusting our program guidelines and getting more conservative as time goes on.

[Tr. at 7; emphasis added].

## LOSS CAUSATION/ECONOMIC LOSS

228.   During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated

IndyMac's stock price and operated as a fraud or deceit on Class Period purchasers of IndyMac stock.  During the Class Period,  Defendants achieved a façade of stable revenue results, success, growth and strong future business prospects by:

- Disseminating financial forecasts Defendants knew lacked a reasonable basis;
- Disseminating statements Defendants knew were false and misleading regarding, *inter alia*, the Company's underwriting, hedging, loan loss provisions, secondary market reserves, market forces, internal controls, and compliance with securities laws.

229.   Defendants' false and misleading statements and forecasts caused IndyMac stock to trade at artificially inflated levels, reaching as high as $50.11 per share, throughout the Class Period.

230.   On January 16, 2007, Defendants began to disclose that IndyMac would experience an earnings shortfall. Notwithstanding that Defendants' disclosures on this day were still materially false and misleading because they failed to fully disclose Defendants' fraud, the revelation of the Company's earnings miss caused the price of the Company's common stock to fall from an opening price of $41.01 on January 16, 2007, to a close of $39.15 on January 17, 2007.

231.   On January 25, 2007, Defendants were forced to publicly disclose that IndyMac was not the financially sound company investors had been led to believe it was during the Class Period.  Defendants revealed that it would be unable to achieve the unreasonably high forecasted results for the fourth quarter of 2006, and that the manner in which the forecasts were determined was so flawed that a complete overhaul was necessary.  Defendants further explained that they were not able to weather the industry downturns as they had previously

claimed, and that the Company's highly touted hedging activities had been unsuccessful. As a direct result of Defendant's fraud and recklessness, the artificial inflation of its common stock evaporated, and its price per share fell 7% to close at $37.71, damaging investors.

232. The timing and magnitude of IndyMac's stock price decline negates any inference that the loss suffered by Plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.

## APPLICABILITY OF THE PRESUMPTION OF RELIANCE:

## FRAUD-ON-THE-MARKET DOCTRINE

233. At all relevant times, the market for IndyMac common stock was an efficient market for the following reasons, among others:

(a) IndyMac stock met the requirement for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, IndyMac filed periodic public reports with the SEC and NYSE;

(c) IndyMac regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) IndyMac was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

234.   As a result of the foregoing, the market for IndyMac common stock promptly digested current information regarding IndyMac from all publicly-available sources and reflected such information in IndyMac's stock price.  Under these circumstances, all purchasers of IndyMac common stock during the Class Period suffered similar injury, and a presumption of reliance applies.

## NO STATUTORY SAFE HARBOR EXISTS
## FOR DEFENDANTS' STATEMENTS

235.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this complaint. The specific statements pleaded herein either were not identified as "forward-looking statements" when made or were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was authorized and/or approved by an executive officer of IndyMac who knew that those statements were false when made.

## CLASS ACTION ALLEGATIONS

236.   Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the common stock of IndyMac from January 26, 2006 through January 25, 2007, inclusive and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

237.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, IndyMac's common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by IndyMac or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

238.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

239.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and they have retained counsel competent and experienced in class and securities litigation.

240.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)   whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)   whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of IndyMac; and

(c)   to what extent the members of the Class have sustained damages and the proper measure of damages.

241.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class

1   members may be relatively small, the expense and burden of individual litigation

2   make it impossible for members of the Class individually to redress the wrongs

3   done to them. There will be no difficulty in the management of this action as a

4   class action.

## FIRST CLAIM

### Violations of Section 10(b) of the Exchange Act
### And Rule 10b-5 Promulgated Thereunder
### Against All Defendants

9       242.   Plaintiffs repeat and reallege each and every allegation contained

10  above.

11      243.   Each of the Defendants: (a) knew or recklessly disregarded material

12  adverse nonpublic information about the Company's financial results and then

13  existing business conditions, which were not disclosed; and (b) participated in

14  drafting, reviewing and/or approving the misleading statements, releases, reports,

15  and other public representations of and about the Company.

16      244.   During the Class Period, Defendants, with knowledge of or reckless

17  disregard for the truth, disseminated or approved the false statements specified

18  above, which were misleading in that they contained misrepresentations and

19  failed to disclose material facts necessary in order to make the statements made,

20  in light of the circumstances under which they were made, not misleading.

21      245.   Defendants have violated § 10(b) of the Exchange Act and Rule 10b-

22  5 promulgated thereunder in that they: (a) employed devices, schemes and

23  artifices to defraud; (b) made untrue statements of material facts or omitted to

24  state material facts necessary in order to make  statements made, in light of the

25  circumstances under which they were made, not misleading; or (c) engaged in

26  acts, practices and a course of business that operated as a fraud or deceit upon the

27  purchasers of IndyMac stock during the Class Period.

28      246.   Plaintiffs and the Class have suffered damage in that, in reliance on

the integrity of the market, they paid artificially inflated prices for IndyMac

stock. Plaintiffs and the Class would not have purchased IndyMac stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' false and misleading statements.

247.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

**SECOND CLAIM**

**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

248.   Plaintiffs repeat and reallege each and every allegation contained above.

249.   The Individual Defendants acted as controlling persons of the Company within the meaning of § 20(a) of the Exchange Act. By reason of their senior executive positions, they had the power and authority to cause the Company to engage in the wrongful conduct complained of herein.

250.   By reason of such wrongful conduct, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act. As a direct and proximate result of their wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of IndyMac stock during the Class Period.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.      Determining that this action is a proper class action and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at

trial, including interest thereon;

    C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

    D.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

    Plaintiffs hereby demand a trial by jury.

Dated: January 18, 2008        Respectfully submitted,

    GLANCY BINKOW & GOLDBERG, LLP

    *s/Peter A. Binkow*
    Peter A. Binkow
    Lionel Z. Glancy
    Neal A. Dublinsky
    1801 Avenue of the Stars
    Suite 311
    Los Angeles, CA 90067
    (310) 201-9150

        *and*

    Frederick W. Gerkens, III
    1501 Broadway, Suite 1900
    New York, New York 10036
    (212) 917-0009

    **Liaison Counsel for Plaintiffs**

    SCHIFFRIN BARROWAY TOPAZ
     & KESSLER, LLP
    Katharine M. Ryan
    Christopher L. Nelson
    John J. Gross
    280 King of Prussia Road
    Radnor, PA 19087
    (610) 667-7706

    **Lead Counsel for Plaintiffs**

COHEN, MILSTEIN, HAUSFELD
  & TOLL, P.L.L.C.
Steven J. Toll
Andrew N. Friedman
Matthew B. Kaplan
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC 20005
(202) 408-4600

**Additional Counsel for Plaintiffs**