1  EDWIN V. WOODSOME, JR. (State Bar No. 56305)
   DANIEL J. TYUKODY, JR. (State Bar No. 123323)
2  MICHAEL C. TU (State Bar No. 186793)
   TEODORA E. MANOLOVA (State Bar No. 233333)
3  ORRICK, HERRINGTON & SUTCLIFFE LLP
   777 South Figueroa Street, Suite 3200
4  Los Angeles, California 90017
   Telephone:  (213) 629-2020
5  Facsimile:  (213) 612-2499
   Email: ewoodsome@orrick.com
6         dtyukody@orrick.com
          mtu@orrick.com
7         tmanolova@orrick.com

8  Attorneys for Defendants IndyMac Bancorp, Inc.,
   Michael W. Perry and Scott Keys
9

10                  **UNITED STATES DISTRICT COURT**

11                 **CENTRAL DISTRICT OF CALIFORNIA**

12                        **WESTERN DIVISION**

13

| | |
|---|---|
| 14  WAYMAN TRIPP and SVEN MOSSBERG, Individually and on | Case No. CV-07-1635 GW (VBKx) |
| 15  Behalf of all Others Similarly Situated, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF** |
| 16              Plaintiffs, | **DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND** |
| 17      vs. | **AMENDED CLASS ACTION COMPLAINT** |
| 18  INDYMAC BANCORP, INC.; | |
| 19  MICHAEL W. PERRY; and SCOTT KEYS, | Date:   May 8, 2008 |
| 20              Defendants. | Time:   8:30 a.m. |
| 21  | Ctrm.:  Hon. George H. Wu Courtroom 10 Spring Street Courthouse |

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

Page

I.   INTRODUCTION ......................................................................... 1

II.  PLAINTIFFS FAIL TO PLEAD "COGENT AND COMPELLING" FACTS ESTABLISHING A "STRONG INFERENCE" OF SCIENTER ................................................................................. 5

III. PLAINTIFFS' ALLEGATIONS REGARDING ALLEGEDLY POOR UNDERWRITING, INTERNAL CONTROLS, AND HEDGING CAPABILITIES HAVE NOT CHANGED IN ANY MATERIAL RESPECT AND STILL FAIL TO STATE A CLAIM .......................... 8

    A.   The SAC's Allegations Regarding Allegedly Deficient "Underwriting Controls" Fail To State A Claim ................................. 9

    B.   Plaintiffs' Hedging Allegations Still Fail to State A Claim .............. 13

        1.   The "Hedge As We Talk" Allegations Are Deliberately Misleading And Fail To State A Claim ................................... 13

        2.   Allegations That IndyMac Intentionally Allowed Hedges To Expire Fail To State A Claim ............................................ 14

        3.   Plaintiffs' Hedging Allegations Based On The Opinion Of CW8 Are Legally Deficient For A Multitude Of Reasons ....... 15

    C.   Plaintiffs' Pattern Of Repeating The Same Litany Of Allegedly "False" Things About Each Public Statement Has Been Widely Criticized And Is Contrary To The Court's Order ............................ 15

IV.  NONE OF PLAINTIFFS' "MISCELLANEOUS" ALLEGATIONS STATE A SECURITIES LAW CLAIM ........................................... 18

    A.   The 80/20 Piggyback Loans Allegations Are Based On A Deliberate Distortion ................................................................. 18

    B.   Plaintiffs' GAAP-Based Allegations Fail To State A Claim .............. 19

    C.   Plaintiffs Continue To Attempt To Plead A Claim Based On Nonactionable Statements Of General Optimism ............................ 20

    D.   Plaintiffs' Sarbanes-Oxley Based Allegations Add Nothing ............. 21

V.   INDYMAC'S EXTENSIVE RISK DISCLOSURES INVOKE THE REFORM ACT'S SAFE HARBOR PROTECTION ................................... 22

VI.  PLAINTIFFS' SECTION 20(A) CLAIM MUST FAIL ............................... 25

VII. THE SAC SHOULD BE DISMISSED WITH PREJUDICE ...................... 25

**TABLE OF AUTHORITIES**

Page

**FEDERAL CASES**

*Acito v. IMCERA Group, Inc.*,
 47 F.3d 47 (2d Cir. 1995) .......................................................................... 7

*Aldridge v. A.T. Cross Corp.*,
 284 F.3d 72 (1st Cir. 2002) ....................................................................... 7

*In re Autodesk, Inc. Sec. Litig.*,
 132 F. Supp. 2d 833 (N.D. Cal. 2000) ...................................................... 7

*In re Burlington Coat Factory Sec. Litig.*,
 114 F.3d 1410 (3d Cir. 1997) .................................................................. 18

*Cent. Laborers' Pension Fund v. Integrated Elec. Servs., Inc.*,
 497 F.3d 546 (5th Cir. 2007) ................................................................... 21

*Coble v. BroadVision, Inc.*,
 2002 WL 31093589 (N.D. Cal. Sept. 11, 2002) ...................................... 21

*In re Copper Mountain Sec. Litig.*,
 311 F. Supp. 2d 857 (N.D. Cal. 2004) .................................................... 21

*In re Cypress Semiconductor Sec. Litig.*,
 1992 WL 394927 (N.D. Cal. Sept. 23, 1992) ............................................ 6

*DSAM Global Value Fund v. Altris Software, Inc.*,
 288 F.3d 385 (9th Cir. 2002) .................................................................. 20

*In re Daou Sys., Inc.*,
 411 F.3d 1006 (9th Cir. 2005) ........................................................... 10, 15

*Eminence Capital, LLC v. Aspeon, Inc.*,
 316 F.3d 1048 (9th Cir. 2003) ................................................................ 25

*Fecht v. Price Co.*,
 70 F.3d 1078 (9th Cir. 1995) .................................................................... 9

*Garfield v. NDC Health Corp.*,
 466 F.3d 1255 (11th Cir. 2006) .............................................................. 21

*In re GlenFed Inc. Sec. Litig.*,
 42 F.3d 1541 (9th Cir. 1994) .................................................................. 16

*Gold v. New Century Fin. Corp.*,
 Case No. CV 07-00931 DDP (JTLx), *slip.op*. (C.D. Cal. Jan. 31, 2008) ......... 16

*In re Hansen Natural Corp.*,
 ___ F. Supp. 2d ___, 2007 WL 3244646 (C.D. Cal. Oct. 16, 2007) ................ 22

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3
*In re Harmonic, Inc. Sec. Litig.,*
   2002 WL 31974384 (N.D. Cal. Nov. 13, 2002), *rev'd in part on other*
4   *grounds, aff'd in part sub nom. Knollenberg v. Harmonic, Inc.,* 152 Fed.
   Appx. 674 (9th Cir. Nov. 8, 2005) ............................................................ 12

5
*Heliotrope Gen., Inc. v. Ford Motor Co.,*
6   189 F.3d 971 (9th Cir. 1999) ................................................................... 25

7
*Higginbotham v. Baxter Int'l, Inc.,*
   ___ F.3d ___, 2007 WL 2142298 (7th Cir. July 27, 2007) ............................. 15
8

*In re Immune Response Sec. Litig.,*
9   375 F. Supp. 2d 983 (S.D. Cal. 2005) ..................................................... 24

10
*In re Invision Techs., Inc. Sec. Litig.,*
   2006 WL 538752 (N.D. Cal. Jan. 24, 2006) ............................................ 21
11

*In re K-tel Int'l Sec. Litig.,*
12   300 F.3d 881 (8th Cir. 2002) .................................................................. 20

13
*Limantour v. Cray,*
   432 F. Supp. 2d 1129 (W.D. Wash. 2006) ...................................... 11, 21
14

*Melder v. Morris,*
15   27 F.3d 1097 (5th Cir. 1994) ..................................................................... 7

16
*Metawave Commc'ns. Corp. Sec. Litig,*
   298 F. Supp. 2d 1056 (W.D. Wash. 2003) ............................................. 12
17

*Morgan v. AXT, Inc.,*
18   2005 WL 2347125 (N.D. Cal. Sept. 23, 2005) ...................................... 21

19
*In re Northpoint Commc'ns. Group, Inc. Sec. Litig.,*
   184 F. Supp. 2d 991 (N.D. Cal. 2001) ................................................... 12
20

*In re Pacific Gateway Exch., Inc., Sec. Litig.,*
21   169 F. Supp. 2d 1160 (N.D. Cal. 2001) ................................................. 20

22
*Plevy v. Haggerty,*
   38 F. Supp. 2d 816 (C.D. Cal. 1998) ................................................. 7, 21
23

*Ronconi v. Larkin,*
24   253 F.3d 423 (9th Cir. 2001) ......................................................... 4, 6, 8

25
*Santa Fe Indus. v. Green,*
   430 U.S. 462 (1977) ..................................................................... 3, 8. 14
26

*In re Seebeyond Tech. Corp. Sec. Litig.,*
27   266 F. Supp. 2d 1150 (C.D. Cal. 2003) ............................................ 23, 24

28

1
2

**TABLE OF AUTHORITIES**
(continued)

**Page**

3

*In re Silicon Graphics, Inc. Sec. Litig.*,
183 F.3d 970 (9th Cir. 1999) ............................................................. 6, 9, 25

4

5

*In re Silicon Storage Tech., Inc. Sec. Litig.*,
2007 WL 760535 (N.D. Cal. March 9, 2007) ......................................... 4

