FILED

1 | Lionel Z. Glancy (Bar No. 134180)
Peter A. Binkow (Bar No. 173848)
2 | Neal A. Dublinsky (Bar No. 135712)
GLANCY BINKOW & GOLDBERG LLP
3 | 1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067
4 | Tel: (310) 201-9150
Fax: (310) 201-9160

5

*Liaison Counsel for Plaintiffs*

6

7 | Christopher L. Nelson (Pro Hac Vice)
Lauren Wagner Pederson (Pro Hac Vice)
8 | John J. Gross (Pro Hac Vice)
BARROWAY TOPAZ KESSLER
  MELTZER & CHECK, LLP
9 | 280 King of Prussia Road
Radnor, PA 19087
10 | Tel: (610) 667-7706
Fax: (610) 667-7056
11

12 | Ramzi Abadou (Bar No. 222567)
BARROWAY TOPAZ KESSLER
13 |  MELTZER & CHECK, LLP
580 California Street, Suite 1750
14 | San Francisco, California 94104
Phone: (415) 400-3000
15 | Fax: (415) 400-3001

16 | *Lead Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**

17 | **CENTRAL DISTRICT OF CALIFORNIA**

18

19 | WAYMAN TRIPP and SVEN          Case No. 07-CV-1635-GW (VBK)
MOSSBERG, Individually and on
20 | Behalf of all Others Similarly Situated,

21 |                                **FIFTH AMENDED CLASS**
                               **ACTION COMPLAINT FOR**
                    Plaintiffs, **VIOLATIONS OF SECTIONS 10(b)**
22 |                                **AND 20(a) OF THE SECURITIES**
            v.                 **EXCHANGE ACT OF 1934**
23 | INDYMAC BANCORP, INC. and
MICHAEL W. PERRY,
24 |                                **JURY TRIAL DEMANDED**

25 |                  Defendants.

26

27

28

FIFTH AMENDED CLASS ACTION COMPLAINT

2009 OCT -5 PM 3: 29

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY_____

1

## TABLE OF CONTENTS

2

3     I.      NATURE OF THE ACTION ............................................................3

4     II.     JURISDICTION AND VENUE .......................................................9

5     III.    PARTIES............................................................................................9

6     IV.    THE COMPANY'S UNDERWRITING CONTROLS WERE
7             INADEQUATE OR UNDERMINED BY DEFENDANT PERRY,
8             RENDERING DEFENDANTS' PUBLIC STATEMENTS
9             FALSE ............................................................................................ 10

10      A.    Underwriting Background................................................................ 11

11      B.    Facts Supporting a Strong Inference that IndyMac Regularly
12            Overrode its Stated Underwriting Practices on a Companywide
13            Basis During the Class Period and that Perry was Either Aware
            of, or Caused, the Same.................................................................. 13

14      C.    Examples of Conduit-Generated 80/20 Piggyback Loans
15            that Suffered Early Payment Defaults and Contributed to
16            IndyMac's 2006 Fourth Quarter Losses and Losses that Should
17            Have Been Incurred Earlier in 2005 and 2006 .............................. 26

18       1.     Silver State Toxic Loan Pool....................................................... 26

19       2.     Lancaster Toxic Loan Pool .......................................................... 31

20       3.     Geneva Toxic Loan Pool.............................................................. 35

21     V.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS 40

22      A.    2005 Annual Report on Form 10-K................................................ 40

23      B.    2006 First Quarter Form 10-Q....................................................... 42

24      C.    April 25, 2006 Conference Call ...................................................... 43

25      D.    2006 Second Quarter Form 10-Q................................................... 45

26

27

28

---

E.    September 13, 2006 Lehman Brothers Presentation .................... 45

F.    September 21, 2006 RBC Financial Institutions Conference....... 50

G.    2006 Third Quarter Form 10-Q.......................................... 51

H.    November 2, 2006 Conference Call.................................... 52

VI.    LOSS CAUSATION/ECONOMIC LOSS ...................................... 53

A.    The Truth About the Company's True Condition Begins to
Emerge as Defendants Disclose that IndyMac had Saddled Itself
with Toxic Loans as a Result of its Poor Underwriting Practices
Thereby Causing Substantial Charges and Increased Loan Loss
Reserves............................................................................ 55

VII.    POST CLASS PERIOD DISCLOSURES: THE OFFICE OF THE
INSPECTOR GENERAL'S AUDIT REPORT ......................... 68

VIII.    ADDITIONAL FACTS SUPPORTING DEFENDANTS'
SCIENTER ................................................................... 71

A.    Perry's Certifications ................................................... 71

B.    Perry's Financial Incentive............................................. 74

IX.    APPLICABILITY OF THE PRESUMPTION OF
RELIANCE_FRAUD-ON-THE-MARKET DOCTRINE............. 75

X.    NO STATUTORY SAFE HARBOR EXISTS FOR DEFENDANTS'
STATEMENTS.................................................................. 76

XI.    CLASS ACTION ALLEGATIONS.................................... 76

XII.    FIRST CLAIM ............................................................ 78

XIII.    SECOND CLAIM ........................................................ 80

XIV.    PRAYER FOR RELIEF................................................. 80

XV.    JURY TRIAL DEMANDED .......................................... 81

1    Lead Plaintiffs, Wayman Tripp and Sven Mossberg (collectively,
2  "Plaintiffs" or "Lead Plaintiffs"), individually and on behalf of all others similarly
3  situated, by and through their attorneys, allege the following based upon personal
4  knowledge as to themselves, and information and belief as to all other matters,
5  including an investigation conducted by Plaintiffs' counsel.  This investigation
6  included a review and analysis of all filings made with the Securities and
7  Exchange Commission ("SEC") by IndyMac Bancorp, Inc. ("IndyMac" or the
8  "Company") during the relevant time period, as well as securities analyst reports,
9  press releases, media reports and other publications issued by and through the
10 Company and interviews with numerous former employees of IndyMac.

