1    rewarded more work, but not the detection of fraud.  This, of course, encouraged

2    workers to simply review, in a cursory fashion, potentially fraudulent loans.

3        80.    Confidential Witness Number Seven ("CW 7") is a former Business

4    Development Manager, Broker & Emerging Banker at IndyMac.  CW 7 was

5    employed by IndyMac from 2004 through the beginning of 2008, *and had direct*

6    *contact with Perry.*

7        81.    CW 7 confirms the statements of the other confidential witnesses

8    regarding the problems with IndyMac's underwriting controls.  CW 7 also offered

9    additional detail regarding the nature of the violations of the Company's

10   underwriting guidelines.  In particular, CW 7 stated that the vast majority of

11   IndyMac purportedly "Full Doc" loans were underwritten merely based on a

12   Verification of Employment ("VOE"), not on W-2s and pay stubs.  This statement

13   stands in stark contrast to those of defendant Perry who, as noted at ¶ x, expressly

14   and publicly stated during the Q3 2006 IndyMac Bancorp, Inc. Earnings

15   Conference Call that "typically on full doc borrowers we ask them to provide W-

16   2s and pay stubs."

17       82.    CW 7's statement demonstrating the falsity in Perry's statement that

18   "typically on full doc borrowers we ask them to provide W-2s and pay stubs" is

19   further confirmed by an internal Indymac document entitled "NonPrime Lending,

20   Indymac Nonprime…Offering Unique Mortgage Solutions for Everyday

21   Situations," last updated on February 13, 2006, which states: **"Indymac**

22   **NonPrime will accept a Verification of Employment for a full documentation**

23   **loan with no pay stubs or W2s needed!"** (Bold in original.)

24       83.    As described in ¶¶193-198 below, the 2009 Audit Report from the

25   Office of Inspector General, Department of the Treasury, confirms the testimony

26   of the CWs noted above.

27

28

84.    In addition to the statements of the confidential witnesses, a number of lawsuits filed by (and against) reveal the Company's knowledge that loans it had underwritten were defaulting at rates as high as 97% in 2006, and 90% in 2005.  In particular, shortly before, during and after the Class Period, IndyMac was involved in litigation with mortgage bankers, appraisers, and others that alerted Defendants to the weaknesses in the Company's loan underwriting practices and internal/operational controls.  This litigation and/or the underlying facts thereto were red flags to Defendants of IndyMac's vulnerability to widespread loan origination and appraisal fraud, as well as strong warnings that IndyMac needed to tighten its credit quality control practices.

**C.    Examples of Conduit-Generated 80/20 Piggyback Loans that Suffered Early Payment Defaults and Contributed to IndyMac's 2006 Fourth Quarter Losses and Losses that Should Have Been Incurred Earlier in 2005 and 2006**

**1.    Silver State Toxic Loan Pool**

85.    As one dramatic example, IndyMac Bank sued a mortgage broker, Silver State Mortgage ("Silver State"), alleging that Silver State breached its warranties and obligations to IndyMac concerning 35 out of a pool of 36 loans sold to IndyMac in 2005 and 2006.  This action is styled *IndyMac Bank, F.S.B. v. Silver State Mortgage,* No. 07-CV-00405 (D. Nev. Mar. 29, 2007)(complaint filed).

86.    Pursuant to the *Silver State* complaint, as alleged by IndyMac, thirty-five (35) of those borrowers either "did not make their first payment after IndyMac's purchase of the loan, or failed to make a timely payment as to anyone of the first three months after" such purchase (the "early defaulting Silver State loans").  *Id.*, at ¶12(emphasis added).  As such, Silver State was obligated under

1   its agreement with IndyMac to repurchase each such distressed loan within <u>thirty</u>

2   (30) days of receiving IndyMac's notice of default. *Id.* at ¶7.

3         87.    Mortgage companies typically use such early payment default

4   ("EPD") by delinquent borrowers as a proxy for fraud. Industry trade associations

5   and regulators have examined early payment default statistics to ascertain the type

6   and extent of mortgage fraud. The Mortgage Bankers Association ("MBA") has

7   utilized the Mortgage Asset Research Institute, Inc. ("MARI") to analyze and

8   compile data regarding mortgage fraud. For instance, the Sixth Periodic Report to

9   the MBA noted that early payment default indicates possible fraud, and compiled

10  statistical data on early payment default by state and metropolitan area (available at

11  <u>www.mari-inc.com/pdfs/mba/MBA6thCaseRpt.pdf</u>). William Matthews, MARI's

12  vice president and general manager, reiterated this in his testimony before the

13  United States House of Representatives Subcommittee on Housing and

14  Community Opportunity (available at <u>www.financialservices.house.gov/media/</u>

15  <u>pdf/100704wm.pdf</u>).

16        88.    Early payment defaults are telling indicators of double selling,

17  equity skimming and/or straw borrowers. One of the easiest mechanisms to track

18  the performance and credibility of brokers is to monitor first payment and early

19  payment default. The presence of early payment defaults should be taken as a red

20  flag that brokers/correspondents are not underwriting in a careful manner and

21  may be potentially falsifying information themselves.

22        89.    Nonetheless, according to the *Silver State* complaint, it was not until

23  August 30, 2006 – *i.e.*, well into Q3 2006 – that IndyMac first demanded that

24  Silver State make good on its repurchase obligations. *Id.*, at ¶13. Silver State,

25  however, breached its obligations and refused to repurchase the early defaulting

26  Silver State loans. *Id.*

27

28

FIFTH AMENDED CLASS ACTION COMPLAINT

90.     The available public data surrounding the early defaulting Silver State loans (the "Silver State public data") reflects that certain of these loans originated no later than November 2005.  Yet, IndyMac turned a "blind eye" to these "red flags" and, per the *Silver State* complaint, waited as much as one year, *i.e.*, until August 2006, till it posed its repurchase demand to Silver State (*id.*) and even longer, until late March 2007 until it commenced its lawsuit.

91.     Indeed, the Silver State public data reflects that a substantial number of other early defaulting loans originated in the months preceding August 30, 2006 – by which time IndyMac, upon its own judicial admission, had certainly become aware of the collectability problems besetting the distressed Silver State loan pool.

92.     Most strikingly, as reflected in the forthcoming chart, most of the EPD loans complained of in *Silver State* consisted of especially toxic "80-20 Piggyback loans" or other piggyback combinations.  A "piggyback loan" is a home financing option in which a property is purchased using more than one mortgage from two or more lenders. Piggyback mortgages are second mortgages that close simultaneously with the first mortgage and provide extended financing behind a first mortgage lien. Typically, this is effectuated with an 80/20 split where the borrower puts no money down:  80% financing through a first mortgage and 20% financing through a second mortgage.  However, 80/15/5 and 80/10/10 piggybacks (where the borrower finances 5% or 10% of the transaction) and other configurations are also available.[3]

93.     Piggyback loans are of extremely high risk because they are the last to be repaid in the event of a foreclosure.  According to Standard & Poor's credit

---

[3]  As defined in the OIG Audit Report, an 80/20 piggyback loan "[r]equires no borrower down payment or mortgage insurance for this fully financed loan, which is written as two separate loans of 80 percent and 20 percent." Audit Report at 46.

1   analyst Kyle Beauchamp, as described in a July 8, 2006 Washington Post article

2   entitled "Piggybacking Onto Trouble," "an exhaustive study of piggyback loans

3   found them anywhere from 43% to 50% more likely to go into default than

4   comparable stand-alone first-lien purchase transactions" (available at

5   www.Washingtonpost. com/wp-dyn/

6   content/article/2006/07/07/AR2006070700013.html).  Among the reasons for this

7   dramatic spike, according to the article, is that "[s]ignificant numbers of

8   piggybacks have been made to buyers who were financially stretched to begin

9   with and had marginal credit scores."

10        94.     As reflected in the following chart, the Silver State public data

11  reveals that at least 26 of the 35 EPDS complained of involved either 80/20

12  Piggybacks, or in four instances, other piggyback configurations.  The aggregated

13  principal amount of these 26 loans comes to approximately $6.46 million.

14  Evidencing IndyMac's laggard conduct with respect to these especially toxic

15  loans, 19 of these risky piggybacks involved Silver State itself as the lender for

16  both the primary and piggyback loans.  Moreover, the data reflects that IndyMac

17  would have been aware of its exposure to these loans before or by early into the

18  fourth quarter of 2006.  Thus, 5 of these 26 Piggyback EPDs involve loans which

19  Silver State originated as early as 2005, 20 of these 26 Piggyback EPDs involve

20  loans which Silver State originated by the end of August 2006, and 25 of these 26

21  Piggyback EPDs involve loans which Silver State originated by the close of the

22  third quarter of 2006.

23

24  **Chronological Chart of the 80/20 and Other Piggyback Configurations
    Resulting in Early Payment Defaults, Derived from the *Silver State* Complaint**

25

26

27

28

| | Mortgage Transaction or Recording Date | Paragraph Source from the Silver State Complaint ("SS."), Filed 3/29/07 | Last Name (Sourced from the S.S. Complaint) | Principal Amount of Delinquent Loan (Sourced from the S.S. Complaint) | First Mortgage Amount on Subject Property | Lender ID | Second Mortgage Amount on Subject Property | Lender ID | Total Sale Price of Subject Property | Type of Piggyback |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 8/17/2005 | 13(k) | Datt | $340,000.00 | $340,000 | S.S. | $85,000 | S.S. | $425,000 | 80/20 |
| 2 | 9/23/2005 | 13(j) | Contreras | $235,200.00 | $235,200 | S.S. | $44,100 | S.S. | $294,036 | 80/10 |
| 3 | 9/28/2005 | 13(y) | Rhude | $776,000.00 | $776,000 | S.S. | $194,000 | S.S. | $970,000 | 80/20 |
| 4 | 10/24/2005 | 13(z) | Rivera | $315,900.00 | $315,900 | S.S. | $78,950 | S.S. | $395,000 | 80/20 |
| 5 | 11/7/2005 | 13(g) | Bower | $213,600.00 | $213,600 | S.S. | $53,400 | S.S. | $267,004 | 80/20 |
| 6 | 4/26/2006 | 13(a) | Ambartsumian | $59,200.00 | $236,800 | S.S. | $59,200 | S.S. | $296,000 | 80/20 |
| 7 | 6/9/2006 | 13(r) | Liuzza | $432,900.00 | $423,900 | S.S. | $105,950 | S.S. | $529,900 | 80/20 |
| 8 | 6/9/2006 | 13(v) | Oeurn | $650,000 | $650,000 | S.S. | $176,500 | n/a | $870,000 | 70/20 |
| 9 | 7/3/2006 | 13(gg) | Tibby | $196,000.00 | $196,000 | S.S. | $15,200 | n/a | $245,000 | 80/10 |
| 10 | 7/19/2006 | 13(i) | Caputo | $160,000.00 | $160,000 | S.S. | $20,000 | SS | $200,000 | 80/10 |
| 11 | 7/21/2006 | 13(m) | Dayao | $200,000.00 | $200,000 | S.S. | $50,000 | n/a | $250,000 | 80/20 |
| 12 | 7/21/2006 | 13(cc) | Sanders | $248,000.00 | $248,000 | S.S. | $62,000 | S.S. | $310,000 | 80/20 |
| 13 | 7/26/2006 | 13(h) | Caberto | $361,600.00 | $361,600 | S.S. | $90,400 | n/a | $452,000 | 80/20 |
| 14 | 7/28/2006 | 13(ii) | Vongchanh | $420,550.00 | $420,550 | S.S. | $105,100 | n/a | $526,000 | 80/20 |
| 15 | 7/29/2006 | 13(w) | Petersen | $308,000.00 | $308,000 | S.S. | $77,000 | S.S. | $385,000 | 80/20 |

FIFTH AMENDED CLASS ACTION COMPLAINT

| 16 | 8/1/2006 | 13(c) | Bautista | $162,700.00 | $162,700 | S.S. | $40,650 | S.S. | $203,400 | 80/20 |
| 17 | 8/2/2006 | 13(o) | Elumba | $352,000.00 | $352,000 | S.S. | $88,000 | S.S. | $440,000 | 80/20 |
| 18 | 8/14/2006 | 13(aa) | Ross | $130,000.00 | $520,000 | S.S. | $130,000 | n/a | $650,000 | 80/20 |
| 19 | 8/17/2006 | 13(e) | Blue | $190,200.00 | $760,800 | S.S. | $190,200 | S.S. | $951,000 | 80/20 |
| 20 | 8/31/2006 | 13(n) | Duran | $46,000.00 | $184,000 | S.S. | $46,000 | S.S. | $230,000 | 80/20 |
| 21 | 9/1/2006 | 13(c) | Bermudez | $83,000.00 | $332,000 | S.S. | $83,000 | S.S. | $415,000 | 80/20 |
| 22 | 9/5/2006 | 13(u) | McCall | $103,650.00 | $414,150 | S.S. | $103,650 | S.S. | $518,446 | 80/20 |
| 23 | 9/11/2006 | 13(t) | Madrigal | $40,600.00 | $162,400 | S.S. | $40,600 | S.S. | $203,000 | 80/20 |
| 24 | 9/13/2006 | 13(l) | Davenport | $65,800.00 | $263,200 | S.S. | $65,800 | S.S. | $329,000 | 80/20 |
| 25 | 9/27/2006 | 13(bb) | Ryan | $51,150.00 | $204,750 | S.S. | $51,150 | S.S. | $255,990 | 80/20 |
| 26 | 12/8/2006 | 13(jj) | Willis | $323,000.00 | $323,000 | S.S. | $80,750 | n/a | $403,770 | 80/20 |

Total: $6,465,050

95.    Thus, overall, many of the loans originated by Silver State experienced early payment defaults by no later than the end of the third quarter or during the fourth quarter of 2006.  These recklessly underwritten loans contributed to the Company's fourth quarter 2006 losses.

