DAVID B. BAYLESS (SBN 189235)
E-mail: dbayless@cov.com
TAMMY ALBARRAN (SBN 215605)
E-mail: talbarran@cov.com
PAUL WATKINS (SBN 244974)
E-mail: pwatkins@cov.com
COVINGTON & BURLING LLP
One Front Street
San Francisco, CA 94111-5356
Telephone: 415-591-6000
Facsimile: 415-591-6091

Attorneys for Defendant Michael W. Perry

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| WAYMAN TRIPP and SVEN MOSSBERG, Individually and On Behalf of All Others Similarly Situated,<br><br>       Plaintiffs,<br><br> v.<br><br>INDYMAC BANCORP, INC., and MICHAEL W. PERRY,<br><br>       Defendants. | Case No.: 2:07-cv-1635-GW (VBK)<br><br>**DEFENDANT MICHAEL W. PERRY'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' FIFTH AMENDED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:   December 10, 2009<br>Time:   8:30 a.m.<br>Courtroom: 10<br>Judge:  Hon. George H. Wu |

**NOTICE OF MOTION**

TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on December 10, 2009, at 8:30 a.m., or as soon thereafter as the matter may be heard, in the Courtroom of the Honorable George H. Wu, at the United States District Court, Central District of California, 312 N. Spring Street, Los Angeles, CA 90012, defendant Michael W. Perry ("Perry") will and hereby does move the Court, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss this action against him with prejudice. This Motion is brought on the grounds that the Fifth Amended Class Action Complaint ("5AC") fails to state a claim upon which relief can be granted and does not meet the pleading requirements of Federal Rules of Civil Procedure 8(a)(2) and 9(b), and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4.

This Motion is based on this Notice of Motion and Motion, the concurrently filed Memorandum of Points and Authorities; the Declaration of Tammy Albarrán in support of Perry's Motion ("Albarrán Declaration") and exhibits attached thereto ("Ex. __"); the Request for Judicial Notice of documents attached to the Albarrán Declaration; the papers and pleadings on file with this Court; and such other written or oral argument and other materials as may be presented to this Court.

This Motion is made following the conference of counsel pursuant to L.R. 7-3, which took place on October 6, 2009.

DATED: October 26, 2009       COVINGTON & BURLING LLP

By:     */s/ David B. Bayless*
           David B. Bayless
Attorneys for Defendant Michael W. Perry

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................1

LEGAL ARGUMENT ............................................................................1

I.   The 5AC Fails to Plead Loss Causation......................................1

    A.   The Two Elements of Loss Causation. ................................1

    B.   The March 1, 2007 Shareholder Letter Does Not Correct, or Reveal the Alleged Falsity of, Perry's Prior Statements. ...................3

    C.   IndyMac Had Previously Disclosed the "Loosening" of the Two Underwriting Metrics Discussed in the March 1, 2007 Shareholder Letter.................................................................6

    D.   Judicially Noticed Facts of Market Reaction Confirms That Perry's Remarks Did Not Reveal That His Prior Underwriting Statements Were False. ....................................9

        1.   Two Analyst Reports Issued Immediately After the March 1, 2007 Disclosure Confirm That It Did Not Correct, or Reveal as Untrue, Prior Underwriting Statements.......................................................9

        2.   The April 2007 Shareholder Vote Also Confirms That Perry Did Not Reveal on March 1, 2007 That His Prior Underwriting Statements Were False or Misleading. ...........................................................11

    E.   Market Conditions, Not Fraud, Caused the Share Price Decline. ..............................................................................12

II.  The 5AC Fails to Plead that Perry's Alleged Misstatements Were Material When Made................................................................14

    A.   A Complaint Alleging Securities Fraud Must Allege Facts That Show That Each Alleged Misstatement Was Material..............14

    B.   The 5AC Fails to Allege Facts That Show the Materiality of Any of the Alleged Misstatements.....................................16

CONCLUSION...................................................................................20

# TABLE OF AUTHORITIES

Page(s)

**FEDERAL CASES**

*Ashcroft v. Iqbal*
129 S. Ct. 1937 (2009) ........................................................................ 12, 15, 17

*Basic, Inc. v. Levinson*
485 U.S. 224 (1988) ............................................................................ 14, 15, 18

*Bell Atl. Corp. v. Twombly*
550 U.S. 544 (2007) .................................................................................. 15, 17

*Caremark, Inc. v. Coram Healthcare Corp.*
113 F.3d 645 (7th Cir. 1997) .............................................................................. 2

*Dura Pharms., Inc. v. Broudo*
544 U.S. 336 (2005) .............................................................................. passim

*ECA and Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*
553 F.3d 187 (2d Cir. 2009) ................................................................................ 15

*Garber v. Legg Mason, Inc.*
537 F. Supp. 2d 597 (S.D.N.Y. 2008), *aff'd*, No. 08-1831-cv, 2009 WL 3109914 (2d Cir. Sept. 30, 2009) ....................................................... 15, 16, 18

*In re Countrywide Fin. Corp. Sec. Litig.*
588 F. Supp. 2d 1132 (C.D. Cal. 2008)....................................................... passim

*In re Daou Sys., Inc. Sec. Litig.*
411 F.3d 1006 (9th Cir. 2005) ........................................................................... 13

*In re Dot Hill Sys. Corp. Sec. Litig.*
No. 06-CV-228 JLS .............................................................................................. 1

*In re Hansen Natural Corp. Sec. Litig.*
527 F. Supp. 2d 1142 (C.D. Cal. 2007)............................................................... 16