6

*In re Software Toolworks, Inc. v. Painewebber, Inc.*,
50 F.3d 615 (9th Cir. 1995) ...................................................................... 20

7

8

*In re Sourcecorp Sec. Litig.*,
2006 U.S. Dist. LEXIS 41381 (N.D. Tex. Jun. 6, 2006) ..................... 21

9

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
160 F. Supp. 2d 1059 (N.D. Cal. 2001) .............................................. 24

10

*Steckman v. Hart Brewing Inc.*,
143 F.3d 1293 (9th Cir. 1998) ............................................................... 25

11

12

*In re Syncor Int'l Corp. Sec. Litig.*,
2007 WL 1729968 (9th Cir. June 12, 2007) ......................................... 7

13

*Tellabs, Inc. v. Makor Issues & Rights Ltd.*,
___ U.S. ___, 127 S. Ct. 2499 (2007) ................................................. 2, 3, 5

14

15

*Tripp v. IndyMac Fin. Inc.*,
2007 WL 4591930 (C.D. Cal. Nov. 29, 2007) ...........................Passim

16

*In re Watchguard Sec. Litig.*,
2006 WL 2038656 (W.D. Wash. Apr. 21, 2006) ................................ 22

17

18

*In re Watchguard Sec. Litig.*,
2006 WL 2927663 (W.D. Wash. Oct. 12, 2006) ............................... 11

19

*Wenger v. Lumisys, Inc.*,
2 F. Supp. 2d 1231 (N.D. Cal. 1998) ............................................... 15, 16

20

21

*In re Wet Seal, Inc. Sec. Litig.*,
518 F. Supp. 2d 1148 (C.D. Cal. 2007) ............................................. 25

22

*Winer Family Trust v. Queen*,
___ F.3d ___, 2007 WL 2753734 (3d Cir. Sept. 24, 2007) ................ 3

23

24

*In re Worlds of Wonder Sec. Litig.*,
35 F.3d 1407 (9th Cir. 1994) .......................................................... 6, 20

25

*Wu Group v. Synopsys, Inc.*,
2005 U.S. Dist. LEXIS 42351 (N.D. Cal. Aug. 10, 2005) .................. 24

26

27

*Zack v. Allied Waste Indus.*,
2005 WL 3501414 (D. Ariz. Dec. 15, 2005) ...................................... 10

28

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Zucco Partners, LLC v. Digimarc Corp.*,
  445 F. Supp. 2d 1201 (D. Ore. 2006) ............................................................ 4, 11

## FEDERAL STATUTES AND AUTHORITIES

15 U.S.C. §78u-4 ...................................................................................................... 1

15 U.S.C. §78u-5(c) ............................................................................................... 24

15 U.S.C. §78u-5(d) ............................................................................................... 18

15 U.S.C. §78u-5(e) ............................................................................................... 24

Fed. R. Civ. P. 8 ...................................................................................................... 1

Fed. R. Civ. P. 9(b) ................................................................................................. 1

Fed. R. Civ. P. 12(b)(6) ........................................................................................... 1

H.R. Conf. Rep. No. 369, 104th Cong., 1st Sess., (1995) ...................................... 24

1   Defendants IndyMac Bancorp, Inc. ("IndyMac" or the "Company"), Michael

2   W. Perry and Scott Keys (collectively, the "Individual Defendants") respectfully

3   submit this memorandum in support of their motion to dismiss plaintiffs' Second

4   Amended Complaint ("SAC"), pursuant to the provisions of the Private Securities

5   Litigation Reform Act of 1995 (the "Reform Act")[1] and FRCP 8, 9(b) and 12(b)(6).

6   ## I.   **INTRODUCTION**

7   Plaintiffs' SAC represents no improvement whatsoever from the (First)

8   Amended Complaint ("AC") which this Court dismissed by its Order of November

9   29, 2007.  *See Tripp v. IndyMac Fin. Inc.,* 2007 WL 4591930 (C.D. Cal. Nov. 29,

10   2007).  In fact, in many ways the pleading only got worse because plaintiffs

11   completely ignored the Court's Order that "any further amendment greatly simplify

12   the operative pleading by clearly identifying only those statements that are alleged to

13   be false or misleading and (briefly, but specifically), stating why."  *Id.* at *6.

14   Instead, plaintiffs did the opposite. They repeated the much criticized pattern

15   of quoting IndyMac's public statements at length and then adding a more or less

16   identical laundry list of things they say were wrong with the statements, no matter

17   how different the statements were or when they occurred during the class period.[2]

18   To this plaintiffs added meaningless filler regarding other non-securities cases

19   involving IndyMac that lack any relevance to this dispute.[3]

20   The basic theory of the case is unchanged.  It remains fundamentally a "false

21   projections" case, where during what plaintiffs themselves call a period of "industry-

22   wide downturns" (SAC ¶4) and the collapse of a "bubble in the housing market"

23   (SAC ¶43), IndyMac missed its year end projections for 2006 by just 9% (SAC

24   ¶¶161 & 215) after which its stock declined a modest 7% (SAC ¶19).  All this

25   occurred during a period when IndyMac's competitors were going into bankruptcy

26

27   [1] Pub. L. No. 104-67, 109 Stat. 737 (1995), codified at 15 U.S.C. §78u-4 & 5.
    [2] *See infra* n.23.

28   [3] *See* SAC ¶¶188-214.

1    or were facing severe capital requirements.[4]

2         The core allegations likewise remain unchanged.  The Court's prior summary

3    of the AC's allegations need not change one iota in describing the SAC:

4              Plaintiffs' allegations … are that, despite the onset of the downturn in the
5         national housing and mortgage markets, Defendants maintained that they
          were well-positioned, contrary to other players in the markets.  Plaintiffs
6         contend that this was misleading and untrue for three general reasons: 1)
          IndyMac had inappropriately loosened its underwriting guidelines such that it
7         had extended far riskier loans that were going into default at an increasing
          rate; 2) IndyMac had inadequately hedged against its risks; 3) IndyMac had
8         inadequate "internal controls." *IndyMac,* 2007 WL 4591930, at *3.
9

10        And as before, the SAC lacks a coherent theory of fraud that could support

11   even a *reasonable* inference that the defendants acted with fraudulent intent, much

12   less the "*cogent and compelling*" case required under the Supreme Court's decision

13   in *Tellabs, Inc. v. Makor Issues & Rights Ltd*., ___ U.S. ___, 127 S.Ct. 2499, 2510

14   (2007).[5]  Plaintiffs once again attempt to establish defendants' scienter primarily

15   through the statements of their purported "Confidential Witnesses" ("CWs"), whose

16   collective testimony is that defendants deliberately pushed through a host of bad

17   management practices that harmed the Company.  The central question which the

18   SAC never addresses is why anyone would ever want to do that.

19        One theory could be that defendants pursued their own pecuniary interests at

20   the expense of the shareholders, but the SAC actually refutes that argument.  It states

21   that IndyMac's CEO Michael Perry owns 3.7% of the Company.  SAC ¶29.  The

22   Court can take judicial notice of the fact that Mr. Perry did not sell a single share

23   during the class period or since (nor did IndyMac's CFO, Mr. Keys, who is the only

24   other Individual Defendant remaining in the case).  *See* RJN, Exs. B, C & D.  That

25   means that during the class period alone, Mr. Perry's holdings declined more than

26

27        [4] *See* SAC ¶46; *Request for Judicial Notice In Support of Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint* ("RJN"), Exs. U-CC.
28        [5] Unless otherwise noted, throughout this brief all emphasis has been added.

OHS West:260375633.13                                                                    MP&A ISO Motion to Dismiss Plaintiffs'
Second Amended Class Action Complaint
(Case No. CV-07-1635 GW (VBKx))

- 2 -

$33 million, and as of the filing of the SAC his losses would have been $124 million. (Similarly, Mr. Keys lost $1.68 million during the class period, and as of the filing of the SAC his losses would have been $6.18 million.)[6]  Why would anyone pursue policies that he "knew" would harm the Company just to suffer such extraordinary personal loss?  Plaintiffs have no answer, which is unsurprising since none exists.

The SAC adds the allegation that between the end of the class period and the filing of the SAC, IndyMac's stock declined from $37.71 to $4.50.  SAC ¶¶19-20. But this new allegation only further undermines plaintiffs' case.  Plaintiffs allege that IndyMac's January 25, 2007 announcement at the end the class period was the point at which "[t]he falsity of Defendants' Class Period statements was revealed." SAC ¶12.  Yet, after this date, the stock price declined over ten times more than it did when the supposed fraud was revealed.[7]  The most "cogent and compelling" inference that arises from those facts is that IndyMac got caught in the same financial hurricane that affected every other participant in the mortgage and housing industries and that its earnings per share miss in the fourth quarter of 2006 was part of that "industry-wide downturn[]" (SAC ¶4).[8]  *See Winer Family Trust v. Queen*, ___ F.3d ___, 2007 WL 2753734, at *6-7 (3d Cir. Sept. 24, 2007) (applying *Tellabs* to dismiss a claim that defendants' revision of cost estimates was the result of fraudulent projections, as opposed to the more plausible inference of defendants simply accumulating better knowledge over time).