11 **I.    NATURE OF THE ACTION**

12
13    1.    This is a class action brought by Lead Plaintiffs on behalf of all
14 persons and entities who purchased and/or otherwise acquired common stock of
15 IndyMac from March 1, 2006 through March 1, 2007, inclusive (the "Class
16 Period") and were damaged thereby (the "Class").  Lead Plaintiffs seek to pursue
17 remedies under the Securities Exchange Act of 1934, 15 U.S.C.S. § 78 *et seq.*
18 (the "Exchange Act").

19    2.    Defendant IndyMac is the holding company for IndyMac Bank
20 F.S.B., which operates as a hybrid thrift/mortgage banker (collectively,
   "IndyMac" or the "Company").

21    3.    From 2001 until 2006, the United States experienced a "bubble" in
22 the housing market resulting in inflated home valuations, and a related
23 refinancing boom.  This "bubble" was driven by ever-loosening underwriting
24 standards by mortgage lenders and securitizers such as IndyMac.  During this
25 period, IndyMac grew by focusing on utilizing Alt-A, negative/interest only
26 amortizing loans, and other high risk loans. By the third quarter of 2006,
27
28

---

1    IndyMac was a top Alt-A lender with over approximately $49 billion in Alt-A

2    production which represented 77.5% of IndyMac's total origination volume. *See*

3    Zelman Credit Suisse Analyst Report, "Mortgage Liquidity du Jour:

4    Underestimated No More," March 12, 2007.

5         4.    The booming real estate market opened up new opportunities for the

6    Company to deal in higher-risk loans. IndyMac's mortgage production during

7    this time was focused on the adjustable rate mortgage and 80/20 piggyback

8    product mix. Indeed, during the fourth quarter of 2006, IndyMac produced

9    approximately $5 billion of 80/20 piggyback loans, despite the fact that these

10   loans were becoming increasingly risky during this time period. IndyMac was

11   also generating a significant percentage of its loan production from low/no

12   documentation loans (stated income Alt-A loans) now generically referred to as

13   "liars' loans" because they were subject to widespread fraud during the real estate

14   boom.

15        5.    By August, 2006, however, the median price of new homes had

16   dropped by almost 3%, existing home inventories were 39% higher than one year

17   before and sales were down by 10% from the prior year. *See The No Money*

18   *Down Disaster*, Barron's, August 21, 2006. In addition, a significant number of

19   subprime lenders began to close shop during 2006, causing dislocation in the

20   housing market.

21        6.    Notwithstanding the downturn in the real estate market, Defendants

22   portrayed IndyMac as a stable and growing company that would not only weather

23   the bad times facing the mortgage industry, but would emerge from troubling

24   times even stronger. Indeed, even given the negative news hammering the rest of

25   the mortgage industry, IndyMac boldly touted its operating performance.

26        7.    Defendant Michael W. Perry ("Perry") recognized that in order for

27   IndyMac to continue to grow in difficult times (which he thought 2006 would

28

---

FIFTH AMENDED CLASS ACTION COMPLAINT

4

1  be), the Company would have to loosen underwriting standards and quickly
2  dispose of risky mortgage loans before borrowers defaulted, by selling them
3  outright or securitizing them and selling them. The market, however, was
4  unaware of the extent to which Perry had manipulated the Company's
5  underwriting controls, and the exposure it faced from its obligations to buy back
6  bad loans. Perry's plan, for a time, worked, and by the beginning of the Class
7  Period the Company had a new market share high of 2.5% in the fourth quarter of
8  2005, and its compound annual growth in mortgage production since the first
9  quarter of 1999 was an astounding 44% compared to a mortgage industry average
10  of 8% to 16% for the top five mortgage loan lenders. Perry and the Company are,
11  collectively, "Defendants."

12      8.      At the same time, Defendants issued numerous materially false and
13  misleading statements concerning, *inter alia,* IndyMac's growth and stability,
14  resulting from the quality and success of the Company's strong
15  internal/operational controls and underwriting.

16      9.      In reality, however, IndyMac's internal/operational controls were
17  grossly deficient. According to several former IndyMac employees, the
18  Company's management, including Perry, exploited internal/operational control
19  weaknesses or simply overrode controls to drive loan originations and sales
20  growth. For example, a former IndyMac vice-president states Perry sought to
21  make his short term goals for the Company "at all costs." To this end, Perry put
22  immense pressure on subordinates to "push loans through," even if it meant
23  consistently making "exceptions" to the Company's guidelines and policies (at
24  the expense of the Company's future).

25      10.     Other confidential witnesses ("CWs") – former employees of
26  IndyMac before and during the Class Period – report an atmosphere of
27  "organized chaos" at the Company where loan closings were done on an

28

1    "anything goes" basis. According to these witnesses, the following practices,

2    which were contrary to stated Company policies, were employed to close loans:

3    (a) intentionally manipulating software used to compute loan eligibility; (b)

4    violating stated rate lock protocols and controls; and (c) disregarding

5    underwriting guidelines generally. Instead, the focus was on growing loans

6    without the required documentation, while reporting fraud or concerns with

7    transactions was *discouraged*.  These witnesses, whose statements are detailed

8    below, state that all this occurred with the knowledge and direction of senior

9    management.