96.    At the same time, the Silver State public data reflect that in the aftermath of IndyMac's August 2006 demand and despite its bad loss experience with Silver State, the Company continued to purchase a significant amount of the early defaulting loans from Silver State.

**2.    Lancaster Toxic Loan Pool**

FIFTH AMENDED CLASS ACTION COMPLAINT

97.    Confirmation of this *modus operandi* emerges from IndyMac's lawsuit against another mortgage broker, Lancaster Mortgage Bankers, LLC ("Lancaster"), alleging that Lancaster breached its warranties and obligations to IndyMac concerning a pool of forty-nine (49) loans.  This action is styled *IndyMac Bank, F.S.B. v. Lancaster Mortgage Bankers, LLC,* No. CV07-00270-DDP (C.D. Ca. Jan. 10, 2007) (complaint filed).

98.    Pursuant to the *Lancaster* complaint, as alleged by IndyMac, forty-four (44) of the borrowers on the distressed Lancaster loans either "did not make their first payment after IndyMac's purchase of the loan, or failed to make a timely payment as to anyone of the first three months after" such purchase  (the "early defaulting Lancaster loans").  *Id.*, at ¶11 (emphasis added).

99.    Each of these borrower failures amounted to an "Early Payment Default" as defined by the Purchase Agreement governing the subject loans which had been entered into by the parties, on or about June 24, 2004. *Id.*, at ¶¶5-6. As such, Lancaster was obligated under its agreement with IndyMac to repurchase each such distressed loan within thirty (30) days of receiving IndyMac's notice of default. *Id.*, at ¶6.

100.   According to the *Lancaster* complaint, IndyMac first demanded that Lancaster make good on its repurchase obligations on some unspecified date in 2005. *Id.*, at ¶17.  Lancaster, however, breached its obligations and refused to repurchase the early defaulting Lancaster loans. *Id.*

101.   The available public data surrounding the early defaulting Lancaster loans (the "Lancaster public data") reflects that a substantial portion of the early defaulting Lancaster loans originated in 2005 and that certain others originated in the first third of the year 2006. Yet, despite the "red flags," IndyMac held off on commencing litigation against Lancaster until January 2007 – *i.e.*, at least one

year after it had made its year 2005 demand against Lancaster and well after the

close of its Q3 2006 reporting period.

102.    As reflected in the following chart, the Lancaster public data reveals

that at least 29 of the 44 EPDS complained of involved either 80/20 Piggybacks,

or in nine instances, other piggyback configurations.  The aggregated principal

amount of these 26 loans is approximately $7.9 million.  Evidencing IndyMac's

laggard conduct with respect to these especially toxic loans, 12 of these risky

piggybacks involved Lancaster itself as the lender for both the primary and

piggyback loans.  Moreover, the data reflect that IndyMac would have had to

been aware of its exposure to these loans well before the fourth quarter of 2006.

Thus, 24 of these 29 Piggyback EPDS involve loans which Lancaster originated

as early as 2005 and all 29 of these Piggyback EPDS involve loans which

Lancaster originated by the first week of May 2006.

### Chronological Chart of the 80/20 and Other Piggyback Configurations Resulting in Early Payment Defaults, Derived From the *Lancaster* Complaint

|  | Mortgage Transaction or Recording Date | Paragraph Source from the Lancaster Complaint ("L."), filed 1/10/07 | Last Name (Sourced from the L. Complaint) | Principal Amount of Delinquent Loan (Sourced from the L. Complaint) | First Mortgage Amount on the Subject Property | Lender ID | Second Mortgage Amount on the Subject Property | Lender ID | Total Sale Price of the Subject Property | Type of Piggyback |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 9/12/2005 | 12(q) | Lopez | $116,000 | $116,000 | L. | $29,000 | n/a | $145,000 | 80/20 |
| 2 | 9/16/2005 | 12(nn) | Williams | $424,800 | $424,800 | L. | $106,200 | L. | $531,000 | 80/20 |
| 3 | 9/21/2005 | 12(d) | Chacon | $416,000 | $416,000 | L. | $78,000 | L. | $520,000 | 80/15 |
| 4 | 9/23/2005 | 12(pp) | Philemond | $345,000 | $345,000 | L. | $115,000 | L. | $460,000 | 80/20 |
| 5 | 9/26/2005 | 12(h) | Godfrey | $195,200 | $195,200 | L. | $48,800 | L. | $244,000 | 80/20 |
| 6 | 9/29/2005 | 12(r) | Loyola | $284,000 | $284,000 | L. | $71,000 | n/a | $355,000 | 80/20 |

FIFTH AMENDED CLASS ACTION COMPLAINT

| 7 | 9/29/2005 | 12(ee) | Samuels | $140,000 | $140,000 | L. | $35,000 | n/a | $175,000 | 80/20 |
| 8 | 10/11/2005 | 12(o) | Lester | $192,000 | $192,000 | L. | $48,000 | n/a | $240,000 | 75/25 |
| 9 | 10/14/2005 | 12(gg) | Sheikh | $61,500 | $61,500 | L. | $20,500 | L. | $82,000 | 80/20 |
| 10 | 10/17/2005 | 12(hh) | Tinglin | $240,000 | $240,000 | L. | $60,000 | n/a | $300,000 | 80/20 |
| 11 | 10/17/2005 | 12(jj) | Viotti | $384,000 | $384,000 | L. | $96,000 | L. | $480,000 | 75/25 |
| 12 | 10/21/2005 | 12(oo) | Fabunan | $127,495 | $127,495 | L. | $41,495 | n/a | $169,999 | 80/20 |
| 13 | 10/31/2005 | 12(e) | Charles | $358,400 | $358,400 | L. | $89,600 | L. | $450,000 | 80/20 |
| 14 | 11/2/2005 | 12(rr) | Weston | $236,000 | $236,000 | L. | $59,000 | n/a | $295,000 | 80/20 |
| 15 | 11/10/2005 | 12(ll) | Williams | $390,080 | $390,800 | L. | $97,520 | L. | $487,600 | 80/20 |
| 16 | 11/14/2005 | 12(mm) | Williams | $320,000 | $320,000 | L. | $80,000 | n/a | $400,000 | 70/30 |
| 17 | 11/17/2005 | 12(u) | Mattei | $337,400 | $337,400 | L. | $144,600 | L. | $482,000 | 80/20 |
| 18 | 11/30/2005 | 12(l) | James | $348,000 | $348,000 | L. | $87,000 | n/a | $435,000 | 75/25 |
| 19 | 12/7/2005 | 12(a) | Benita | $285,000 | $285,000 | L. | $95,000 | n/a | $380,000 | 75/25 |
| 20 | 12/12/2005 | 12(ff) | Sciacca Mendez | $262,500 | $262,500 | L. | $87,500 | n/a | $350,000 | 80/20 |
| 21 | 12/20/2005 | 12(ss) | Belthrop | $88,000 | $88,000 | L. | $22,000 | n/a | $110,000 | 70/30 |
| 22 | 12/20/2005 | 12(qq) | Smithward | $378,000 | $378,000 | L. | $162,000 | n/a | $540,000 | 70/30 |
| 23 | 12/22/2005 | 12(cc) | Pinder | $182,000 | $182,000 | L. | $78,000 | n/a | $260,000 | 80/20 |
| 24 | 12/28/2005 | 12(z) | Pettiford | $181,280 | $181,280 | L. | $45,320 | L. | $226,600 | 80/20 |
| 25 | 2/21/2006 | 12(g) | Del Socorro | $372,000 | $372,000 | L. | $93,000 | L. | $465,000 | 80/20 |
| 26 | 2/24/2006 | 12(y) | Palleija | $332,000 | $332,000 | L. | $83,000 | n/a | $415,000 | 80/20 |
| 27 | 4/7/2006 | 12(k) | Jackson | $511,200 | $511,200 | L. | $127,800 | n/a | $639,000 | 70/30 |
| 28 | 4/28/2006 | 12(aa) | Picardo | $265,930 | $265,930 | L. | $113,970 | L. | $379,900 | 80/20 |

FIFTH AMENDED CLASS ACTION COMPLAINT

| 29 | 5/5/2006 | 12(t) | Martins | $172,800 | $172,800 | L. | $43,200 | n/a | $217,000 | 80/20 | |
|----|----------|-------|---------|----------|----------|-----|---------|-----|----------|-------|---|
|    |          |       | Total:  | $7,946,585 | | | | | | | |

103.   As was the case with Silver State, IndyMac's lengthy delay in pursuing its rights against Lancaster with respect to these numerous distressed loans bespeak IndyMac's knowing or, at least, deliberately reckless desperation to maintain the facade of ever-increasing loan production growth during the Class Period.

### 3.   Geneva Toxic Loan Pool

104.   Further confirmation of this *modus operandi* emerges from IndyMac's lawsuit against yet another mortgage broker, Geneva Mortgage Corp. ("Geneva"), alleging that Geneva breached its warranties and obligations to IndyMac concerning a pool of eighteen (18) loans.  This action is styled *IndyMac Bank, F.S.B. v. Geneva Mortgage Bankers, LLC,* No. CV07-01914-ER (C.D. Ca., March 22, 2007) (complaint filed).

105.   Pursuant to the *Geneva* complaint, as alleged by IndyMac, sixteen (16) of the borrowers on these Geneva loans either "did not make their first payment after IndyMac's purchase of the loan, or failed to make a timely payment as to anyone of the first three months after" such purchase (the "early defaulting Geneva loans").  *Id.*, at ¶12 (emphasis added).

106.   Each of these borrower failures amounted to an "Early Payment Default" as defined by the Purchase Agreement governing the subject loans which had been entered into by the parties, on or about April 9, 2003. *Id.*, at ¶¶5-6.  As such, Geneva was obligated under that agreement to repurchase each such distressed loan within thirty (30) days of receiving IndyMac's notice of default. *Id.*, at ¶6.

1    107.   According to the *Geneva* complaint, "on or about December 2003,"

2  IndyMac first demanded that Geneva make good on its repurchase obligations as

3  to two (2) of the early defaulting Geneva loans but to no avail. *Id.*, at ¶18.

4  "Commencing on or about 2006," IndyMac made such demand on Geneva as to

5  the remaining such loans. *Id.*  Geneva, however, breached its obligations and

6  refused to repurchase the early defaulting loans. *Id.*

7    108.   The available public data surrounding the early defaulting Geneva

8  loans (the "Geneva public data") reflects that two of those loans originated in the

9  year 2003, more than half originated in the year 2005 and the remaining ones

10  originated in the year 2006.  Yet, despite these "red flags," IndyMac held off on

11  commencing litigation against Geneva until late March 2007 – *i.e.*, no earlier than

12  approximately fifteen (15) months from the cutoff point by which the majority of

13  the early defaulting Geneva loans had already originated.