*In re Intelligroup Sec. Litig.*
468 F. Supp. 2d 670 (D. N.J. 2006) ................................................. 2, 12, 13, 14

*In re Maxim Integrated Prods., Inc. Sec. Litig.*
No. C 08-00832 JW, 2009 WL 2136939 (N.D. Cal. Jul. 16, 2009)..................... 9

*In re Shoretel, Inc. Sec. Litig.*
No. C 08-00271 CRB, 2009 WL 248326 (N.D. Cal. Feb. 2, 2009)....................2

*J&R Marketing, SEP v. Gen. Motors. Corp.*
549 F.3d 384 (6th Cir. 2008) ...............................................................15

*Lentell v. Merrill Lynch & Co., Inc.*
396 F.3d 161 (2d Cir. 2005) ..........................................................1, 5

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*
540 F.3d 1049 (9th Cir. 2008) ......................................................2, 12

*New York State Teachers' Ret. Sys. v. Fremont Gen. Corp.*
No. 07-cv-5756-FMC-FFMx, 2009 WL 3112574 (C.D. Cal. Sept. 25,
2009) .......................................................................................16

*Norfolk County Ret. Sys. v. Ustian*
No. 07 C 7014, 2009 WL 2386156 (N.D. Ill. Jul. 28, 2009) .............................14

*Teamsters Local Pension and Welfare Funds v. Apollo Group, Inc.*
633 F. Supp. 2d 763 (D. Ariz. Mar. 31, 2009) ...........................................2, 9, 13

**OTHER AUTHORITIES**

17 C.F.R. § 240.10b-5(b)...........................................................................14

Fed. R. Civ. Proc. 8 .................................................................................17

**INTRODUCTION**

Defendant Michael W. Perry moves to dismiss the Fifth Amended Complaint ("5AC"). Like the numerous earlier iterations of the complaint, all of which have been dismissed, the 5AC fails to plead securities fraud adequately.

First, the 5AC fails to plead loss causation. Plaintiffs' earlier complaints alleged that Perry's supposed fraud was revealed to the market in January 2007. Plaintiffs now argue that the truth was revealed on March 1, 2007. But plaintiffs' new story likewise fails because Perry's March 1, 2007 statements did not correct, or reveal the falsity of, any of Perry's earlier alleged underwriting misstatements. And the minimal share price decline that day was due to IndyMac's reduced 2007 projections for return on equity, not to any revelation about Perry's alleged earlier misstatements. Second, the 5AC fails to plead facts that show that Perry's alleged misstatements were material when made. Accordingly, the 5AC should be dismissed -- this time with prejudice.[1]

**LEGAL ARGUMENT**

**I.    THE 5AC FAILS TO PLEAD LOSS CAUSATION**

**A.    The Two Elements of Loss Causation.**

Loss causation is an essential component of a federal securities fraud claim. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345-46 (2005) (plaintiff has burden of pleading loss causation). To plead loss causation, a complaint must plead two key facts. First, it must plead a "corrective disclosure," *i.e.*, a disclosure to the market that reveals that a prior representation was false when made. *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 175 n.4 (2d Cir. 2005); *In re Dot Hill Sys. Corp. Sec. Litig.*, No. 06-CV-228 JLS (WMc), 2009 WL 734296, at *14 (S.D. Cal. Mar. 18, 2009) (dismissing complaint and noting that "[a] disclosing

---

[1] Finally, and only if the Court finds that loss causation and materiality are pled, certain alleged misstatements must be stricken as not actionable. *See infra* note 8.

event which does not actually disclose the falsity of the alleged misrepresentations is inadequate."); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1200 (C.D. Cal. 2008).

Second, in reaction to this revelation of the truth, the share price must drop significantly. *Dura*, 544 U.S. at 347; *see also Teamsters Local Pension and Welfare Funds v. Apollo Group, Inc.*, 633 F. Supp. 2d 763, 822 (D. Ariz. Mar. 31, 2009) ("highly doubtful that a 5.3 percent price drop, assuming it was sufficiently tethered to [a purported corrective] disclosure would satisfy *Dura*'s requirement" of a "significant" fall in share price.) A share price decline due to "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events," such as reduced future projections, does not establish loss causation. *Dura*, 544 U.S. at 343.

Thus, a complaint cannot simply allege that a misrepresentation "'touches upon' a later economic loss." *Id.* Instead, it must plead facts that show that the market reacted negatively and significantly to the corrective disclosure. *See Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1062 (9th Cir. 2008) (citing *Dura*, 544 U.S. at 347); *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir. 1997) ("plaintiff must allege that it was the very facts about which the defendant lied which caused its injuries").

District courts have followed *Metlzer*'s holding and dismissed complaints where the share price decline was due to events *other than* a corrective disclosure. *In re Shoretel, Inc. Sec. Litig.*, No. C 08-00271 CRB, 2009 WL 248326, at *6 (N.D. Cal. Feb. 2, 2009) (dismissing Section 11 claim and finding, as in *Metzler*, the disclosure that allegedly caused plaintiffs' losses "cannot rationally be inferred as disclosing the alleged misstatements or misleading omissions" in the registration statement); *In re Intelligroup Sec. Litig.*, 468 F. Supp. 2d 670, 693-94 (D. N.J. 2006) (no loss causation merely on the basis of temporal proximity of the purported disclosure to a drop in share price, where plaintiff failed to "plead facts

1  indicating the presence of an *actual and quantifiable* relationship between the

2  alleged fraud and the decline of the stock price") (emphasis in original).

### B. The March 1, 2007 Shareholder Letter Does Not Correct, or Reveal the Alleged Falsity of, Perry's Prior Statements.