The original complaint which initiated this action had as its principal cause of action a claim for "breach of fiduciary duty" based on allegedly deficient underwriting,[9] but no such cause of action exists under federal law pursuant to *Santa Fe Indus. v. Green*, 430 U.S. 462, 479 (1977).  While we are now two consolidated

---

[6] *See* calculations *infra* n.21.

[7] *See* SAC ¶¶19-20 (end of class period decline of $2.99 versus a decline $33.21 from the end of the class period to the filing of the SAC).

[8] *See* RJN, Exs.U-CC.

[9] *See* Docket at 1 (*Breach of Fiduciary Duty And Class Action Complaint For Violations Of Federal Securities Laws*).

amended complaints past this original filing, that essential "mismanagement" flavor remains in plaintiffs' case.  The SAC does nothing to satisfy the Court's central concern that a Section 10(b) claim "is a fraud case, not a mismanagement case." *IndyMac,* 2007 WL 4591930, at *4.

Six of the eight CWs identified in the SAC are the same as those previously identified in the AC, and the allegations pertinent to these CWs are virtually identical to what the Court previously rejected.  In fact, almost all plaintiffs did regarding the prior six CWs was renumber them.[10]  The two new CWs, identified as (new) CW1 and CW8, add nothing materially different or legally relevant.  CW1 essentially repeats what others said previously and fails to connect his statements to anything the IndyMac Individual Defendants actually knew or believed to be true.[11]  And CW8, far from helping plaintiffs' case, is the paradigmatic example of what is wrong with the SAC.  First, CW8 left IndyMac before the start of the class period (SAC ¶118) and therefore as a matter of law his statements have no legal relevance.[12]  Second, CW8 does not allege any *facts* at all, but merely opines that Mr. Perry "'had no idea how to hedge'" (SAC ¶116), along with similar caustic comments.  Given IndyMac's outstanding financial performance for years prior to the current industry crisis, including periods of volatile interest rates,[13] CW8's sour grapes opinion seems

---

[10] *See Declaration of Teodora E. Manolova In Support of Motion to Dismiss Plaintiffs' Second Amended Class Action Complaint,* Ex. A (excerpts of blacklined comparison between SAC and AC).  Current CW2 is former CW5 (*compare* SAC ¶¶71-77 & 93-94 *with* AC ¶¶56-62 & 65-66); current CW3 is former CW1 (*compare* SAC ¶¶78-79 *with* AC ¶¶38-39); current CW4 is former CW2 (*compare* SAC ¶¶81-82 & 92 *with* AC ¶¶48-49 & 64); current CW5 is former CW3 (*compare* SAC ¶¶83-84, 95 & 100-02 *with* AC ¶¶50-51, 67 & 82-84); current CW6 is former CW4 (*compare* SAC ¶¶87-89 *with* AC ¶¶52-54); and current CW7 is former CW6 (*compare* SAC ¶¶98-99 *with* AC ¶¶80-81). Only the current CW1 and current CW8 are alleged to be new people.

[11] *See infra* pp.10-11.

[12] *See In re Silicon Storage Tech., Inc. Sec. Litig.,* 2007 WL 760535, at *18 (N.D. Cal. March 9, 2007) (rejecting allegations of "confidential informants" who left their employment before the class period); *Zucco Partners, LLC v. Digimarc Corp.*, 445 F. Supp. 2d 1201, 1206 (D. Ore. 2006) (similar); *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001) (Reform Act requires "specific '*contemporaneous* statements or conditions'").

[13] *See, e.g.*, RJN, Ex. T at 1103-04 (1-25-07 conference call) (fourth quarter of

1   inherently unreasonable, but in any event it is still just his nonactionable opinion,

2   offered without a single specific fact to support it.

3          Finally, it remains the case that throughout the class period IndyMac gave

4   detailed cautionary warnings articulating the very risks which plaintiffs allege came

5   to pass.  Pursuant to the Reform Act's statutory safe harbor, IndyMac's statements

6   are nonactionable as a matter of law because they are protected by both prongs of the

7   safe harbor.  *See* 15 U.S.C. §78u-5(c)(1)(A)&(B).

8          In sum, the SAC is long on words but short on substance.  It lacks even a

9   reasonable theory of intentional wrongful conduct, much less the "cogent and

10  compelling" one required under *Tellabs*.  The "factual" pleading simply ignored the

11  Court's Order, and the newest additions only detract from plaintiffs' case.  Plaintiffs

12  have nothing legally relevant left to say and no hope of pleading a viable core theory

13  of fraud.  Accordingly, the SAC should be dismissed with prejudice.

14  **II.    PLAINTIFFS FAIL TO PLEAD "COGENT AND COMPELLING" FACTS ESTABLISHING A "STRONG INFERENCE" OF SCIENTER**

15         In its Order, the Court held that the AC failed to plead a "cogent and

16  compelling case" sufficient to establish a "strong inference" of scienter under

17  *Tellabs*.  *IndyMac*, 2007 WL 4591930, at *2-3.  Plaintiffs' attempt at repleading

18  scienter in the SAC actually represents a step backwards.

19         Plaintiffs abandoned their attempt to plead scienter based on a former

20  defendant's modest insider sales,[14] but the judicially noticeable fact remains that the

21  two remaining Individual Defendants *retained 100% of their holdings*.[15]  This

22  *negates* any reasonable inference of scienter.  *See IndyMac*, 2007 WL 4591930, at

23  *4 ("an inference of scienter is functionally negated at least as to Perry and Keys,

24  _____

2006 only second time in past 20 quarters that IndyMac has "missed low").

25  [14] On January 29, 2008, plaintiffs voluntarily dismissed Mr. Abernathy as a defendant.  *See* Docket at 55.

26  [15] The Form 4's filed by Mr. Perry and Mr. Keys with the SEC along with relevant excerpts from the Proxy Statement filed March 23, 2007, establish that Mr. Perry

27  held 2,720,980 shares of IndyMac stock and fully vested options at the end of the class period and that Mr. Keys held 135,595 shares of IndyMac stock and fully

28  vested options at the end of the class period.  RJN, Exs. B, C & D.

1  who sold no stock whatsoever.").[16]

2       Plaintiffs are reduced to making two sets of "scienter" allegations, neither of

3  which makes sense.  First, plaintiffs offer six pages describing lawsuits that *IndyMac*

4  *brought* against entities which sold mortgages to IndyMac, where IndyMac is

5  enforcing its contractual rights to "put" early defaulting loans back to the sellers.

6  SAC ¶¶189-209.  There is no relevant securities law point that arises from these

7  allegations, where plaintiffs complain only that IndyMac delayed too long in filing

8  suit,[17] or that these lawsuits were "red flags" about IndyMac's vulnerability to being

9  defrauded.[18]  But even if true, delay in suing someone and "vulnerability" to being

10  defrauded are not recognized bases for pleading a defendant's scienter.[19]

11       Second, plaintiffs offer two conclusory paragraphs asserting that Mr. Perry

12  received incentive-based compensation and thus "had a motive to inflate loan

13  production . . . by directing that [] internal controls be overridden."  SAC ¶¶215-16.

14  Allegations that an individual defendant wanted to maximize incentive-based

---

15  [16] *Accord In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1424-25 (9th Cir.
16  1994) ("*WOW*") ("[I]f, as Plaintiffs allege, the Officers knew [the company] was
   heading for financial disaster, they probably would have bailed out of their
17  substantial holdings.  Each of the Officer Defendants, by contrast, held onto most of
   their [company] stock and incurred the same large losses as did the Plaintiffs
18  themselves."); *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 986-87 (9th Cir.
   1999) (no strong inference of scienter where "[c]ollectively the officers . . . retained
19  90 percent of their available holdings"); *Ronconi*, 253 F.3d at 436 (similar); *In re
   Cypress Semiconductor Sec. Litig.*, 1992 WL 394927, at *2 (N.D. Cal. Sept. 23,
20  1992) ("[Defendant's] stock ownership, coupled with his failure to sell such stock,
   undermines plaintiffs' theory . . . .").
21  [17] *See* SAC ¶192 ("waited as much as one year" to commence "Silver State"
   lawsuit), ¶200 (waited "at least one year" to commence "Lancaster" lawsuit), ¶207
22  (waited "approximately . . . 15 months" to commence "Geneva" lawsuit).
   [18] SAC ¶188 ("This litigation and/or the underlying facts thereto were red flags to
23  defendants of IndyMac's vulnerability to widespread loan origination and appraisal
   fraud . . . .").
24  [19] Similarly irrelevant are the two pages plaintiffs devote to describing a purported
   class action lawsuit in New York by a home mortgage borrower (the *Cedeno*
25  lawsuit).  SAC ¶¶210-14.  Besides being factually far afield, the allegations in the
   *Cedeno* lawsuit purportedly are based on an entirely different set of CWs with whom
26  the plaintiffs in this case seemingly have had no contact.  Plaintiffs therefore cannot
   have the good faith factual basis required under Rule 11 of the FRCP for knowing or
27  believing the truth about what unidentified people said in an action pending a
   continent away.  *See Memorandum of Points and Authorities in Support of
28  Defendants' Motion to Strike* at 1-2.

1   compensation have been widely rejected as an adequate basis for alleging scienter.