10          11.    For a period of time, the Company was able to play "hot potato"

11   with these poor quality loans, selling them off quickly through the securitization

12   market before the borrowers defaulted. However, IndyMac's ability to pass off

13   these "hot potato" loans began to dramatically decline near the end of the Class

14   Period as the secondary market became less liquid and information about

15   IndyMac's lax credit quality practices began to seep into the marketplace. Many

16   of the companies IndyMac sold these loans to promptly returned them to

17   IndyMac pursuant to warranty provisions contained in the respective sale

18   contracts.  Thus, IndyMac was stuck with a substantial portion of loans that

19   defaulted quickly and which IndyMac was unable to resell to the secondary

20   market.

21          12.    On January 16, 2007, news began to trickle out from the Company

22   about the adverse impact that Defendants' actions had on IndyMac.  On January

23   16, 2007, IndyMac issued a press release forewarning of a substantial earnings

24   shortfall caused by credit losses and increases in provisions for loss reserves as a

25   result of the Company's impaired loans.  As a result, and for the first time, the

26   public began to understand the precarious condition of IndyMac's operations as

27

28

FIFTH AMENDED CLASS ACTION COMPLAINT

6

evidenced by, for example, an analyst downgrading IndyMac shortly after the January 16, 2007 Press Release.

13.    IndyMac's January 16, 2007 partial disclosure caused its stock to tumble to $40.50 at close, down from $43.55 at close on January 12, 2007 (the prior trading day).

14.    On January 25, 2007, Defendants issued a press release (the "January 25, 2007 Press Release"), which informed the market that the Company had not met its forecasted results for the fourth quarter of 2006, primarily because the Company doubled its credit reserves from the previous quarter to cover the massive number of defaults on the loans it had underwritten.

15.    Also on January 25, 2007, the Company revealed that several of the business areas Defendants had touted as its strongest virtues were, in actuality, profoundly weakened and impaired, and that the Company experienced a substantial negative financial impact as a result of losses from bad/uncollectible loans held by the Company.  Specifically, IndyMac admitted that "Higher credit mark-to-market losses in Q4 06 were concentrated in the prime 80/20 and subprime products."  As described fully below, IndyMac purchased a significant amount of 80/20 piggyback loans from third-party brokers through its Conduit Division that suffered a severe rate of early payment defaults before and during the Class Period (see discussion of Silver State-, Geneva- and Lancaster-originated loans, at ¶¶85-115).  In addition, the OIG Audit Report severely criticized IndyMac's reckless interactions with conduit lenders and underwriting of 80/20 piggyback loans.  (*See* ¶¶35-42, 193-197 below.)

16.    Perry added that IndyMac's supposedly superior internal/operational controls were insufficient in a conference call with investors that coincided with the January 25, 2007 disclosures.  For example, Perry admitted that, "[o]ur provision for loan losses is increasing. . . Credit quality generally is deteriorating

---

so I would say that's something we have to do a better job forecasting, and clearly we want to be a little more conservative as it relates to that... This is something we should have done a better job forecasting on. This is something that we probably could have seen better if we had more precise models . . ."

17.    IndyMac's January 25, 2007 partial disclosure caused its stock to tumble to $37.71 at close, down from $40.70 at close on January 24, 2007.

18.    The full truth regarding the Company's condition and Defendants' Class Period statements was revealed on March 1, 2007, when Defendants issued a press release entitled "IndyMac Issues 2006 Annual Shareholder Letter, Updating 2007 Forecast" (the "March 1, 2007 Press Release"). In the March 1, 2007 Press Release, Perry *admitted that the Company had "loosened its lending standards"* during 2006, and promised that the Company would be, going forward, "smart and prudent" in managing its underwriting guidelines and risk.

19.    IndyMac's March 1, 2007 corrective disclosure, which disclosed the Company's true condition, caused its stock price to fall to $32.16 at close, down from $34.33 on February 28, 2007 and a far cry from the Class Period high of $50.11 on May 8, 2006.

20.    On July 8, 2008, the FDIC seized IndyMac and subsequently fired Perry and the Company's other senior management. As a result, the FDIC will have suffered losses of approximately $10.7 *billion* dollars.

21.    On February 26, 2009, the Office of Inspector General ("OIG"), Department of the Treasury announced the results of its investigation of IndyMac's demise in an Audit Report (the "Audit Report"),[1] finding, *inter alia*,

---

[1]    Plaintiffs filed a true and correct copy of the Audit Report with the Court on March 3, 2009 as Exhibit A to the Declaration of Andy Sohrn in Support of Plaintiffs' Opposition to Defendant Perry's Supplemental Motion to Strike Allegations in the Third Amended Complaint. (Dkt. Item No. 149)

1  that the "underlying cause of [the Company's] failure was the unsafe and
2  unsound manner in which the thrift was operated" and that the Company was
3  well aware of material deficiencies in the Company's underwriting controls
4  before, during, and after the Class Period.