14    109.   As reflected in the following chart, the Geneva public data reveals

15  that at least 9 of the 16 EPDS complained of involved either 80/20 Piggybacks, or

16  in two instances, a virtual 80/20 configuration.  The aggregated principal amount

17  of these 9 loans comes to approximately $2.62 million.  Evidencing IndyMac's

18  laggard conduct with respect to these especially toxic loans, 8 of these risky

19  piggybacks involved Geneva itself as the lender for both the primary and

20  piggyback loans – and, in these instances, IndyMac was exposed to the very same

21  borrowers on both loans.  Moreover, the data reflects that IndyMac would have

22  had to been aware of its exposure to these loans well before the fourth quarter of

23  2006.  Thus, 6 of these 9 Piggyback EPDS involve loans which Geneva originated

24  as early as 2005 and all 9 of these Piggyback EPDS involve loans which Geneva

25  originated by the end of July 2006.

26

27    **Chronological Chart of the 80/20 and Other Piggyback Configurations**
      **Resulting in Early Payment Defaults, Derived From the *Geneva* Complaint**

28

| | Mortgage Transaction or Recording Date | Paragraph Source from the Geneva Complaint ("G."), Filed 3/22/07 | Last Name (Sourced from the G. Complaint) | Principal Amount of Delinquent Loan (Sourced from the G. Complaint) | First Mortgage Amount on the Subject Property | Lender ID | Second Mortgage Amount on the Subject Property | Lender ID | Total Sale Price of the Subject Property | Piggyback Type |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 9/16/2005 | 13(o) | Rivera | $368,000 | $368,000 | G. | $92,000 | G. | $465,000 | 80/20 |
| 2 | 9/16/2005 | 13(p) | Rivera | $92,000 | $368,000 | G. | $92,000 | G. | $465,000 | 80/20 |
| 3 | 11/3/2005 | 13(j) | Pratt | $327,200 | $327,200 | G. | $81,800 | G. | $409,000 | 80/20 |
| 4 | 11/3/2005 | 13(k) | Pratt | $81,800 | $327,200 | G. | $81,800 | G. | $409,000 | 80/20 |
| 5 | 12/16/2005 | 13© | Clarke | $240,000 | $240,000 | G. | $55,000 | G. | $300,000 | 80/18 |
| 6 | 12/16/2005 | 13(d) | Clarke | $55,000 | $240,000 | G. | $55,000 | G. | $300,000 | 80/18 |
| 7 | 5/25/2006 | 13(n) | Reyes | $344,000 | $344,000 | G. | $86,000 | n/a | $430,000 | 80/20 |
| 8 | 7/26/2006 | 13(l) | Puckett | $204,000 | $204,000 | G. | $51,000 | G. | $255,000 | 80/20 |
| 9 | 7/26/2006 | 13(m) | Puckett | $51,000 | $204,000 | G. | $51,000 | G. | $255,000 | 80/20 |
| | | Total | | $2,622,000 | | | | | | |

110.   As was the case with Silver State and Lancaster, IndyMac's lengthy delay in pursuing its rights against Geneva with respect to these numerous distressed loans bespeaks IndyMac's knowing or, at least, deliberately reckless desperation to maintain the facade of ever-growing loan production growth during the Class Period.[4]

_____

[4]   The *Silver State*, *Lancaster*, and *Geneva* actions are representative of the plethora of litigation IndyMac initiated in connection with distressed loans, many of which were 80/20 piggyback loans that suffered early payment defaults in 2005 and 2006.  For example, IndyMac has been involved in, *inter alia*: *IndyMac Bank,*

FIFTH AMENDED CLASS ACTION COMPLAINT

111.    In addition to the foregoing lawsuits filed *by* IndyMac, a lawsuit filed against the Company confirms the allegations of CW 2, who stated that the Company violated its underwriting guidelines by artificially inflating the appraised values of properties.

112.    In *Cedeno v. IndyMac Bancorp, Inc., et al.*, No. 06-CV-6438 (JGK) (S.D.N.Y.), the plaintiff, a residential home mortgage borrower, sued IndyMac and alleged that it had improperly and systematically selected and coerced various appraisal professionals so as to generate greater loan volumes. These appraisers would perform faulty and defective appraisal services which inflated the value of residential properties and thereby allowed Defendants to complete more real estate transactions and obtain greater profits. This action is styled *Cedeno v. IndyMac Bancorp, Inc., et al.*, No. 06-CV-6438 (JGK) (S.D.N.Y.).

113.    Cedeno, in her Amended Class Action Complaint (filed on July 20, 2007), alleged, based on confidential witnesses, that "IndyMac threatened and retaliated against appraisers and management firms that failed to give in to pressure to meet the target appraisal values by IndyMac and to inflate the appraisal values."

114.    The practice of encouraging inflated appraisal values resulted in borrowers incurring more mortgage debt than necessary and/or more mortgage

*F.S.B. v. Weststar Mortgage, Inc.*, No. 08-cv-00748 (C.D. Cal., complaint filed Feb. 4, 2008); *IndyMac Bank, F.S.B. v. Cameron Financial Group, Inc.*, No. BC376578 (Los Angeles Superior Court, complaint filed Aug. 27, 2007); *IndyMac Bank, F.S.B. v. Just Mortgage, Inc.*, No. BC384487 (Los Angeles Superior Court, complaint filed Jan. 28, 2008); *IndyMac Bank, F.S.B. v. Kay-Co Investments, Inc.*, No. BC375931 (Los Angeles Superior Court, complaint filed Aug. 14, 2007); *IndyMac Bank, F.S.B. v. Fidelity & Trust Mortgage, Inc.*, No. BC374417 (Los Angeles Superior Court, complaint filed July 18, 2007); and *IndyMac v. Solutions Funding, Inc.*, No. BC369971 (Los Angeles Superior Court, complaint filed Apr. 23, 2007).

1   debt than the borrower could afford.  All this was to meet loan origination targets
2   set by IndyMac's senior management.
3        115.    In order to accomplish this subterfuge, IndyMac had to override
4   stated lending practices and internal/operational controls:

> . . . Specifically, Defendants allowed Production
> Personnel to improperly influence Credit\Valuation
> Personnel.  Production Personnel threatened and
> intimidated Credit\Valuation Personnel to approve
> inflated appraisals received from outside appraisal
> companies or appraisal management firms.  Contrary to
> Defendants' representations to Plaintiff and members of
> the Class, Defendants failed to provide the necessary
> insulation and separation between Production Personnel
> and Credit/Valuation Personnel;
>
> According to a confidential witness, IndyMac executives,
> including the Chief Appraiser, were aware and allowed
> the improper influence Production Personnel placed on
> their own Credit\Valuation Personnel to choose
> appraisers and to approve appraisers obtained from third
> party appraisal companies or appraisal management firms
> willing to supply IndyMac with inflated appraisals;
>
> Indeed according to this confidential witness,
> Credit/Valuation Personnel at IndyMac were told not to
> reject inflated or otherwise improper appraisals and were
> threatened or told by Production Personnel that they
> would be terminated if they failed to do so;
>
> According to another confidential witness, IndyMac was
> in fact operating its appraisal review department under
> pressure to make the values that IndyMac's loan officers
> and processing department were pushing.  This
> confidential witness further stated that employees of
> IndyMac exerted pressure to make sure loans would be
> approved regardless of accurate appraisal values.

FIFTH AMENDED CLASS ACTION COMPLAINT

## V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS

116.   During the Class Period, Defendants issued numerous materially false and misleading statements.  Each of those statements is set forth below, including detail regarding (i) the date of the statement; (ii) the speaker; (iii) the nature of the statement (oral or written); (iv) to whom the statement was made; (v); the location/context of the statement (vi) why the statement was materially false and misleading; and (vii) facts giving rise to a strong inference that the particular defendant who made (or caused to be made) the statement had the requisite state of mind.  The facts that provide the basis for the foregoing allegations, including a full recitation of the statements of numerous confidential witnesses and various lawsuits in which the Company is engaged, are set forth at ¶¶120; 139; 158; 198, *supra*.

### A.    2005 Annual Report on Form 10-K

117.   On March 1, 2006, the Company filed its Annual Report for the year ended December 31, 2005 with the SEC on Form 10-K (the "2005 10-K").  Because Perry signed the 2005 10-K, all statements contained therein were made by him and the Company.

**Statement One:**

118.   The 2005 10-K stated:

> *By closely monitoring key factors such* as product type, origination channels, progress or "status" of transactions, as well as changes in market interest rates since IndyMac committed a rate to the borrower ("*rate lock commitments*"), *the Company seeks to quantify the optional component of each rate lock*, and in turn, the aggregate rate lock pipeline. By accurately evaluating these factors, the Company has been able to minimize the purchase of options and also stabilize gain on sale margins over different rate environments. [2005 10-K at p. 41-42].

119.    The foregoing statement was materially false and misleading because the Company's "rate lock commitments" were no commitments at all. This is so because the "rate lock commitments" were regularly violated by and at the direction of defendant Perry, which rendered them meaningless as a risk control device.

120.    Plaintiffs rely on the following facts in support of their allegation that the foregoing statement (at ¶118) was materially false and misleading and that Perry knew it: CW 1 stated that defendant Perry directed the Executive Vice President and CEO, Ashwin Adarkar (and thus, the Central Banking Group) to engage in violations of the Company's "rate lock" protocols and controls.  ¶¶ 43-49.

**Statement Two:**

121.    The 2005 10-K stated:

> We hedge the risks associated with our mortgage commitments to purchase mortgage loans ("rate locks") and funded mortgage loans that will be sold in the secondary market.  The risk associated with the rate locks and funded mortgage loans is that interest rates will fluctuate between the time we commit to purchase a loan at a pre-determined price, or the customer locks in the interest rate on a loan, and the time we sell or commit to sell the mortgage loan. [2005 10-K at 78].

122.    The foregoing statement was materially false and misleading because the Company regularly violated, at the direction of defendant Perry, the "rate locks," rendering them meaningless as a risk control device.  This allowed the Company to achieve revenue and volume targets in the short-run, while exposing itself to losses on the back end of the loan.

123.    Plaintiffs rely on the following facts in support of their allegation that the foregoing statement (at ¶121) was materially false and misleading and

1    that Perry knew it: CW 1 stated that defendant Perry directed Adarkar (and thus,

2    the Central Banking Group) to engage in violations of the Company's "rate lock"

3    protocols and controls. ¶¶43-49.

4        **B.    2006 First Quarter Form 10-Q**

5        124.    On April 25, 2006, the Company filed its Report on Form 10-Q for

6    the quarter ended March 31, 2006 with the SEC (the "2006 First Quarter 10Q").

7    Because Perry signed the 2006 First Quarter 10-Q, all statements therein were

8    made by him and the Company.

9        125.    The 2006 First Quarter 10-Q stated:

10

11       A component of the overall allowance for loan losses is not
         specifically allocated to the loan portfolios ("unallocated
12       component"). The unallocated component reflects management's
         assessment of various factors that create inherent imprecision in the
13       methods used to determine the specific portfolio allocations. Those
         factors include, but are not limited to levels of and trends in
14
         delinquencies and impaired loans, charge-offs and recoveries, volume
15       and terms of the loans, *effects of any changes in risk selection and*
         *underwriting standards*, other changes in lending policies,
16       procedures, and practices, and national and local economic trends and
17       conditions. *Id.* at 48. (Emphasis added)

18

19

20       126.    The foregoing statement was materially false and misleading when

21   made as IndyMac's loan loss reserves did not consider the "effects of any

22   changes in risk selection and underwriting standards, other changes in lending

23   policies, procedures, and practices, and national and local economic trends and

24   conditions."

25       127.    This is so because the Company's "underwriting standards" were

26   wholly ineffective (and violated by or caused to be violated by Perry *see e.g.* ¶

27

28   _____

         FIFTH AMENDED CLASS ACTION COMPLAINT

111), and thus, meaningless as a factor in the calculation of the Company's loan loss reserves.

128.   It is clear that defendant Perry knew or was reckless in not knowing of the violations of the Company's underwriting controls and standards (rendering the statement at ¶125 materially false and misleading) for the following reasons.  First, Perry directed employees to (i) "push loans through" regardless of whether they satisfied the Company's underwriting guidelines; (ii) input false information into the Company's e-MITS underwriting control system, to cause the approval of loans that would normally be rejected; and (iii) engage in violations of the Company's "rate lock" protocols and controls.  ¶¶10,48. Second, Perry was aware that rampant fraud and lying by loan sales representatives was taking place, yet he continued to push employees to close loans "at all costs."  ¶ 50.  Third, the wide-ranging and management-directed violations of the Company's underwriting guidelines and controls evidences a culture of fraud at the Company.  ¶50.  Fourth, the number of fraudulent loans discovered at the Company increased by 1500% from 2003 to mid-2006, rendering the lack of control over underwriting facially obvious.  ¶68.  Fifth, the massive increase in bad loan "kickbacks" requiring repurchase by the Company resulted in the initiation of a "special project" at the Company to rehabilitate those loans.  ¶¶73; 75.  Finally, the numerous lawsuits filed by the Company show that it knew that certain pools of loans that it had underwritten were defaulting at rates as high as 90% (in 2005), and 97% (in 2006), rendering the inadequacy of the Company's underwriting controls facially obvious to Perry and the Company.  ¶¶72; 84.