5  This Court has already held that the January 16 and January 25, 2007

6  disclosures do not constitute loss causation. (*See* Albarrán Decl., Ex. 10 at 880;

7  Ex. 11 at 991.) For this reason, plaintiffs change their story and now allege in the

8  5AC that the market "learned the truth" on March 1, 2007 -- more than a month

9  later than they previously alleged. (5AC ¶¶ 191-92.) Thus, the 5AC must plead

10 facts that show that the disclosures on March 1, 2007 corrected, or revealed the

11 alleged falsity of, Perry's earlier underwriting statements. It must also plead that

12 the market reacted to this revelation (and not other events) with a significant

13 decline in IndyMac's share price on that day. *Dura*, 544 U.S. at 343, 347.

14 On March 1, 2007, IndyMac publicly disclosed Perry's Letter to

15 Shareholders on Form 8-K. (Albarrán Decl., Ex. 13.) The 5AC alleges that

16 Perry's statement in this Shareholder Letter about IndyMac having "loosened its

17 lending standards" was a corrective disclosure that revealed that Perry's earlier

18 underwriting statements were false and misleading. (5AC ¶ 191.)

19 But, as they have done in prior complaints, plaintiffs again omit from the

20 quote at ¶ 191 a key portion of Perry's statement that puts the quoted portion in

21 context and explains its meaning. This omission materially misleads this Court.

22 (*See* Albarrán Decl., Ex. 39.) When the March 1, 2007 letter is analyzed in its

23 entirety, it is clear that it does not correct, or reveal the falsity of, Perry's earlier

24 underwriting statements.

25 Specifically, the 5AC quotes the portion of the Shareholder Letter that

26 states that in 2006, to compete with other lenders, IndyMac "loosened its lending

27 standards, though in a much more responsible way." (5AC ¶ 191.) But the

28 sentence *immediately following* this quote, which plaintiffs have carefully omitted

from their allegation, spells out exactly what Perry means by "loosening its lending standards." The entire quote is as follows:

> Given the robust housing market and highly liquid secondary markets (for even the "riskiest loans") -- both of which persisted for years longer than anticipated -- and given strong competition in a declining overall mortgage market, IndyMac, in order to compete and grow, also loosened its lending standards, though in a much more responsible way. *That we did not do this to the same extent as many other lenders is evidenced by the fact that our mortgage production in 2006 had an average FICO of 701 and average combined loan-to-value (CLTV) ratio of 80% as compared to an average FICO of 702 and average CLTV of 76% in 2005.*

(Albarrán Decl., Ex. 13 at 1239 (emphasis on text that 5AC ¶ 191 omitted).)

Thus, the so-called "loosening" actually involved very minor changes to two underwriting metrics -- from 2005 to 2006, IndyMac's average FICO score declined from 702 to 701 and its average CLTV increased from 76% to 80%.[2] Nothing in the 5AC shows how this statement, taken as a whole, corrects, or reveals the alleged falsity of, Perry's earlier underwriting statements, or discloses pervasive fraud in IndyMac's underwriting practices and controls. And the 5AC does not allege any facts that show that these minor changes are even material.

Indeed, the 5AC is devoid of any allegation that Perry made any misrepresentation relating to either underwriting metric discussed in the March 1, 2007 Shareholder Letter. Perry is never alleged to have made any statement that even suggested that IndyMac would not make any change, no matter how small, to its FICO or CLTV metrics. Thus, plaintiffs have failed to allege that "the *subject*

---

[2] Relevant to the issue of the share price decline, the Shareholder Letter also revisited IndyMac's 2007 Target Return on Equity ("ROE"). IndyMac now projected a 10-15% ROE, whereas it had initially projected 12.5-17.5% ROE.

of [Perry's alleged fraudulent statements] was the cause" of their claimed losses. *Lentell*, 396 F.3d at 173. This is fatal to plaintiffs' loss causation claims.

The 5AC here stands in stark contrast to the loss causation allegations in *Countrywide*, where Countrywide disclosed that its *actual* underwriting practices were directly contrary to, and departed significantly from, public statements about its underwriting standards. In *Countrywide*, plaintiffs alleged that Chairman and CEO Angelo Mozilo *specifically ordered* lowered underwriting standards to meet his stated goal of gaining 30% market share. 588 F. Supp. 2d at 1145. Significantly, Countrywide publicly *denied* that its underwriting standards had declined and openly stated that it would *not* lower underwriting standards to meet the sought-after market share. But the *Countrywide* complaint identified *by date* specific internal documents in which high-level managers memorialized Countrywide's systematic lowering of lending standards. *Id*. at 1145-46. These internal documents and e-mails *directly contradicted* the CEO's public statements.

This alleged fraud was revealed at the end of the class period when Countrywide disclosed its actual underwriting practices. The *Countrywide* court noted analysts' "shock" and a corresponding significant share price drop (10.5%) immediately following Countrywide's disclosure that it actually had classified borrowers with "FICOs in the 'low 500s' as 'prime.'" *Id*. at 1147. This classification contradicted Countrywide's internal policy of setting a FICO score of 620 as the lower limit for a "prime" classification, as well as the industry standard of setting 660 as the lower limit. *Id*. at 1146-47. This classification allowed Countrywide to publicly represent during the class period that over 90% of its loan origination volume was "prime quality," while concealing that it had secretly manipulated the definition of "prime." *Id.* at 1154.[3]

---

[3] In another instance, Countrywide revealed that 89% of its 2006 pay-option adjustable rate mortgage loans would not have been approved under its own pre-class period guidelines. *Countrywide*, 588 F. Supp. 2d at 1146.