2   *See In re Syncor Int'l Corp. Sec. Litig.*, 2007 WL 1729968, at *2 (9th Cir. June 12,

3   2007) ("[a]llegations that defendants had a motive to inflate [company's] stock,

4   through bonus incentives tied to stock price . . . fail to show scienter.").[20]

5         In this case, plaintiffs' allegations are even less compelling for two reasons.

6   First, Perry's 2006 incentive bonus of $791,300 is minuscule compared to the over

7   $33.7 million he personally lost at the end of the class period by retaining 100% of

8   his stock holdings, and the over $124 million he has lost from the class period to the

9   filing of the SAC.[21]  Second, plaintiffs' theory is internally inconsistent.  The SAC

10  alleges that IndyMac increased reserves and took a larger write-off in the fourth

11  quarter of 2006 (SAC ¶¶221-22) which led the Company to miss its 2006 projections

12  (SAC ¶13).  Obviously, if the "scheme" was to maximize short-term compensation,

13  the last thing one would do would be to increase reserves and charge-offs in the final

14  quarter.

15        Finally, as weak as these theories are as to Mr. Perry, it should be noted that

16  plaintiffs offer absolutely no rationale as to why Mr. Keys would have been

---

18  [20] *Accord In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 845 (N.D. Cal. 2000) (the prospect of receiving large bonuses, standing alone, has been rejected by the Ninth Circuit as a means of alleging scienter); *Plevy v. Haggerty*, 38 F. Supp. 2d 816, 833 (C.D. Cal. 1998) (the motive "to reap the benefits of munificent incentive compensation plans that were tied to [the company's] reported earnings and stock price . . . [is] insufficient as a matter of law"); *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) ("If scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions."); *Melder v. Morris*, 27 F.3d 1097, 1102 (5th Cir. 1994) (accepting this motive "would effectively eliminate the state of mind requirement as to all corporate officers and defendants."); *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) (fact that executive compensation depended on the company's earnings is not enough to establish scienter).

[21] Mr. Perry held 2,720,980 shares of IndyMac stock and fully vested options at the end of the class period. *See supra* n.15.  When "IndyMac's stock tumbled to $37.71 on January 25, 2007 . . . from the Class Period high of $50.11" (SAC ¶19), Perry's stock holdings lost approximately $33,740,152 in value.  Using plaintiffs' methodology of comparing the difference between the class period high of $50.11 and IndyMac's stock price of approximately $4.50 per share at the time plaintiffs filed their SAC (SAC ¶20), this loss would increase to approximately $124,103,898. The corresponding losses for Mr. Keys's holdings (*supra* n.15) are $1,681,378 and $6,184,488, respectively.

motivated to commit fraud. *See, e.g., Ronconi*, 253 F.3d at 436 (scienter allegation against one insider not a sufficient basis for alleging the scienter of other insiders).

### III. PLAINTIFFS' ALLEGATIONS REGARDING ALLEGEDLY POOR UNDERWRITING, INTERNAL CONTROLS, AND HEDGING CAPABILITIES HAVE NOT CHANGED IN ANY MATERIAL RESPECT AND STILL FAIL TO STATE A CLAIM

The SAC describes two general categories of "problems facing the Company." SAC ¶52.[22] First, plaintiffs assert that "the Company's underwriting controls were ineffective and, as such, the Company was effectively unable to underwrite and value loans . . . ." *Id.* Second, the SAC asserts that "the Company, contrary to its public representations, was not hedging major categories of risk – loans held for investment and loans held for sale." *Id.* The SAC then goes on to repeat formulaically that every class period public statement failed to adequately disclose either or both of these problems.[23]

All this merely reflects a modest repackaging of what the Court previously rejected. The central problem remains. Although plaintiffs casually assert that these problems were "known to defendants" and that as a result "the Company's projections lacked *any* reasonable basis" (SAC ¶52) (emphasis in the original), the SAC never establishes any defendant's actual knowledge of falsity through well-pled factual allegations.[24] At best one could infer that in plaintiffs' minds the defendants "should have" adjusted business practices and reserves sooner, and "should have" made different projections, but such assertions come nowhere close to stating a case for fraud. *See Santa Fe*, 430 U.S. at 479. Moreover, in a pleading as lengthy as the

---

[22] While the AC purported to raise three categories of alleged "problems" (AC ¶36), the SAC combines two of them (allegedly poor underwriting and weak internal controls) into one, which it now calls "underwriting controls." *See, e.g.,* SAC ¶52.

[23] *See* SAC ¶¶121-24, 133-34 & 168-69 (both allegations); ¶¶136-39, 145, 148-50, 158, 161-62 (both allegations, reverse order); ¶¶125-29, 130-31, 146-47, 151-52, 159-60, 163-64 (hedging allegation); ¶¶140-41, 153-54, 165-66 (underwriting controls allegation).

[24] As discussed *infra* p.14-15, IndyMac in fact never claimed that it fully hedged all risks associated with loans held for investment or loans held for sale, or that its internal controls had eliminated all hedging or underwriting risk.

OHS West:260375633.13                                                                          MP&A ISO Motion to Dismiss Plaintiffs'
Second Amended Class Action Complaint
(Case No. CV-07-1635 GW (VBKx))

- 8 -

SAC, one can sometimes miss the forest for the trees (which may be the desired effect). In this case, the core facts are that during what defendants described as "challenging times" facing its industry,[25] and during what plaintiffs describe as a time of "industry-wide downturns" (SAC ¶4) and the bursting of the housing "bubble" (SAC ¶43), prior to which home valuations were "inflated" (SAC ¶43), IndyMac stock fell a mere 7% after IndyMac missed its year end projections by a mere 9%. And the Individual Defendants were among those who felt the downturn in IndyMac's stock most acutely.

## A.   The SAC's Allegations Regarding Allegedly Deficient "Underwriting Controls" Fail To State A Claim

As before, plaintiffs attempt to establish defendants' knowledge of allegedly defective underwriting practices and internal controls through the allegations of their CWs. And as before, these allegations boil down to the unsubstantiated assertion that the Individual Defendants deliberately acted to harm the long term health of the Company by engaging in practices the CWs considered relatively too risky.

The CWs, who are mostly former lower level, short term employees,[26] never allege any facts offering insight as to why any of the Individual Defendants would have wanted to harm the Company's long-term interests. In fact, the SAC itself articulates a rationale as to why reasonable people might have assessed risk differently when it alleges that "[the] *booming real estate market* [from 2001 to 2006] *opened new opportunities* for mortgage lenders like IndyMac to deal in new types of higher-risk loans. IndyMac's growth was propelled by its utilization of [these loans]." SAC ¶44. Essentially, the CWs disagree with the policies they believe IndyMac undertook to pursue these "new opportunities," but these

---

[25] *See* AC ¶33. Although SAC omits this part of Mr. Perry's January 26, 2006 statement from the statements which begin the Class Period, it is properly considered pursuant to the doctrine of incorporation by reference. *See Silicon Graphics*, 183 F.3d at 986. *Fecht v. Price Co.*, 70 F.3d 1078, 1080 n.1 (9th Cir. 1995).

[26] *See* SAC ¶98 (CW7 "[a]nalyst," one year); ¶87 (CW6 "[l]oan [p]rocessor," three years); ¶71 (CW2 "underwriter," two years); ¶83 (CW5 "[i]nvestigator," two years).

1  differences over policy do not state a case for fraud.  *See Zack v. Allied Waste Indus.*,
2  2005 WL 3501414, at *13 (D. Ariz. Dec. 15, 2005) (confidential witnesses'
3  allegations were simply disagreements with management that did not give rise to a
4  strong inference of scienter).

5      In dismissing the AC, the Court rejected plaintiffs' reference to "the beliefs
6  and opinions of certain confidential witnesses" as insufficient, because plaintiffs
7  "failed to allege that the individual Defendants shared these beliefs and opinions or
8  even that they were aware of them and found them to be reliable and justified."
9  *IndyMac,* 2007 WL 4591930, at *3.  The SAC never answered the bell on this
10 charge.  In fact, the only thing plaintiffs did that was even partially responsive to the
11 Court's concern was to add, in the middle of the discussion of current CW6 (former
12 CW4 in the AC), a reference to ". . . Defendant Perry's actual knowledge thereof
13 [i.e., of bad loans and loose underwriting guidelines]."  SAC ¶91.  But as written this
14 does not even appear to be CW6's allegation (as opposed to the SAC author's
15 inference or conclusion).  If it actually is CW6's allegation, there is no basis pled to
16 support a reasonable inference that this "loan processor" (SAC ¶87) would have had
17 any knowledge regarding the thinking of the Company's CEO.  *See In re Daou Sys.,*
18 *Inc.,* 411 F.3d 1006, 1015 (9th Cir. 2005) (allegations must be pled "with sufficient
19 particularity [to show the CW] would possess the information alleged" and the
20 complaint must "contain[] adequate corroborating details").

21      As to the new CWs, only CW1 is said to have anything to say about
22 underwriting and controls.[27]  However, CW1 is not alleged to have had any direct
23 contact with the Individual Defendants or any basis for knowing what they actually
24 thought or believed.  Plaintiffs allege only that CW1 "had regular contact with the
25 most senior managers and officers of the Company" (SAC ¶62),[28] which is an

26  ―――――――――――――
27 [27] The CW8 allegations concern hedging and fail to state anything legally relevant
    for reasons discussed *infra* p.15.
28 [28] *See also* SAC ¶¶5-7 (repeated references to what unidentified "senior
    management" allegedly knew).

oblique way of admitting that CW1 did not have any direct contact with Messrs. Perry or Keys, and therefore has nothing to say that is of legal relevance. *See Limantour v. Cray*, 432 F. Supp. 2d 1129, 1155 (W.D. Wash. 2006) (dismissing allegations where the confidential witnesses could not "claim to have reported directly to any of the Defendants . . . [or] . . . provide any basis to conclude that the information was reported to the Defendants").