## II.    JURISDICTION AND VENUE

6
7        22.    The claims asserted herein arise under and pursuant to Sections
8  10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78(j)(b) and 78(t)), and Rule
   10b-5 promulgated there-under (17 C.F.R. § 240.10b-5).
9        23.    This Court has jurisdiction over the subject matter of this action
10
11 pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. §
   1331(b).
12
        24.    Venue is proper in this Judicial District pursuant to § 27 of the
13
14 Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Many of the acts and
15 transactions alleged herein, including the preparation and dissemination of
16 materially false and misleading information, occurred in substantial part in this
17 Judicial District.  Additionally, the Company maintains its principal executive
   office in this Judicial District.
18
19        25.    In connection with the acts, conduct and other wrongs alleged in this
20 Complaint, Defendants, directly or indirectly, used the means and
21 instrumentalities of interstate commerce, including but not limited to, the United
22 States mails, interstate telephone communications and the facilities of the
23 national securities exchange.

## III.   PARTIES

### Plaintiffs
25
26        26.    Lead Plaintiffs, as set forth in their certifications previously filed
27 with the Court and incorporated by reference herein, purchased IndyMac stock at

28

1    artificially inflated prices during the Class Period and have suffered damages as a

2    result of the wrongful acts of Defendants as alleged herein.

3

4    **Defendants**

5         27.    IndyMac was, at all relevant times, the seventh largest savings and

6    loan and the second largest independent mortgage lender in the nation,

7    maintaining its principal executive offices at 888 East Walnut Street, Pasadena,

8    California, 91101.  As of December 31, 2006, IndyMac reported total assets of

9    over $29 billion and a market capitalization of $3.2 billion.

10        28.    Perry was, at all relevant times, Chairman of IndyMac's Board of

11   Directors and Chief Executive Officer of IndyMac.  Perry is a Master Certified

12   Mortgage Banker, as designated by the Mortgage Bankers Association, and is a

13   Certified Public Accountant.  Prior to working in the mortgage industry, Perry

14   spent four years as an auditor with KPMG Peat Marwick.  Perry reviewed,

15   approved and signed IndyMac's false and misleading SEC filings, including the

16   2005 Form 10-K and all 2006 Form 10-Qs, and issued numerous other false and

17   misleading public statements during the Class Period.

18   **IV.    THE COMPANY'S UNDERWRITING CONTROLS WERE**
19   **        INADEQUATE OR UNDERMINED BY  DEFENDANT PERRY,**
20   **        RENDERING DEFENDANTS' PUBLIC  STATEMENTS FALSE**

21

22        29.    During the Class Period, the Company, directed by defendant Perry,

23   engaged in a pattern and practice of overriding and abandoning its own loan

24   underwriting guidelines, approving substantial numbers of high-risk loans for the

25   purpose of increasing reported loan volume.  IndyMac's significant departure

26   from its own loan underwriting guidelines was facilitated by the Company's

27   grossly deficient underwriting and auditing controls, exposing the Company to a

28

1  vast amount of undisclosed risk – a risk further enhanced by IndyMac's practice

2  of approving these loans with little or no documentation from borrowers ("stated

3  loans" or "liars' loans").  Defendants failed to disclose the true condition of the

4  Company's business, and misled the public with regard to the rigor of IndyMac's

5  loan origination process and the quality of its loans.

6       30.    As a result of the foregoing problems, Plaintiffs allege that the

7  Company's Class Period statements regarding internal/operational controls and

8  underwriting practices were false when made.  Plaintiffs further allege that Perry

9  either knew of, or was reckless in not knowing of, the foregoing problems *or*

10 actually caused those problems, himself.

11      **A.    Underwriting Background**

12      31.    Before discussing Perry's conduct and knowledge, it is first

13 necessary to discuss underwriting in general, how/where IndyMac acquired the

14 loans it underwrote, and how the Company underwrote those loans.

15      32.    Underwriting in the context of mortgage lending should consist of a

16 detailed analysis of a borrower's creditworthiness.  When underwriting a

17 mortgage loan, an issuer should analyze credit information furnished by the

18 potential borrower (such as employment and salary information) in conjunction

19 with information provided from outside sources (such as agency credit reports

20 and scores).  IndyMac uses a software program called "e-MITS" to assist in this

21 process, which computes interest rates based on information such as the above (as

22 entered).

23      33.    Accurate underwriting is essential to the success of any business

24 extending loans, including mortgage companies such as IndyMac because,

25 without accurate underwriting, a company cannot (i) evaluate how likely a loan is

26 to be repaid; (ii) attach a particular interest rate to a loan based on

27

28

FIFTH AMENDED CLASS ACTION COMPLAINT

11

1   creditworthiness; or (iii) accurately price the loan for sale in the secondary
2   market.

3        34.     IndyMac acquired mortgages principally through four channels:
4   mortgage professionals, consumer direct, correspondents and conduits.

5               (a)     Mortgage professionals include mortgage brokers, mortgage
6   bankers, financial institutions, and homebuilders who have taken applications
7   from prospective borrowers and submitted them to IndyMac. Eighty-six percent
8   of IndyMac's loans were derived from mortgage professionals in 2006. IndyMac
9   2006 Form 10-K filed on March 1, 2007 (the "2006 10-K") at 7.

10              (b)     Correspondent channel loans are obtained through mortgage
11  brokers, mortgage bankers, financial institutions, and homebuilders who sell
12  previously funded mortgage loans to IndyMac. They are a sub-section of the
13  mortgage professional channel of loans, as disclosed in IndyMac's 2006 10-K.
14  Eleven percent of IndyMac's mortgage loan business came from this channel.
15  Derived from 2006 10-K at 40.