**C.    April 25, 2006 Conference Call**

129.    On April 25, 2006, defendant Perry spoke to analysts and the investing public on behalf of the Company during a public earnings conference telephone call (the "Q1 2006 IndyMac Bancorp, Inc. Earnings Conference Call").

130.    During this Q1 2006 IndyMac Bancorp, Inc. Earnings Conference Call, Perry stated:

> *[W]e have the best quality control function* of any thrift out there because we sell 95% of our production in the secondary market.  Who does their own due diligence and if we have problems with it, if we have mispricing like we did with the home equity business, right, *it immediately gets reflected in our numbers and we fix it*.  Do you see what I'm saying?  That's a big quality control function, the fact that we turn our loans on average, this quarter was about 50 days, 55 days and in 55 days we know if we priced them right and we know if the investor is willing to buy them…. Tr. at 13 (emphasis added).

131.    The foregoing statements were false and misleading because IndyMac's quality control, both pre-purchase and post-purchase were so recklessly deficient that IndyMac was unable to monitor, let alone "fix," its early payment defaults and representations and warranties related to its loans.  Indeed, IndyMac permitted intentionally and grossly exaggerated stated income loans to be processed without appropriate due diligence in the pre-funding quality control process.  For instance, IndyMac should have and could have verified loan applicants' income as reported to the IRS by utilizing Form 4506T.  IndyMac recklessly, if not willfully, turned a blind eye to false, inflated stated incomes.  Incredibly, IndyMac actually marketed to brokers its willingness to ignore most stated income deficiencies. *See* IndyMac Presentation *Here We Grow* at 14 ("Required Form: 4506T (will not be pulled unless income is outrageous).").

FIFTH AMENDED CLASS ACTION COMPLAINT

1   Furthermore, IndyMac's post-funding quality control audits were conducted on

2   an untimely basis as IndyMac's post-funding quality control department was

3   significantly understaffed. The Solutions Funding post-funding quality control

4   audits were performed months after the loans were in early payment default,

5   significantly undermining their utility.

6       **D.    2006 Second Quarter Form 10-Q**

7       132.   On July 27, 2006, the Company filed its Report on Form 10-Q for

8   the quarter ended June 30, 2006 with the SEC (the "2006 Second Quarter 10Q").

9   Because Perry signed the 2006 Second Quarter 10-Q, all statements therein were

10  made by him and the Company.

11      133.   The 2006 Second Quarter 10-Q stated:

12

13      A component of the overall allowance for loan losses is not
        specifically allocated to the loan portfolios ("unallocated
14      component"). The unallocated component reflects management's
        assessment of various factors that create inherent imprecision in the
15      methods used to determine the specific portfolio allocations. Those
        factors include, but are not limited to levels of and trends in
16
        delinquencies and impaired loans, charge-offs and recoveries, volume
17      and terms of the loans, ***effects of any changes in risk selection and
        underwriting standards***, other changes in lending policies,
18      procedures, and practices, and national and local economic trends and
19      conditions. *Id.* at 45. (Emphasis added)
20

21

22      134.   The foregoing statement was knowingly or recklessly materially

23  false and misleading for the same reasons that the identical statement, set forth in

24  the Company's 2006 First Quarter 10-Q, was knowingly or recklessly materially

25  false and misleading. *See* ¶153 (discussing same).

26

27      **E.    September 13, 2006 Lehman Brothers Presentation**

28  _____

135.    On or about September 13, 2006, Michael Perry participated at Lehman Brothers' 2006 Financial Services Conference.  IndyMac's presentation was filed with the SEC in an 8-K on September 13, 2006.  A table entitled, "Risk Management Functions Are Also Performed at Business-Unit Level," catalogs the following systemic safeguards in place in connection with IndyMac's SFR Mortgage Production:

    1.  Thorough sellers/3rd party approval and monitoring;

    2.  Pre-funding quality control reviews;

    3.  Sound underwriting guidelines;

    4.  Rigorous in-house appraisal reviews;

    5.  Post-funding quality control audits; and

    6.  Loss mitigation/fraud recovery management.

Presentation at 23.

**Statement One:**

136.    IndyMac's statement that it conducted "thorough sellers/3rd party approval and monitoring" was false and misleading.  IndyMac's seller/3rd party approval and monitoring were severely deficient.  As reflected in the litigation between IndyMac and its various brokers, such as Lancaster, Silver State and Geneva, IndyMac recklessly continued to conduct business with sellers who experienced massive early payment defaults and significant representation and warranty deficiencies.

137.    Plaintiffs allege that defendant Perry knew or was reckless in not knowing that the foregoing statement (at ¶¶135-136) was materially false and misleading because IndyMac, by its own judicial admission, was aware, at least as early as 2005, of significant early payment defaults and representation and warranty deficiencies plaguing loans obtained through sellers.

1      **Statement Two:**

2          138.    IndyMac's statement that it conducted "pre-funding quality control

3      reviews" was false and misleading.  IndyMac's pre-funding quality control

4      reviews were grossly inadequate.  Indeed, IndyMac permitted intentionally and

5      grossly exaggerated stated income loans to be processed without appropriate due

6      diligence in the pre-funding quality control process.  For instance, IndyMac

7      should have and could have verified loan applicants' income as reported to the

8      IRS by utilizing Form 4506T.  IndyMac recklessly, if not willfully, turned a blind

9      eye to false, inflated stated incomes.  Incredibly, IndyMac actually marketed to

10     brokers its willingness to ignore most stated income deficiencies.  *See* IndyMac

11     Presentation *Here We Grow* at 14 ("Required Form: 4506T (will not be pulled

12     unless income is outrageous).").

13         139.    Plaintiffs allege that defendant Perry knew or was reckless in not

14     knowing that the foregoing statement (at ¶138) was materially false and

15     misleading because (i) Perry directed IndyMac employees to "push loans

16     through" without regard to approval guidelines, as attested to by the CWs,

17     evidenced in, *inter alia*, "Disneyland Loans"; (ii) Perry and other senior

18     managers encouraged the manipulation of the e-MITS system; (iii) loan sales

19     representatives solicited fraudulent letters in connection with purported

20     verification of customer income, which was reported to upper management; (iv)

21     as stated by CW4, during the Class Period IndyMac experienced and was aware

22     of a substantial increase in defaults attributable to misrepresentations and fraud in

23     the loan applications facilitated by the Company's relaxing of underwriting

24     guidelines; and (v) IndyMac instituted auditor bonus structures that dissuaded the

25     detection of fraud.

26     **Statement Three:**

27

28     _____

FIFTH AMENDED CLASS ACTION COMPLAINT

1    140.   IndyMac's statement that it had "sound underwriting guidelines"
2    was false and misleading.  IndyMac routinely approved high-risk loans that
3    departed significantly from the Company's established underwriting guidelines.
4    As described fully at ¶¶29; 112 herein, IndyMac, and defendant Perry in
5    particular, created a company-wide culture and practice of ignoring and
6    intentionally overriding the Company's underwriting guidelines for the singular,
7    myopic goal of generating loan volume.  Combined with IndyMac's substantial
8    reliance on high-risk loans, the actual practice at IndyMac to ignore and
9    intentionally override the Company's stated underwriting guidelines placed the
10   Company's business in the precarious condition of relying on a flimsy base of
11   significantly risky loans – unbeknownst to the public.  In short, IndyMac had in
12   place, and adhered to, anything but "sound underwriting guidelines."
13   141.   Plaintiffs allege that defendant Perry knew or was reckless in not
14   knowing that the foregoing statement (at ¶135) was materially false and
15   misleading because Perry himself created a company-wide pattern of abandoning
16   underwriting guidelines, directing IndyMac employees to "push loans through"
17   without regard to approval guidelines.  As attested to by various confidential
18   witnesses, the company-wide environment had become an "organized chaos"
19   focused on the singular goal of increasing reported loan volume, regardless of
20   loan quality.
21   **Statement Four:**
22   142.   IndyMac's statement that it conducted "rigorous in-house appraisal
23   reviews" was false and misleading.  IndyMac's appraisal reviews were limited
24   and recklessly deficient.
25   143.   Plaintiffs allege that Perry and IndyMac knew or were reckless in
26   not knowing that the foregoing statement (at ¶142) was materially false and
27   misleading because IndyMac's appraisal reviews were performed under only
28

FIFTH AMENDED CLASS ACTION COMPLAINT

1    limited circumstances, as reflected in the deposition transcripts of Nicholas

2    Nyland and Ignacio Gomez in the *Indymac Bank v. Chandler Appraisal Services*

3    litigation.

4        **Statement Five:**

5        144.    IndyMac's statement that it conducted "post-funding quality control

6    audits" was false and misleading.  IndyMac's post-funding quality control audits

7    were conducted on an untimely basis as IndyMac's post-funding quality control

8    department was significantly understaffed.  The Solutions Funding post-funding

9    quality control audits were performed months after the loans were in early

10   payment default, significantly undermining their utility.

11       145.    Plaintiffs allege that defendant Perry knew or was reckless in not

12   knowing that the foregoing statement (at ¶144) was materially false and

13   misleading because these audits were not being done on a timely basis, *i.e.*,

14   quarterly.  Instead, IndyMac and Perry recklessly permitted delays far in excess

15   of a quarter before post-funding quality control audits were performed.  Even

16   after the post-funding quality  control reports were completed, IndyMac's

17   procedures permitted substantial delays before repurchase requests were even

18   sent to sellers.

19       **Statement Six:**

20       146.    IndyMac's statement that it purportedly had adequate "loss

21   mitigation/fraud recovery management" was false and misleading.  IndyMac's

22   seller pursuit department was patently ineffective as a result of its inadequate

23   staffing and resources causing inordinate delay in its attempts to recover from

24   recidivist sellers.  As such, IndyMac frequently only pursued litigation years after

25   problems with a seller became apparent, with limited success.

26       147.    Plaintiffs allege that defendant Perry knew or was reckless in not

27   knowing that the foregoing statement (at ¶146) was materially false and

28

---

FIFTH AMENDED CLASS ACTION COMPLAINT

misleading because IndyMac failed to pursue delinquent loan sellers for excessive time periods.  IndyMac's legal department was acutely aware of the inordinate delays that occurred with respect to seller pursuit litigation.  Moreover, IndyMac recklessly purchased loans from sellers who had failed to cure repurchase requests.

F.    **September 21, 2006 RBC Financial Institutions Conference**

148.    Scott Keys, Executive Vice President and Chief Financial Officer of IndyMac, on behalf of IndyMac, made the following statement at an RBC Financial Institutions Conference on September 21, 2006:

> I joke with Mike Perry, our CEO, that if we did a slide for every negative article that comes out in the mortgage -- kind of about mortgages, Jim, I'd need the rest of the day for the presentation.  But we wanted to spend the bulk of the presentation trying to dispel some myths about the industry, and also some myths about the Company, where we think people are lumping us in with -- maybe with issues that don't really exist.  So, I'm going to spend the bulk of time the time on enterprise risk management today.
>
> *    *    *
>
> One of the other things that we have the ability to do is we do a fair amount of our purchases in our conduit business. And there we're dealing with larger financial institutions, and we have a pretty high success rate. **If we end up having to repurchase a loan, we are able to turn around and put that repurchase back to the seller. To us it's probably about a 90% effectiveness rate there. So, we -- so, a lot of the risk where we may repurchase (indiscernible) we can turn around and pass that back to the seller.**

(Emphasis added.)

149.    The statement regarding the effectiveness of IndyMac's success rate in obtaining seller repurchases was false and misleading because IndyMac's routine practice of delaying repurchase requests limited IndyMac's ability to

---

gauge this important metric. As reflected in IndyMac's seller litigation (described above), IndyMac was frequently unable to successfully force recidivist sellers to repurchase the substantial quantity of early payment defaults and representation and warranty claims and knew or was reckless in not knowing this fact.

150. Defendant Perry is liable for this statement because, while it was actually uttered by Mr. Keys, Mr. Keys references defendant Perry as a joint participant in the preparation of the statement. Accordingly, when Mr. Keys uttered this statement on behalf of the Company, defendant Perry had a duty to correct it as he knew, or was severely reckless in not knowing, of the statement's material falsity.