The extreme situation the *Countrywide* court confronted, in which plaintiffs' alleged losses were caused by the revelation of a massive and wholesale deviation from both industry norms and Countrywide's internal policies, could not be further from the circumstances of Perry's March 1 Shareholder Letter. Perry simply stated that IndyMac had made a business decision, due to competitive conditions, to change, minimally, two underwriting metrics. This disclosure did not reveal the falsity of any prior representation. And it is in no way comparable to Countrywide's revelation that it had reduced its "prime" classification by roughly 150 FICO points relative to industry norms.

In sum, Perry's remarks in the March 1, 2007 Shareholder Letter -- when read in their entirety -- do not "reveal" that Perry's 2006 statements, as alleged in the 5AC, were false when made, nor do they reveal a fraud relating to IndyMac's underwriting practices. There simply is no corrective disclosure. Without such a "revelation of the truth," loss causation has not been pled.

### C. IndyMac Had Previously Disclosed the "Loosening" of the Two Underwriting Metrics Discussed in the March 1, 2007 Shareholder Letter.

Moreover, Perry's March 1, 2007 disclosure about the minor changes in FICO scores and CLTV percentages from 2005 to 2006 was not a corrective disclosure because it did not reveal any new information. Rather, throughout 2006, IndyMac disclosed the FICO and CLTV information on a quarterly basis.

On January 26, 2006, IndyMac disclosed for Q4 2005 an average FICO score of 700 and a CLTV of 78%.

| S&P Evaluated Quarterly Production [(2)] Loan Characteristics | | |
|---|---|---|
| $ in millions | 12/31/2004 | 12/31/2005 |
| Evaluated Production | $ 9,326 | $ 14,896 |
| Avg. Loan Size (actual) | $ 253,983 | $ 284,936 |
| S&P Lifetime Loss | 0.50% | 0.51% |
| LTV | 73% | 73% |
| CLTV | 78% | 78% |
| FICO | 697 | 700 |
| | | |
| Product | | |
| Fixed | 28% | 32% |
| Option ARMs | 26% | 32% |
| Hybrid/ARM | 14% | 9% |
| Hybrid ARM I/O | 32% | 27% |
| Total | 100% | 100% |
| | | |
| Doc Type | | |
| Full Doc | 35% | 26% |

(Albarrán Decl., Ex. 1 at 111.)

Later, on April 25, 2006, IndyMac disclosed a Q1 2006 average FICO of 697 and CLTV of 80%.

| S&P Evaluated Quarterly Production [(2)] Loan Characteristics | | |
|---|---|---|
| $ in millions | 3/31/2005 | 3/31/2006 |
| Evaluated Production | $ 9,835 | $ 16,282 |
| Avg. Loan Size (actual) | $ 261,302 | $ 290,466 |
| S&P Lifetime Loss | 0.47% | 0.51% |
| LTV | 73% | 74% |
| CLTV | 78% | 80% |
| FICO | 700 | 697 |
| Product | | |
| Fixed | 25% | 32% |
| Option ARMs | 35% | 34% |
| Hybrid/ARM | 11% | 7% |
| Hybrid ARM I/O | 29% | 27% |
| Total | 100% | 100% |
| Doc Type | | |
| Full Doc | 32% | 20% |

(Albarrán Decl., Ex. 3 at 372.)

On July 27, 2006, IndyMac disclosed a Q2 2006 average FICO of 702 and CLTV of 80%.

**S&P Evaluated Quarterly Production** [2]
**Loan Characteristics**

| $ in millions | 6/30/2005 | 6/30/2006 |
|---|---|---|
| Evaluated Production | $ 11,890 | $ 15,839 |
| Avg. Loan Size (actual) | $ 277,639 | $ 296,124 |
| S&P Lifetime Loss | 0.42% | 0.51% |
| LTV | 73% | 74% |
| CLTV | 77% | 80% |
| FICO | 706 | 702 |
| Product | | |
| Fixed | 24% | 31% |
| Option ARMs | 39% | 26% |
| Hybrid/ARM | 9% | 8% |
| Hybrid ARM I/O | 28% | 35% |
| Total | 100% | 100% |
| Doc Type | | |
| Full Doc | 31% | 19% |

(Albarrán Decl., Ex. 6 at 631.)

On November 2, 2006, IndyMac disclosed a Q3 2006 average FICO of 702 and CLTV of 81%.



**S&P Evaluated Quarterly Production** **
**Loan Characteristics**

| $ in millions | 9/30/2005 | 9/30/2006 |
|---|---|---|
| Evaluated Production | $ 13,970 | $ 20,092 |
| Avg. Loan Size (actual) | $279,469 | $ 299,341 |
| S&P Lifetime Loss | 0.72% | 0.82% |
| LTV | 73% | 74% |
| CLTV | 77% | 81% |
| FICO | 703 | 702 |
| Product | | |
| Fixed | 29% | 30% |
| Option ARMs | 31% | 26% |
| Intermediate term fixed | 10% | 9% |
| Intermediate term fixed I/O | 30% | 35% |
| Total | 100% | 100% |
| Doc Type | | |
| Full Doc | 30% | 20% |

(Albarrán Decl., Ex. 9 at 869.)