Plaintiffs also try to establish a case through hearsay and speculation. CW1, who was employed at IndyMac for less than eighteen months, and who left just three months into the class period (SAC ¶62), allegedly reported to an Executive Vice President (Mr. Adarkar) who allegedly reported to Mr. Perry. The allegations which follow consist of CW1's speculation about what Mr. Perry might have told Mr. Adarkar,[29] or double hearsay, neither of which is sufficient. *See Zucco Partners, LLC v. Digimarc Corp.*, 445 F. Supp. 2d 1201, 1205 (D. Or. 2006) ("This allegation contains double hearsay as CW1 alleges [what someone else purportedly said that defendant said] . . . and, therefore, the allegation is not admissible to support an inference of scienter."); *In re Watchguard Sec. Litig.*, 2006 WL 2927663, at *3 (W.D. Wash. Oct. 12, 2006) ("speculative innuendo" insufficient to demonstrate knowledge on the part of any defendant).

The substance of what CW1 alleges adds no new "facts" beyond those the Court has already considered and rejected,[30] except one particular allegation that in some cases IndyMac gave consumers the benefit of a lower mortgage rate after the expiration of a "rate lock." SAC ¶67. CW1 offers no rational reason why IndyMac would harm itself only to benefit its customers (the only scenario CW1 can imagine), but in fact there are good business reasons why a mortgage lender would honor a

---

[29] *See, e.g.*, SAC ¶68 ("According to CW1, the Company engaged in those practices at the behest of defendant Perry (again through Adarkar) . . . .").

[30] *Compare* SAC ¶63 *with* AC ¶¶59, 61 (repeating "push loans through" allegation); SAC ¶64 *with* AC ¶59 (bad loans approved because of relaxed underwriting guidelines); SAC ¶66 *with* AC ¶¶54-55 (approving bad loans to meet loan production goals).

1   rate lock after its expiration.  These include the ability to sell the loan at a profit, the

2   ability to profit by servicing the loan in future years, and customer relations

3   purposes.  Seeing only a small part of the picture, CW1 speculates his way to a

4   nonsensical conclusion.[31]

5       The Court previously recognized that "none of the confidential witnesses to

6   whom Plaintiffs point offer any information as to the 'actual knowledge' of any

7   Defendant."  *IndyMac*, 2007 WL 4591930, at *5.  Nothing has changed.  The SAC

8   makes no allegation that any of the CWs were in any way involved with the process

9   of making projections.  There is no allegation that they had access or insight into

10  what senior management thought or actually believed in connection with making

11  projections.  There is no allegation that the CWs were instructed to change a

12  projection or a financial result, or that they even heard of that happening improperly.

13  There is also no allegation that any of them were involved in the preparation of the

14  Company's financial reports, SEC filings or press releases.  This makes it impossible

15  for plaintiffs to allege "'that they told the [defendant] the true facts before the false

16  statement was made . . . [but defendant] made the statement anyway,'" or that there

17  was a "'contemporaneous receipt of a report with information directly at odds with

18  an alleged misrepresentation.'"  *In re Northpoint Commc'ns. Group, Inc. Sec. Litig.*,

19  184 F. Supp. 2d 991, 997 (N.D. Cal. 2001).[32]

20

21      [31] Like the other CWs, CW1's allegations are also internally inconsistent.  For
       example, SAC ¶70 asserts that CW1 was "rebuffed" "every time" he/she complained
22     about "fraud."  However, SAC ¶66 acknowledges that when CW1 raised issues
       regarding internal controls violations connected with loan production, IndyMac's
23     Compliance Department responded vigorously by having the entire Central Banking
       group "written up."
24      [32] *Accord In re Harmonic, Inc. Sec. Litig.*, 2002 WL 31974384, at *16 n.14 (N.D.
       Cal. Nov. 13, 2002) (complaint must "describe how [plaintiffs] gained the relevant
25     information from the source; . . . what form the information took – whether it was
       written or oral; whether it consisted of recollection or contemporaneous descriptions,
26     vague hints or detailed explanations."), *rev'd in part on other grounds, aff'd in part
       sub nom. Knollenberg v. Harmonic, Inc.*, 152 Fed. Appx. 674 (9th Cir. Nov. 8,
27     2005); *Metawave Commc'ns. Corp. Sec. Litig*, 298 F. Supp. 2d 1056, 1068 (W.D.
       Wash. 2003) ("Plaintiffs must plead 'with substantial specificity' how confidential
28     witnesses 'came to learn of the information they provide in the complaint.'").

### B.    Plaintiffs' Hedging Allegations Still Fail to State A Claim

Plaintiffs' recycled hedging allegations add no new facts whatsoever, and continue to rely upon (i) constant repetition of a "short quote" offered out of context;[33] and (ii) second-guessing IndyMac's business judgment about what hedges to purchase and at what price.[34]

### 1.    The "Hedge As We Talk" Allegations Are Deliberately Misleading And Fail To State A Claim

As plaintiffs first quote it, what Mr. Perry said during the January 25, 2007 conference call was "*we don't hedge as we talk many times* the loans for sale net interest margin . . . ." SAC ¶114 (emphasis in the original).  As this gets constantly repeated throughout the SAC, plaintiffs either keep the part they italicized and forget about the rest or selectively "short quote" it to distort its meaning.[35]  As defendants previously pointed out, the full quote of what Mr. Perry is saying is perfectly consistent with what IndyMac said in its 2005 Form 10-K.  Plaintiffs concede that this SEC filing disclosed that IndyMac did not hedge the net interest *income* it earned on the spread on loans held for sale (i.e., the "margin"), but that it did hedge the interest *rate* inherent in these loans.[36]  SAC ¶126 & n.8.

Plaintiffs' only response to the fact that these statements are perfectly consistent is to contend that Mr. Perry could not possibly have meant what he allegedly said, because this concept had already been disclosed in the Company's 2005 Form 10-K and so there would have been no need to repeat it.  SAC ¶126 n.8. Little needs to be said about this argument.  Mr. Perry's statement was made in the context of an analyst conference call (SAC ¶¶113-14), and saying essentially, "as we have told you before" and reminding analysts of a point made in a prior SEC filing

---

[33] SAC ¶¶16, 119, 126 n.8, 129, 136-37, 147, 152 & 164.
[34] SAC ¶¶122, 124, 129, 134, 145, 147, 149, 152, 158, 160, 162 & 164.
[35] *See* SAC ¶¶16, 119, 126 n.8, 129, 131, 136, 137, 147, 152 & 164.
[36] *See* SAC ¶126 (quoting IndyMac's 2005 Form 10-K: "The Company hedges the *interest rate risk* inherent in its pipeline . . .") & n.8 ("earlier on the same page [the 10-K] states that [the Company] *does not hedge 'net interest income* on loans held for sale.'").

can hardly be considered surprising or unusual.

### 2. Allegations That IndyMac Intentionally Allowed Hedges To Expire Fail To State A Claim

Plaintiffs once again allege that "the Company . . . intentionally allowed hedges on $1.5 billion worth of potential liabilities to expire – leaving the Company naked and wholly unprotected."[37]  *Compare* SAC ¶130 *with* AC ¶74.[38]  Plaintiffs assert that IndyMac essentially guaranteed that the Company would continue to be successful, in part due to its hedging activities,[39] but that is not consistent with either the SAC itself, or judicially noticeable facts.  What Mr. Perry actually said in response to a confused questioner regarding the hedges in question was that they expired *pursuant to their own contractual terms*.  SAC ¶114.  IndyMac did not "intentionally" cause contracts to expire.  Plaintiffs seem to believe that the hedges should have been renewed, but they do not say at what cost or what the interest rate risk appeared to be immediately after the hedges expired.  Pursuant to *Santa Fe*, the Court should not get in the business of second-guessing these business judgments.

Second, plaintiffs' underlying premise is that defendants represented that IndyMac was always perfectly hedged – an assertion belied by the SAC itself and by IndyMac's judicially noticeable SEC filings.  As quoted in the SAC, IndyMac's 2005 Form 10-K and 2006 Form 10-Qs repeatedly stated that "*[t]ypically* we hedge the risk of overall changes in fair value of loans" (SAC ¶¶128 & 137), not that it always happened or was guaranteed to always happen.

Third, far from guaranteeing perfection, IndyMac specifically warned about the potential risks associated with its hedging strategies:

> We seek to mitigate our interest rate risks through the various hedging strategies . . . . *However, there can be no assurance that these strategies* (including assumptions concerning the correlation thought to

---

[37] SAC ¶¶130-131.

[38] While plaintiffs originally asserted that this resulted in "$0.05 of the Company's earnings per share miss" (AC ¶75), they now assert that the correct figure is $0.08 per share, or in other words, just a 5.9% difference from the original fourth quarter forecast of $1.35 (SAC ¶¶13 &119).

[39] *See, e.g.*, SAC ¶4.