16              (c)     Conduit procurement is where IndyMac acquires pools of
17  mortgage loans in negotiated transactions either with the original mortgagee or an
18  intermediate owner of mortgage loans.[2] They are a sub-section of the mortgage
19  professional channel of loans, as disclosed in IndyMac's 2006 10-K. Thirty-three
20  percent of IndyMac's mortgage loan business came from this channel. Derived
21  from 2006 10-K at 40.

22

23

24

25   [2] IndyMac approved each of the above-described mortgage loan sellers prior to
     the initial transaction on the basis of the seller's financial and management
26   strength, reputation and prior experience. According to IndyMac, sellers were
     periodically reviewed and if their performance, as measured by compliance with
27   the applicable loan sale agreement, was unsatisfactory, IndyMac would cease
     doing business with them.
28

FIFTH AMENDED CLASS ACTION COMPLAINT

1        (d) Consumer direct involves mortgage loans initiated through direct

2    contact with the borrower.  This contact may arise from Internet advertising and

3    IndyMac web site traffic, affinity relationships, company referral programs,

4    realtors and retail banking branches, located mostly in Southern California. Only

5    2% of IndyMac's mortgage loan business was derived from this channel. Derived

6    from 2006 10-K at 40.

**B.**     **Facts Supporting a Strong Inference that IndyMac Regularly Overrode its Stated Underwriting Practices on a Companywide Basis During the Class Period and that Perry was Either Aware of, or Caused, the Same**

    35.    IndyMac's undisclosed loosening of its underwriting guidelines saddled the Company with substantial amounts of high-risk loans, such as 80/20 piggyback and conduit channel loans.

    36.    As confirmed in the OIG Audit Report at page 2: "IndyMac's business model was to offer loan products to fit the borrower's needs, using an extensive array of risky...subprime loans, 80/20 loans, and other nontraditional products.  Ultimately, loans were made to many borrowers who simply could not afford to make their payments." As detailed in the Audit Report at page 12, the risks associated with 80/20 piggyback loans were further compounded by IndyMac's deficient appraisal process by which IndyMac assigned inflated values to the underlying properties.

    37.    Further, "[t]o increase loan production, IndyMac relied heavily on outside mortgage brokers to originate loans." (Audit Report at 21)  "This became such a large part of IndyMac's operations that a separate unit, the Conduit Division, was set up to purchase loans in bulk from other loan originators" (*Id.*)

FIFTH AMENDED CLASS ACTION COMPLAINT

1    38.    IndyMac's Conduit Division grew significantly and quickly, from

2  generating under $3 billion in loans in 2003, to generating nearly $30 billion in

3  loans at its peak in 2006. (Audit Report at 22)

4    39.    However, reliance on outside mortgage brokers carried with it higher

5  credit risks as conduit channel loans were particularly prone to underwriting

6  deficiencies.  IndyMac was aware of such problems as early as 2005, when

7  IndyMac's internal audit group reported problems with the Conduit Division.

8  [Audit Report at 22]  "Specifically, because of concerns the [audit] group had in

9  the [conduit] division's loan approval and underwriting process, it recommended

10  that the division increase investment in infrastructure and personnel."

11    40.    Indeed, in 2006, IndyMac's independent auditor also expressed

12  concerns with the Conduit Division being "a financial reporting control

13  deficiency."  The independent auditor also recommended that the conduit

14  division "strengthen controls."

15    41.    Ultimately, IndyMac's problematic Conduit Division and the

16  deficient loans originated thereby led to the Office of Thrift Supervision ("OTS")

17  citing "major weaknesses" in its review on January 8, 2007. (Audit Report at 23,

18  67-68) The OTS specifically stated that IndyMac must, *inter alia*, "[e]nsure the

19  Conduit Division corrects the internal audit findings…and ensure the Division is

20  operating in a strong internal controls environment… [and have] the Division []

21  develop more robust, transparent management reports"; and "[e]stablish a policy

22  and related procedures for the identification and classification of troubled

23  collateral dependent loans." (*Id.* at 67)

24    42.    Shortly after the OTS review, IndyMac belatedly recognized that

25  losses were occurring from the Conduit Division and closed it.  (*Id.* at 23)

26    43.    Confidential Witness Number 1 ("CW 1") is a former Vice President

27  of the Company's Central Banking Group.  CW 1 reported directly to Ashwin

28

1   Adarkar ("Adarkar"), Executive Vice President, Chief Executive Officer, New

2   Business Incubation, Organizational Effectiveness and Mergers and Acquisitions.

3   As such, Adarkar's duties included "operating new or underperforming

4   businesses." March 23, 2007 Proxy at 6. Adarkar reported directly to defendant

5   Perry. CW 1 was employed at IndyMac from October, 2004 through March,

6   2006. CW 1 was directly involved in supervising many aspects of the

7   Company's underwriting activities, and had regular contact with the most senior

8   managers and officers of the Company. CW 1 described in detail the many

9   problems in the Company's underwriting guidelines, policies, and controls.

10          44.    According to CW 1, Adarkar was directly pressured by his/her

11  superiors, including Perry, to "push loans through" regardless of whether they

12  satisfied the Company's underwriting guidelines. Adarkar passed on these orders

13  to CW 1, and his/her subordinates, who were actually instructed to abandon

14  approval guidelines and "push all loans through for approval which came in the

15  door."