151. Scienter is attributable to the Company and defendant Perry because IndyMac, by its own judicial admission, was on notice as early as 2005 that IndyMac was frequently unable to successfully force recidivist sellers to repurchase the loans with early payment defaults and representation and warranty claims.

## G.    2006 Third Quarter Form 10-Q

152. On November 2, 2006, the Company filed its Report on Form 10-Q for the quarter ended September 30, 2006 with the SEC (the "2006 Third Quarter 10Q"). Because Perry signed the 2006 Third Quarter 10-Q, all statements therein were made by him and the Company.

153. The 2006 Third Quarter 10Q stated:

A component of the overall allowance for loan losses is not specifically allocated to the loan portfolios ("unallocated component"). The unallocated component reflects management's assessment of various factors that create inherent imprecision in the methods used to determine the specific portfolio allocations. Those factors include, but are not limited to levels of and trends in

delinquencies and impaired loans, charge-offs and recoveries, volume and terms of the loans, *effects of any changes in risk selection and underwriting standards*, other changes in lending policies, procedures, and practices, and national and local economic trends and conditions. *Id.* at 52. (Emphasis added).

154.   The foregoing statement was knowingly or recklessly materially false and misleading for the same reasons that the identical statement, set forth in the Company's 2006 First Quarter 10-Q, was knowingly or recklessly materially false and misleading. *See* ¶153 (discussing same).

**H.    November 2, 2006 Conference Call**

155.   On November 2, 2006, defendant Perry spoke to analysts and the investing public on behalf of the Company during a public earnings conference telephone call (the "Q3 2006 IndyMac Bancorp, Inc. Earnings Conference Call").

156.   During the Q3 2006 IndyMac Bancorp, Inc. Earnings Conference Call Perry stated, regarding the documentation required before a Company underwrites a loan that "typically on full doc borrowers we ask them to provide W-2s and pay stubs." Tr. at 14.

157.   This statement was materially false and misleading because the Company's internal policies did not require W-2s *and* pay stubs as verification of income for "full doc" loans.

158.   Plaintiffs rely on the following facts in support of their allegation that the foregoing statement was materially false and misleading. CW 7 states that the vast majority of IndyMac purportedly "Full Doc" loans were underwritten merely based on a Verification of Employment ("VOE"), not on W-2s and pay stubs. CW 7 further provided documentation in the form of the "IndyMac Bank NonPrime Program Matrix" confirming the same.

1         159.    Plaintiffs allege that defendant Perry and the Company knew or were

2    reckless in not knowing that the foregoing statement (at ¶156) was materially

3    false and misleading because Perry's statement facially contradicts the

4    Company's official, written internal policies.

5    **VI.     LOSS CAUSATION/ECONOMIC LOSS**

6         160.    As detailed herein, during the Class Period, Defendants engaged in a

7    scheme to deceive the market and artificially inflate IndyMac's securities prices,

8    which scheme operated as a fraud or deceit on Class Period purchasers of

9    IndyMac securities.  In particular, Defendants misrepresented the Company's

10   underwriting standards, risk management policies, and the adequacy of its loan

11   loss reserves.  Later, however, when Defendants' misrepresentations and

12   fraudulent conduct began to be disclosed and became apparent to the market (or,

13   in the alternative, when the risks concealed by Defendants' misrepresentations

14   materialized), IndyMac stock fell as the artificial inflation came out of the

15   Company's stock price.

16        161.    Specifically, during the Class Period, Defendants misrepresented: (i)

17   IndyMac's underwriting guidelines and controls and their compliance therewith;

18   (ii) IndyMac's risk management policies; and (iii) the adequacy of IndyMac's

19   loan loss reserves.  These misrepresentations concealed, inter alia, that the

20   Company's loan portfolio was severely impaired as a result of Defendants'

21   repeated violations of the Company's internal/operational controls over

22   underwriting.  Defendants' false and misleading statements had their intended

23   effect and caused IndyMac's common stock to trade at artificially inflated levels

24   throughout the Class Period, reaching as high as $50.11 per share on May 8,

25   2006.

26        162.    Starting on January 16, 2007, and through March 1, 2007, investors

27   began to learn the truth through a number of partial disclosures, including

28

1    Defendants' own admissions. The series of disclosures revealed, among other

2    things that: (1) the Company faced a substantial earnings shortfall caused by

3    credit losses and increases in provisions for loan loss reserves as a result of the

4    Company's impaired loans; (2) the Company would not meet its forecasted

5    results for the fourth quarter of 2006, primarily because the Company doubled its

6    credit reserves from the previous quarter to cover the massive number of defaults

7    on the loans it had underwritten; (3) several of the Company's business areas

8    (*e.g.* its 80/20 loan portfolio) that Defendants had touted as its strongest virtues

9    were, in actuality, profoundly weakened and impaired; (4) the Company

10   experienced a substantial negative financial impact as a result of losses from

11   bad/uncollectible loans held by the Company; and (5) the Company had

12   "loosened its lending standards" during 2006, and that, going forward, the

13   Company would correct this by being "smart and prudent" in managing its

14   underwriting guidelines and risk.

15        163.   As a direct result of these disclosures IndyMac's stock price dropped

16   from a close of $43.55 per share on January 12, 2007 (the last trading day before

17   Defendants' disclosures began) to $32.16 on March 1, 2007 (the day of

18   Defendants' last corrective disclosure). Together, these drops removed the

19   inflation from IndyMac's stock price, causing real economic loss to Indymac

20   investors. In sum, as the truth was revealed, the Company's stock price

21   plummeted, the artificial inflation came out of the stock, and Plaintiffs and other

22   members of the Class were damaged.

23        164.   The decline in IndyMac's stock price during the Class Period was a

24   direct result of Defendants' earlier misrepresentations finally being revealed to

25   investors and the market. The timing and magnitude of IndyMac's stock price

26   declines negate any inference that the loss suffered by Plaintiffs and other Class

27   members was caused by changed market conditions, macroeconomic or industry

28

factors or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiffs and other members of the Class was a direct result of Defendants' fraudulent scheme to artificially inflate IndyMac's securities prices and the subsequent significant decline in the value of IndyMac's securities when the truth was revealed through a series of partial disclosures.

**A.  The Truth About the Company's True Condition Begins to Emerge as Defendants Disclose that Indymac had Saddled Itself with Toxic Loans as a Result of its Poor Underwriting Practices Thereby Causing Substantial Charges and Increased Loan Loss Reserves**

165.  On January 16, 2007, the Company issued a written press release to the public on its website and to various media outlets (the "January 16, 2007 Press Release") in which it stated:

> Unfortunately, we are starting the year off with some bad news.
>
> Based on the earnings forecast we provided after the end of last quarter, we anticipated that our EPS for the fourth quarter would be $1.35 (in a range of $1.30 to $1.40). However, last week, as we began to complete our quarterly accounting "roll-up," it became clear that our Q4 earnings would be substantially below our forecast. While our internal quarterly accounting certification process is not yet complete and adjustments could still be made as we finalize our accounting, we now expect to report approximately $0.97 EPS for the quarter when we release earnings as scheduled on January 25th.
>
> …While we have not yet completed our detailed analysis of all of the variances, our assessment as of today is that the main differences between our prior forecast of $1.35 and what looks to be our earnings of $0.97 are the following:

> *1. An increase in credit costs related to the loan loss provision, secondary market reserve, and marking-to-market delinquent loans held-for-sale and residuals and non-investment grade securities;*
>
> *2. A reduction in net interest margin related to loans held-for-sale and the thrift investment portfolio due to yield curve inversion and the fact that our loan production mix shifted more toward fixed rate and intermediate term fixed rate loans* ... (Emphasis added).

166.   The foregoing statements, while leaking portions of the truth concealed during the Class Period, were still knowingly or recklessly materially false and misleading because they failed to fully disclose weaknesses in IndyMac's internal/operational controls, which enabled Defendants *inter alia*, improperly to manipulate underwriting protocols, direct that unqualified loans be approved, violate rate lock protocols, direct that loans returned from the secondary market be rewritten to "work," and stifle/ignore reports of internal fraud (*see* ¶¶10; 48; 70; 204).

167.   The market quickly began keying in on the import of IndyMac's January 16, 2007 earnings miss warning, linking IndyMac's poor performance with the Company's shoddy loan portfolio.

168.   For example, Manuel Ramirez, an analyst at Keefe, Bruyette & Woods, wrote in his analyst report dated January 17, 2007 that "Where There's Smoke, There Might Be Fire" and *downgraded* IndyMac to "underperform." Citing "credit quality deterioration" as the "most significant factor," Ramirez noted the concern with IndyMac's "volume driven model." Ramirez specifically attributed the Company's poor performance to, *inter alia*: (a) "the deterioration in the quality of production (more correspondent and conduit volumes)…"; and (b)

inadequate reserves for losses related to rep and warranty losses for loans sold on the secondary market.

169.    In the same report, Ramirez also described how the Company's poor performance was related to its need to boost reserves as a result of shoddy loans. "<u>Secondary Market Reserve</u>: Relates to rep and warranty losses for loans sold into the capital markets.  Management had strongly defended the adequacy of the [secondary market] reserve on the past two quarterly conference calls *despite the fact* that the reserve had looked light at only $30.2 million, or 2.8 basis points of loans sold.  Questions had arisen due to the rash of early payment defaults in the subprime market.  We assume the secondary market reserve will be bolstered by $8 million in the quarter, which is a contra to gain on sale income."

170.    A Foxx-Pitt, Kelton analyst report dated January 17, 2007 corroborated as much, attributing much of the Company's announced decline to "elevated instances of early payment defaults and other rep and warranty breaches."

171.    Notwithstanding that Defendants' partial disclosure failed to fully disclose Defendants' fraud, the revelation of the Company's earnings miss – a direct result of Defendants' conduct – caused the price of the Company's common stock to fall to $40.50 at close, down from $43.55 at close on January 12, 2007 (the prior trading day).

172.    Analysts also expressed skepticism with IndyMac's belated recognition of impairments to its shoddy loan portfolio.  A Roth Capital Partners report dated January 22, 2007 noted:

> The issue, in our estimation, is the timing of the disclosures—or to be more precise, the timing of increases in loan loss provisions, valuation allowances, repurchase provisions, and fair value adjustments, where we believe most of the hike in credit costs and decline in servicing ROE will be reflected.

The report specifically questioned the timetable of the Company's accounting for its toxic loan exposures:

> The question that arises in our minds [sic] whether the increases in provisions and fair value adjustments we are anticipating were necessitated by changes in actual loss experience and prepayment speeds in the fourth quarter—or change in expectations that formed in the fourth quarter—*or should have been reflected in the company's financial statements earlier in the year.* Many nonconforming lenders started reporting spikes in EPDs and repurchase requirements in the middle of 2006. They also reported sharp increases in delinquencies and loans going into foreclosure in 2006 loan production vintages.

(Emphasis added.)

**B.     The Truth Continues to Emerge as the Market Learns that Indymac's Loosening of Underwriting Guidelines Caused Indymac's Abysmal Performance**

173.    On January 25, 2007, Defendants publicly disclosed that the Company had been financially impaired, and would be unable to achieve the forecasted results for the fourth quarter of 2006.

174.    On January 25, 2007, the Company issued a written press release to the public on its website and to various media outlets (the "January 25, 2007 Press Release") in which it stated:

> PASADENA, Calif.--(BUSINESS WIRE)--Jan. 25, 2007--IndyMac Bancorp, Inc. (NYSE:NDE) ("IndyMac(R)" or the "Company"), the holding company for IndyMac Bank, F.S.B. ("IndyMac Bank(R)"), today reported net earnings of $72 million, or $0.97 per share, for the fourth quarter of 2006, compared with net earnings of $70 million, or $1.06 per share, in the fourth quarter of 2005, representing a 3 percent increase in net earnings and an 8 percent decrease in earnings per share (EPS). . .

*            *            *

"However, I and the rest of IndyMac's management team are clearly disappointed with these results because they were considerably below our normal earnings growth and ROE levels and fell far short of what we had forecasted for the quarter. In response, I want to assure our shareholders that we are redoubling our efforts to both improve our earnings and tighten up our forecasting processes.

*          *          *

"Tough times, like what we are now facing, are when companies like IndyMac can gain ground on the competition - and that is exactly what we are doing. We had a strong quarter for loan production, with $26 billion in total loans produced, up 8 percent over the prior quarter and 44 percent over Q4-05. With these production gains, we grew our estimated market share(1) to 4.51 percent in the fourth quarter versus 3.83 percent in the third quarter and 2.51 percent one year ago.