| | Three Months Ended | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | September 30, 2006 | | | September 30, 2005 | | | June 30, 2006 | | |
| | Production | FICO | CLTV(3) | Production | FICO | CLTV(3) | Production | FICO | CLTV(3) |
| Total production | $ 24,439 | N/A | N/A | $ 17,489 | N/A | N/A | $ 20,591 | N/A | N/A |
| Less: | | | | | | | | | |
| Home equity line of credit(2)/Seconds | 1,840 | 716 | 87% | 1,106 | 704 | 88% | 1,860 | 716 | 86% |
| Reverse mortgages | 1,128 | N/A | 53% | 835 | N/A | 53% | 1,337 | N/A | 53% |
| Consumer construction(2) | 908 | 722 | 76% | 1,039 | 721 | 74% | 1,024 | 724 | 77% |
| Builder construction commitments | 471 | N/A | 74% | 539 | N/A | 71% | 531 | N/A | 82% |
| Total S&P evaluated production | $ 20,092 | 702 | 81% | $ 13,970 | 703 | 77% | $ 15,839 | 702 | 80% |

(Albarrán Decl., Ex. 8 at 702.)

This publicly disclosed information shows that throughout 2006 IndyMac had disclosed the on-going small changes in average FICO score and CLTV percentage. Notably, each disclosure also compared the FICO score and CLTV percentage, as well as the percentage of "full doc" loans, to the same period in the prior year. This year-over-year comparison highlighted the fact that these particular metrics were being minimally "loosened" and that IndyMac was issuing *fewer* "full doc" loans than it had in the prior year. So, Perry's statement in March 2007 that underwritings standards were being loosened in this way for all of 2006 was not news. Thus, it cannot be a "corrective disclosure." *In re Maxim Integrated Prods., Inc. Sec. Litig.*, No. C 08-00832 JW, 2009 WL 2136939, at *8 (N.D. Cal. Jul. 16, 2009); *Teamsters*, 633 F. Supp. 2d at 818 ("a disclosure that does not reveal anything new to the market is, by definition, not corrective").

**D.** **Judicially Noticed Facts of Market Reaction Confirms That Perry's Remarks Did Not Reveal That His Prior Underwriting Statements Were False.**

**1.** **Two Analyst Reports Issued Immediately After the March 1, 2007 Disclosure Confirm That It Did Not Correct, or Reveal as Untrue, Prior Underwriting Statements.**

Immediately after the March 1, 2007 disclosure, Foxx-Pitt, Kelton ("Foxx") published its analyst report on IndyMac specifically. The Foxx report did not question IndyMac's underwriting. Rather, Foxx rated IndyMac's stock as "In Line" and noted that the stock price was weakening due to updated return on equity ("ROE") projections for 2007 that IndyMac issued on March 1, 2007. (Albarrán Decl., Ex. 25 at 1591.)

In addition, the Foxx analyst report made two important observations. First, it noted that "[l]iquidity is not as big of a risk for [IndyMac], *as it is primarily a prime lender* and has deposit and Federal Home Loan Bank Funding, and the company [has] not experienced a significant rise in repurchases reserves." (*Id.* (emphasis added).) Second, it concluded that "[i]n 2008, in our opinion,

[IndyMac] will still be a viable, growing and sound company." (*Id*.) Both statements would make no sense (and no analyst would publish them) if Perry had just revealed that he, as IndyMac's CEO, had made numerous material misstatements in 2006 about IndyMac's underwriting, or that IndyMac engaged in fraudulent underwriting practices.

The very next day, on March 2, 2007, RBC Capital Markets ("RBC") issued an analyst report that rated IndyMac as "Outperform." (Albarrán Decl., Ex. 26 at 1594.) And, like the Foxx analyst report, the RBC analyst report noted that the reason it was lowering IndyMac's 2007 EPS target was the company's announcement of reduced ROE projections for 2007. (*Id.* (noting triggering event was "Revised 2007 Target ROE to 10-15% From 12.5-17.5%").) There was *no* discussion (or even mention) of any problem with IndyMac's underwriting. And there was most certainly no mention that the company had corrected, or revealed the falsity of, Perry's 2006 statements about underwriting.

In fact, the RBC analyst "view[ed] the company as *well-managed*." (*Id*. (emphasis added).) Significantly, the RBC analyst report stated that IndyMac's loan portfolio was prudently underwritten:

> [t]his is not a risk-less loan portfolio. Without question, non
> performing assets and charge-offs will rise in 2007. *But, we believe*
> *the collective portfolio has been prudently underwritten*, and believe
> that, barring the onset of a recession and a spike in unemployment,
> that credit losses should be quite manageable in 2007.

(*Id.* at 1595 (emphasis added).)

The RBC analyst report then concluded "that [IndyMac] is a *solid, well-run*
*company*, and one of the better mortgage banks in the country." (*Id*. (emphasis added).)

Thus, the analysts who covered IndyMac closely did not view Perry's
March 1, 2007 Shareholder Letter as revealing the falsity of his prior underwriting

statements. Instead, they expressed their belief that IndyMac was a solid and well-run company, one of the better mortgage banks in the country, and possessed a "prudently underwritten" portfolio. It would be impossible for any analyst to make these statements if IndyMac had just revealed new information showing that its CEO's prior statements about the company's underwriting were actually false or misleading.

### 2. The April 2007 Shareholder Vote Also Confirms That Perry Did Not Reveal on March 1, 2007 That His Prior Underwriting Statements Were False or Misleading.