*exist between different types of instruments) or their implementation will be successful in any particular interest rate environment, as market volatility cannot be predicted.*

\* \* \*

*[T]he change in value of hedges may not equal or completely offset the change in value of the financial asset or liability being hedged.* While we choose hedges we *believe* will correlate effectively with the hedged asset or liability under a variety of market conditions, *"perfect" hedges are not available.* RJN, Ex. A at 96 (2005 Form 10-K).

### 3. <u>Plaintiffs' Hedging Allegations Based On The Opinion Of CW8 Are Legally Deficient For A Multitude Of Reasons</u>

The only new addition to plaintiffs' former hedging allegations comes from CW8 who reportedly left IndyMac in "late 2005" (SAC ¶118), which is *before the class period*. Therefore his statements are legally irrelevant. *See supra* n.12. That aside, CW8 offers little more than vitriolic opinions along the lines that Mr. Perry "'had no idea how to hedge'" and "'did not understand credit risk.'" SAC ¶116. Plaintiffs never reveal the position CW8 had at IndyMac (if he did have a position), whom he reported to, what specific role he played in IndyMac's hedging or how CW8 is in a position to evaluate Mr. Perry's knowledge of hedging. Instead plaintiffs cloak CW8 in a fog of generalities – such as the assertion that he was "involved in all aspects" of IndyMac's hedging (SAC ¶118), and that he has "decades of experience" with "hedge activities." SAC ¶115. Such allegations are insufficient under *Daou*, 411 F.3d at 1015-16. The overall impression one is left with is that this pre-class period employee continues to have an axe to grind[40] and his opinions, unsupported by any specific facts, are legally irrelevant.

### C. <u>Plaintiffs' Pattern Of Repeating The Same Litany Of Allegedly "False" Things About Each Public Statement Has Been Widely Criticized And Is Contrary To The Court's Order</u>

Despite the Court's Order, the SAC engages in the much discredited practice[41] of quoting at length each of IndyMac's public statements and following

---

[40] *See Higginbotham v. Baxter Int'l, Inc.* ___ F.3d ___, 2007 WL 2142298, at \*2 (7th Cir. July 27, 2007) (plausible inference under *Tellabs* that confidential witnesses "have axes to grind").

[41] *See, e.g., Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1243-45 (N.D. Cal.

1  each of them with a standardized litany of alleged problems.[42]  The "litany" fails in

2  every case to plead adequately any defendant's actual knowledge of falsity, or

3  plaintiffs' good faith factual basis for making such an allegation.

4          Paragraph 122 of the SAC exemplifies the problem.  First, paragraph 122

5  asserts that defendants "manipulate[d] underwriting protocols" to "direct that

6  unqualified loans be approved,"[43] a generalized allegation that the Court has already

7  rejected.[44]  Second, paragraph 122 claims that IndyMac "violated rate lock

8  protocols" based upon the assertions of CW1,[45] but as discussed *supra* p.11-12, this

9  only evidences CW1's lack of knowledge.  Third, paragraph 122 asserts that

10  IndyMac "stifle[d]/ignore[d] reports of internal fraud,"[46] a claim belied by the SAC

11  itself.[47]  Fourth, paragraph 122 claims that the defendants directed that loans

12  returned from the secondary market be rewritten to "work."[48]  The basis for this

13  _____

14  1998) ("The 65-page Complaint fails to conform with the presentation requirements
    of Rule 8 and the Reform Act . . . . [It] requires a laborious deconstruction and
15  reconstruction of a great web of scattered, vague, redundant, and often irrelevant
    allegations");  *In re GlenFed Inc. Sec. Litig.*, 42 F.3d 1541, 1554 (9th Cir. 1994) ("A
16  complaint is not a puzzle … and we are loathe to allow plaintiffs to tax defendants,
    against whom they have levelled very serious charges, with the burden of solving
    puzzles."); *Gold v. New Century Financial Corp.*, Case No. CV 07-00931 DDP
17  (JTLx), *slip. op.* at 7 n.6 (C.D. Cal. Jan. 31, 2008) ("The Court should not have to
    comb through the complaint to identify reasonable inferences from the factual
18  allegations to the legal conclusions.").
    [42] *See, e.g.*, SAC ¶¶122-24 (Jan. 26, 2006 conference call), repeated verbatim at
19  ¶¶134 (Sarbanes-Oxley certifications).  Thereafter, plaintiffs repeat the pattern with
    each SEC filing or press release.  *See* SAC ¶139 (April 25, 2006 press release);
20  ¶¶149-50 (July 27, 2006 press release); ¶141 (2006 First Quarter 10-Q); ¶154 (2006
    Second Quarter 10-Q); ¶166 (2006 Third Quarter 10-Q); ¶169 (Jan. 16, 2007 press
21  release); ¶129 (2005 Form 10-K); ¶136 (2006 First Quarter 10-Q); ¶137 (2006 First
    Quarter 10-Q); ¶147 (April 25, 2006 conference call); ¶152 (2006 Second Quarter
22  10-Q); ¶160 (July 27, 2006 conference call); and ¶164 (2006 Third Quarter 10-Q).
    [43] SAC ¶¶122, 124, 134, 149, 158, 162 & 169 (repeating this allegation).
23  [44] *See IndyMac*, 2007 WL 4591930, at *4 (rejecting "generalized allegations . . .
    such as '[t]he Company's policy of 'pushing through' unqualified loans evidences a
24  Company-wide knowledge of IndyMac's underwriting problems.'").
    [45] SAC ¶¶122, 123, 134, 149, 158, 162 & 169 (repeating this allegation).
25  [46] SAC ¶¶122, 124 134, 149, 158, 162 & 169 (repeating this allegation).
    [47] *See supra* n.31 (discussing how the SAC contradicts this assertion); ¶54 (loan
26  decisions being reviewed by management and CW2 recording such reviews in
    Company database); ¶81 (CW4 employed as an auditor to "review[] loan
27  delinquencies for fraud"); ¶83 (CW5 employed as fraud investigator).
    [48] SAC ¶¶122, 124, 134, 149, 158, 162 & 169 (repeating this allegation).
28

OHS West:260375633.13                                    MP&A ISO Motion to Dismiss Plaintiffs'
                                                         Second Amended Class Action Complaint
                                                         (Case No. CV-07-1635 GW (VBKx))

allegation is a corporate "special project" attempting to cure deficiencies in mortgage paperwork, so loans could be sold in the secondary market.  SAC ¶¶93-95.  This sounds like exactly what IndyMac should have been doing to preserve shareholder value.  Finally, paragraph 122 asserts that IndyMac failed to properly engage in "hedging activities," which are not actionable for the reasons discussed above.

Paragraphs 139, 145, 149-50 and 158 essentially repeat paragraph 122 for public statements made in connection with each successive financial reporting period, and paragraphs 149, 158 and 162 assert that because of this litany, defendants' projections were not reasonable.

It should also be noted that despite the nearly verbatim nature of what plaintiffs say was wrong with each public statement, each statement occurred during the course of a rapidly changing factual landscape and, accordingly, those statements said different things.[49]  For example, IndyMac finished the 2006 year squarely within the predicted range of the estimates it offered at the start of the class period.  On January 25, 2006, which marks the start of the class period, IndyMac predicted a 2006 EPS year-end range of $4.50 to $5.20,[50] and IndyMac's year-end result of $4.82 per share (SAC ¶215), was in the middle of that range.  Although IndyMac later raised this estimate in connection with its report of first quarter results on April 25, 2006, the SAC does not assert that the "booming real estate market" (SAC ¶44) had any visible downturn until "August 2006 [when] the medium price of new homes had dropped by almost 3% . . . and sales were down 10% . . . ."  SAC ¶46.

Obviously, things happened fast in 2006, particularly during the second half of the year.  As the SAC acknowledges, IndyMac responded by increasing reserves[51]

---

[49] *See* plaintiffs' "laundry list" allegations and corresponding statements listed at *supra* n.42.

[50] *See* SAC ¶138; RJN, Ex. H at 627 (1-26-06 Press Release).

[51] *See* SAC ¶165 (3Q '06 "reported an approximate $11.0 million increase to loan loss provisions and $5.2 million loan charge-offs . . . ."); ¶221 ("In the fourth quarter of 2006, Defendants increased the provision for loan losses by almost twice that of

1  and giving the market an early earnings warning – something that IndyMac was

2  under no legal obligation to give[52] –when it foresaw that its full year projections

3  would not be reached.  SAC ¶168.  Yet, the litany of what plaintiffs say was wrong

4  with each of IndyMac's public statements remains the same throughout the class

5  period.  This cannot be what the Court intended by its Order.  Plaintiffs constant

6  repetition only demonstrates an absence of anything meaningful to say.

7  **IV.   NONE OF PLAINTIFFS' "MISCELLANEOUS" ALLEGATIONS STATE A SECURITIES LAW CLAIM**

8         Consistent with their "throw it against the wall" approach, plaintiffs repeat a

9  number of previously rejected allegations concerning things like an alleged GAAP

10  violation, misleading statements of optimism, and "false" Sarbanes-Oxley Act

11  certifications.  With one minor exception, all of this simply repeats allegations which

12  the Court previously rejected.