16          45.    CW 1 explained that in pushing the loans through, the Company did

17  not officially "change" the Company's underwriting guidelines and policies, but

18  rather, institutionalized "exceptions to the rules" that allowed the Company to

19  approve loans that should have been denied under the actual guidelines.

20  According to CW 1, the exceptions were made across the board, for all classes of

21  loans (prime, Alt-A, and sub-prime, as discussed in detail, below). CW 1 stated

22  that most of the exceptions were made in reporting the borrower's stated

23  income/assets.

24          46.    Confirming the statements of other CW's, CW 1 explained that

25  many of the exceptions occurred despite the Company's much vaunted e-MITS

26  system (described above at ¶32), which was supposed to prevent gaming of the

27  Company's underwriting guidelines. The problem, however, was that e-MITS

28

1    was a "junk-in, junk-out" system that was only as good as the information it was
2    provided.  That is, if underwriters wanted approval for a loan that did not satisfy
3    the Company's underwriting guidelines, they would simply need to input
4    information that was not reflective of the borrower's true characteristics and e-
5    MITS would provide approval based on the false information entered by the
6    underwriter.  As noted, above, this conduct was engaged in at the direction of
7    Adarkar, who passed along the orders of defendant Perry and other senior
8    managers.
9        47.    In addition to violating the Company's underwriting guidelines, CW
10   1 stated that the Company's Central Banking Group regularly and as a matter of
11   course violated the Company's controls over loan production by prematurely (and
12   improperly) funding loans to meet production and revenue goals.  CW 1 raised
13   this issue with Adarkar, and the Central Banking Group was "written up" by the
14   Company's Compliance Department, to no avail.
15       48.    Similarly, according to CW 1, defendant Perry directed Adarkar (and
16   thus, the Central Banking Group) to engage in violations of the Company's "rate
17   lock" protocols and controls.  Essentially, a rate lock is a commitment by a lender
18   guaranteeing a specified interest rate for a specified period of time.  Here, once a
19   rate-lock expired rather than re-pricing the terms of a loan to account for
20   fluctuations in the credit market, the Company allowed the loans to proceed on
21   the now-expired prior terms.  As a result, the customer was able to capture the
22   gains associated with the prior (lower) rate to the detriment of the Company.
23   This was a problem because it drastically impacted the profitability of loans on
24   the back-end *but appeared to have no impact on the front end*.  Thus, the
25   Company was able to achieve revenue and volume targets in the short-run, while
26   exposing itself to tremendous losses on the back end of the loan.
27
28

1    49.    According to CW 1, the Company engaged in these practices at the

2    express behest of defendant Perry (again through Adarkar) so that the Company

3    could make its short term goals "at all costs."

4    50.    Finally, CW 1 stated that direct fraud and "lying" by loan sales

5    representatives was rampant at IndyMac.  Specifically, loan sales representatives

6    solicited "fraudulent" letters from CPAs in connection with the purported

7    verification of customer income.  CW 1 stated that it was obvious that the letters

8    were fraudulent, and that he/she repeatedly reported the fraud to Adarkar and that

9    though upper management, including defendant Perry, was aware of this fraud

10   (and the other underwriting fraud), they nonetheless continued to pressure

11   employees to "close loans at all costs."

12   51.    According to CW 1, every time he/she complained about the fraud,

13   or attempted to institute a review committee to control the fraud, his/her efforts

14   were rebuffed by upper management.

15   52.    Confidential Witness Two ("CW 2") was an underwriter for

16   IndyMac from March, 2005 until June 30, 2007.  In this position, CW 2 was

17   responsible for writing and reviewing loan applications.

18   53.    According to CW 2, loan originations increased significantly during

19   his/her tenure at the Company.  CW 2 directly attributed this increase to relaxed

20   underwriting guidelines and the closing of "questionable deals."

21   54.    CW 2 stated that when he/she first started at IndyMac, there was a

22   very strict environment regarding loan originations; however, toward the end of

23   his/her employment, this had evolved into "organized chaos" that was little more

24   than a "free-for-all" where "anything goes" to get a loan closed.

25   55.    These changes were expressly mandated by IndyMac's senior

26   management to drive loan origination volume.  CW 2 stated underwriters were

27   encouraged by management to "push through loans" that normally would not be

28

1   closed.  During the origination process, all loans that were not closed and

2   processed because of borrower qualification issues had to be reported to

3   management.  Management was consistently giving the "green light" on loans

4   that CW 2 would not have closed.  For example, if a loan was submitted based on

5   income, and income could not be verified, managers would look to verify bank

6   account balances.  Even if the source of funding for the balance in the bank

7   account could not be verified, managers would try to use unsubstantiated bank

8   account balances as verification of income.  CW 2 also noted that appraisal

9   values were adjusted in order to "make the loan work."

10      56.    CW 2 stated that, in several instances, management overturned

11  his/her decision to not approve a loan, which CW 2 documented in his/her

12  "working notepad field" in e-MITS.

13      57.    According to CW 2, as a result of lax underwriting guidelines and

14  bad loan push-throughs, loan delinquencies had increased significantly at

15  IndyMac by mid-2006.

16      58.    Further according to CW 2, the increases in bad loans and push

17  throughs is not surprising, as the Company directly rewarded underwriters and

18  managers with bonuses for reaching loan origination targets.  That is,

19  underwriters were issued bonuses one month after loan targets were reached

20  without regard to whether the loans ultimately ended in default.  This Company

21  policy incentivized the issuance of loans without regard to quality or the

22  creditworthiness and encouraged "making deals work" that should not have

23  worked, according to CW 2.