*          *          *

**Mortgage Production**

"While we achieved records for loan production and market share, we are not happy with the fact that earnings from the mortgage production segment did not grow this quarter versus last," commented Richard Wohl, IndyMac Bank's President. "Our mortgage banking revenue margin declined to 91 basis points during the fourth quarter from 103 basis points in the prior quarter and 110 basis points in Q4-05. Market conditions contributed to the margin erosion in the form of a shift in our production mix from higher margin ARM loans to lower margin fixed rate loans and increased credit costs related to marking-to-

FIFTH AMENDED CLASS ACTION COMPLAINT

59

market delinquent loans held for sale and increasing our
secondary marketing loan repurchase reserve.

                    *              *              *

Looking ahead, there will likely be further erosion in
mortgage banking revenue margins and overall
profitability before the current down cycle eventually
turns up."

                    *              *              *

**Residuals and Non-Investment Grade Securities**

"We are clearly not satisfied with the performance of
these portfolios during the quarter, but we feel that this
quarter's performance was an aberration that will likely
not recur in the future," continued Olinski. "Two main
factors drove the earnings decline. First, we implemented
a new, more refined prepayment model for our residual
securities that resulted in a one-time downward valuation
adjustment of $5 million. Going forward the new model
will enable us to hedge these assets more effectively,
improving our performance. Second, HELOC residual
securities from 2004 incurred a $6.5 million write-down
for credit impairment required by GAAP accounting that
we feel does not reflect the true economics of these
securities. These securities are callable over the next 4-24
months, and, accordingly, we expect to book gains during
this time period more than offsetting the fourth quarter
write-downs, such that we expect strong overall returns
on our 2004 HELOC residual securities over their lives.

                    *              *              *

**Thrift Portfolio**

FIFTH AMENDED CLASS ACTION COMPLAINT

Net earnings for the thrift portfolio, which consists of single-family residential mortgage loans (whole loans), consumer and subdivision construction loans, and mortgage backed securities (MBS), were $25 million, down 30 percent from the third quarter and 23 percent from one year ago. "Even though we increased our average earning assets in the thrift investment portfolio, our net interest margin declined substantially to 1.64 percent in the fourth quarter from 2.02 percent both in the third quarter and one year ago," noted Blair Abernathy, IndyMac's Chief Investment Officer. "The compression in net interest margin was due primarily to an increased cost of funds for our whole loan and MBS portfolios. Longer term, fixed-rate funding for these portfolios of approximately $1.5 billion at roughly a 2.95 percent cost of funds matured during the quarter and was replaced at a significantly higher funding cost. This has resulted in a more permanent shift in our net interest margin, such that the 1.64 percent margin realized during the quarter is likely what we can expect going forward. In retrospect, we should have more properly planned for this happening.

"Net earnings for the fourth quarter were also negatively impacted by a GAAP $6.5 million credit-related valuation write-down on HELOC residual securities (noted above) and an increase in the loan loss provision to $9 million from $5 million in the prior quarter and $1.6 million in Q4-05. As a result of the earnings decline, the thrift portfolio produced an ROE of 14 percent, below our expectations, versus 20 percent in the prior quarter and 22 percent one year ago. Going forward, we believe the ROE for this portfolio should be in a range of 15 percent to 20 percent. We are clearly not happy about the fact that the fourth quarter's performance fell below this range, and we will provide updates on steps we are taking to improve performance as the year progresses."

Non-performing Assets and Charge-offs Increase from
Historic Low Levels

Non-performing assets to total assets increased to 63
basis points during the quarter from 51 basis points in the
third quarter and 34 basis points in Q4-05. Net charge-
offs increased to $7.6 million during the quarter from
$1.9 million both in the prior quarter and one year ago.
"We have previously noted that the historically low
NPAs and charge-offs we have experienced over the last
few years were unsustainable, and, indeed, we saw
erosion in our credit metrics during the fourth quarter. In
light of this, we are increasing our provision for loan
losses," commented Scott Keys, IndyMac's Chief
Financial Officer. "We expect current credit conditions to
worsen further in 2007 in connection with the housing
market cycle and therefore are planning for significant
increases in loan loss provisions and charge-offs in 2007
versus 2006.

175.   Notably, the Company further revealed some of the details of the
financial problems caused by Defendants' fraud:

- increased credit costs related to marking-to-market delinquent loans
  held for sale;

- an increase in the Company's secondary marketing loan repurchase
  reserve;

- a nearly two-fold increase in the Company's loan loss provision to
  $9 million from $5 million in the prior quarter and $1.6 million in
  Q4-05; and

- Non-performing assets to total assets increased to 63 basis points
  during the quarter from 51 basis points in the third quarter and 34
  basis points in Q4-05. Net charge-offs increased approximately

FIFTH AMENDED CLASS ACTION COMPLAINT

four-fold to $7.6 million during the quarter from $1.9 million both in the prior quarter and one year ago.

176.    While Defendants were careful not to specifically admit fraud or misconduct in the January 25, 2007 statements, the statements further disclosed the impact of their fraud.  That is, *inter alia*, but for Defendants' violations of the Company's internal/operational controls over underwriting (which resulted in the issuance of bad and/or uncollectible loans that never should have been underwritten or purchased in the first place) the Company would not have experienced an increase in its credit costs and an increase non-performing assets on its books or been forced to increase its loan repurchase reserve, each of which negatively impacted the Company's financial results.

177.    While Defendants' false and misleading statements during the Class Period were repeated (and not expressly repudiated) by Defendants, incident to and after the Company's January 17 & 25, 2007 disclosures, Defendants' partial revelations of the truth were sufficient for the market to discern the falsity of Defendants' prior misrepresentations.  *See* ¶¶169-172 (discussing analyst statements).

178.    IndyMac's loosening of underwriting standards resulted in the Company's increasing reliance on high-risk 80/20 piggyback loans.  This was a direct cause of the Company's dramatic increase in credit losses for the fourth quarter of 2006 and the Company's need to significantly increase its provisions for loan loss and secondary market reserves.  During the Class Period, IndyMac began suffering credit losses as a result of a rash of EPDs on piggyback loans.  IndyMac was therefore forced to hold these defective loans, and was either unable to sell them in the secondary market or was subject to repurchase demands from the securitizations thereof.

179.    The underlying fraud, IndyMac's shoddy, camouflaged underwriting practices, directly caused the losses that the Company announced – and that

FIFTH AMENDED CLASS ACTION COMPLAINT

1   investors suffered – at the end of the Class Period.  IndyMac's excuses for its

2   abysmal performance – credit losses, increased provisions for loan loss reserves,

3   and mark downs on its impaired loan portfolio – were the direct and natural

4   consequences of the Company's loosening of underwriting standards.  As it

5   began to rely precariously and heavily on high-risk 80/20 piggyback loans, the

6   Company was doomed to face more loan delinquencies and defaults, and thus

7   suffer greater credit losses, be required to increase its loan loss reserves and be

8   forced to mark down its impaired loans.

9        180.   IndyMac's increased credit losses were, in part, the direct result of

10  IndyMac's declining credit quality which was inextricably linked to the

11  Company's reliance on piggyback loans.  Perry discussed these issues during an

12  earnings conference call IndyMac held on January 25, 2007 (the "January 25,

13  2007 Earnings Conference Call").

14       181.   Perry admitted on the January 25, 2007 analyst Conference Call that

15  in connection with "[t]he increase [in credit costs] from the third to fourth

16  quarter, we are seeing some problems in certain pieces of 80/20 piggyback

17  programs."  It was further admitted in IndyMac's Earnings Presentation filed

18  January 25, 2007 that "Higher credit mark-to-market losses in Q4 06 were

19  concentrated in the prime 80/20 and subprime products."

20       182.   Indeed, the disproportionately-high tendency for piggyback loans to

21  default specifically manifested in the Company's credit losses recognized at the

22  end of the Class Period.  While about 20% of IndyMac's loan production for the

23  fourth quarter of 2006 – or $5 billion out of $25.9 billion – consisted of 80/20

24  piggyback loans, nearly <u>60%</u> of credit losses on loans held for sale during the

25  fourth quarter of 2006 – or $10.27 million out of $17.66 million – were

26  attributable entirely to 80/20 piggyback loans.  As revealed in a press release

27  issued by IndyMac on March 15, 2007:

28

Appendix A
Recent Guideline Cutbacks(a)

| Product Group ($ in millions) | 4th Quarter Production | Production Eliminated | Percent of 4th Quarter Production Eliminated |
|---|---|---|---|
| 80/20 Piggybacks | $ 4,990 | $ 2,689.5 | 53.9% |
| Subprime | $ 1,155 | $ 444.7 | 38.5% |
| Alt-A and Prime | $ 11,205 | $ 586.5 | 5.2% |
| Option ARM | $ 5,201 | $ 211.3 | 4.1% |
| Second Liens (CES and HELOCs) | $ 1,169 | $ 201.7 | 17.3% |
| Consumer Construction | $ 785 | $ 1.2 | 0.2 % |
| Reverse Mortgages | $ 1,441 | $ - | - % |
| Total | $ 25,946 | $ 4,134.9 | 15.9% |

| Product Group ($ in millions) | 4th Quarter Credit Losses on Loans Held for Sale (LHFS) | 4th Quarter Credit Losses on LHFS Related To Eliminated Production | Percent of 4th Quarter Credit Losses on LHFS Eliminated |
|---|---|---|---|
| 80/20 Piggybacks | $ 10.27 | $ 9.06 | 88.2% |
| Subprime | $ 3.12 | $ 2.64 | 84.4% |
| Alt-A and Prime | $ 2.10 | $ 0.01 | 0.3 % |
| Option ARM | $ 1.42 | $ 0.02 | 1.7% |
| Second Liens (CES and HELOCs) | $ 0.41 | $ 0.40 | 96.8% |
| Consumer Construction | $ 0.34 | $ - | - % |
| Reverse Mortgages | $ - | $ - | - % |
| Total | $ 17.66 | $ 12.12 | 68.6% |

FIFTH AMENDED CLASS ACTION COMPLAINT

(a) Includes some guideline cutbacks that are scheduled to take place
on March 19, 2007.

183.   Indeed, the Company subsequently further <u>admitted</u> – beyond its
January 25, 2007 admissions – that its losses were heavily tied to its precarious
reliance on high-risk piggyback loans.  In the IndyMac Earnings Presentation
dated April 26, 2007 the Company stated that "The Credit M[ark to Market]
Allowance On Loans Held For Sale Has Increased Due To Poor Performance of
'Piggybacks' And Subprime…"  (April 26, 2007 Presentation Slide at page 24.)
The presentation further stated that "Credit Losses In Our H[eld For Sale]
Portfolio Were Due Primarily To Higher Early Payment Defaults In Our
Piggyback And Higher LTV Subprime Programs."  (April 26, 2007 Presentation
Slide at page 25.)

184.   Furthermore, in a UBS Conference Presentation, dated May 15,
2007, the Company admitted "Yes, We Expanded Guidelines Too Far On
Piggyback And Subprime Loans…" which impacted the Company's earnings
with "Estimated abnormal credit costs of $30-35 million from 2006-Q2 07."
(May 15, 2007 Presentation Slide at page 11.)

185.   Indeed, early or first payment defaults on piggyback loans plagued
entire loan pools.  As detailed above in the section elaborating on the Silver State,
Lancaster and Geneva toxic loan pools, there is no doubt that a material portion
of IndyMac's fourth quarter 2006 credit losses (and need to increase loan loss
reserves) were a direct result of its growing reliance on piggyback loans
stemming from its shoddy underwriting practices during the Class Period.

186.   During the January 25, 2007 Earnings Conference Call, Perry
disclosed flaws in the Company's internal/operational controls and forecasting.
For example, Perry admitted that "[o]ur provision for loan losses is increasing. . .

1  Credit quality generally is deteriorating so I would say that's something we have
2  to do a better job forecasting, and clearly we want to be a little more conservative
3  as it relates to that… This is something we should have done a better job
4  forecasting on.  This is something that we probably could have seen better if we
5  had more precise models . . ." *Id.* at 4.

6      187.  On the January 25, 2007 Conference Call, analysts also focused on
7  the Company's need to substantially increase provisions for loan loss reserves.
8  For example, one concerned analyst, Manuel Ramirez, asked: "I was kind of
9  doing the math on the provision, given your charge-off guidance and your
10  guidance for net-loan growth, and ***it seems like the provision could be up pretty***
11  ***substantially year-over-year.***" (*Id.* at 15) (emphasis added).