In addition to the reaction of market analysts, the conduct of IndyMac shareholders confirms that the market did not view Perry's March 1 statements as revealing fraudulent underwriting practices and controls or that his prior underwriting statements were false and misleading. At the annual meeting of IndyMac's shareholders on April 26, 2007 -- only six weeks after the March 1, 2007 disclosure -- IndyMac shareholders voted to elect IndyMac's directors. As IndyMac's SEC filings show, shareholders overwhelmingly voted to re-elect Perry (over 64 million shares in favor compared to only 1.9 million votes against):

ITEM 4. *SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS*

At the annual meeting of IndyMac Bancorp, Inc.'s stockholders held on April 26, 2007, the shareholders voted to elect Indymac Bancorp's directors. The votes cast in this regard were as follows:

| | Shares for | Shares Withheld |
|---|---|---|
| Michael W. Perry | 64,439,188 | 1,922,680 |
| Louis E. Caldera | 64,762,491 | 1,599,377 |
| Lyle E. Gramley | 64,767,414 | 1,594,454 |
| Hugh M. Grant | 64,750,260 | 1,611,608 |
| Patrick C. Haden | 64,781,939 | 1,579,929 |
| Terrance G. Hodel | 64,786,037 | 1,575,831 |
| Robert L. Hunt II | 64,785,237 | 1,576,631 |
| Lydia H. Kennard | 64,778,480 | 1,583,388 |
| Senator John Seymour (ret.) | 62,528,311 | 3,833,557 |
| Bruce G. Willison | 64,756,892 | 1,604,976 |

In addition, the stockholders voted to ratify the appointment of Ernst & Young LLP as Indymac Bancorp's independent auditors for the year ending December 31, 2007. The votes cast in this regard were as follows:

| | Number of Votes Cast |
|---|---|
| For | 65,847,498 |
| Against | 456,131 |
| Abstain | 58,240 |

(Albarrán Decl., Ex. 17 at 1493.)

Had IndyMac shareholders viewed Perry's March 1, 2007 statements as revealing that he had made materially false statements about IndyMac's underwriting practices, his reelection by such an overwhelming majority would have been inconceivable.

In sum, Perry's March 1, 2007 statement did not correct, or reveal the alleged falsity of, his earlier underwriting statements. This information had been previously disclosed on a quarter-by-quarter basis throughout 2006, and so Perry's statement was not new information. And this explains why neither analysts, shareholders, nor the market reacted to it in any way. Thus, loss causation has not been pled.

### E.    Market Conditions, Not Fraud, Caused the Share Price Decline.

To meet the second requirement for pleading loss causation, plaintiffs must plead facts that show that a *significant* share price decline resulted from the revelation of the truth. *Dura*, 544 U.S. at 347. Without a significant decline caused by the revelation of the truth, loss causation is not pled. *Metzler*, 540 F.3d at 1062.

In evaluating whether a significant share price decline was due to the so-called revelation of the truth, a court must consider any "obvious alternative explanation" for the share price decline. *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1951 (2009). Indeed, loss causation allegations will fail where the alleged share price drop "might be attributable to other forces, events or announcements that took place prior to or contemporaneously with the public airing of the alleged fraud but had nothing to do with the challenged conduct by the defendant." *Intelligroup*, 468 F. Supp. 2d at 692; *see also Morgan v. AXT, Inc.*, Nos. C 04-4362 MJJ, C 05-5106 MJJ, 2005 WL 2347125, at *16 (N.D. Cal. Sept. 23, 2005) (no loss causation where recent volatility in stock price suggested influence by factors other than alleged misrepresentations).

Here, no pled facts indicate that Perry's remarks about the minimal changes

in IndyMac's 2006 average FICO score and average CLTV percentage were the reason for the 6% share price decline. But other judicially noticeable facts *do* explain it. On March 1, 2007, IndyMac disclosed that it was revising its projected 2007 ROE to 10-15%, a decline from its earlier stated 2007 goal of 12.5-17.5%. Significantly, as noted in the prior section, *both* the Foxx and RBC analyst reports noted the negative impact of this ROE announcement on IndyMac's share price. (*See* Albarran Decl., Exs. 12 at 1591; 26 at 1594.) *No one* attributed the share price decline to Perry's statements about the minor changes in two underwriting metrics.

Further, plaintiffs' failure to quantifiably disaggregate the supposed effects of Perry's March 1 statement from the effects of other simultaneous non-fraudulent disclosures fatally undermines any claim of actionable causality. The law requires plaintiffs to allege an "actual and quantifiable" relationship between Perry's March 1, 2007 statement and their claimed loss, but they have manifestly failed to do so. *Intelligroup*, 468 F. Supp. 2d at 693-94.

Finally, even if the Court were to find that plaintiffs have pointed to *some* causal relationship between Perry's statement and the share price decline, the 6% drop in IndyMac's share price on March 1 is hardly the type of "significant" drop in share price envisioned by the Supreme Court in *Dura*. Indeed, a district court in the Ninth Circuit recently suggested that a stock drop of 5.3% was insufficient under *Dura*'s mandate.[4] *See Teamsters*, 633 F. Supp. 2d at 822; *compare In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1026 (9th Cir. 2005) (loss causation

---

[4] Indeed, plaintiffs themselves recognized early on this fundamental problem with their case. The first complaint filed by plaintiffs alleged a class period through March 1, 2007. (*See* Tripp Compl., d.e. 1 at 1). After consolidating the various cases into this present action, plaintiffs cherry-picked January 26, 2007 as the date the truth was supposedly revealed specifically because it had a larger stock price drop than March 1, 2007. But, as this Court has already ruled, nothing corrective was disclosed on that date. So, to rescue their case, plaintiffs revert to their original class period ending date.

adequately alleged where stock price dropped from $18.50 to $3.25 per share after corrective disclosures); *Norfolk County Ret. Sys. v. Ustian*, No. 07 C 7014, 2009 WL 2386156, at *6 (N.D. Ill. Jul. 28, 2009) (series of partial disclosures leading to cumulative 30% drop in share price sufficiently "significant" under *Dura*).