13  **A.   The 80/20 Piggyback Loans Allegations Are Based On A Deliberate Distortion**

14
15         The only new allegation concerns so-called "80/20 Piggyback" loans where

16  plaintiffs leave out some key words and call it a misrepresentation.  IndyMac stated

17  that it had eliminated "80/20 Piggyback loans" in the *subprime* sector.  *See* SAC

18  ¶156 ("we were doing some *piggyback loans in the subprime sector* and we've

19  eliminated *that* product and don't expect to have those losses going forward.").

20  Plaintiffs disingenuously drop the "subprime" part of the sentence and imply that

21  IndyMac said during the class period that it eliminated 80/20 Piggyback loans for *all*

22  categories of debt, which simply is not true.  *See* SAC ¶¶143-44 (defendants

23  "misrepresented the status of IndyMac's involvement in 'piggyback' and subprime

24  loans" because IndyMac "did not 'cut out the products that were causing these

25  _____

26  the entire year . . . "); ¶222 ("increased . . . 'charge-offs, net of recoveries' to $12.8 million by year ended December 31, 2006 or by $7.6 million in the fourth quarter of 2006").

27  [52] *See, e.g.,* 15 U.S.C. §78u-5(d) ("Nothing in this section shall impose . . . a duty to update a forward-looking statement."); *In re Burlington Coat Factory Sec. Litig.*,

28  114 F.3d 1410, 1432 (3d Cir. 1997) (no duty to make or update earnings forecast).

problems' and indeed at least 20% . . . of IndyMac's loan production for the 2006 fourth quarter alone was accounted for by '80/20 Piggybacks.'").[53]  The SAC then quotes IndyMac's March 15, 2007 Form 8-K, which states that IndyMac was still doing 80/20 Piggyback loans in the fourth quarter of 2006, (SAC ¶144).  However, even the chart appended to the Form 8-K has separate sections for "Subprime" and "80/20 Piggybacks" loans.  SAC ¶183.  The two were not coterminous although plaintiffs imply otherwise.

## B.   Plaintiffs' GAAP-Based Allegations Fail To State A Claim

Plaintiffs again make a half-hearted attempt at pleading a GAAP violation, but the current allegations are even weaker than those which the Court previously dismissed.  Whereas once plaintiffs contended in the AC that defendants engaged in "widespread and flagrant violations of the basic and core principles of GAAP" (AC ¶163), the SAC now drops that assertion, as it does the one specific GAAP violation alleged in the AC, which had the unfortunate feature of completely misstating what GAAP required.[54]

Notwithstanding these deletions plaintiffs persist with their previously rejected contention that charge offs and reserves taken in the fourth quarter of 2006 should have been recognized earlier in the year, or perhaps should have been higher.[55]

But plaintiffs' theory fails for a multitude of reasons.  First, as the Court previously recognized, although a GAAP violation may sometimes "provide evidence of scienter . . . . Plaintiffs must first show that there was a GAAP violation."  *IndyMac,* 2007 WL 4591930, at *5.  As the Court noted, "IndyMac's

---

[53] *See also* SAC ¶¶156-57 where this allegation is repeated.

[54] *See* AC ¶150 discussed in Defendants' Reply Brief at III.A.2.

[55] *Compare* SAC ¶219 ("Defendants violated SFAS No. 5 in that during the Class Period IndyMac[] . . . failed to accrue for and/or disclose credit losses that were at least "probable and/or reasonably possible.") *with* AC ¶167 (same); *compare* SAC ¶220 ("Defendants violated SFAS No. 5 . . . [because] they failed to increase their credit reserves . . . until the fourth quarter of 2006) *with* AC ¶169 (same).

1    [2006] financials have been audited without a restatement," and even in this

2    amended pleading plaintiffs have not alleged that there should have been a

3    restatement.  Second, even if IndyMac had violated GAAP, that itself would not be

4    sufficient to establish scienter or to state a claim.  Under well-established Ninth

5    Circuit law, "even deliberate violations of [GAAP] without more do not amount to

6    fraud."  *WOW*, 35 F.3d at 1426 (internal quotation omitted).[56]  Third, even in cases

7    where there has been a restatement, Ninth Circuit law requires that a plaintiff plead

8    when defendants allegedly knew an accounting violation occurred, what its

9    magnitude was, and precisely how plaintiffs know that the violation was the product

10   of an intent to deceive.  *See In re Pacific Gateway Exch., Inc., Sec. Litig.*, 169 F.

11   Supp. 2d 1160, 1167 (N.D. Cal. 2001).[57]  Attempts to plead a GAAP violation based

12   upon assertions that defendants should have made different estimates for

13   contingencies under SFAS 5 (and similar accounting provisions) are particularly

14   suspect as speculative.[58]  The SAC offers no new facts supporting the existence of a

15   GAAP violation or any defendant's knowledge thereof.

   C.    **Plaintiffs Continue To Attempt To Plead A Claim Based On Nonactionable Statements Of General Optimism**

          The SAC also continues to attempt to base a claim on nonactionable

   statements of corporate optimism.[59]  The SAC cites statements by Mr. Perry that

   "IndyMac would do very well in a flat market because we tend to do well when the

─────────────────────

[56] *Accord DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 390-91 (9th Cir. 2002) (despite admitted failure to follow GAAP, the "allegations of negligence are insufficient to establish a strong inference of" scienter).

[57] *Accord In re Software Toolworks, Inc. v. Painewebber, Inc.*, 50 F.3d 615, 628 (9th Cir. 1995) (facts must be pled establishing each defendant's "egregious refusal to see the obvious, or to investigate the doubtful").

[58] *See In re K-tel Int'l Sec. Litig.*, 300 F.3d 881, 893 (8th Cir. 2002) ("The complaint does not explain what specific information was available and how any loss could be reasonably estimated for the . . . 10-Q or the . . . 10-K.  Accordingly, the . . . allegations related to FAS 5 also fail for lack of particularity.").

[59] *Compare* SAC ¶4 ("Defendants portrayed IndyMac as a company that was, and would continue to be, financially stable despite industry-wide downturns . . . .") *with* AC ¶3 ("Defendants falsely portrayed IndyMac as a company that was, and would continue to be, financially stable despite industry-wide downturns . . . .").  Note that the SAC does not allege that IndyMac is currently financially unstable.

market is flat and also when the market is declining" and "our superior execution will result in us performing better than most" (SAC ¶123),[60] as being misleading. These general statements of optimism are not actionable.  *See, e.g., Plevy v. Haggerty*, 38 F. Supp. 2d 816, 827 (C.D. Cal. 1998) ("no reasonable investor would rely upon" statements such as the "[company's] success [is] due to 'its crisp execution'" and "the inherent advantages of [its] business model").[61]

### D.     Plaintiffs' Sarbanes-Oxley Based Allegations Add Nothing

Plaintiffs repeat their assertion that defendants' lack of internal controls violated the provisions of the Sarbanes-Oxley Act ("SOX").[62]  As discussed above, the factual predicate of such a violation is not pled in the SAC.  Furthermore, numerous courts have held that an allegation of a false Sarbanes-Oxley certification adds little or nothing to a Rule 10b-5 case.  *See In re Sourcecorp Sec. Litig.*, 2006 U.S. Dist. LEXIS 41381, at *9 (N.D. Tex. Jun. 6, 2006) ("If [Sarbanes-Oxley certifications were sufficient for a strong inference of scienter] the Court would be hard pressed to avoid finding scienter in any case that contained internal control allegations."); *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006) ("[Under plaintiff's] proffered interpretation of Sarbanes-Oxley, scienter would be established in every case where there was an accounting error . . . thereby eviscerating the pleading requirements for scienter set forth in the [Reform Act]").[63]

---

[60] *Compare* SAC ¶123 *with* AC ¶92 (nearly identical).

[61] *Accord Coble v. BroadVision, Inc.*, 2002 WL 31093589, at *1 (N.D. Cal. Sept. 11, 2002) (holding nonactionable the statement "[w]e firmly believe BroadVision is currently very well positioned not just to survive in this challenging environment, but to thrive and emerge even a stronger player when this economic downturn is over"); *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 868-69 (N.D. Cal. 2004) (statement "consolidation in the DSL market would be very positive for [defendant]" was "run-of-the-mill corporate optimism on which no reasonable investor would rely").

[62] *Compare* SAC ¶¶132-134 & n.9 (referring to SOX certifications in IndyMac's 2005 10-K and Form 10-Q's filed during the class period) *with* AC ¶¶99-101 (similar).

[63] *Accord Cent. Laborers' Pension Fund v. Integrated Elec. Servs., Inc.*, 497 F.3d 546 (5th Cir. 2007); *Morgan v. AXT, Inc.*, 2005 WL 2347125, at *15 (N.D. Cal. Sept. 23, 2005); *In re Invision Techs., Inc. Sec. Litig.*, 2006 WL 538752, at *6 n.3 (N.D. Cal. Jan. 24, 2006); *Limantour v. Cray, Inc.*, 432 F. Supp. 2d 1129, 1160-61

Plaintiffs also repeat verbatim their prior allegation that Mr. Keys' purported ability to change estimates is evidence of weak internal controls.  CW6 asserts that "if Keys had a number in mind, and the forecasts did not reflect that number, Keys had the authority to change it."  SAC ¶99; *compare* AC ¶81.  Note that plaintiffs do not allege Mr. Keys actually changed any forecast, and having the power to make a change does not mean that the process for doing so was undisciplined.