24      59.    Confidential Witness Number Three ("CW 3") is a former Vice

25  President and Director of Financial Institutions, Correspondent Lending, in

26  IndyMac's Mortgage Banking Segment.  CW 3 was employed by IndyMac from

27  July, 2003 until January, 2006, and was directly responsible for (i) designing and

28

1    implementing sales and marketing for IndyMac's business loan division; and (ii)

2    overseeing loan production and acquisition for the Company's Correspondent

3    Lending Department. Although CW 3 left IndyMac at or about the beginning of

4    the Class Period, his/her statements are particularly germane, in that they detail

5    the many problems that were, by the beginning of the Class Period, already

6    impairing the Company's ability to underwrite its loans effectively.

7         60.    According to CW 3, by the beginning of the Class Period, due to its

8    desire to keep up with the rest of the players in the industry, IndyMac had been

9    forced to become extremely aggressive with its underwriting guidelines.

10    Specifically, to keep pace with competitors in terms of loan origination volume,

11    by the time CW 3 left IndyMac in January 2006, the Company had greatly

12    loosened its underwriting guidelines in order to drive volume and bring in more

13    loan sales (as noted by the other CWs).

14         61.    Additional witnesses confirm the change in the Company's focus,

15    explain how the Company "loosened" its underwriting quality guidelines, and

16    expound on the impact thereof.

17         62.    Confidential Witness Four ("CW 4") is a former IndyMac Senior

18    Auditor, Post Purchase Quality Control, Central Mortgage Operations, who

19    worked for the Company from December 1, 2003, through July 19, 2007. CW 4

20    was responsible for reviewing loan delinquencies for fraud or misrepresentations

21    in the documents, and determining whether the loan's underwriting comported

22    with IndyMac's guidelines, policies and procedures. Prior to being promoted to

23    Senior Auditor, CW 4 was a Senior Underwriter with IndyMac, and is intimately

24    familiar with all aspects of the Company's loan underwriting.

25         63.    According to CW 4, throughout the Class Period, CW 4 saw an

26    increasing number of loans that appeared to have been issued only through

27    fraudulent or misrepresented documentation. He/she also saw a substantial

28

1   increase in the number of loan delinquencies.  CW 4 stated that this increase

2   represented an increase in the number of defaults attributable to

3   misrepresentations and fraud in the loan applications, not in the number of

4   "straight default" cases (which are typically caused by a change in circumstance,

5   such as divorce or change in employment status).  CW 4 stated that the increase

6   of loans in default because of misrepresentations in the origination process was

7   due to relaxed underwriting guidelines, and approvals of borderline loans on the

8   front end.  That is, loans were being approved to individuals with insufficient or

9   false documentation for the loans that they were seeking *because* the

10  underwriting guidelines had been relaxed.

11        64.     This is confirmed by Confidential Witness Five ("CW 5"), who was

12  an Investigator, Fraud Investigation Department, Post Purchase Quality Control,

13  Central Mortgage Operations, at IndyMac from December 2004 until July 17,

14  2007.  In this position, CW 5 investigated loans suspected of being delinquent

15  due to fraud and reported his/her findings to management.

16        65.     According to CW 5, during the Class Period, the quality of the loans

17  originated became a running joke within the Company. In particular, certain loans

18  with deficient documentation or that were issued to borrowers unable to pay them

19  back became known as "Disneyland Loans."  These loans were called Disneyland

20  Loans, referring to a loan issued to a Disneyland *cashier* who claimed in his/her

21  application that he/she earned $90,000 per year – a proposition that, on its face,

22  belies logic and even common sense given prevailing wage rates for retail cashier

23  operators.  As another example of a particularly egregious "Disneyland Loan,"

24  CW 5 related the story of a $500,000 loan that was issued for "swamp lands" in

25  Florida, to a 26 year old first time home buyer with a reported income of $26,000

26  per year and $15.00 in a bank account.

27

28

FIFTH AMENDED CLASS ACTION COMPLAINT

66.    Stated income loans were the easiest to manipulate, and the easiest for IndyMac to follow through on due diligence had the Company so desired. IndyMac could have insisted on double-checking a client's stated income by utilizing IRS Form 4506T. When asked by analysts during the November 2, 2006 Conference Call, as to what percentage of IndyMac's Alt-A customers provided the Company with IRS Form 4506T, Perry was evasive and non-responsive. Indeed, studies have confirmed that upwards of 90% of stated income loan buyers inflated their purported income by 5% or more, and as much as 60% of stated income buyers exaggerated their stated income by over 50%. *See* "Eighth Periodic Mortgage Fraud Case Report to Mortgage Bankers' Association," produced by Mortgage Asset Research Institute, Inc., April, 2006.

67.    As a result of the loosened underwriting guidelines, the Company's default rates skyrocketed during the Class Period. Confidential Witness Six ("CW 6"), was a Senior Loan Processor, Investigation Unit, Post Purchase Quality Control, Central Mortgage Operations at IndyMac from August 10, 2003 until October, 2006, and responsible for researching loan transactions.

68.    According to CW 6, the number of loans being examined by the Company increased by 1500% from 2003 to mid-2006. Specifically, according to CW 6, his/her department was responsible for reviewing 10% of the loans originated by IndyMac each month. In 2003, this translated to approximately 60 loans per month. By October, 2006, CW 6's department was reviewing approximately 900 loans per month.