12      188.  IndyMac's January 25, 2007 partial disclosure caused its stock to
13  tumble to $37.71 at close, down from $40.70 at close on January 24, 2007.

14      189.  The timing and magnitude of IndyMac's stock price decline negates
15  any inference that the loss suffered by Plaintiffs and other Class members was
16  caused by changed market conditions, macroeconomic or industry factors or
17  Company-specific facts unrelated to the Defendants' fraudulent conduct.

18      190.  This fact was confirmed by financial analysts covering IndyMac,
19  who, although aware of the tough real estate/mortgage market, were shocked by
20  IndyMac's January disclosures and questioned management's credibility as a
21  result.  *See* January 26, 2007 Lehman Brothers IndyMac research report ("The
22  challenging environment was not surprising, but the extent of NDE's struggles
23  was"; January 26, 2007 FBR IndyMac research report ("With the disappointing
24  4Q06 earnings and significantly reduced FY07 outlook, we feel NDE's
25  management team lost some credibility.").

26
27  **C.    The Market Learns the Truth About Indymac's
        Deficient Underwriting Guidelines and Risk Management**
28

191.   On March 1, 2007, the Company issued a Press Release in which Perry admitted that the Company had loosened its underwriting guidelines during 2006, and promised to mend its ways.  Specifically, Perry stated that:

> 2006 was a challenging year in the mortgage banking industry. Industry loan volumes of $2.5 trillion were 34 percent below 2003's historic high level and 17 percent lower than in 2005.

> *            *            *

> Given that reality, here is what we will do to improve performance for our shareholders right now:

> ***1.  Manage our credit risks by being smart and prudent in adjusting our mortgage underwriting guidelines, setting our risk-based pricing, making decisions as to what assets go into our investment portfolio and/or distributing our risk into the secondary market, and executing on best in class loss prevention and loss mitigation practices.***

> *            *            *

> ***Given the robust housing market and highly liquid secondary markets (for even the "riskiest loans") - both of which persisted for years longer than anticipated - and given strong competition in a declining overall mortgage market, IndyMac, in order to compete and grow, also loosened its lending standards, though in a much more responsible way.***
> [Emphasis added.]

192.   As a result of the March 1, 2007 disclosure, IndyMac's share price dropped even more, to $32.16 at close, down from $34.33 on February 28, 2007, on large trading volume.

## VII.   POST CLASS PERIOD DISCLOSURES: THE OFFICE OF THE INSPECTOR GENERAL'S AUDIT REPORT

1    193.   In the wake of IndyMac's failure and seizure by the FDIC, the

2  Office of the Inspector General, Department of the Treasury (the "OIG")

3  conducted an investigation to determine what went so wrong at the Company.

4    194.   On February 26, 2009, the OIG issued a report setting forth its

5  findings (the "Audit Report"), aptly summarized as follows: the "underlying

6  cause of [IndyMac's] failure was the unsafe and unsound manner in which the

7  thrift was operated."  Audit Report at 3.

8    195.   Consistent with Plaintiffs' allegations concerning the Company's

9  "anything goes" attitude concerning underwriting (*see* ¶¶10; 54), the Audit

10 Report confirms that the Company engaged in "unsound underwriting practices,"

11 stating:

12       • "IndyMac encouraged the use of nontraditional loans.

13          IndyMac's underwriting guidelines provided flexibility in

14          determining whether, or how, loan applicants' employment,

15          income, and assets were documented or verified. . . .  For the

16          loans reviewed, we found little, if any, review of borrower

17          qualifications, including income, assets, and employment. We

18          also found weaknesses with property appraisals obtained to

19          support the collateral on the loans. . . ." (*Id.* at 11); and

20       • "IndyMac's business model was to produce as many loans as

21          possible and sell them on the secondary market.  To facilitate this

22          level of production. . . IndyMac often did not perform adequate

23          underwriting" (*Id.* at 21).

24    196.   The Audit Report also confirms Plaintiffs' allegations concerning

25 the Company's inadequate loan loss reserves, stating:

26       • As early as 2004, IndyMac senior management began observing the

27          probability of a downward trend in real estate values, which could

28

reduce the collateral supporting loans and result in possible loan losses. Regardless, IndyMac's ALLL [Allowance for Loan and Lease Losses] decreased as a percentage of the thrift's total loans until 2007 when it finally increased its ALLL because it began to experience losses in its loan portfolio.

197.    Additionally, the Audit Report criticized IndyMac's Conduit Division which, as described at ¶¶15; 37-41, was responsible for bulk purchases of loans from brokers (such as Silver State and Lancaster), finding that:

- IndyMac's "internal audit group reported problems with the Conduit Division as early as 2005" relating to its "loan approval and underwriting process" (*Id.* at 22);

- IndyMac's Conduit Division was reported as a "financial reporting control deficiency" by the Company's independent auditor in 2006 (*Id.*); and that

- Despite the above described warnings (over a period of two years), these "major weaknesses" continued until the Office of Thrift Supervision stepped in during 2007. *Id.* at 23. "Shortly after, IndyMac recognized losses were occurring from this division and closed it." *Id.*

198.    The above-cited statement from the Audit Report, along with others, corroborate the testimony of the CWs as follows:

| Audit Report Findings | Corroborates CW Testimony |
|---|---|
| "Appraisals obtained by IndyMac on underlying collateral were often questionable as well." (p.2) "IndyMac often made loans without verification of the borrower's income or assets, and to borrowers with poor credit histories." (p.2) | CW1 testimony (¶¶46) CW2 testimony (¶53) CW4 testimony |

FIFTH AMENDED CLASS ACTION COMPLAINT

| | |
|---|---|
| "IndyMac engaged in very high-risk activities over many years" (p.3)<br>"Many of [IndyMac's] nontraditional mortgages, however, came with an increased risk of borrower default." (p.8)<br>"These [IndyMac] loans proved to be even riskier because for the most part they were originated with less than full documentation." (p.8)<br>"For the loans reviewed, we found little, if any, review of borrower qualifications, including income, assets, and employment." (p.11)<br>"We also found weaknesses with property appraisals obtained to support the collateral on the loans." (p.12)<br>"Loan 3" -- $1.475 million stated income 80/20 piggyback loan; no borrower income verification; a peculiar "exception" to IndyMac underwriting guidelines; questionable appraisal; first payment default (pp.72-73) | (¶63)<br>CW5 testimony<br>(¶65)<br>CW7 testimony<br>(¶¶81) |
| "IndyMac embarked on a path of aggressive growth." (p.6)<br>IndyMac "generated about $10 billion in loans in 2000 to a high of $90 billion in 2006." (p.7)<br>"IndyMac's business model was to produce as many loans as possible and sell them in the secondary market.  To facilitate this level of production, we found that IndyMac often did not perform adequate underwriting." (p.21) | CW1 testimony<br>(¶¶45)<br>CW2 testimony<br>(¶¶73)<br>CW3 testimony<br>(¶60)<br>CW5 testimony<br>(¶65) |
| "By May 2005, signs of borrower distress were evident." (p.9)<br>"As early as 2004, IndyMac senior management began observing the probability of a downward trend in real estate values, which could reduced the collateral supporting loans and result in possible loan losses. Regardless, IndyMac's [Allowance for Loan and Lease Losses] decreased as a percentage of the thrift's total loans until 2007..." (p.10) | CW2 testimony<br>(¶53)<br>CW4 testimony<br>(¶72)<br>CW6 testimony<br>(¶69) |

## VIII.    ADDITIONAL FACTS SUPPORTING

### DEFENDANTS' SCIENTER

### A.    Perry's Certifications

FIFTH AMENDED CLASS ACTION COMPLAINT

1      199.   Throughout the Class Period, Perry repeatedly certified that he had

2   reviewed and approved of the Company's internal controls and financial

3   reporting, both of which have been demonstrated above to be false and

4   misleading.

5      200.   For example, attached to the 2005 10-K, as Exhibit 31.1 and 32.1

6   were certifications required by SOX, and executed by Perry.  In his certifications

7   attached to the 2005 Form 10-K, Perry stated that he had:

8

9           designed such internal control over financial reporting,
            or caused such internal control over financial reporting
10          to be designed under our supervision, to provide
11          reasonable assurance regarding the reliability of
            financial reporting and the preparation of financial
12          statements for external purposes in accordance with
13          generally accepted accounting principles.[5]

14     201.   Perry further stated, again in his written certifications attached to the

15  2005 Form 10-K that:

16

17          I have disclosed, based on our most recent evaluation of
            internal control over financial reporting, to the registrant's
18          auditors and the audit committee of the registrant's board of
19          directors (or persons performing the equivalent functions):

20          (a) all significant deficiencies and material weaknesses in
21          the design or operation of internal control over financial
            reporting which are reasonably likely to adversely affect
22          the registrant's ability to record, process, summarize and
23          report financial information; and

24

25

26

27  _____
    [5] Perry repeated this statement in each of the Company's filings with the SEC
28  on Form 10-Q during the Class Period.

FIFTH AMENDED CLASS ACTION COMPLAINT

72

1      (b) any fraud, whether or not material, that involves
2      management or other employees who have a significant role in
       the registrant's internal control over financial reporting.

3      202.  Perry's certification of the Company's internal/operational controls

4    is probative of his scienter.

5      203.  This is so because the Company's controls over underwriting were

6    wholly ineffective (and violated by or caused to be violated by Perry *see e.g.*

7    ¶¶127; 128), resulting in the Company underwriting hundreds of millions of

8    dollars worth of loans for which it was "probable" and/or "reasonably possible"

9    that the Company would experience default.  Given that the Company did not

10   adequately reserve against these potential losses, the Company's presentation of

11   its financial results violated Statements of Financial Accounting Standards No. 5,

12   Accounting for Contingencies ("SFAS 5"), a core principle of Generally

13   Accepted Accounting Principles, rendering any statement that the Company had

14   "reasonable assurance regarding the reliability of financial reporting" utterly

15   false.

16     204.  It is clear that defendant Perry knew or was reckless in not knowing

17   of the violations of the Company's underwriting controls and standards

18   (rendering the statements at ¶¶200-201 materially false and misleading) for the

19   following reasons.  First, Perry directed employees to (i) "push loans through"

20   regardless of whether they satisfied the Company's underwriting guidelines; (ii)

21   input false information into the Company's e-MITS underwriting control system,

22   to cause the approval of loans that would normally be rejected; and (iii) engage in

23   violations of the Company's "rate lock" protocols and controls.  *See* ¶¶119, 120,

24   122, 123.  Second, Perry was aware that rampant fraud and lying by loan sales

25   representatives was taking place, yet he continued to push employees to close

26   loans "at all costs."  *See id.*  Third, the wide-ranging and management-directed

27   violations of the Company's underwriting guidelines and controls evidences a

28

---

FIFTH AMENDED CLASS ACTION COMPLAINT

culture of fraud at the Company. *See* ¶¶128. Fourth, the number of fraudulent loans discovered at the Company increased by 1500% from 2003 to mid-2006, rendering the lack of control over underwriting facially obvious. *See* ¶68. Fifth, the massive increase in bad loan "kickbacks" requiring repurchase by the Company resulted in the initiation of a large "special project" initiated by management to rehabilitate those loans. *See* ¶¶73, 75. Finally, the numerous lawsuits filed by the Company show that it knew that certain pools of loans that it had purchased and underwritten from certain sellers were defaulting at rates as high as 90% (in 2005), and 97% (in 2006), rendering the inadequacy of the Company's underwriting controls facially obvious to Perry and the Company. *See* ¶84.

**B.    Perry's Financial Incentive**

205.   In addition to the facts supporting the conclusion that Defendants made false statements knowingly or with deliberate recklessness, defendant Perry had a financial incentive to make such false statements.

206.   Defendant "Perry's 2006 Short-Term Cash Incentive was entirely performance based, determined by IndyMac's 2006 EPS and ROE." 2006 Proxy at 39. The Proxy continued:

> Thresholds of 2005's EPS and a 14 percent ROE were specified on an award matrix, growing to a $1 million award when EPS grew 15 percent and ROE exceeded 19 percent. Based on IndyMac's 2006 EPS of $4.82, and 8.8 percent growth, and a 19.1 percent ROE, the award matrix yielded a $791,300 payout. The MDC ["IndyMac's Management Development and Compensation Committee"] retained the right to make a potential downward adjustment to this amount if regulatory ratings worsened or if certain strategic criteria were not met. Based on 2006 results, the MDC made no adjustments.