At bottom, plaintiffs ask this Court to look at a relatively small drop in share price and assume, without any alleged quantifiable basis, that the drop was due to only one out of several potential causes. But the securities laws require much more than such an unwarranted assumption at the pleading stage. Plaintiffs have failed to allege how the 6% share price decline is both significant and attributable to Perry's statement cited in ¶ 191. This is a separate and independent basis for concluding that the 5AC has not pled loss causation. *See Intelligroup*, 468 F. Supp. 2d at 693-94.

## II. THE 5AC FAILS TO PLEAD THAT PERRY'S ALLEGED MISSTATEMENTS WERE MATERIAL WHEN MADE.

A second, and separate, problem for the 5AC is the failure to plead the materiality of Perry's alleged underwriting misstatements.

### A. A Complaint Alleging Securities Fraud Must Allege Facts That Show That Each Alleged Misstatement Was Material.

To state a cause of action for federal securities fraud, plaintiffs must also allege with particularity that each of Perry's alleged false or misleading statements was *material* to investors. 17 C.F.R. § 240.10b-5(b); *Countrywide*, 588 F. Supp. 2d at 1185 ("Materiality must be pled with particularity.") (citing *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Corp.*, 320 F.3d 920, 951 (9th Cir. 2003)). A false but immaterial statement is not actionable. *Basic, Inc. v. Levinson*, 485 U.S. 224, 238 (1988) ("It is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant.")

Information is material if there is a substantial likelihood that a reasonable

investor would consider it important in deciding to buy or sell a security. *Id.* at 231-32; *see also America West*, 320 F.3d at 934 (9th Cir. 2003). Importantly, materiality is evaluated not by looking at information in isolation but rather in the context of the "total mix" of information available at the time the statement is made. *Id.* And, "the importance of the topic of the representation does not . . . automatically make it material. . . . [M]ateriality hinges on what particularly was represented." *J&R Marketing, SEP v. Gen. Motors. Corp.*, 549 F.3d 384, 396 (6th Cir. 2008); *ECA and Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 205-06 (2d Cir. 2009) (statements by a bank not material solely because they related to risk management practices).

And it is not enough simply to allege the legal conclusion that a statement is "material." As the Supreme Court has stated, a court must reject "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 129 S. Ct. at 1949. Such conclusory allegations "do not suffice" and are *not* entitled to an assumption of truth. *Id.*[5]; *see also Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 613 (S.D.N.Y. 2008), *aff'd*, No. 08-1831-cv, 2009 WL 3109914 (2d Cir. Sept. 30, 2009) (where pleadings "fail[] . . . to describe in any way the magnitude" of a purported omission, they are "simply too conclusory, as they offer no possibility at all of assessing materiality as a matter of law.")

Finally, just as falsity and scienter must be evaluated on a statement-by-statement basis, the Court must determine whether plaintiffs have pled the materiality of *each* alleged misstatement. *See Garber*, 537 F. Supp. 2d at 612-14 (conducting an independent materiality analysis for each purported material

_____

[5] The Supreme Court held in *Iqbal* that the standard articulated in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), is applicable to all federal actions. 129 S. Ct. at 1953. A plaintiff must plead more than "mere labels and conclusions;" instead, he must plead sufficient factual allegations to "raise a right to relief above the speculative level." *Bell Atl.*, 550 U.S. at 555.

omission).

Courts have not hesitated to dismiss federal securities complaints for failure to allege specific facts that show materiality. In *New York State Teachers' Ret. Sys. v. Fremont Gen. Corp.*, No. 07-cv-5756-FMC-FFMx, 2009 WL 3112574 (C.D. Cal. Sept. 25, 2009), Judge Cooper dismissed a complaint that alleged fraudulent underwriting for failure to plead materiality. The court noted that the issue is not whether, in the abstract, a reasonable investor would consider information about Fremont General's underwriting practices and controls material. Rather, the court held, the issue is whether the specific challenged statements about underwriting were "*materially* false when . . . made." *Id.* at *7 (emphasis in original); *Garber*, 537 F. Supp. 2d at 616-17 (plaintiffs' failure to plead materiality is "an independent basis for dismissing" securities fraud claims); *see also In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1161 (C.D. Cal. 2007) (failure to plead facts showing that alleged misrepresentations would be material to a reasonable investor where, *inter alia*, the plaintiff "fail[ed] to quantify the financial impact" of those purported misstatements).

Thus, plaintiffs must plead facts for each alleged misstatement that show why there is a substantial likelihood that a reasonable investor, given the total mix of information available at the time of the statement, would have considered the statement significant in deciding whether to buy or sell IndyMac stock. They have not done so.

**B.** **The 5AC Fails to Allege Facts That Show the Materiality of Any of the Alleged Misstatements.**

The 5AC sets forth fourteen alleged misstatements.[6] For two of them, the 5AC fails to plead, even in a conclusory fashion, that they were "materially" false

---

[6] There are twelve different statements, but one is repeated in three Form 10-Qs filed in 2006.

and misleading. (*See* 5AC ¶¶ 129-31, 148-51.) The word "material" or "materiality" does not even appear as to these two alleged misstatements.

As to the twelve other alleged misstatements, the 5AC simply alleges, in a conclusory fashion, that the statements were "materially false and misleading." (*See* 5AC ¶¶ 119, 126, 134, 137, 139, 141, 143, 145, 147, and 154.) But such conclusory allegations plainly lack the particularity required for pleading materiality in a securities fraud case. *Countrywide*, 588 F. Supp. 2d at 1185. Even under Rule 8's pleading standard, as interpreted by the Supreme Court (in both *Twombly* and *Iqbal*), plaintiffs' allegations are insufficient. There must be factual allegations that support the conclusory label.