## V.   INDYMAC'S EXTENSIVE RISK DISCLOSURES INVOKE THE REFORM ACT'S SAFE HARBOR PROTECTION

In its Order, the Court declined to rule on the applicability of the Reform Act's safe harbor for forward-looking statements because plaintiffs had not sufficiently "delineate[d] the allegedly false/misleading statements" and the Court felt "the analysis [was] not in sufficiently concrete terms."  *IndyMac*, 2007 WL 4591930, at *5.  Still, the Court noted that "[p]laintiffs would appear to have a hard time convincing the Court that the safe harbor warnings employed [by IndyMac] . . . were the type of 'blanket' or 'boilerplate' warnings discounted" by courts.  *Id.*

Because the SAC is not materially different than its predecessor, the Court may well conclude it is equally unnecessary to decide upon the applicability of the statutory safe harbor in determining the sufficiency of the SAC.  Still, the fact remains that this is fundamentally a projections case which asserts that, "Defendants portrayed IndyMac as a company that was, and would continue to be financially stable despite industry-wide downturns [because of], *inter alia,* . . . hedging activities and strong internal controls."  SAC ¶4.[64]  And the fact remains that defendants gave detailed, non-boilerplate warnings and descriptions of the assumptions inherent in their projections and described exactly the risks which plaintiffs allege came to pass.  Repeatedly and specifically, IndyMac warned about the uncertainty and risks endemic to it and its industry, and cautioned that actual

(W.D. Wash. 2006); *In re Watchguard Sec. Litig.*, 2006 WL 2038656 at *9-10 (W.D. Wash. Apr. 21, 2006); *In re Hansen Natural Corp.*, ___ F. Supp. 2d ___, 2007 WL 3244646, at *7 (C.D. Cal. Oct. 16, 2007).

[64] *Compare* AC ¶3 (similar).

1  results could differ materially from those projected because of "the effect of

2  economic and market conditions including industry volumes and margins; the level

3  and volatility of interest rates; . . . [and] the execution of IndyMac's growth plans

4  and ability to gain market share *in a significant market transition.*"[65]

5      Defendants similarly warned that "[a]ctual results . . . could differ materially

6  from those projected . . . due to . . . the Company's hedging strategies, hedge

7  effectiveness and asset and liability management."[66]  IndyMac's risk factors also

8  specifically identified as a material risk "the accuracy of subjective estimates used in

9  determining the fair value of financial assets of IndyMac [and] the credit risks with

10  respect to [its] loans and other financial assets."[67]  In short, as to each of plaintiffs'

11  key issues, IndyMac provided detailed, substantive warnings that satisfied the

12  statutory safe harbor.  As a matter of law, projections that fail to come to pass based

13  on the occurrence of these clearly identified risks are simply nonactionable.[68]

14      Under the safe harbor's disjunctive test, dismissal is required if *either* (i)

15  meaningful cautionary language accompanies the forward-looking statement, *or* (ii)

16  plaintiffs fail to "prove" contemporaneous "actual knowledge" of falsity.  *See* 15

17  U.S.C. §78u-5(c)(1)(A)&(B).[69]  As the Court noted in addressing the AC "at this

18  _____

19  [65] RJN, Ex. H at 647 (1-26-06 press release); *see also* RJN, Exs. I at 707, J
at 759, K at 806 & L at 845 (4-25-06, 7-27-06, 11-2-06 & 1-16-07 press
20  releases) (similar); RJN, Ex. A at 102 (2005 Form 10-K) ("The mortgage
industry is a cyclical business. . . . As the industry *transitions to a higher
interest rate environment*, the *demand* for mortgage loans is expected to
21  *decrease*, which would cause a *lower level of growth*, or even a *reduction, in
earnings per share . . . .*").
22  [66] RJN, Ex. H at 647 (1-26-06 press release); *see also* RJN, Exs. I at 707, J at 759,
K at 806 & L at 845 ( 4-25-06, 7-27-06, 11-2-06 & 1-16-07 press releases) (similar);
23  *see also* discussion *supra* at IV.B pp.19-20.
24  [67] RJN, Ex. H at 647 (1-26-06 press release); *see also* RJN, Exs. I at 707, J at 759,
K at 806 & L at 845 ( 4-25-06, 7-27-06, 11-2-06 & 1-16-07 press releases) (similar).
25  [68] Each of IndyMac's press releases identified the existence of forward-looking
statements, and cautioned that they were "inherently subject to risks and
26  uncertainties," and that "[a]ctual results . . . could differ materially from those
projected in or contemplated . . ." and then discussed specific risk factors that could
27  cause the Company's actual results to differ materially.  *See* RJN, Exs. H at 647, I at
707, J at 759, K at 806 & L at 845 (1-26-06, 4-25-06, 7-27-06, 11-2-06 & 1-16-07
28  press releases).
[69] *See In re Seebeyond Tech. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1164 (C.D.

point, at the very least, Plaintiffs' allegations of Defendants' 'actual knowledge of falsity' . . . are clearly insufficient." *IndyMac,* 2007 WL 4591930, at *5.  The SAC offers no reason to alter that view.

As far as the adequate cautionary language alternative prong of the safe harbor is concerned, were the Court to address this issue, it should find these detailed warnings sufficient as a matter of law.  The Reform Act's legislative history makes clear that the adequate cautionary language prong of the statutory safe harbor was intended to facilitate dismissals *at the pleading stage*.  *See* H.R. Conf. Rep. No. 369, 104th Cong., 1st Sess., (1995) at 44 ("The use of the words 'meaningful' and 'important factors' are *intended to* provide a standard for the types of cautionary statements upon which a court may, where appropriate, *decide a motion to dismiss, without examining the state of mind of the defendant*.").  While some cases like the *Synopsis* decision cited by the Court have held that a 12(b)(6) motion is too early in the case to decide the safe harbor defense,[70] the weight of authority has recognized that in light of the legislative history and the statute's literal language, dismissals at the pleading stage are exactly what Congress intended should happen.  *See* 15 U.S.C. §78u-5(e) ("on *any motion to dismiss* . . . the court *shall* consider . . . any cautionary statement accompanying the forward-looking statement . . . ."); *Seebeyond,* 266 F. Supp. 2d at 1167 n. 9 (rejecting contention that safe harbor provision involves questions of fact and is thus inappropriate for determination on motion to dismiss); *In re Splash Tech. Holdings Sec. Litig.,* 160 F. Supp. 2d 1059, 1067 (N.D. Cal. 2001) ("Whether a statement qualifies for the safe harbor is an appropriate inquiry on a motion to dismiss."); *In re Immune Response Sec. Litig.,* 375 F. Supp. 2d 983, 1033-

Cal. 2003) (The "two prongs of the safe harbor provision are taken to be independent, alternative means by which a defendant may insulate itself from liability."); *In re Splash Tech. Holdings, Inc. Sec. Litig.,* 160 F. Supp. 2d 1059, 1069 n.4 (N.D. Cal. 2001) ("'subsections (A) and (B) of 15 U.S.C. §78u-5(c)(1) provide alternative means by which forward-looking statements may qualify for the safe harbor. . . .'").

[70] *Wu Group v. Synopsys, Inc.*, 2005 U.S. Dist. LEXIS 42351, at *36 (N.D. Cal. Aug. 10, 2005).

1   36 (S.D. Cal. 2005) (same); *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148,

2   1169 (C.D. Cal. 2007) (same).

3   ## VI.   PLAINTIFFS' SECTION 20(A) CLAIM MUST FAIL

4   Because plaintiffs have failed to state a valid primary claim for a violation of

5   Section 10(b) or Rule 10b-5, their Section 20(a) control person liability claim against

6   the Individual Defendants fails as a matter of law.  *See Heliotrope Gen., Inc. v. Ford*

7   *Motor Co.*, 189 F.3d 971, 978 (9th Cir. 1999).

8   ## VII.   THE SAC SHOULD BE DISMISSED WITH PREJUDICE

9   The "general rule that parties are allowed to amend their pleadings . . . does

10  not extend to cases in which any amendment would be an exercise in futility, or

11  where the amended complaint would also be subject to dismissal." *Steckman v. Hart*

12  *Brewing Inc.*, 143 F.3d 1293, 1298 (9th Cir. 1998).  In this case, plaintiffs' failure to

13  come up with anything more than filler despite the Court's pointed instructions as to

14  what was previously lacking confirms that any further amendment would be futile.

15  The plaintiffs cannot change the core facts or cure their complete inability to

16  adequately plead scienter, and endless rounds of repleading will only harm the very

17  shareholders that plaintiffs purport to represent.  *See Eminence Capital, LLC v.*

18  *Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (plaintiffs' "'repeated failure to

19  cure deficiencies . . . undue prejudice to [defendants] by virtue of allowance of the

20  amendment, [and] futility of amendment'" support dismissal with prejudice).  This

21  case should not have been filed in the first place, and it should now be dismissed

22  with prejudice.  *See Silicon Graphics,* 183 F.3d at 991 (denying leave to amend

23  because defects in the pleadings could not be cured).

24  Dated:  February 19, 2008

      Respectfully submitted,

25    ORRICK, HERRINGTON & SUTCLIFFE LLP

26

27  By:_____*/s/ Daniel J. Tyukody, Jr.*_____
              Daniel J. Tyukody, Jr.

28  Attorneys for Defendants