69.    The drastic increase in defaulted loans was at its worst during the Class Period. CW 6 stated the number of delinquent loans at IndyMac tripled by October, 2006. According to CW 6, this increase was the result of misrepresentations and fraud that were occurring at the "front end" of the loan

1  originations. Thus, had the Company's underwriting guidelines been stricter, this

2  drastic increase would not have occurred.

3       70.    The above problems were exacerbated by IndyMac management.  In

4  particular, the number of unqualified loans increased so drastically (as a direct

5  result of management's direction) that underwriters began "pushing through"

6  unqualified loans to maintain origination volume.  The Company's policy of

7  "pushing through" unqualified loans evidences a Company-wide knowledge of

8  IndyMac's underwriting problems. *See supra* ¶¶ 44-45; 55.

9       71.    In addition to the above direct evidence of the origination of bad

10  loans and loose underwriting guidelines, and defendant Perry's actual knowledge

11  thereof, IndyMac (as discussed below) was forced, under warranty agreements, to

12  repurchase substantially increased numbers of loans (now in default) that it had

13  previously sold on the secondary market.  The repurchases resulted in a

14  corresponding decrease in net income as the Company was, in effect, giving back

15  revenue.

16       72.    By way of background, according to CW 4, once a loan was

17  originated, it was immediately packaged with other loans and sold on the

18  secondary market. For example, during the second quarter of 2006, IndyMac sold

19  97% of the mortgage loans it produced.  During that quarter, IndyMac had

20  mortgage production of $20.06 billion and sold off $19.415 billion of those loans.

21  By contrast, in the third quarter of 2006, IndyMac was suddenly only able to sell

22  81% of its mortgage production.  During that quarter, IndyMac had mortgage

23  production of $23.968 billion and sold $19.508 billion of those loans. According

24  to Perry, IndyMac makes representations and warranties on all loans sold into the

25  secondary market, "just like a manufacturer of an automobile would make

26  warranty reps on a car," *See* April 25, 2006 Conference Call at 11.  When a loan

27

28

FIFTH AMENDED CLASS ACTION COMPLAINT

1  that it has sold is deficient, IndyMac repurchases it.  These repurchases are called
2  "kickbacks."

3       73.    According to CW 2, during his/her employment, the number of
4  "kickbacks" from the secondary market increased drastically.  In an effort to
5  "cushion the blow" of these kickbacks, IndyMac initiated a "special project" on
6  the weekends in 2006.  According to CW 2, underwriters would receive a list of
7  loans that IndyMac had to repurchase after the loan had been previously sold on
8  the secondary market. Underwriters would then have to rework the loan and
9  "make it work" so that it could be bundled and sold again in the secondary
10  market.  The underwriters involved in the "special project" aggressively did what
11  they could to make the loans "work," according to CW 2.  For example, in
12  instances where the loan had defaulted and been kicked back because of lack of
13  income verification, underwriters would go to a website provided by IndyMac,
14  such as www.salary.com, and try to obtain a more favorable "average national
15  salary" for the borrower based on the data found on such websites for those
16  positions.

17       74.    Further, underwriters were receiving loans that already had been
18  closed by other underwriters at the Company; therefore, the underwriter trying to
19  fix particular loans was not familiar with their details.  Additionally, when
20  underwriters received loan data, they did not receive the entire loan application;
21  only the portions that were deficient.  Therefore, there was no documentation
22  pertaining to the other data provided by the borrower – eliminating underwriters'
23  ability to cross-check borrower reported information.

24       75.    CW 5 confirms the Company's "special projects."  According to CW
25  5, some of the loans rewritten by the underwriters were resold, and the remaining
26  loans were channeled to his/her department, so those employees could also try to
27  "make [them] work."

28

FIFTH AMENDED CLASS ACTION COMPLAINT

23

76.    Defendants knew or were deliberately reckless in not knowing about these problems. The implications on the company were devastating. During 2005, IndyMac was forced to repurchase $106 million worth of kicked-back deficient loans from the secondary market. In 2006, the value of kicked-back loans climbed to $167 million – an increase of over 50% in less than a year. Most striking, however, is that during the **first quarter** of 2007 IndyMac repurchased $224 million worth of loans from the secondary market – clear evidence that the loans issued during the Class Period were grossly deficient as a result of the Company's decision to grossly loosen its underwriting guidelines and controls.

77.    In addition to the problems with the Company's underwriting controls, the Company's controls over the accuracy of financial reporting were also deeply flawed.

78.    For example, CW 5 states that even the Company's former Vice President of the Fraud Investigation Department, Michelle Leigh, was pressured by upper management not to report fraud. According to CW 5, Leigh's superior, Michelle Minier, in one case, expressly requested that Leigh make changes to a monthly report that Leigh felt did not accurately depict the loan pipeline. Despite Leigh's protest, the report was subsequently sanitized. Michelle Minier is Executive Vice President, Chief Executive Officer and Vice Chairman of Financial Freedom, wholly-owned by IndyMac. As such, she reports to defendant Perry.

79.    As was the case with the bonus structure for managers and underwriting, IndyMac's auditors' bonus structure also dissuaded the detection of fraud. Auditor bonuses were based on the number of loans reviewed, not the number of fraudulent findings found. Thus, according to CW 5, IndyMac