1

2      207.   Thus, defendant Perry had motive to inflate loan production during

3  the Class Period by directing that internal/operational controls be overridden.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## IX.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

208.   At all relevant times, the market for IndyMac common stock was an efficient market for the following reasons, among others:

      (a)   IndyMac stock met the requirement for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

      (b)   As a regulated issuer, IndyMac filed periodic public reports with the SEC and NYSE;

      (c)   IndyMac regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

      (d)   IndyMac was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

209.   As a result of the foregoing, the market for IndyMac common stock promptly digested current information regarding IndyMac from all publicly-available sources and reflected such information in IndyMac's stock price.  Under these circumstances, all purchasers of IndyMac common stock during the Class

1  Period suffered similar injury, and a presumption of reliance applies.

2

3  **X.    NO STATUTORY SAFE HARBOR EXISTS**
   **FOR DEFENDANTS' STATEMENTS**

4

5        210.   The statutory safe harbor provided for forward-looking statements

6  under certain circumstances does not apply to any of the false statements pleaded

7  in this complaint. The specific statements pleaded herein either were not

8  identified as "forward-looking statements" when made or were not accompanied

9  by meaningful cautionary statements identifying important factors that could

10 cause actual results to differ materially from those in the purportedly forward-

11 looking statements. To the extent that the statutory safe harbor does apply to any

12 forward-looking statements pleaded herein, Defendants are liable for those false

13 forward-looking statements because at the time each of those forward-looking

14 statements was made, the particular speaker knew that the particular forward-

15 looking statement was authorized and/or approved by an executive officer of

16 IndyMac who knew that those statements were false when made.

17 **XI.   CLASS ACTION ALLEGATIONS**

18       211.   Lead Plaintiffs bring this action as a class action pursuant to Federal

19 Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all

20 those who purchased or otherwise acquired the common stock of IndyMac from

21 January 26, 2006 through March 1, 2007, inclusive and who were damaged

22 thereby. Excluded from the Class are Defendants, the officers and directors of the

23 Company, at all relevant times, members of their immediate families and their

24 legal representatives, heirs, successors or assigns and any entity in which

25 Defendants have or had a controlling interest.

26       212.   The members of the Class are so numerous that joinder of all

27 members is impracticable.  Throughout the Class Period, IndyMac's common

28

1  stock was actively traded on the NYSE.  While the exact number of Class

2  members is unknown to Plaintiffs at this time and can only be ascertained

3  through appropriate discovery, Plaintiffs believe that there are hundreds or

4  thousands of members in the proposed Class.  Record owners and other members

5  of the Class may be identified from records maintained by IndyMac or its transfer

6  agent and may be notified of the pendency of this action by mail, using the form

7  of notice similar to that customarily used in securities class actions.

8        213.   Plaintiffs' claims are typical of the claims of the members of the

9  Class as all members of the Class are similarly affected by Defendants' wrongful

10 conduct in violation of federal law that is complained of herein.

11       214.   Plaintiffs will fairly and adequately protect the interests of the

12 members of the Class and they have retained counsel competent and experienced

13 in class and securities litigation.

14       215.   Common questions of law and fact exist as to all members of the

15 Class and predominate over any questions solely affecting individual members of

16 the Class. Among the questions of law and fact common to the Class are:

17             (a)    whether the federal securities laws were violated by

18       Defendants' acts as alleged herein;

19             (b)    whether statements made by Defendants to the investing

20       public during the Class Period misrepresented material facts about the

21       business, operations and management of IndyMac; and

22             (c)    to what extent the members of the Class have sustained

23       damages and the proper measure of damages.

24       216.   A class action is superior to all other available methods for the fair

25 and efficient adjudication of this controversy since joinder of all members is

26 impracticable. Furthermore, as the damages suffered by individual Class

27 members may be relatively small, the expense and burden of individual litigation

28

FIFTH AMENDED CLASS ACTION COMPLAINT

1  make it impossible for members of the Class individually to redress the wrongs

2  done to them.  There will be no difficulty in the management of this action as a

3  class action.

4  **XII.    FIRST CLAIM**

**Violations of Section 10(b) of the Exchange Act**
**And Rule 10b-5 Promulgated Thereunder**
**Against All Defendants**

8       217.    Plaintiffs repeat and reallege each and every allegation contained

9  above.

10      218.    Each of the Defendants: (a) knew or recklessly disregarded material

11  adverse nonpublic information about the Company's financial results and then

12  existing business conditions, which were not disclosed; and (b) participated in

13  drafting, reviewing and/or approving the misleading statements, releases, reports,

14  and other public representations of and about the Company.

15      219.    Defendant Perry was privy to adverse non-public information

16  concerning IndyMac's business, finances, products, markets and present and

17  future business prospects via access to internal corporate documents,

18  conversations and connections with other corporate officers and employees,

19  attendance at management and Board of Directors meetings and committees

20  thereof, and via reports and other information provided to him in connection

21  therewith.  Because of his possession of such information, Perry knew or

22  recklessly disregarded that the adverse facts specified herein had not been

23  disclosed to, and were being concealed from, the investing public.

24      220.    By virtue of his high-level positions with the Company, defendant

25  Perry directly participated in the management of the Company, was directly

26  involved in the day-to-day operations of the Company at the highest levels and

27  was privy to confidential proprietary information concerning the Company and its

28

FIFTH AMENDED CLASS ACTION COMPLAINT

78

1   business, operations, growth, financial statements, and financial condition, as

2   alleged herein.  Perry was involved in drafting, producing, reviewing and/or

3   disseminating the false and misleading statements and information alleged herein,

4   was aware, or recklessly disregarded, that the false and misleading statements

5   was being issued regarding the Company, and approved or ratified these

6   statements, in violation of the federal securities laws.

7        221.   As an officer and director (as well as a controlling person) of a

8   publicly-held company whose common stock was, and is, registered with the

9   SEC pursuant to the Exchange Act, and was traded on the New York Stock

10  Exchange ("NYSE") and governed by the provisions of the federal securities

11  laws, defendant Perry had a duty to disseminate promptly, accurate and truthful

12  information with respect to the Company's financial condition and performance,

13  growth, operations, financial statements, business, markets, management,

14  earnings and present and future business prospects, and to correct any previously-

15  issued statements that had become materially false and/or misleading, so that the

16  market price of the Company's publicly-traded common stock would be based

17  upon truthful and accurate information. Defendants' misrepresentations and

18  omissions during the Class Period violated these specific requirements and

19  obligations.

20       222.   During the Class Period, Defendants, with knowledge of or reckless

21  disregard for the truth, disseminated or approved the false statements specified

22  above, which were misleading in that they contained misrepresentations and

23  failed to disclose material facts necessary in order to make the statements made,

24  in light of the circumstances under which they were made, not misleading.

25       223.   Defendants have violated § 10(b) of the Exchange Act and Rule 10b-

26  5 promulgated thereunder in that they: (a) employed devices, schemes and

27  artifices to defraud; (b) made untrue statements of material facts or omitted to

28

FIFTH AMENDED CLASS ACTION COMPLAINT

79

1  state material facts necessary in order to make statements made, in light of the

2  circumstances under which they were made, not misleading; or (c) engaged in

3  acts, practices and a course of business that operated as a fraud or deceit upon the

4  purchasers of IndyMac stock during the Class Period.

5      224.  Plaintiffs and the Class have suffered damage in that, in reliance on

6  the integrity of the market, they paid artificially inflated prices for IndyMac

7  stock. Plaintiffs and the Class would not have purchased IndyMac stock at the

8  prices they paid, or at all, if they had been aware that the market prices had been

9  artificially and falsely inflated by Defendants' false and misleading statements.

10      225.  As a direct and proximate result of Defendants' wrongful conduct,

11  Plaintiffs and the Class suffered damages in connection with their respective

12  purchases of the Company's common stock during the Class Period.

13  **XIII.** <u>**SECOND CLAIM**</u>

14  

**Violations of Section 20(a) of the Exchange Act**

15  **Against Perry**

16

17      226.  Plaintiffs repeat and reallege each and every allegation contained

17  above.

18

19      227.  Perry acted as a controlling person of the Company within the

20  meaning of § 20(a) of the Exchange Act. By reason of his senior executive

21  positions, he had the power and authority to cause the Company to engage in the

21  wrongful conduct complained of herein.

22

23      228.  By reason of such wrongful conduct, Perry is liable pursuant to §

24  20(a) of the Exchange Act. As a direct and proximate result of his wrongful

25  conduct, Plaintiffs and the other members of the Class suffered damages in

25  connection with their purchases of IndyMac stock during the Class Period.

26  **XIV.** <u>**PRAYER FOR RELIEF**</u>

27      WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

28

FIFTH AMENDED CLASS ACTION COMPLAINT

1        A.      Determining that this action is a proper class action and certifying

2    Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil

3    Procedure;

4        B.      Awarding compensatory damages in favor of Plaintiffs and the other

5    Class members against all Defendants, jointly and severally, for all damages

6    sustained as a result of Defendants' wrongdoing, in an amount to be proven at

7    trial, including interest thereon;

8        C.      Awarding Plaintiffs and the Class their reasonable costs and

9    expenses incurred in this action, including counsel fees and expert fees; and

10       D.      Such other and further relief as the Court may deem just and proper.

11   **XV.**         **JURY TRIAL DEMANDED**

12       Plaintiffs hereby demand a trial by jury.

13   Dated:  October 5, 2009            Respectfully submitted,

14

15                     GLANCY BINKOW & GOLDBERG, LLP

16

17                By: _____

18                     Lionel Z. Glancy
                  Peter A. Binkow

19                     Neal A. Dublinsky
                  Andy Sohrn

20                     1801 Avenue of the Stars
                  Suite 311

21                     Los Angeles, CA 90067

22                     (310) 201-9150

23                     *and*

24

25                     Frederick W. Gerkens, III

26                     1430 Broadway, Suite 1603
                  New York, New York 10018

27                     (212) 382-2221

28

FIFTH AMENDED CLASS ACTION COMPLAINT

*Liaison Counsel for Plaintiffs*

BARROWAY TOPAZ KESSLER
MELTZER & CHECK, LLP
Christopher L. Nelson
Lauren Wagner Pederson
John J. Gross
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706

*and*

Ramzi Abadou (Bar No. 222567)
580 California Street, Suite 1750
San Francisco, California 94104
Phone: (415) 400-3000
Fax: (415) 400-3001

Email:    rabadou@btkmc.com
          cnelson@btkmc.com
          lpederson@btkmc.com
          jgross@btkmc.com

*Lead Counsel for Plaintiffs*

COHEN, MILSTEIN, SELLERS
   & TOLL, PLLC
Steven J. Toll
Andrew N. Friedman
Matthew B. Kaplan
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC 20005
(202) 408-4600

*Additional Counsel for Plaintiffs*

FIFTH AMENDED CLASS ACTION COMPLAINT

82

1

## PROOF OF SERVICE BY ELECTRONIC MAIL

2

3      I, the undersigned, say:

4

5      I am a citizen of the United States and am employed in the office of a member
of the Bar of this Court. I am over the age of 18 and not a party to the within action.

6 My business address is 1801 Avenue of the Stars, Suite 311, Los Angeles, California
90067.

7      On October 5, 2009, I served the following document:

8

9           **FIFTH AMENDED CLASS ACTION COMPLAINT**
       **FOR VIOLATIONS OF SECTIONS 10(b) AND 20(a) OF**

10            **THE SECURITIES EXCHANGE ACT OF 1934**

11

12 upon the following parties:

13

       David B Bayless                        Christopher L Nelson
14     Tammy Albarran                         John J Gross
       Kelly Patrice Finley                   Katharine M Ryan
15     Covington and Burling LLP              Barroway Topaz Kessler Meltzer & Check,
       Email: dbayless@cov.com                LLP
16     Email: talbarran@cov.com               Email: cnelson@btkmc.com
       Email: kfinley@cov.com                 Email: jgross@btkmc.com
17                                            Email: kryan@btkmc.com

       Andrew N Friedman
18     Matthew B Kaplan                       Frederick W Gerkens , III
       Cohen Milstein Sellers and Toll        Email: fgerkens@glancylaw.com
19     Email: afriedman@cmht.com
       Email: mkaplan@cohenmilstein.com

20

21      **By Electronic Mail**: I sent the above-referenced document to the parties listed

22 above via electronic mail no later than 5:00 p.m. on October 5, 2009.

23      I certify under penalty of perjury under the laws of the United States of
America that the foregoing is true and correct. Executed on October 5, 2009, at Los

24 Angeles, California.

25

26

                                 _____
27                               Sasha A. Radcliffe

28