But, with respect to Perry's alleged misstatements, the 5AC cites no facts that would indicate a substantial likelihood that, at the time the statement was made, a reasonable investor would have considered the allegedly misstated information -- in the context of the total mix of information available -- significant in deciding to buy or sell IndyMac stock. Indeed, while the 5AC has specific allegations for each alleged misstatement purporting to establish each statement's *falsity* and Perry's *scienter*,[7] there is no attempt whatsoever to plead facts that show how each alleged misstatement was *material* at the time it was made. This deficiency is fatal.

For example, paragraphs 125, 133, and 153 of the 5AC each allege the same misrepresentation in IndyMac's three 2006 10-Q filings. The statement says that IndyMac's allowance for loan loss reserves considers the "effects of any changes in risk selection and underwriting standards." Plaintiffs allege that these statements were "materially false and misleading" because "IndyMac's loan loss

---

[7] Perry incorporates by reference his previous arguments showing why these alleged misstatements are *not* false and why the allegations fail to establish Perry's scienter. (*See* Perry's Supplemental Motion to Strike Allegations in the Third Amended Complaint, d.e. # 140).

reserves did not consider the 'effects of any changes in risk selection and underwriting standards.'" (5AC ¶ 126.)

But this improperly conflates materiality with falsity. A statement must be *both* false *and* materially so. *See Basic*, 485 U.S. at 238. Plaintiffs, however, only allege facts that purportedly show that the Form 10-Q statements were false. The 5AC "does not contain a single factual allegation relating to the magnitude" of this purported misrepresentation, which is necessary to determine whether the information would have been viewed by the "reasonable investor as significantly altering the total mix of available information." *Garber*, 2009 WL 3109914, at *3.

A second example further serves to highlight the general failure of the 5AC to sufficiently allege materiality. In paragraph 140 of the 5AC, plaintiffs allege that on September 13, 2006, Perry made a materially false representation that IndyMac's underwriting guidelines were "sound." (5AC ¶¶ 135, 140.) According to plaintiffs, the falsity of this statement was later revealed on March 1, 2007, when Perry acknowledged that IndyMac had "loosened" its underwriting standards. (5AC ¶ 191.) Plaintiffs are thus alleging that Perry committed securities fraud by stating that the underwriting guidelines were "sound," whereas they had, in fact, been "loosened."

The allegation regarding "sound" underwriting, however, fails because it ignores the import of this statement in light of the "total mix" of information available at the time the statement was made. *Basic*, 485 U.S. at 231-32. As discussed extensively in Section I.C., *supra*, IndyMac consistently disclosed fluctuations in several of its underwriting metrics throughout 2006. For example, on April 25, 2006, IndyMac disclosed a Q1 2006 average FICO score of 697 and CLTV of 80%. (Albarrán Decl., Ex. 3 at 372.) Similarly, on July 27, 2006, IndyMac disclosed a Q2 2006 average FICO score of 702 and CLTV of 80%. (Albarrán Decl., Ex. 6 at 631.) In addition to disclosing these fluctuating

underwriting metrics, IndyMac disclosed throughout 2006 that the percentage of full documentation loans made in 2006 decreased from roughly 30% of total loan production in 2005 to 20% of total loan production in 2006. (Albarrán Decl., Exs. 3 at 372; 6 at 631; 9 at 869.)

Despite continuous public disclosure of changes to IndyMac's underwriting during 2006, plaintiffs complain about Perry's September 13, 2006 remark that the underwriting guidelines were "sound." The 5AC, however, completely ignores the fact that the total mix of publicly available information on September 13, 2006 included ample information relating to the fluctuations in the quality of IndyMac's loan production. Further, this allegation is deficient because of plaintiffs' overt failure to allege *any* facts showing why, in light of this public information, a reasonable investor would consider Perry's "sound" underwriting comment material in deciding to buy or sell IndyMac stock. In other words, public information permitted investors to draw their own conclusions about whether IndyMac, in fact, employed "sound" underwriting guidelines. No facts alleged in the 5AC suggest why Perry's September 13 comment was otherwise material.

The same analysis applies to all other alleged misstatements in the 5AC. Among other things, plaintiffs have improperly conflated materiality with falsity, ignored the total mix of information available at the time of the alleged misstatements, and in some cases have only impermissibly alleged the bare legal conclusion that Perry's statements were "material." Consequently, the 5AC has failed to plead materiality for any of Perry's alleged misstatements. This failure is an independent basis requiring dismissal of the 5AC.[8]

---

[8] The 5AC has other problems. It repeats two alleged misstatements (¶¶ 121, 148) even though this Court previously ruled that neither is actionable as to Perry. (Albarrán Decl., Ex. 38 at 1876, 1878). And the Court has ruled that only "certain of" the underwriting misstatements are actionable, but has never squarely ruled which ones can proceed and which cannot. Of course, all of this is moot because the 5AC fails to plead loss causation or materiality.

## CONCLUSION

For these reasons, Perry respectfully requests that this Court dismiss the Fifth Amended Complaint with prejudice.

DATED:  October 26, 2009     Respectfully submitted,

COVINGTON & BURLING LLP

By:    */s/ David B. Bayless*
          David B. Bayless
          Tammy Albarrán
          Paul Watkins

Attorneys for Defendant Michael W. Perry