FILED

2010 FEB 16 PM 4: 17

CLERK U.S. DISTRICT COURT
CENTRAL DIST. C CALIF.
LOS ANGELES

BY _____

1 Ramzi Abadou (Bar No. 222567)
rabadou@btkmc.com
2 Erik D. Peterson (Bar No. 257098)
epeterson@btkmc.com
3 BARROWAY TOPAZ KESSLER
 MELTZER & CHECK, LLP
4 580 California Street, Suite 1750
San Francisco, CA 94104
5 Tel: (415) 400-3000
Fax: (415) 400-3001
6

7 *Lead Counsel for Plaintiffs*
*Additional counsel listed on signature page*
8

9
10 **UNITED STATES DISTRICT COURT**

11 **CENTRAL DISTRICT OF CALIFORNIA**

12 **WESTERN DIVISION**

| | |
|---|---|
| 13 WAYMAN TRIPP and SVEN | Case No. 07-CV-1635-GW (VBK) |
| 14 MOSSBERG, Individually and on | |
| Behalf of all Others Similarly Situated, | **SIXTH AMENDED CLASS** |
| 15 | **ACTION COMPLAINT FOR** |
| 16 Plaintiffs, | **VIOLATIONS OF SECTIONS 10(b)** |
| v. | **AND 20(a) OF THE SECURITIES** |
| 17 INDYMAC BANCORP, INC. and | **EXCHANGE ACT OF 1934** |
| 18 MICHAEL W. PERRY, | |
| 19 | JURY TRIAL DEMANDED |
| Defendants. | |

20
21
22
23
24
25
26
27
28

SIXTH AMENDED CLASS ACTION COMPLAINT

1773662.1

# TABLE OF CONTENTS

I.  NATURE OF THE ACTION ........................................................................1

II.  JURISDICTION AND VENUE................................................................7

III.  PARTIES ..............................................................................................8

IV.  THE COMPANY'S UNDERWRITING CONTROLS WERE
     INADEQUATE OR UNDERMINED BY DEFENDANT PERRY,
     RENDERING DEFENDANTS' PUBLIC STATEMENTS FALSE..............8

     A.  Underwriting Background....................................................9

     B.  Facts Supporting a Strong Inference that IndyMac Regularly Overrode
         its Stated Underwriting Practices on a Companywide Basis During the
         Class Period and that Perry was Either Aware of, or Caused,
         the  Same ...........................................................................11

     C.  Examples of Conduit-Generated 80/20 Piggyback Loans that Suffered
         Early Payment Defaults and Contributed to IndyMac's 2006 Fourth
         Quarter Losses and Losses that Should Have Been Incurred Earlier in
         2005 and 2006 ...................................................................24

     1.  Silver State Toxic Loan Pool .............................................24

     2.  Lancaster Toxic Loan Pool ...............................................29

     3.  Geneva Toxic Loan Pool....................................................32

V.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING
    STATEMENTS ...................................................................................37

     A.  2005 Annual Report on Form 10-K ...................................37

     B.  2006 First Quarter Form 10-Q ...........................................39

     C.  April 25, 2006 Conference Call ........................................41

     D.  2006 Second Quarter Form 10-Q.......................................42

     E.  September 13, 2006 Lehman Brothers Presentation...........................43

     F.  September 21, 2006 RBC Financial Institutions Conference .............49

G.    2006 Third Quarter Form 10-Q ...........................................................51

H.    November 2, 2006 Conference Call ...........................................51

VI.   LOSS CAUSATION/ECONOMIC LOSS ...........................................52

A.    The Truth About the Company's True Condition Begins to Emerge as Defendants Disclose that Indymac had Saddled Itself with Toxic Loans as a Result of its Poor Underwriting Practices Thereby Causing Substantial Charges and Increased Loan Loss Reserves ....................54

B.    The Truth Continues to Emerge as the Market Learns that Indymac's Loosening of Underwriting Guidelines Caused Indymac's Abysmal Performance ....................................................................57

C.    The Market Learns the Truth About Indymac's Deficient Underwriting Guidelines and Risk Management .................................66

VII.  POST CLASS PERIOD DISCLOSURES: THE OFFICE OF THE INSPECTOR GENERAL'S AUDIT REPORT ...........................................66

VIII. ADDITIONAL FACTS SUPPORTING DEFENDANTS' SCIENTER .......69

A.    Perry's Certifications ...........................................................69

B.    Perry's Financial Incentive ...................................................71

IX.   APPLICABILITY OF THE PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE ...........................................................72

X.    NO STATUTORY SAFE HARBOR EXISTS FOR DEFENDANTS' STATEMENTS ...............................................................................73

XI.   CLASS ACTION ALLEGATIONS ...................................................73

XII.  FIRST CLAIM: Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants ..............................75

XIII. SECOND CLAIM: Violations of Section 20(a) of the Exchange Act Against Perry .........................................................................................77

XIV. PRAYER FOR RELIEF ...................................................................77

XV.  JURY TRIAL DEMANDED ............................................................78

ii

Lead Plaintiffs, Wayman Tripp and Sven Mossberg (collectively, "Plaintiffs" or "Lead Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following based upon personal knowledge as to themselves, and information and belief as to all other matters, including an investigation conducted by Plaintiffs' counsel.  This investigation included a review and analysis of all filings made with the Securities and Exchange Commission ("SEC") by IndyMac Bancorp, Inc. ("IndyMac" or the "Company") during the relevant time period, as well as securities analyst reports, press releases, media reports and other publications issued by and through the Company and interviews with numerous former employees of IndyMac.  Attached as Exhibit "A" is a redlined version of the Fifth Amended Class Action Complaint for Violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 showing the substantive changes between it and the Sixth Amended Class Action Complaint for Violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934.

# I.  NATURE OF THE ACTION

1.      This is a class action brought by Lead Plaintiffs on behalf of all persons and entities who purchased and/or otherwise acquired common stock of IndyMac from March 1, 2006 through March 1, 2007, inclusive (the "Class Period") and were damaged thereby (the "Class").  Lead Plaintiffs seek to pursue remedies under the Securities Exchange Act of 1934, 15 U.S.C.S. § 78 *et seq.* (the "Exchange Act").

2.      Defendant IndyMac is the holding company for IndyMac Bank F.S.B., which operates as a hybrid thrift/mortgage banker (collectively, "IndyMac" or the "Company").

3.      From 2001 until 2006, the United States experienced a "bubble" in the housing market resulting in inflated home valuations, and a related refinancing

boom.  This "bubble" was driven by ever-loosening underwriting standards by mortgage lenders and securitizers such as IndyMac.  During this period, IndyMac grew by focusing on utilizing Alt-A, negative/interest only amortizing loans, and other high risk loans. By the third quarter of 2006, IndyMac was a top Alt-A lender with over approximately $49 billion in Alt-A production which represented 77.5% of IndyMac's total origination volume.  *See* Zelman Credit Suisse Analyst Report, "Mortgage Liquidity du Jour: Underestimated No More," March 12, 2007.

4.     The booming real estate market opened up new opportunities for the Company to deal in higher-risk loans. IndyMac's mortgage production during this time was focused on the adjustable rate mortgage and 80/20 piggyback product mix.  Indeed, during the fourth quarter of 2006, IndyMac produced approximately $5 billion of 80/20 piggyback loans, despite the fact that these loans were becoming increasingly risky during this time period.  IndyMac was also generating a significant percentage of its loan production from low/no documentation loans (stated income Alt-A loans) now generically referred to as "liars' loans" because they were subject to widespread fraud during the real estate boom.

5.     By August, 2006, however, the median price of new homes had dropped by almost 3%, existing home inventories were 39% higher than one year before and sales were down by 10% from the prior year.  *See The No Money Down Disaster*, Barron's, August 21, 2006.  In addition, a significant number of subprime lenders began to close shop during 2006, causing dislocation in the housing market.

6.     Notwithstanding the downturn in the real estate market, Defendants portrayed IndyMac as a stable and growing company that would not only weather the bad times facing the mortgage industry, but would emerge from troubling times even stronger.  Indeed, even given the negative news hammering the rest of the

mortgage industry, IndyMac boldly touted its operating performance.

7.     Defendant Michael W. Perry ("Perry") recognized that in order for IndyMac to continue to grow in difficult times (which he thought 2006 would be), the Company would have to loosen underwriting standards and quickly dispose of risky mortgage loans before borrowers defaulted, by selling them outright or securitizing them and selling them.  The market, however, was unaware of the extent to which Perry had manipulated the Company's underwriting controls, and the exposure it faced from its obligations to buy back bad loans.  Perry's plan, for a time, worked, and by the beginning of the Class Period the Company had a new market share high of 2.5% in the fourth quarter of 2005, and its compound annual growth in mortgage production since the first quarter of 1999 was an astounding 44% compared to a mortgage industry average of 8% to 16% for the top five mortgage loan lenders.  Perry and the Company are, collectively, "Defendants."

8.     At the same time, Defendants issued numerous materially false and misleading statements concerning, *inter alia*, IndyMac's growth and stability, resulting from the quality and success of the Company's strong internal/operational controls and underwriting.

9.     In reality, however, IndyMac's internal/operational controls were grossly deficient.  According to several former IndyMac employees, the Company's management, including Perry, exploited internal/operational control weaknesses or simply overrode controls to drive loan originations and sales growth.  For example, a former IndyMac vice-president states Perry sought to make his short term goals for the Company "at all costs."  To this end, Perry put immense pressure on subordinates to "push loans through," even if it meant consistently making "exceptions" to the Company's guidelines and policies (at the expense of the Company's future).

SIXTH AMENDED CLASS ACTION COMPLAINT

3

1773662.1

10.     Other confidential witnesses ("CWs") – former employees of IndyMac before and during the Class Period – report an atmosphere of "organized chaos" at the Company where loan closings were done on an "anything goes" basis. According to these witnesses, the following practices, which were contrary to stated Company policies, were employed to close loans:  (a) intentionally manipulating software used to compute loan eligibility; (b) violating stated rate lock protocols and controls; and (c) disregarding underwriting guidelines generally. Instead, the focus was on growing loans without the required documentation, while reporting fraud or concerns with transactions was ***discouraged***.  These witnesses, whose statements are detailed below, state that all this occurred with the knowledge and direction of senior management.

11.     For a period of time, the Company was able to play "hot potato" with these poor quality loans, selling them off quickly through the securitization market before the borrowers defaulted. However, IndyMac's ability to pass off these "hot potato" loans began to dramatically decline near the end of the Class Period as the secondary market became less liquid and information about IndyMac's lax credit quality practices began to seep into the marketplace. Many of the companies IndyMac sold these loans to promptly returned them to IndyMac pursuant to warranty provisions contained in the respective sale contracts.  Thus, IndyMac was stuck with a substantial portion of loans that defaulted quickly and which IndyMac was unable to resell to the secondary market.

12.     On January 16, 2007, news began to trickle out from the Company about the adverse impact that Defendants' actions had on IndyMac.  On January 16, 2007, IndyMac issued a press release forewarning of a substantial earnings shortfall caused by credit losses and increases in provisions for loss reserves as a result of the Company's impaired loans.  As a result, and for the first time, the

SIXTH AMENDED CLASS ACTION COMPLAINT

public began to understand the precarious condition of IndyMac's operations as evidenced by, for example, an analyst downgrading IndyMac shortly after the January 16, 2007 Press Release.

13.     IndyMac's January 16, 2007 partial disclosure caused its stock to tumble to $40.50 at close, down from $43.55 at close on January 12, 2007 (the prior trading day).

14.     On January 25, 2007, Defendants issued a press release (the "January 25, 2007 Press Release"), which informed the market that the Company had not met its forecasted results for the fourth quarter of 2006, primarily because the Company doubled its credit reserves from the previous quarter to cover the massive number of defaults on the loans it had underwritten.

15.     Also on January 25, 2007, the Company revealed that several of the business areas Defendants had touted as its strongest virtues were, in actuality, profoundly weakened and impaired, and that the Company experienced a substantial negative financial impact as a result of losses from bad/uncollectible loans held by the Company.  Specifically, IndyMac admitted that "Higher credit mark-to-market losses in Q4 06 were concentrated in the prime 80/20 and subprime products."  As described fully below, IndyMac purchased a significant amount of 80/20 piggyback loans from third-party brokers through its Conduit Division that suffered a severe rate of early payment defaults before and during the Class Period (*see* discussion of Silver State-, Geneva- and Lancaster-originated loans, at ¶¶85-115).  In addition, the OIG Audit Report severely criticized IndyMac's reckless interactions with conduit lenders and underwriting of 80/20 piggyback loans.  (*See* ¶¶35-42, 204-208 below.)

16.     Perry added that IndyMac's supposedly superior internal/operational controls were insufficient in a conference call with investors that coincided with

SIXTH AMENDED CLASS ACTION COMPLAINT

the January 25, 2007 disclosures.  For example, Perry admitted that, "[o]ur provision for loan losses is increasing. . . Credit quality generally is deteriorating so I would say that's something we have to do a better job forecasting, and clearly we want to be a little more conservative as it relates to that… This is something we should have done a better job forecasting on.  This is something that we probably could have seen better if we had more precise models . . ."

17.    IndyMac's January 25, 2007 partial disclosure caused its stock to tumble to $37.71 at close, down from $40.70 at close on January 24, 2007.

18.    The full truth regarding the Company's condition and Defendants' Class Period statements was revealed on March 1, 2007, when Defendants issued a press release entitled "IndyMac Issues 2006 Annual Shareholder Letter, Updating 2007 Forecast" (the "March 1, 2007 Press Release").  In the March 1, 2007 Press Release, Perry **admitted that the Company had "loosened its lending standards"** during 2006, and promised that the Company would be, going forward, "smart and prudent" in managing its underwriting guidelines and risk.

19.    IndyMac's March 1, 2007 corrective disclosure, which disclosed the Company's true condition, caused its stock price to fall to $32.16 at close, down from $34.33 on February 28, 2007 and a far cry from the Class Period high of $50.11 on May 8, 2006.

20.    On July 8, 2008, the FDIC seized IndyMac and subsequently fired Perry and the Company's other senior management.  As a result, the FDIC will have suffered losses of approximately $10.7 **billion** dollars.

21.    On February 26, 2009, the Office of Inspector General ("OIG"), Department of the Treasury announced the results of its investigation of IndyMac's

SIXTH AMENDED CLASS ACTION COMPLAINT

demise in an Audit Report (the "Audit Report"),[1] finding, *inter alia*, that the "underlying cause of [the Company's] failure was the unsafe and unsound manner in which the thrift was operated" and that the Company was well aware of material deficiencies in the Company's underwriting controls before, during, and after the Class Period.

## II.        JURISDICTION AND VENUE

22.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78(j)(b) and 78(t)), and Rule 10b-5 promulgated there-under (17 C.F.R. § 240.10b-5).

23.    This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331(b).

24.    Venue is proper in this Judicial District pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District.  Additionally, the Company maintains its principal executive office in this Judicial District.

25.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

_____

[1] Plaintiffs filed a true and correct copy of the Audit Report with the Court on March 3, 2009 as Exhibit A to the Declaration of Andy Sohrn in Support of Plaintiffs' Opposition to Defendant Perry's Supplemental Motion to Strike Allegations in the Third Amended Complaint.  (Dkt. Item No. 149)

SIXTH AMENDED CLASS ACTION COMPLAINT

7

## III.      PARTIES

**Plaintiffs**

26.    Lead Plaintiffs, as set forth in their certifications previously filed with the Court and incorporated by reference herein, purchased IndyMac stock at artificially inflated prices during the Class Period and have suffered damages as a result of the wrongful acts of Defendants as alleged herein.

**Defendants**

27.    IndyMac was, at all relevant times, the seventh largest savings and loan and the second largest independent mortgage lender in the nation, maintaining its principal executive offices at 888 East Walnut Street, Pasadena, California, 91101.  As of December 31, 2006, IndyMac reported total assets of over $29 billion and a market capitalization of $3.2 billion.

28.    Perry was, at all relevant times, Chairman of IndyMac's Board of Directors and Chief Executive Officer of IndyMac.  Perry is a Master Certified Mortgage Banker, as designated by the Mortgage Bankers Association, and is a Certified Public Accountant.  Prior to working in the mortgage industry, Perry spent four years as an auditor with KPMG Peat Marwick.  Perry reviewed, approved and signed IndyMac's false and misleading SEC filings, including the 2005 Form 10-K and all 2006 Form 10-Qs, and issued numerous other false and misleading public statements during the Class Period.

## IV.      THE COMPANY'S UNDERWRITING CONTROLS WERE INADEQUATE OR UNDERMINED BY DEFENDANT PERRY, RENDERING DEFENDANTS' PUBLIC STATEMENTS FALSE

29.    During the Class Period, the Company, directed by defendant Perry, engaged in a pattern and practice of overriding and abandoning its own loan underwriting guidelines, approving substantial numbers of high-risk loans for the purpose of increasing reported loan volume.  IndyMac's significant departure from

SIXTH AMENDED CLASS ACTION COMPLAINT

8

1773662.1

its own loan underwriting guidelines was facilitated by the Company's grossly deficient underwriting and auditing controls, exposing the Company to a vast amount of undisclosed risk – a risk further enhanced by IndyMac's practice of approving these loans with little or no documentation from borrowers ("stated loans" or "liars' loans").  Defendants failed to disclose the true condition of the Company's business, and misled the public with regard to the rigor of IndyMac's loan origination process and the quality of its loans.

30.     As a result of the foregoing problems, Plaintiffs allege that the Company's Class Period statements regarding internal/operational controls and underwriting practices were false when made.  Plaintiffs further allege that Perry either knew of, or was reckless in not knowing of, the foregoing problems *or* actually caused those problems, himself.

## A.     **Underwriting Background**

31.     Before discussing Perry's conduct and knowledge, it is first necessary to discuss underwriting in general, how/where IndyMac acquired the loans it underwrote, and how the Company underwrote those loans.

32.     Underwriting in the context of mortgage lending should consist of a detailed analysis of a borrower's creditworthiness.  When underwriting a mortgage loan, an issuer should analyze credit information furnished by the potential borrower (such as employment and salary information) in conjunction with information provided from outside sources (such as agency credit reports and scores).  IndyMac uses a software program called "e-MITS" to assist in this process, which computes interest rates based on information such as the above (as entered).

33.     Accurate underwriting is essential to the success of any business extending loans, including mortgage companies such as IndyMac because, without

accurate underwriting, a company cannot (i) evaluate how likely a loan is to be repaid; (ii) attach a particular interest rate to a loan based on creditworthiness; or (iii) accurately price the loan for sale in the secondary market.

34.    IndyMac acquired mortgages principally through four channels: mortgage professionals, consumer direct, correspondents and conduits.

(a)    Mortgage professionals include mortgage brokers, mortgage bankers, financial institutions, and homebuilders who have taken applications from prospective borrowers and submitted them to IndyMac. Eighty-six percent of IndyMac's loans were derived from mortgage professionals in 2006. IndyMac 2006 Form 10-K filed on March 1, 2007 (the "2006 10-K") at 7.

(b)    Correspondent channel loans are obtained through mortgage brokers, mortgage bankers, financial institutions, and homebuilders who sell previously funded mortgage loans to IndyMac. They are a sub-section of the mortgage professional channel of loans, as disclosed in IndyMac's 2006 10-K. Eleven percent of IndyMac's mortgage loan business came from this channel. Derived from 2006 10-K at 40.

(c)    Conduit procurement is where IndyMac acquires pools of mortgage loans in negotiated transactions either with the original mortgagee or an intermediate owner of mortgage loans.[2] They are a sub-section of the mortgage professional channel of loans, as disclosed in IndyMac's 2006 10-K. Thirty-three percent of IndyMac's mortgage loan business came from this channel. Derived from 2006 10-K at 40.

---

[2] IndyMac approved each of the above-described mortgage loan sellers prior to the initial transaction on the basis of the seller's financial and management strength, reputation and prior experience. According to IndyMac, sellers were periodically reviewed and if their performance, as measured by compliance with the applicable loan sale agreement, was unsatisfactory, IndyMac would cease doing business with them.

(d)    Consumer direct involves mortgage loans initiated through direct contact with the borrower.  This contact may arise from Internet advertising and IndyMac web site traffic, affinity relationships, company referral programs, realtors and retail banking branches, located mostly in Southern California. Only 2% of IndyMac's mortgage loan business was derived from this channel. Derived from 2006 10-K at 40.

**B.    <u>Facts Supporting a Strong Inference that IndyMac Regularly Overrode its Stated Underwriting Practices on a Companywide Basis During the Class Period and that Perry was Either Aware of, or Caused, the Same</u>**

35.    IndyMac's undisclosed loosening of its underwriting guidelines saddled the Company with substantial amounts of high-risk loans, such as 80/20 piggyback and conduit channel loans.

36.    As confirmed in the OIG Audit Report at page 2: "IndyMac's business model was to offer loan products to fit the borrower's needs, using an extensive array of risky...subprime loans, 80/20 loans, and other nontraditional products.  Ultimately, loans were made to many borrowers who simply could not afford to make their payments."  As detailed in the Audit Report at page 12, the risks associated with 80/20 piggyback loans were further compounded by IndyMac's deficient appraisal process by which IndyMac assigned inflated values to the underlying properties.

37.    Further, "[t]o increase loan production, IndyMac relied heavily on outside mortgage brokers to originate loans."  (Audit Report at 21)  "This became such a large part of IndyMac's operations that a separate unit, the Conduit Division, was set up to purchase loans in bulk from other loan originators"  (*Id.*)

38.    IndyMac's Conduit Division grew significantly and quickly, from generating under $3 billion in loans in 2003, to generating ***nearly $30 billion*** in

1773662.1

loans at its peak in 2006.  (Audit Report at 22)

39.    However, reliance on outside mortgage brokers carried with it higher credit risks as conduit channel loans were particularly prone to underwriting deficiencies.  IndyMac was aware of such problems as early as 2005, when IndyMac's internal audit group reported problems with the Conduit Division. [Audit Report at 22]  "Specifically, because of concerns the [audit] group had in the [conduit] division's loan approval and underwriting process, it recommended that the division increase investment in infrastructure and personnel."

40.    Indeed, in 2006, IndyMac's independent auditor also expressed concerns with the Conduit Division being "a financial reporting control deficiency."  The independent auditor also recommended that the conduit division "strengthen controls."

41.    Ultimately, IndyMac's problematic Conduit Division and the deficient loans originated thereby led to the Office of Thrift Supervision ("OTS") citing "major weaknesses" in its review on January 8, 2007.  (Audit Report at 23, 67-68) The OTS specifically stated that IndyMac must, *inter alia*, "[e]nsure the Conduit Division corrects the internal audit findings…and ensure the Division is operating in a strong internal controls environment… [and have] the Division [] develop more robust, transparent management reports"; and "[e]stablish a policy and related procedures for the identification and classification of troubled collateral dependent loans."  (*Id.* at 67)

42.    Shortly after the OTS review, IndyMac belatedly recognized that losses were occurring from the Conduit Division and closed it.  (*Id.* at 23)

43.    Confidential Witness Number 1 ("CW 1") is a former Vice President of the Company's Central Banking Group.  CW 1 reported directly to Ashwin Adarkar ("Adarkar"), Executive Vice President, Chief Executive Officer, New

SIXTH AMENDED CLASS ACTION COMPLAINT

1773662.1

Business Incubation, Organizational Effectiveness and Mergers and Acquisitions. As such, Adarkar's duties included "operating new or underperforming businesses." March 23, 2007 Proxy at 6. Adarkar reported directly to defendant Perry. CW 1 was employed at IndyMac from October, 2004 through March, 2006. CW 1 was directly involved in supervising many aspects of the Company's underwriting activities, and had regular contact with the most senior managers and officers of the Company. CW 1 described in detail the many problems in the Company's underwriting guidelines, policies, and controls.

44.     According to CW 1, Adarkar was directly pressured by his/her superiors, including Perry, to "push loans through" regardless of whether they satisfied the Company's underwriting guidelines. Adarkar passed on these orders to CW 1, and his/her subordinates, who were actually instructed to abandon approval guidelines and "push all loans through for approval which came in the door."

45.     CW 1 explained that in pushing the loans through, the Company did not officially "change" the Company's underwriting guidelines and policies, but rather, institutionalized "exceptions to the rules" that allowed the Company to approve loans that should have been denied under the actual guidelines. According to CW 1, the exceptions were made across the board, for all classes of loans (prime, Alt-A, and sub-prime, as discussed in detail, below). CW 1 stated that most of the exceptions were made in reporting the borrower's stated income/assets.

46.     Confirming the statements of other CW's, CW 1 explained that many of the exceptions occurred despite the Company's much vaunted e-MITS system (described above at ¶32), which was supposed to prevent gaming of the Company's underwriting guidelines. The problem, however, was that e-MITS was a "junk-in, junk-out" system that was only as good as the information it was

provided.  That is, if underwriters wanted approval for a loan that did not satisfy the Company's underwriting guidelines, they would simply need to input information that was not reflective of the borrower's true characteristics and e-MITS would provide approval based on the false information entered by the underwriter.  As noted, above, this conduct was engaged in at the direction of Adarkar, who passed along the orders of defendant Perry and other senior managers.

47.     In addition to violating the Company's underwriting guidelines, CW 1 stated that the Company's Central Banking Group regularly and as a matter of course violated the Company's controls over loan production by prematurely (and improperly) funding loans to meet production and revenue goals.  CW 1 raised this issue with Adarkar, and the Central Banking Group was "written up" by the Company's Compliance Department, to no avail.

48.     Similarly, according to CW 1, defendant Perry directed Adarkar (and thus, the Central Banking Group) to engage in violations of the Company's "rate lock" protocols and controls.  Essentially, a rate lock is a commitment by a lender guaranteeing a specified interest rate for a specified period of time.  Here, once a rate-lock expired rather than re-pricing the terms of a loan to account for fluctuations in the credit market, the Company allowed the loans to proceed on the now-expired prior terms.  As a result, the customer was able to capture the gains associated with the prior (lower) rate to the detriment of the Company.  This was a problem because it drastically impacted the profitability of loans on the back-end *but appeared to have no impact on the front end*.  Thus, the Company was able to achieve revenue and volume targets in the short-run, while exposing itself to tremendous losses on the back end of the loan.

49.     According to CW 1, the Company engaged in these practices at the

SIXTH AMENDED CLASS ACTION COMPLAINT

14

1773662.1

express behest of defendant Perry (again through Adarkar) so that the Company could make its short term goals "at all costs."

50.     Finally, CW 1 stated that direct fraud and "lying" by loan sales representatives was rampant at IndyMac.  Specifically, loan sales representatives solicited "fraudulent" letters from CPAs in connection with the purported verification of customer income.  CW 1 stated that it was obvious that the letters were fraudulent, and that he/she repeatedly reported the fraud to Adarkar and that though upper management, including defendant Perry, was aware of this fraud (and the other underwriting fraud), they nonetheless continued to pressure employees to "close loans at all costs."

51.     According to CW 1, every time he/she complained about the fraud, or attempted to institute a review committee to control the fraud, his/her efforts were rebuffed by upper management.

52.     Confidential Witness Two ("CW 2") was an underwriter for IndyMac from March, 2005 until June 30, 2007.  In this position, CW 2 was responsible for writing and reviewing loan applications.

53.     According to CW 2, loan originations increased significantly during his/her tenure at the Company.  CW 2 directly attributed this increase to relaxed underwriting guidelines and the closing of "questionable deals."

54.     CW 2 stated that when he/she first started at IndyMac, there was a very strict environment regarding loan originations; however, toward the end of his/her employment, this had evolved into "organized chaos" that was little more than a "free-for-all" where "anything goes" to get a loan closed.

55.     These changes were expressly mandated by IndyMac's senior management to drive loan origination volume.  CW 2 stated underwriters were encouraged by management to "push through loans" that normally would not be

1773662.1

closed.  During the origination process, all loans that were not closed and

processed because of borrower qualification issues had to be reported to

management.  Management was consistently giving the "green light" on loans that

CW 2 would not have closed.  For example, if a loan was submitted based on

income, and income could not be verified, managers would look to verify bank

account balances.  Even if the source of funding for the balance in the bank

account could not be verified, managers would try to use unsubstantiated bank

account balances as verification of income.  CW 2 also noted that appraisal values

were adjusted in order to "make the loan work."

56.    CW 2 stated that, in several instances, management overturned his/her

decision to not approve a loan, which CW 2 documented in his/her "working

notepad field" in e-MITS.

57.    According to CW 2, as a result of lax underwriting guidelines and bad

loan push-throughs, loan delinquencies had increased significantly at IndyMac by

mid-2006.

58.    Further according to CW 2, the increases in bad loans and push

throughs is not surprising, as the Company directly rewarded underwriters and

managers with bonuses for reaching loan origination targets.  That is, underwriters

were issued bonuses one month after loan targets were reached without regard to

whether the loans ultimately ended in default.  This Company policy incentivized

the issuance of loans without regard to quality or the creditworthiness and

encouraged "making deals work" that should not have worked, according to CW 2.

59.    Confidential Witness Number Three ("CW 3") is a former Vice

President and Director of Financial Institutions, Correspondent Lending, in

IndyMac's Mortgage Banking Segment.  CW 3 was employed by IndyMac from

July, 2003 until January, 2006, and was directly responsible for (i) designing and

1773662.1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

implementing sales and marketing for IndyMac's business loan division; and (ii) overseeing loan production and acquisition for the Company's Correspondent Lending Department.  Although CW 3 left IndyMac at or about the beginning of the Class Period, his/her statements are particularly germane, in that they detail the many problems that were, by the beginning of the Class Period, already impairing the Company's ability to underwrite its loans effectively.

60.     According to CW 3, by the beginning of the Class Period, due to its desire to keep up with the rest of the players in the industry, IndyMac had been forced to become extremely aggressive with its underwriting guidelines. Specifically, to keep pace with competitors in terms of loan origination volume, by the time CW 3 left IndyMac in January 2006, the Company had greatly loosened its underwriting guidelines in order to drive volume and bring in more loan sales (as noted by the other CWs).

61.     Additional witnesses confirm the change in the Company's focus, explain how the Company "loosened" its underwriting quality guidelines, and expound on the impact thereof.

62.     Confidential Witness Four ("CW 4") is a former IndyMac Senior Auditor, Post Purchase Quality Control, Central Mortgage Operations, who worked for the Company from December 1, 2003, through July 19, 2007.  CW 4 was responsible for reviewing loan delinquencies for fraud or misrepresentations in the documents, and determining whether the loan's underwriting comported with IndyMac's guidelines, policies and procedures.  Prior to being promoted to Senior Auditor, CW 4 was a Senior Underwriter with IndyMac, and is intimately familiar with all aspects of the Company's loan underwriting.

63.     According to CW 4, throughout the Class Period, CW 4 saw an increasing number of loans that appeared to have been issued only through

SIXTH AMENDED CLASS ACTION COMPLAINT

17

fraudulent or misrepresented documentation.  He/she also saw a substantial increase in the number of loan delinquencies.  CW 4 stated that this increase represented an increase in the number of defaults attributable to misrepresentations and fraud in the loan applications, not in the number of "straight default" cases (which are typically caused by a change in circumstance, such as divorce or change in employment status).  CW 4 stated that the increase of loans in default because of misrepresentations in the origination process was due to relaxed underwriting guidelines, and approvals of borderline loans on the front end.  That is, loans were being approved to individuals with insufficient or false documentation for the loans that they were seeking *because* the underwriting guidelines had been relaxed.

64.     This is confirmed by Confidential Witness Five ("CW 5"), who was an Investigator, Fraud Investigation Department, Post Purchase Quality Control, Central Mortgage Operations, at IndyMac from December 2004 until July 17, 2007.  In this position, CW 5 investigated loans suspected of being delinquent due to fraud and reported his/her findings to management.

65.     According to CW 5, during the Class Period, the quality of the loans originated became a running joke within the Company. In particular, certain loans with deficient documentation or that were issued to borrowers unable to pay them back became known as "Disneyland Loans."  These loans were called Disneyland Loans, referring to a loan issued to a Disneyland *cashier* who claimed in his/her application that he/she earned $90,000 per year – a proposition that, on its face, belies logic and even common sense given prevailing wage rates for retail cashier operators.  As another example of a particularly egregious "Disneyland Loan," CW 5 related the story of a $500,000 loan that was issued for "swamp lands" in Florida, to a 26 year old first time home buyer with a reported income of $26,000 per year and $15.00 in a bank account.

1773662.1

66.     Stated income loans were the easiest to manipulate, and the easiest for IndyMac to follow through on due diligence had the Company so desired. IndyMac could have insisted on double-checking a client's stated income by utilizing IRS Form 4506T.  When asked by analysts during the November 2, 2006 Conference Call, as to what percentage of IndyMac's Alt-A customers provided the Company with IRS Form 4506T, Perry was evasive and non-responsive. Indeed, studies have confirmed that upwards of 90% of stated income loan buyers inflated their purported income by 5% or more, and as much as 60% of stated income buyers exaggerated their stated income by over 50%. *See* "Eighth Periodic Mortgage Fraud Case Report to Mortgage Bankers' Association," produced by Mortgage Asset Research Institute, Inc., April, 2006.

67.     As a result of the loosened underwriting guidelines, the Company's default rates skyrocketed during the Class Period.  Confidential Witness Six ("CW 6"), was a Senior Loan Processor, Investigation Unit, Post Purchase Quality Control, Central Mortgage Operations at IndyMac from August 10, 2003 until October, 2006, and responsible for researching loan transactions.

68.     According to CW 6, the number of loans being examined by the Company increased by 1500% from 2003 to mid-2006.  Specifically, according to CW 6, his/her department was responsible for reviewing 10% of the loans originated by IndyMac each month.  In 2003, this translated to approximately 60 loans per month.  By October, 2006, CW 6's department was reviewing approximately 900 loans per month.

69.     The drastic increase in defaulted loans was at its worst during the Class Period.  CW 6 stated the number of delinquent loans at IndyMac tripled by October, 2006.  According to CW 6, this increase was the result of misrepresentations and fraud that were occurring at the "front end" of the loan

1773662.1

originations. Thus, had the Company's underwriting guidelines been stricter, this drastic increase would not have occurred.

70.     The above problems were exacerbated by IndyMac management.  In particular, the number of unqualified loans increased so drastically (as a direct result of management's direction) that underwriters began "pushing through" unqualified loans to maintain origination volume.  The Company's policy of "pushing through" unqualified loans evidences a Company-wide knowledge of IndyMac's underwriting problems. *See supra* ¶¶44-45, 55.

71.     In addition to the above direct evidence of the origination of bad loans and loose underwriting guidelines, and defendant Perry's actual knowledge thereof, IndyMac (as discussed below) was forced, under warranty agreements, to repurchase substantially increased numbers of loans (now in default) that it had previously sold on the secondary market.  The repurchases resulted in a corresponding decrease in net income as the Company was, in effect, giving back revenue.

72.     By way of background, according to CW 4, once a loan was originated, it was immediately packaged with other loans and sold on the secondary market. For example, during the second quarter of 2006, IndyMac sold 97% of the mortgage loans it produced.  During that quarter, IndyMac had mortgage production of $20.06 billion and sold off $19.415 billion of those loans. By contrast, in the third quarter of 2006, IndyMac was suddenly only able to sell 81% of its mortgage production.  During that quarter, IndyMac had mortgage production of $23.968 billion and sold $19.508 billion of those loans. According to Perry, IndyMac makes representations and warranties on all loans sold into the secondary market, "just like a manufacturer of an automobile would make warranty reps on a car," *See* April 25, 2006 Conference Call at 11.  When a loan

SIXTH AMENDED CLASS ACTION COMPLAINT

1773662.1

that it has sold is deficient, IndyMac repurchases it.  These repurchases are called "kickbacks."

73.     According to CW 2, during his/her employment, the number of "kickbacks" from the secondary market increased drastically.  In an effort to "cushion the blow" of these kickbacks, IndyMac initiated a "special project" on the weekends in 2006.  According to CW 2, underwriters would receive a list of loans that IndyMac had to repurchase after the loan had been previously sold on the secondary market. Underwriters would then have to rework the loan and "make it work" so that it could be bundled and sold again in the secondary market.  The underwriters involved in the "special project" aggressively did what they could to make the loans "work," according to CW 2.  For example, in instances where the loan had defaulted and been kicked back because of lack of income verification, underwriters would go to a website provided by IndyMac, such as www.salary.com, and try to obtain a more favorable "average national salary" for the borrower based on the data found on such websites for those positions.

74.     Further, underwriters were receiving loans that already had been closed by other underwriters at the Company; therefore, the underwriter trying to fix particular loans was not familiar with their details.  Additionally, when underwriters received loan data, they did not receive the entire loan application; only the portions that were deficient.  Therefore, there was no documentation pertaining to the other data provided by the borrower – eliminating underwriters' ability to cross-check borrower reported information.

75.     CW 5 confirms the Company's "special projects."  According to CW 5, some of the loans rewritten by the underwriters were resold, and the remaining loans were channeled to his/her department, so those employees could also try to "make [them] work."

SIXTH AMENDED CLASS ACTION COMPLAINT

76.     Defendants knew or were deliberately reckless in not knowing about these problems. The implications on the company were devastating.  During 2005, IndyMac was forced to repurchase $106 million worth of kicked-back deficient loans from the secondary market.  In 2006, the value of kicked-back loans climbed to $167 million – an increase of over 50% in less than a year.  Most striking, however, is that during the *first quarter* of 2007 IndyMac repurchased $224 million worth of loans from the secondary market – clear evidence that the loans issued during the Class Period were grossly deficient as a result of the Company's decision to grossly loosen its underwriting guidelines and controls.

77.     In addition to the problems with the Company's underwriting controls, the Company's controls over the accuracy of financial reporting were also deeply flawed.

78.     For example, CW 5 states that even the Company's former Vice President of the Fraud Investigation Department, Michelle Leigh, was pressured by upper management not to report fraud.  According to CW 5, Leigh's superior, Michelle Minier, in one case, expressly requested that Leigh make changes to a monthly report that Leigh felt did not accurately depict the loan pipeline.  Despite Leigh's protest, the report was subsequently sanitized. Michelle Minier is Executive Vice President, Chief Executive Officer and Vice Chairman of Financial Freedom, wholly-owned by IndyMac.  As such, she reports to defendant Perry.

79.     As was the case with the bonus structure for managers and underwriting, IndyMac's auditors' bonus structure also dissuaded the detection of fraud.  Auditor bonuses were based on the number of loans reviewed, not the number of fraudulent findings found.  Thus, according to CW 5, IndyMac rewarded more work, but not the detection of fraud.  This, of course, encouraged workers to simply review, in a cursory fashion, potentially fraudulent loans.

SIXTH AMENDED CLASS ACTION COMPLAINT

80.     Confidential Witness Number Seven ("CW 7") is a former Business Development Manager, Broker & Emerging Banker at IndyMac.  CW 7 was employed by IndyMac from 2004 through the beginning of 2008, and **had direct contact with Perry**.

81.     CW 7 confirms the statements of the other confidential witnesses regarding the problems with IndyMac's underwriting controls.  CW 7 also offered additional detail regarding the nature of the violations of the Company's underwriting guidelines.  In particular, CW 7 stated that the vast majority of IndyMac purportedly "Full Doc" loans were underwritten merely based on a Verification of Employment ("VOE"), not on W-2s and pay stubs.  This statement stands in stark contrast to those of defendant Perry who, as noted at ¶166, expressly and publicly stated during the Q3 2006 IndyMac Bancorp, Inc. Earnings Conference Call that "typically on full doc borrowers we ask them to provide W-2s and pay stubs."

82.     CW 7's statement demonstrating the falsity in Perry's statement that "typically on full doc borrowers we ask them to provide W-2s and pay stubs" is further confirmed by an internal Indymac document entitled "NonPrime Lending, Indymac Nonprime…Offering Unique Mortgage Solutions for Everyday Situations," last updated on February 13, 2006, which states: "**Indymac NonPrime will accept a Verification of Employment for a full documentation loan with no pay stubs or W2s needed!**" (Bold in original.)

83.     As described in ¶¶204-209 below, the 2009 Audit Report from the Office of Inspector General, Department of the Treasury, confirms the testimony of the CWs noted above.

84.     In addition to the statements of the confidential witnesses, a number of lawsuits filed by (and against) reveal the Company's knowledge that loans it had

SIXTH AMENDED CLASS ACTION COMPLAINT

23

underwritten were defaulting at rates as high as 97% in 2006, and 90% in 2005.  In particular, shortly before, during and after the Class Period, IndyMac was involved in litigation with mortgage bankers, appraisers, and others that alerted Defendants to the weaknesses in the Company's loan underwriting practices and internal/operational controls.  This litigation and/or the underlying facts thereto were red flags to Defendants of IndyMac's vulnerability to widespread loan origination and appraisal fraud, as well as strong warnings that IndyMac needed to tighten its credit quality control practices.

### C.   Examples of Conduit-Generated 80/20 Piggyback Loans that Suffered Early Payment Defaults and Contributed to IndyMac's 2006 Fourth Quarter Losses and Losses that Should Have Been Incurred Earlier in 2005 and 2006

#### 1.   Silver State Toxic Loan Pool

85.   As one dramatic example, IndyMac Bank sued a mortgage broker, Silver State Mortgage ("Silver State"), alleging that Silver State breached its warranties and obligations to IndyMac concerning 35 out of a pool of 36 loans sold to IndyMac in 2005 and 2006.  This action is styled *IndyMac Bank, F.S.B. v. Silver State Mortgage*, No. 07-CV-00405 (D. Nev. Mar. 29, 2007)(complaint filed).

86.   Pursuant to the *Silver State* complaint, as alleged by IndyMac, thirty-five (35) of those borrowers either "***did not make their first payment*** after IndyMac's purchase of the loan, or failed to make a timely payment as to anyone of the first three months after" such purchase (the "early defaulting Silver State loans").  *Id.*, at ¶12 (emphasis added).  As such, Silver State was obligated under its agreement with IndyMac to repurchase each such distressed loan within ***thirty*** (30) days of receiving IndyMac's notice of default.  *Id.* at ¶7.

87.   Mortgage companies typically use such early payment default ("EPD") by delinquent borrowers as a proxy for fraud.  Industry trade associations

1773662.1

and regulators have examined early payment default statistics to ascertain the type
and extent of mortgage fraud.  The Mortgage Bankers Association ("MBA") has
utilized the Mortgage Asset Research Institute, Inc. ("MARI") to analyze and
compile data regarding mortgage fraud.  For instance, the Sixth Periodic Report to
the MBA noted that early payment default indicates possible fraud, and compiled
statistical data on early payment default by state and metropolitan area (available at
www.mari-inc.com/pdfs/mba/MBA6thCaseRpt.pdf).  William Matthews, MARI's
vice president and general manager, reiterated this in his testimony before the
United States House of Representatives Subcommittee on Housing and
Community Opportunity (available at www.financialservices.house.gov/media/
pdf/100704wm.pdf).

88.     Early payment defaults are telling indicators of double selling, equity
skimming and/or straw borrowers.  One of the easiest mechanisms to track the
performance and credibility of brokers is to monitor first payment and early
payment default.  The presence of early payment defaults should be taken as a red
flag that brokers/correspondents are not underwriting in a careful manner and may
be potentially falsifying information themselves.

89.     Nonetheless, according to the *Silver State* complaint, it was not until
August 30, 2006 – *i.e.*, well into Q3 2006 –  that IndyMac first demanded that
Silver State make good on its repurchase obligations.  *Id.*, at ¶13.  Silver State,
however, breached its obligations and refused to repurchase the early defaulting
Silver State loans.  *Id.*

90.     The available public data surrounding the early defaulting Silver State
loans (the "Silver State public data") reflects that certain of these loans originated
no later than November 2005.  Yet, IndyMac turned a "blind eye" to these "red
flags" and, per the *Silver State* complaint, waited as much as one year, *i.e.*, until

August 2006, till it posed its repurchase demand to Silver State (*id.*) and even longer, until late March 2007 until it commenced its lawsuit.

91.     Indeed, the Silver State public data reflects that a substantial number of other early defaulting loans originated in the months preceding August 30, 2006 – by which time IndyMac, upon its own judicial admission, had certainly become aware of the collectability problems besetting the distressed Silver State loan pool.

92.     Most strikingly, as reflected in the forthcoming chart, most of the EPD loans complained of in *Silver State* consisted of especially toxic "80-20 Piggyback loans" or other piggyback combinations.  A "piggyback loan" is a home financing option in which a property is purchased using more than one mortgage from two or more lenders. Piggyback mortgages are second mortgages that close simultaneously with the first mortgage and provide extended financing behind a first mortgage lien. Typically, this is effectuated with an 80/20 split where the borrower puts no money down:  80% financing through a first mortgage and 20% financing through a second mortgage.  However, 80/15/5 and 80/10/10 piggybacks (where the borrower finances 5% or 10% of the transaction) and other configurations are also available.[3]

93.     Piggyback loans are of extremely high risk because they are the last to be repaid in the event of a foreclosure.  According to Standard & Poor's credit analyst Kyle Beauchamp, as described in a July 8, 2006 Washington Post article entitled "Piggybacking Onto Trouble," "an exhaustive study of piggyback loans found them anywhere from 43% to 50% more likely to go into default than comparable stand-alone first-lien purchase transactions" (available at

---

[3]  As defined in the OIG Audit Report, an 80/20 piggyback loan "[r]equires no borrower down payment or mortgage insurance for this fully financed loan, which is written as two separate loans of 80 percent and 20 percent."  Audit Report at 46.

1773662.1

www.Washingtonpost. com/wp-dyn/

content/article/2006/07/07/AR2006070700013.html).  Among the reasons for this

dramatic spike, according to the article, is that "[s]ignificant numbers of

piggybacks have been made to buyers who were financially stretched to begin with

and had marginal credit scores."

94.     As reflected in the following chart, the Silver State public data reveals

that at least 26 of the 35 EPDS complained of involved either 80/20 Piggybacks, or

in four instances, other piggyback configurations.  The aggregated principal

amount of these 26 loans comes to approximately $6.46 million.  Evidencing

IndyMac's laggard conduct with respect to these especially toxic loans, 19 of these

risky piggybacks involved Silver State itself as the lender for both the primary and

piggyback loans.  Moreover, the data reflects that IndyMac would have been aware

of its exposure to these loans before or by early into the fourth quarter of 2006.

Thus, 5 of these 26 Piggyback EPDs involve loans which Silver State originated as

early as 2005, 20 of these 26 Piggyback EPDs involve loans which Silver State

originated by the end of August 2006, and 25 of these 26 Piggyback EPDs involve

loans which Silver State originated by the close of the third quarter of 2006.

### Chronological Chart of the 80/20 and Other Piggyback Configurations Resulting in Early Payment Defaults, Derived from the *Silver State* Complaint

| | Mortgage Transaction or Recording Date | Paragraph Source from the Silver State Complaint ("S.S."), Filed 3/29/07 | Last Name (Sourced from the S.S. Complaint) | Principal Amount of Delinquent Loan (Sourced from the S.S. Complaint) | First Mortgage Amount on Subject Property | Lender ID | Second Mortgage Amount on Subject Property | Lender ID | Total Sale Price of Subject Property | Type of Piggy-back |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 8/17/2005 | 13(k) | Datt | $340,000.00 | $340,000 | S.S. | $85,000 | S.S. | $425,000 | 80/20 |
| 2 | 9/23/2005 | 13(j) | Contreras | $235,200.00 | $235,200 | S.S. | $44,100 | S.S. | $294,036 | 80/10 |
| 3 | 9/28/2005 | 13(y) | Rhude | $776,000.00 | $776,000 | S.S. | $194,000 | S.S. | $970,000 | 80/20 |
| 4 | 10/24/2005 | 13(z) | Rivera | $315,900.00 | $315,900 | S.S. | $78,950 | S.S. | $395,000 | 80/20 |

SIXTH AMENDED CLASS ACTION COMPLAINT

| 5 | 11/7/2005 | 13(g) | Bower | $213,600.00 | $213,600 | S.S. | $53,400 | S.S. | $267,004 | 80/20 |
| 6 | 4/26/2006 | 13(a) | Ambartsumian | $59,200.00 | $236,800 | S.S. | $59,200 | S.S. | $296,000 | 80/20 |
| 7 | 6/9/2006 | 13(r) | Liuzza | $432,900.00 | $423,900 | S.S. | $105,950 | S.S. | $529,900 | 80/20 |
| 8 | 6/9/2006 | 13(v) | Oeurn | $650,000 | $650,000 | S.S. | $176,500 | n/a | $870,000 | 70/20 |
| 9 | 7/3/2006 | 13(gg) | Tibby | $196,000.00 | $196,000 | S.S. | $15,200 | n/a | $245,000 | 80/10 |
| 10 | 7/19/2006 | 13(i) | Caputo | $160,000.00 | $160,000 | S.S. | $20,000 | SS | $200,000 | 80/10 |
| 11 | 7/21/2006 | 13(m) | Dayao | $200,000.00 | $200,000 | S.S. | $50,000 | n/a | $250,000 | 80/20 |
| 12 | 7/21/2006 | 13(cc) | Sanders | $248,000.00 | $248,000 | S.S. | $62,000 | S.S. | $310,000 | 80/20 |
| 13 | 7/26/2006 | 13(h) | Caberto | $361,600.00 | $361,600 | S.S. | $90,400 | n/a | $452,000 | 80/20 |
| 14 | 7/28/2006 | 13(ii) | Vongchanh | $420,550.00 | $420,550 | S.S. | $105,100 | n/a | $526,000 | 80/20 |
| 15 | 7/29/2006 | 13(w) | Petersen | $308,000.00 | $308,000 | S.S. | $77,000 | S.S. | $385,000 | 80/20 |
| 16 | 8/1/2006 | 13(c) | Bautista | $162,700.00 | $162,700 | S.S. | $40,650 | S.S. | $203,400 | 80/20 |
| 17 | 8/2/2006 | 13(o) | Elumba | $352,000.00 | $352,000 | S.S. | $88,000 | S.S. | $440,000 | 80/20 |
| 18 | 8/14/2006 | 13(aa) | Ross | $130,000.00 | $520,000 | S.S. | $130,000 | n/a | $650,000 | 80/20 |
| 19 | 8/17/2006 | 13(e) | Blue | $190,200.00 | $760,800 | S.S. | $190,200 | S.S. | $951,000 | 80/20 |
| 20 | 8/31/2006 | 13(n) | Duran | $46,000.00 | $184,000 | S.S. | $46,000 | S.S. | $230,000 | 80/20 |
| 21 | 9/1/2006 | 13(c) | Bermudez | $83,000.00 | $332,000 | S.S. | $83,000 | S.S. | $415,000 | 80/20 |
| 22 | 9/5/2006 | 13(u) | McCall | $103,650.00 | $414,150 | S.S. | $103,650 | S.S. | $518,446 | 80/20 |
| 23 | 9/11/2006 | 13(t) | Madrigal | $40,600.00 | $162,400 | S.S. | $40,600 | S.S. | $203,000 | 80/20 |
| 24 | 9/13/2006 | 13(l) | Davenport | $65,800.00 | $263,200 | S.S. | $65,800 | S.S. | $329,000 | 80/20 |
| 25 | 9/27/2006 | 13(bb) | Ryan | $51,150.00 | $204,750 | S.S. | $51,150 | S.S. | $255,990 | 80/20 |
| 26 | 12/8/2006 | 13(jj) | Willis | $323,000.00 | $323,000 | S.S. | $80,750 | n/a | $403,770 | 80/20 |
| | | | Total: $6,465,050 | | | | | | | |

95.     Thus, overall, many of the loans originated by Silver State
experienced early payment defaults by no later than the end of the third quarter or
during the fourth quarter of 2006.  These recklessly underwritten loans contributed

SIXTH AMENDED CLASS ACTION COMPLAINT

28

1773662.1

1   to the Company's fourth quarter 2006 losses.

2       96.    At the same time, the Silver State public data reflect that in the

3   aftermath of IndyMac's August 2006 demand and despite its bad loss experience

4   with Silver State, the Company continued to purchase a significant amount of the

5   early defaulting loans from Silver State.

6               **2.   Lancaster Toxic Loan Pool**

7       97.    Confirmation of this *modus operandi* emerges from IndyMac's

8   lawsuit against another mortgage broker, Lancaster Mortgage Bankers, LLC

9   ("Lancaster"), alleging that Lancaster breached its warranties and obligations to

10  IndyMac concerning a pool of forty-nine (49) loans.  This action is styled *IndyMac

11  Bank, F.S.B. v. Lancaster Mortgage Bankers, LLC*, No. CV07-00270-DDP (C.D.

12  Cal. Jan. 10, 2007) (complaint filed).

13      98.     Pursuant to the *Lancaster* complaint, as alleged by IndyMac, forty-

14  four (44) of the borrowers on the distressed Lancaster loans either "did not make

15  their first payment after IndyMac's purchase of the loan, or failed to make a timely

16  payment as to anyone of the first three months after" such purchase  (the "early

17  defaulting Lancaster loans").  *Id.*, at ¶11 (emphasis added).

18      99.     Each of these borrower failures amounted to an "Early Payment

19  Default" as defined by the Purchase Agreement governing the subject loans which

20  had been entered into by the parties, on or about June 24, 2004.  *Id.*, at ¶¶5-6.  As

21  such, Lancaster was obligated under its agreement with IndyMac to repurchase

22  each such distressed loan within ***thirty*** (30) days of receiving IndyMac's notice of

23  default.  *Id.*, at ¶6.

24      100.   According to the *Lancaster* complaint, IndyMac first demanded that

25  Lancaster make good on its repurchase obligations on some unspecified date in

26  2005.  *Id.*, at ¶17.  Lancaster, however, breached its obligations and refused to

27

28

SIXTH AMENDED CLASS ACTION COMPLAINT

29

1773662.1

repurchase the early defaulting Lancaster loans. *Id.*

101.   The available public data surrounding the early defaulting Lancaster loans (the "Lancaster public data") reflects that a substantial portion of the early defaulting Lancaster loans originated in 2005 and that certain others originated in the first third of the year 2006. Yet, despite the "red flags," IndyMac held off on commencing litigation against Lancaster until January 2007 – *i.e.*, at least one year after it had made its year 2005 demand against Lancaster and well after the close of its Q3 2006 reporting period.

102.   As reflected in the following chart, the Lancaster public data reveals that at least 29 of the 44 EPDS complained of involved either 80/20 Piggybacks, or in nine instances, other piggyback configurations.  The aggregated principal amount of these 26 loans is approximately $7.9 million.  Evidencing IndyMac's laggard conduct with respect to these especially toxic loans, 12 of these risky piggybacks involved Lancaster itself as the lender for both the primary and piggyback loans.  Moreover, the data reflect that IndyMac would have had to been aware of its exposure to these loans well before the fourth quarter of 2006. Thus, 24 of these 29 Piggyback EPDS involve loans which Lancaster originated as early as 2005 and all 29 of these Piggyback EPDS involve loans which Lancaster originated by the first week of May 2006.

**Chronological Chart of the 80/20 and Other Piggyback Configurations Resulting in Early Payment Defaults, Derived From the *Lancaster* Complaint**

|  | Mortgage Transaction or Recording Date | Paragraph Source from the Lancaster Complaint ("L."), filed 1/10/07 | Last Name (Sourced from the L. Complaint) | Principal Amount of Delinquent Loan (Sourced from the L. Complaint) | First Mortgage Amount on the Subject Property | Lender ID | Second Mortgage Amount on the Subject Property | Lender ID | Total Sale Price of the Subject Property | Type of Piggyback |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 9/12/2005 | 12(q) | Lopez | $116,000 | $116,000 | L. | $29,000 | n/a | $145,000 | 80/20 |

SIXTH AMENDED CLASS ACTION COMPLAINT

30

| 2 | 9/16/2005 | 12(nn) | Williams | $424,800 | $424,800 | L. | $106,200 | L. | $531,000 | 80/20 |
| 3 | 9/21/2005 | 12(d) | Chacon | $416,000 | $416,000 | L. | $78,000 | L. | $520,000 | 80/15 |
| 4 | 9/23/2005 | 12(pp) | Philemond | $345,000 | $345,000 | L. | $115,000 | L. | $460,000 | 80/20 |
| 5 | 9/26/2005 | 12(h) | Godfrey | $195,200 | $195,200 | L. | $48,800 | L. | $244,000 | 80/20 |
| 6 | 9/29/2005 | 12(r) | Loyola | $284,000 | $284,000 | L. | $71,000 | n/a | $355,000 | 80/20 |
| 7 | 9/29/2005 | 12(ee) | Samuels | $140,000 | $140,000 | L. | $35,000 | n/a | $175,000 | 80/20 |
| 8 | 10/11/2005 | 12(o) | Lester | $192,000 | $192,000 | L. | $48,000 | n/a | $240,000 | 75/25 |
| 9 | 10/14/2005 | 12(gg) | Sheikh | $61,500 | $61,500 | L. | $20,500 | L. | $82,000 | 80/20 |
| 10 | 10/17/2005 | 12(hh) | Tinglin | $240,000 | $240,000 | L. | $60,000 | n/a | $300,000 | 80/20 |
| 11 | 10/17/2005 | 12(jj) | Viotti | $384,000 | $384,000 | L. | $96,000 | L. | $480,000 | 75/25 |
| 12 | 10/21/2005 | 12(oo) | Fabunan | $127,495 | $127,495 | L. | $41,495 | n/a | $169,999 | 80/20 |
| 13 | 10/31/2005 | 12(e) | Charles | $358,400 | $358,400 | L. | $89,600 | L. | $450,000 | 80/20 |
| 14 | 11/2/2005 | 12(rr) | Weston | $236,000 | $236,000 | L. | $59,000 | n/a | $295,000 | 80/20 |
| 15 | 11/10/2005 | 12(ll) | Williams | $390,080 | $390,800 | L. | $97,520 | L. | $487,600 | 80/20 |
| 16 | 11/14/2005 | 12(mm) | Williams | $320,000 | $320,000 | L. | $80,000 | n/a | $400,000 | 70/30 |
| 17 | 11/17/2005 | 12(u) | Mattei | $337,400 | $337,400 | L. | $144,600 | L. | $482,000 | 80/20 |
| 18 | 11/30/2005 | 12(l) | James | $348,000 | $348,000 | L. | $87,000 | n/a | $435,000 | 75/25 |
| 19 | 12/7/2005 | 12(a) | Benita | $285,000 | $285,000 | L. | $95,000 | n/a | $380,000 | 75/25 |
| 20 | 12/12/2005 | 12(ff) | Sciacca Mendez | $262,500 | $262,500 | L. | $87,500 | n/a | $350,000 | 80/20 |
| 21 | 12/20/2005 | 12(ss) | Belthrop | $88,000 | $88,000 | L. | $22,000 | n/a | $110,000 | 70/30 |
| 22 | 12/20/2005 | 12(qq) | Smithward | $378,000 | $378,000 | L. | $162,000 | n/a | $540,000 | 70/30 |
| 23 | 12/22/2005 | 12(cc) | Pinder | $182,000 | $182,000 | L. | $78,000 | n/a | $260,000 | 80/20 |

SIXTH AMENDED CLASS ACTION COMPLAINT

| 24 | 12/28/2005 | 12(z) | Pettiford | $181,280 | $181,280 | L. | $45,320 | L. | $226,600 | 80/20 |
| 25 | 2/21/2006 | 12(g) | Del Socorro | $372,000 | $372,000 | L. | $93,000 | L. | $465,000 | 80/20 |
| 26 | 2/24/2006 | 12(y) | Palleija | $332,000 | $332,000 | L. | $83,000 | n/a | $415,000 | 80/20 |
| 27 | 4/7/2006 | 12(k) | Jackson | $511,200 | $511,200 | L. | $127,800 | n/a | $639,000 | 70/30 |
| 28 | 4/28/2006 | 12(aa) | Picardo | $265,930 | $265,930 | L. | $113,970 | L. | $379,900 | 80/20 |
| 29 | 5/5/2006 | 12(t) | Martins | $172,800 | $172,800 | L. | $43,200 | n/a | $217,000 | 80/20 |
| | | | Total: | $7,946,585 | | | | | | |

103.     As was the case with Silver State, IndyMac's lengthy delay in pursuing its rights against Lancaster with respect to these numerous distressed loans bespeak IndyMac's knowing or, at least, deliberately reckless desperation to maintain the facade of ever-increasing loan production growth during the Class Period.

### 3.     **Geneva Toxic Loan Pool**

104.     Further confirmation of this *modus operandi* emerges from IndyMac's lawsuit against yet another mortgage broker, Geneva Mortgage Corp. ("Geneva"), alleging that Geneva breached its warranties and obligations to IndyMac concerning a pool of eighteen (18) loans.  This action is styled *IndyMac Bank, F.S.B. v. Geneva Mortgage Bankers, LLC*, No. CV07-01914-ER (C.D. Cal. March 22, 2007) (complaint filed).

105.     Pursuant to the *Geneva* complaint, as alleged by IndyMac, sixteen (16) of the borrowers on these Geneva loans either "***did not make their first payment*** after IndyMac's purchase of the loan, or failed to make a timely payment as to anyone of the first three months after" such purchase (the "early defaulting Geneva loans").  *Id.*, at ¶12 (emphasis added).

106.     Each of these borrower failures amounted to an "Early Payment

SIXTH AMENDED CLASS ACTION COMPLAINT

Default" as defined by the Purchase Agreement governing the subject loans which had been entered into by the parties, on or about April 9, 2003. *Id.*, at ¶¶5-6. As such, Geneva was obligated under that agreement to repurchase each such distressed loan within ***thirty*** (30) days of receiving IndyMac's notice of default. *Id.*, at ¶6.

107. According to the *Geneva* complaint, "on or about December 2003," IndyMac first demanded that Geneva make good on its repurchase obligations as to two (2) of the early defaulting Geneva loans but to no avail. *Id.*, at ¶18. "Commencing on or about 2006," IndyMac made such demand on Geneva as to the remaining such loans. *Id.* Geneva, however, breached its obligations and refused to repurchase the early defaulting loans. *Id.*

108. The available public data surrounding the early defaulting Geneva loans (the "Geneva public data") reflects that two of those loans originated in the year 2003, more than half originated in the year 2005 and the remaining ones originated in the year 2006. Yet, despite these "red flags," IndyMac held off on commencing litigation against Geneva until late March 2007 – *i.e.*, no earlier than approximately fifteen (15) months from the cutoff point by which the majority of the early defaulting Geneva loans had already originated.

109. As reflected in the following chart, the Geneva public data reveals that at least 9 of the 16 EPDS complained of involved either 80/20 Piggybacks, or in two instances, a virtual 80/20 configuration. The aggregated principal amount of these 9 loans comes to approximately $2.62 million. Evidencing IndyMac's laggard conduct with respect to these especially toxic loans, 8 of these risky piggybacks involved Geneva itself as the lender for both the primary and piggyback loans – and, in these instances, IndyMac was exposed to the very same borrowers on both loans. Moreover, the data reflects that IndyMac would have had

SIXTH AMENDED CLASS ACTION COMPLAINT

33

to been aware of its exposure to these loans well before the fourth quarter of 2006. Thus, 6 of these 9 Piggyback EPDS involve loans which Geneva originated as early as 2005 and all 9 of these Piggyback EPDS involve loans which Geneva originated by the end of July 2006.

### Chronological Chart of the 80/20 and Other Piggyback Configurations Resulting in Early Payment Defaults, Derived From the *Geneva* Complaint

| | Mortgage Transaction or Recording Date | Paragraph Source from the Geneva Complaint ("G."), Filed 3/22/07 | Last Name (Sourced from the G. Complaint) | Principal Amount of Delinquent Loan (Sourced from the G. Complaint) | First Mortgage Amount on the Subject Property | Lender ID | Second Mortgage Amount on the Subject Property | Lender ID | Total Sale Price of the Subject Property | Piggyback Type |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 9/16/2005 | 13(o) | Rivera | $368,000 | $368,000 | G. | $92,000 | G. | $465,000 | 80/20 |
| 2 | 9/16/2005 | 13(p) | Rivera | $92,000 | $368,000 | G. | $92,000 | G. | $465,000 | 80/20 |
| 3 | 11/3/2005 | 13(j) | Pratt | $327,200 | $327,200 | G. | $81,800 | G. | $409,000 | 80/20 |
| 4 | 11/3/2005 | 13(k) | Pratt | $81,800 | $327,200 | G. | $81,800 | G. | $409,000 | 80/20 |
| 5 | 12/16/2005 | 13© | Clarke | $240,000 | $240,000 | G. | $55,000 | G. | $300,000 | 80/18 |
| 6 | 12/16/2005 | 13(d) | Clarke | $55,000 | $240,000 | G. | $55,000 | G. | $300,000 | 80/18 |
| 7 | 5/25/2006 | 13(n) | Reyes | $344,000 | $344,000 | G. | $86,000 | n/a | $430,000 | 80/20 |
| 8 | 7/26/2006 | 13(l) | Puckett | $204,000 | $204,000 | G. | $51,000 | G. | $255,000 | 80/20 |
| 9 | 7/26/2006 | 13(m) | Puckett | $51,000 | $204,000 | G. | $51,000 | G. | $255,000 | 80/20 |
| | | Total | | $2,622,000 | | | | | | |

110.   As was the case with Silver State and Lancaster, IndyMac's lengthy delay in pursuing its rights against Geneva with respect to these numerous distressed loans bespeaks IndyMac's knowing or, at least, deliberately reckless

SIXTH AMENDED CLASS ACTION COMPLAINT

desperation to maintain the facade of ever-growing loan production growth during the Class Period.[4]

111.    In addition to the foregoing lawsuits filed by IndyMac, a lawsuit filed against the Company confirms the allegations of CW 2, who stated that the Company violated its underwriting guidelines by artificially inflating the appraised values of properties.

112.    In *Cedeno v. IndyMac Bancorp, Inc., et al.*, No. 06-CV-6438 (JGK) (S.D.N.Y.), the plaintiff, a residential home mortgage borrower, sued IndyMac and alleged that it had improperly and systematically selected and coerced various appraisal professionals so as to generate greater loan volumes.  These appraisers would perform faulty and defective appraisal services which inflated the value of residential properties and thereby allowed Defendants to complete more real estate transactions and obtain greater profits.

113.    Cedeno, in her Amended Class Action Complaint (filed on July 20, 2007), alleged, based on confidential witnesses, that "IndyMac threatened and retaliated against appraisers and management firms that failed to give in to

---

[4]    The *Silver State*, *Lancaster*, and *Geneva* actions are representative of the plethora of litigation IndyMac initiated in connection with distressed loans, many of which were 80/20 piggyback loans that suffered early payment defaults in 2005 and 2006.  For example, IndyMac has been involved in, *inter alia*:  *IndyMac Bank, F.S.B. v. Weststar Mortgage, Inc.*, No. 08-cv-00748 (C.D. Cal., complaint filed Feb. 4, 2008); *IndyMac Bank, F.S.B. v. Cameron Financial Group, Inc.*, No. BC376578 (Los Angeles Superior Court, complaint filed Aug. 27, 2007); *IndyMac Bank, F.S.B. v. Just Mortgage, Inc.*, No. BC384487 (Los Angeles Superior Court, complaint filed Jan. 28, 2008); *IndyMac Bank, F.S.B. v. Kay-Co Investments, Inc.*, No. BC375931 (Los Angeles Superior Court, complaint filed Aug. 14, 2007); *IndyMac Bank, F.S.B. v. Fidelity & Trust Mortgage, Inc.*, No. BC374417 (Los Angeles Superior Court, complaint filed July 18, 2007); and *IndyMac v. Solutions Funding, Inc.*, No. BC369971 (Los Angeles Superior Court, complaint filed Apr. 23, 2007).

SIXTH AMENDED CLASS ACTION COMPLAINT

pressure to meet the target appraisal values by IndyMac and to inflate the appraisal values."

114.   The practice of encouraging inflated appraisal values resulted in borrowers incurring more mortgage debt than necessary and/or more mortgage debt than the borrower could afford.  All this was to meet loan origination targets set by IndyMac's senior management.

115.   In order to accomplish this subterfuge, IndyMac had to override stated lending practices and internal/operational controls:

> . . . Specifically, Defendants allowed Production Personnel to improperly influence Credit\Valuation Personnel.  Production Personnel threatened and intimidated Credit\Valuation Personnel to approve inflated appraisals received from outside appraisal companies or appraisal management firms.  Contrary to Defendants' representations to Plaintiff and members of the Class, Defendants failed to provide the necessary insulation and separation between Production Personnel and Credit/Valuation Personnel;

> According to a confidential witness, IndyMac executives, including the Chief Appraiser, were aware and allowed the improper influence Production Personnel placed on their own Credit\Valuation Personnel to choose appraisers and to approve appraisers obtained from third party appraisal companies or appraisal management firms willing to supply IndyMac with inflated appraisals;

> Indeed according to this confidential witness, Credit/Valuation Personnel at IndyMac were told not to reject inflated or otherwise improper appraisals and were threatened or told by Production Personnel that they would be terminated if they failed to do so;

> According to another confidential witness, IndyMac was in fact operating its appraisal review department under pressure to make the values that IndyMac's loan officers and processing department were pushing.  This confidential witness further stated that employees of IndyMac exerted pressure to make sure loans would be approved regardless of accurate appraisal values.

SIXTH AMENDED CLASS ACTION COMPLAINT

1773662.1

# V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

116.    During the Class Period, Defendants issued numerous materially false and misleading statements.  Each of those statements is set forth below, including detail regarding (i) the date of the statement; (ii) the speaker; (iii) the nature of the statement (oral or written); (iv) to whom the statement was made; (v) the location/context of the statement; (vi) why the statement was materially false and misleading; and (vii) facts giving rise to a strong inference that the particular defendant who made (or caused to be made) the statement had the requisite state of mind.  The facts that provide the basis for the foregoing allegations, including a full recitation of the statements of numerous confidential witnesses and various lawsuits in which the Company is engaged, are set forth at ¶¶121, 144, 169, 209, *supra*.

## A.    2005 Annual Report on Form 10-K

117.    On March 1, 2006, the Company filed its Annual Report for the year ended December 31, 2005 with the SEC on Form 10-K (the "2005 10-K"). Because Perry signed the 2005 10-K, all statements contained therein were made by him and the Company.

**Statement One:**

118.    The 2005 10-K stated:

> ***By closely monitoring key factors such as product type, origination channels, progress or "status" of transactions, as well as changes in market interest rates since IndyMac committed a rate to the borrower*** *("**rate lock commitments**"), **the Company seeks to quantify the optional component of each rate lock**, and in turn, the aggregate rate lock pipeline. By accurately evaluating these factors, the Company has been able to minimize the purchase of options and also stabilize gain on sale margins over different rate environments.  [2005 10-K at p. 41-42].*

119.    These statements are material because quantifying (and adhering to) rate locks and monitoring key factors related to loan underwriting drastically

1773662.1

impact the bottom-line profitability (or not) of a lender, like IndyMac. *See supra* at ¶¶32-34, 48. A reasonable investor would therefore view IndyMac's monitoring of such "key" factors as important because loan quality (or the absence thereof) would have a serious impact on IndyMac's balance sheet.

120. The foregoing statement was false and misleading because the Company's "rate lock commitments" were no commitments at all. This is so because the "rate lock commitments" were regularly violated by and at the direction of defendant Perry, which rendered them meaningless as a risk control device.

121. Plaintiffs rely on the following facts in support of their allegation that the foregoing statement (at ¶118) was materially false and misleading and that Perry knew it: CW 1 stated that defendant Perry directed the Executive Vice President and CEO, Ashwin Adarkar (and thus, the Central Banking Group) to engage in violations of the Company's "rate lock" protocols and controls. ¶¶43-49.

### Statement Two:

122. The 2005 10-K also stated:

***We hedge the risks associated with our mortgage commitments to purchase mortgage loans ("rate locks")*** and funded mortgage loans that will be sold in the secondary market. The risk associated with the rate locks and funded mortgage loans is that interest rates will fluctuate between the time we commit to purchase a loan at a pre-determined price, or the customer locks in the interest rate on a loan, and the time we sell or commit to sell the mortgage loan. [2005 10-K at 78]. (Emphasis added)

123. These statements are material because hedging risk associated with mortgage commitments to purchase mortgage loans correlates to overall loan quality (and hence, the underlying underwriting practices) which affects a mortgage lender's balance sheet and profitability. *See supra* at ¶¶32-34. There is a substantial likelihood that a reasonable investor would view such facts as

SIXTH AMENDED CLASS ACTION COMPLAINT

1  important.

2      124.   The foregoing statement was false and misleading because the

3  Company regularly violated, at the direction of defendant Perry, the "rate locks,"

4  rendering them meaningless as a risk control device.  This allowed the Company to

5  achieve revenue and volume targets in the short-run, while exposing itself to losses

6  on the back end of the loan.

7      125.   Plaintiffs rely on the following facts in support of their allegation that

8  the foregoing statement (at ¶122) was materially false and misleading and that

9  Perry knew it: CW 1 stated that defendant Perry directed Adarkar (and thus, the

10  Central Banking Group) to engage in violations of the Company's "rate lock"

11  protocols and controls.  ¶¶43-49.

12  

13      **B.   2006 First Quarter Form 10-Q**

14      126.   On April 25, 2006, the Company filed its Report on Form 10-Q for

15  the quarter ended March 31, 2006 with the SEC (the "2006 First Quarter 10Q").

16  Because Perry signed the 2006 First Quarter 10-Q, all statements therein were

17  made by him and the Company.

18      127.   The 2006 First Quarter 10-Q stated:

19      A component of the overall allowance for loan losses is not
       specifically allocated to the loan portfolios ("unallocated
20      component"). The unallocated component reflects management's
       assessment of various factors that create inherent imprecision in the
21      methods used to determine the specific portfolio allocations. Those
       factors include, but are not limited to levels of and trends in
22      delinquencies and impaired loans, charge-offs and recoveries, volume
       and terms of the loans, ***effects of any changes in risk selection and***
23      ***underwriting standards***, other changes in lending policies,
       procedures, and practices, and national and local economic trends and
24      conditions. *Id.* at 48. (Emphasis added)

25      128.   The statements regarding the Company's "risk selection" and

26  "underwriting standards" are material.  As a mortgage lender, IndyMac's

27  underwriting practices are among the most important information looked to by

28  

SIXTH AMENDED CLASS ACTION COMPLAINT

investors in exercising their investment judgment.  In addition, the frequency with which Perry emphasized the Company's underwriting policies in press releases and other public statements, as well as the fact that analysts frequently repeated and commented on Defendants' statements regarding the Company's standards, further supports the materiality of these statements.

129.   The statement set forth at ¶127 was false and misleading when made as IndyMac's loan loss reserves did not consider the "effects of any changes in risk selection and underwriting standards, other changes in lending policies, procedures, and practices, and national and local economic trends and conditions." This is so because the Company's "underwriting standards" were wholly ineffective (and violated by or caused to be violated by Perry, *see e.g.* ¶¶43-51), and thus, meaningless as a factor in the calculation of the Company's loan loss reserves.

130.   Perry knew or was reckless in not knowing of the violations of the Company's underwriting controls and standards (rendering the statement at ¶127 materially false and misleading) for the following reasons.  First, Perry directed employees to (i) "push loans through" regardless of whether they satisfied the Company's underwriting guidelines; (ii) input false information into the Company's e-MITS underwriting control system, to cause the approval of loans that would normally be rejected; and (iii) engage in violations of the Company's "rate lock" protocols and controls.  ¶¶43-49.  Second, Perry was aware that rampant fraud and lying by loan sales representatives was taking place, yet he continued to push employees to close loans "at all costs."  ¶50.  Third, the wide-ranging and management-directed violations of the Company's underwriting guidelines and controls evidences a culture of fraud at the Company.  ¶¶50-51. Fourth, the number of fraudulent loans discovered at the Company increased by

SIXTH AMENDED CLASS ACTION COMPLAINT

1500% from 2003 to mid-2006, rendering the lack of control over underwriting facially obvious.  ¶¶67-70.  Fifth, the massive increase in bad loan "kickbacks" requiring repurchase by the Company resulted in the initiation of a "special project" at the Company to rehabilitate those loans.  ¶¶73-75.  Finally, the numerous lawsuits filed by the Company show that it knew that certain pools of loans that it had underwritten were defaulting at rates as high as 90% (in 2005), and 97% (in 2006), rendering the inadequacy of the Company's underwriting controls facially obvious to Perry and the Company.  *See* ¶84.

## C.   **April 25, 2006 Conference Call**

131.   On April 25, 2006, defendant Perry spoke to analysts and the investing public on behalf of the Company during a public earnings conference telephone call (the "Q1 2006 IndyMac Bancorp, Inc. Earnings Conference Call").

132.   During this Q1 2006 IndyMac Bancorp, Inc. Earnings Conference Call, Perry stated:

> ***[W]e have the best quality control function of any thrift out there*** because we sell 95% of our production in the secondary market.  Who does their own due diligence and if we have problems with it, if we have mispricing like we did with the home equity business, right, ***it immediately gets reflected in our numbers and we fix it***.  Do you see what I'm saying?  That's a big quality control function, the fact that we turn our loans on average, this quarter was about 50 days, 55 days and in 55 days we know if we priced them right and we know if the investor is willing to buy them…. Tr. at 13 (emphasis added).

133.   Defendants' statements regarding the Company's underwriting standards and quality controls are material.  As a mortgage lender, IndyMac's underwriting practices are among the most important information looked to by investors as illustrated by the frequency with which Perry emphasized the Company's underwriting policies in press releases and other public statements, as well as the fact that analysts frequently repeated and commented on Defendants' statements regarding the Company's standards.  Moreover, for a mortgage lender,

like IndyMac, statements touting "the best quality control of **any** thrift out there" goes to the fundamentals of **any** mortgage company and corresponding ability to generate reliable streams of revenue.  There is a substantial likelihood that a reasonable investor would consider such facts important.

134.   The foregoing statements were false and misleading because IndyMac's quality control, both pre-purchase and post-purchase were so recklessly deficient that IndyMac was unable to monitor, let alone "fix," its early payment defaults and representations and warranties related to its loans.  Indeed, IndyMac permitted intentionally and grossly exaggerated stated income loans to be processed without appropriate due diligence in the pre-funding quality control process.  For instance, IndyMac should have and could have verified loan applicants' income as reported to the IRS by utilizing Form 4506T.  IndyMac recklessly, if not willfully, turned a blind eye to false, inflated stated incomes. Incredibly, IndyMac actually marketed to brokers its willingness to ignore most stated income deficiencies.  *See* IndyMac Presentation *Here We Grow* at 14 ("Required Form: 4506T (will not be pulled unless income is outrageous).").  Furthermore, IndyMac's post-funding quality control audits were conducted on an untimely basis as IndyMac's post-funding quality control department was significantly understaffed.  The Solutions Funding post-funding quality control audits were performed months after the loans were in early payment default, significantly undermining their utility.

### D.   2006 Second Quarter Form 10-Q

135.   On July 27, 2006, the Company filed its Report on Form 10-Q for the quarter ended June 30, 2006 with the SEC (the "2006 Second Quarter 10Q").  Because Perry signed the 2006 Second Quarter 10-Q, all statements therein were made by him and the Company.

136.   The 2006 Second Quarter 10-Q stated:

A component of the overall allowance for loan losses is not specifically allocated to the loan portfolios ("unallocated component"). The unallocated component reflects management's assessment of various factors that create inherent imprecision in the methods used to determine the specific portfolio allocations. Those factors include, but are not limited to *levels of and trends in delinquencies and impaired loans, charge-offs and recoveries, volume and terms of the loans, effects of any changes in risk selection and underwriting standards,* other changes in lending policies, procedures, and practices, and national and local economic trends and conditions. *Id.* at 45.  (Emphasis added)

137.   The foregoing statements were material and knowingly or recklessly false and misleading for the same reasons that the same statement, set forth in the Company's 2006 First Quarter 10-Q, was knowingly or recklessly materially false and misleading.  *See* ¶¶132-33 (discussing same).

### E.   September 13, 2006 Lehman Brothers Presentation

138.   On or about September 13, 2006, Michael Perry participated at Lehman Brothers' 2006 Financial Services Conference.  IndyMac's presentation was filed with the SEC in an 8-K on September 13, 2006.  A table entitled, "Risk Management Functions Are Also Performed at Business-Unit Level," catalogs the following systemic safeguards in place in connection with IndyMac's SFR Mortgage Production:

1. Thorough sellers/3rd party approval and monitoring;
2. Pre-funding quality control reviews;
3. Sound underwriting guidelines;
4. Rigorous in-house appraisal reviews;
5. Post-funding quality control audits; and
6. Loss mitigation/fraud recovery management.

Presentation at 23.

### Statement One:

139.   The statement regarding the systemic safeguard in place for the Company's underwriting practices is material because, as a mortgage lender, IndyMac's underwriting practices – including its purported "thorough" third party

1773662.1

approval and monitoring – are among the most important information looked to by investors in exercising their investment judgment.  The frequency with which Perry emphasized the Company's underwriting policies in press releases and other public statements, as well as the fact that analysts frequently repeated and commented on Defendants' statements regarding the Company's standards, confirms the materiality of this statement.

140.   Defendants' statement that they conducted "thorough sellers/3rd party approval and monitoring" was materially false and misleading.  IndyMac's seller/3rd party approval and monitoring were severely deficient.  As reflected in the litigation between IndyMac and its various brokers, such as Lancaster, Silver State and Geneva, IndyMac recklessly continued to conduct business with sellers who experienced massive early payment defaults and significant representation and warranty deficiencies.

141.   Plaintiffs allege that defendant Perry knew or was reckless in not knowing that the foregoing statement (at ¶138) was materially false and misleading because IndyMac, by its own judicial admission, was aware, at least as early as 2005, of significant early payment defaults and representation and warranty deficiencies plaguing loans obtained through sellers.

**Statement Two:**

142.   The statement regarding the systemic safeguard in place for the Company's underwriting practices is material because, as a mortgage lender, IndyMac's underwriting practices – including "pre-funding quality control reviews" – are among the most important information looked to by investors.  The frequency with which Perry emphasized the Company's underwriting policies in press releases and other public statements, as well as the fact that analysts frequently repeated and commented on Defendants' statements regarding the

SIXTH AMENDED CLASS ACTION COMPLAINT

1773662.1

Company's standards, confirms the importance of these statements to investors.

143.   IndyMac's statement that it conducted "pre-funding quality control reviews" was false and misleading.  IndyMac's pre-funding quality control reviews were grossly inadequate.  Indeed, IndyMac permitted intentionally and grossly exaggerated stated income loans to be processed without appropriate due diligence in the pre-funding quality control process.  For instance, IndyMac should have and could have verified loan applicants' income as reported to the IRS by utilizing Form 4506T.  IndyMac recklessly, if not willfully, turned a blind eye to false, inflated stated incomes.  Incredibly, IndyMac actually marketed to brokers its willingness to ignore most stated income deficiencies.  *See* IndyMac Presentation *Here We Grow* at 14 ("Required Form: 4506T (will not be pulled unless income is outrageous).").

144.   Plaintiffs allege that defendant Perry knew or was reckless in not knowing that the foregoing statement (at ¶138) was materially false and misleading because (i) Perry directed IndyMac employees to "push loans through" without regard to approval guidelines, as attested to by the CWs, evidenced in, *inter alia*, "Disneyland Loans"; (ii) Perry and other senior managers encouraged the manipulation of the e-MITS system; (iii) loan sales representatives solicited fraudulent letters in connection with purported verification of customer income, which was reported to upper management; (iv) as stated by CW4, during the Class Period IndyMac experienced and was aware of a substantial increase in defaults attributable to misrepresentations and fraud in the loan applications facilitated by the Company's relaxing of underwriting guidelines; and (v) IndyMac instituted auditor bonus structures that dissuaded the detection of fraud.

**Statement Three:**

145.   The statement regarding the Company's systemic safeguards in place

for its underwriting guidelines is material because, for a mortgage lender, "sound underwriting guidelines" are among the most important information looked to by investors in exercising their investment judgment.  The frequency with which Perry emphasized the Company's "sound" underwriting policies in press releases and other public statements, as well as the fact that analysts frequently repeated and commented on Defendants' statements regarding the Company's standards, confirms the importance of such statements to investors.

146.   IndyMac's statement that it had "sound underwriting guidelines" was false and misleading.  IndyMac routinely approved high-risk loans that departed significantly from the Company's established underwriting guidelines.  As described fully at ¶¶43-51 herein, IndyMac, and defendant Perry in particular, created a company-wide culture and practice of ignoring and intentionally overriding the Company's underwriting guidelines for the singular, myopic goal of generating loan volume.  Combined with IndyMac's substantial reliance on high-risk loans, the actual practice at IndyMac to ignore and intentionally override the Company's stated underwriting guidelines placed the Company's business in the precarious condition of relying on a flimsy base of significantly risky loans – unbeknownst to the public.  In short, IndyMac had in place, and adhered to, anything but "sound underwriting guidelines."

147.   Plaintiffs allege that defendant Perry knew or was reckless in not knowing that the foregoing statement (at ¶138) was materially false and misleading because Perry himself created a company-wide pattern of abandoning underwriting guidelines, directing IndyMac employees to "push loans through" without regard to approval guidelines.  As attested to by various confidential witnesses, the company-wide environment had become an "organized chaos" focused on the singular goal of increasing reported loan volume, regardless of loan quality.

SIXTH AMENDED CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### Statement Four:

148.   The statement regarding the Company's "rigorous" in-house appraisal reviews is material because, as a mortgage lender, IndyMac's underwriting practices – including purportedly conducting "rigorous" appraisal reviews – are among the most important information investors look to in deciding whether to invest in a mortgage lending company's stock.  The frequency with which Perry emphasized such underwriting policies in press releases and other public statements, as well as the fact that analysts frequently repeated and commented on Defendants' statements regarding the Company's standards, confirms the importance of such statements to investors.

149.   IndyMac's statement that it conducted "rigorous in-house appraisal reviews" was false and misleading.  IndyMac's appraisal reviews were limited and recklessly deficient.

150.   Plaintiffs allege that Perry and IndyMac knew or were reckless in not knowing that the foregoing statement (at ¶138) was materially false and misleading because IndyMac's appraisal reviews were performed under only limited circumstances, as reflected in the deposition transcripts of Nicholas Nyland and Ignacio Gomez in the *Indymac Bank v. Chandler Appraisal Services* litigation.

### Statement Five:

151.   The statement regarding the Company's underwriting quality control is material.  High quality loans could be expected by reasonable investors to generate reliable streams of revenue at IndyMac.  In contrast, loans that perform poorly would have a negative impact on IndyMac's balance sheet.  As a mortgage lender, IndyMac's underwriting practices – including "post-funding quality control audits" – are therefore among the most important information looked to by investors.  Moreover, the frequency with which Perry emphasized such

1773662.1

underwriting practices in press releases and other public statements, as well as the fact that analysts frequently repeated and commented on Defendants' statements regarding the Company's standards, confirms the importance of such statements to investors.

152.   IndyMac's statement that it conducted "post-funding quality control audits" was false and misleading.  IndyMac's post-funding quality control audits were conducted on an untimely basis as IndyMac's post-funding quality control department was significantly understaffed.  The Solutions Funding post-funding quality control audits were performed months after the loans were in early payment default, significantly undermining their utility.

153.   Plaintiffs allege that defendant Perry knew or was reckless in not knowing that the foregoing statement (at ¶138) was materially false and misleading because these audits were not being done on a timely basis, *i.e.*, quarterly.  Instead, IndyMac and Perry recklessly permitted delays far in excess of a quarter before post-funding quality control audits were performed.  Even after the post-funding quality control reports were completed, IndyMac's procedures permitted substantial delays before repurchase requests were even sent to sellers.

**Statement Six:**

154.   The Company's "loss mitigation and fraud recovery management" statements are also material.  For a mortgage lender, like IndyMac, such underwriting practices are among the most important information looked to by investors.  The frequency with which Perry emphasized the Company's underwriting policies in press releases and other public statements, as well as the fact that analysts frequently repeated and commented on Defendants' statements regarding the Company's standards, further demonstrates materiality.

155.   IndyMac's statement that it purportedly had adequate "loss

SIXTH AMENDED CLASS ACTION COMPLAINT

mitigation/fraud recovery management" was false and misleading.  IndyMac's seller pursuit department was patently ineffective as a result of its inadequate staffing and resources causing inordinate delay in its attempts to recover from recidivist sellers.  As such, IndyMac frequently only pursued litigation years after problems with a seller became apparent, with limited success.

156.   Plaintiffs allege that defendant Perry knew or was reckless in not knowing that the foregoing statement (at ¶138) was materially false and misleading because IndyMac failed to pursue delinquent loan sellers for excessive time periods.  IndyMac's legal department was acutely aware of the inordinate delays that occurred with respect to seller pursuit litigation.  Moreover, IndyMac recklessly purchased loans from sellers who had failed to cure repurchase requests.

## F.   September 21, 2006 RBC Financial Institutions Conference

157.   Scott Keys, Executive Vice President and Chief Financial Officer of IndyMac, on behalf of IndyMac, made the following statement at an RBC Financial Institutions Conference on September 21, 2006:

> I joke with Mike Perry, our CEO, that if we did a slide for every negative article that comes out in the mortgage -- kind of about mortgages, Jim, I'd need the rest of the day for the presentation.  ***But we wanted to spend the bulk of the presentation trying to dispel some myths about the industry, and also some myths about the Company, where we think people are lumping us in with -- maybe with issues that don't really exist.***  So, I'm going to spend the bulk of time the time on enterprise risk management today.
>
> *              *              *
>
> One of the other things that we have the ability to do is we do a fair amount of our purchases in our conduit business. And there we're dealing with larger financial institutions, and we have a pretty high success rate. ***If we end up having to repurchase a loan, we are able to turn around and put that repurchase back to the seller. To us it's probably about a 90% effectiveness rate there. So, we -- so, a lot of the risk where we may repurchase (indiscernible) we can turn around and pass that back to the seller.***

(Emphasis added.)

SIXTH AMENDED CLASS ACTION COMPLAINT

158.   The statements regarding the Company's ability to effectively defray potential repurchase losses are material because the inability to do so would have a serious impact on IndyMac's balance sheet.  As a mortgage lender, IndyMac's ability (or not) to "put" *90%* of repurchases on sellers is the type of information looked to by investors in deciding whether to invest in the stock of a mortgage lender.  Facts that directly implicate the fundamentals of a company's core operations are important to reasonable investors in exercising their investment judgment.

159.   The statement regarding the effectiveness of IndyMac's success rate in obtaining seller repurchases was false and misleading because IndyMac's routine practice of delaying repurchase requests limited IndyMac's ability to gauge this important metric.  As reflected in IndyMac's seller litigation (described above), IndyMac was frequently unable to successfully force recidivist sellers to repurchase the substantial quantity of early payment defaults and representation and warranty claims and knew or was reckless in not knowing this fact.

160.   Defendant Perry is liable for this statement because, while it was actually uttered by Mr. Keys, Mr. Keys references defendant Perry as a joint participant in the preparation of the statement.  Accordingly, when Mr. Keys uttered this statement on behalf of the Company, defendant Perry had a duty to correct it as he knew, or was severely reckless in not knowing, of the statement's material falsity.

161.   Scienter is attributable to the Company and defendant Perry because IndyMac, by its own judicial admission, was on notice as early as 2005 that IndyMac was frequently unable to successfully force recidivist sellers to repurchase the loans with early payment defaults and representation and warranty claims.

SIXTH AMENDED CLASS ACTION COMPLAINT

1773662.1

### G.    2006 Third Quarter Form 10-Q

162.    On November 2, 2006, the Company filed its Report on Form 10-Q for the quarter ended September 30, 2006 with the SEC (the "2006 Third Quarter 10Q").  Because Perry signed the 2006 Third Quarter 10-Q, all statements therein were made by him and the Company.

163.    The 2006 Third Quarter 10Q stated:

> A component of the overall allowance for loan losses is not specifically allocated to the loan portfolios ("unallocated component"). The unallocated component reflects management's assessment of various factors that create inherent imprecision in the methods used to determine the specific portfolio allocations. Those factors include, but are not limited to levels of and trends in delinquencies and impaired loans, charge-offs and recoveries, volume and terms of the loans, *effects of any changes in risk selection and underwriting standards*, other changes in lending policies, procedures, and practices, and national and local economic trends and conditions. *Id.* at 52. (Emphasis added).

164.    The information contained in the foregoing statement was material to investors when made for the reasons set forth at ¶128.  The foregoing statement was knowingly or recklessly false and misleading for the same reasons that the identical statement, set forth in the Company's 2006 First Quarter 10-Q, was knowingly or recklessly materially false and misleading.  *See* ¶¶129-130 (discussing same).

### H.    November 2, 2006 Conference Call

165.    On November 2, 2006, defendant Perry spoke to analysts and the investing public on behalf of the Company during a public earnings conference telephone call (the "Q3 2006 IndyMac Bancorp, Inc. Earnings Conference Call").

166.    During the Q3 2006 IndyMac Bancorp, Inc. Earnings Conference Call Perry stated, regarding the documentation required before a Company underwrites a loan that "typically on full doc borrowers we ask them to provide W-2s and pay

1773662.1

1    stubs." Tr. at 14.

2    167.   The statement regarding certain of the Company's underwriting

3    practices was material.  As a mortgage lender, IndyMac's underwriting practices –

4    including the creditworthiness of its borrowers – is among the most important

5    information looked to by investors for the same reasons set forth in ¶128.

6    168.   This statement was materially false and misleading because the

7    Company's internal policies ***did not*** require W-2s and pay stubs as verification of

8    income for "full doc" loans.

9    169.   Plaintiffs rely on the following facts in support of their allegation that

10   the foregoing statement was materially false and misleading.  CW 7 states that the

11   vast majority of IndyMac purportedly "Full Doc" loans were underwritten merely

12   based on a Verification of Employment ("VOE"), not on W-2s and pay stubs.  CW

13   7 further provided documentation in the form of the "IndyMac Bank NonPrime

14   Program Matrix" confirming the same.

15   170.   Plaintiffs allege that defendant Perry and the Company knew or were

16   reckless in not knowing that the foregoing statement (at ¶166) was materially false

17   and misleading because Perry's statement facially contradicts the Company's

18   official, written internal policies.

19

20   # VI.    LOSS CAUSATION/ECONOMIC LOSS

21   171.   As detailed herein, during the Class Period, Defendants engaged in a

22   scheme to deceive the market and artificially inflate IndyMac's securities prices,

23   which scheme operated as a fraud or deceit on Class Period purchasers of IndyMac

24   securities.  In particular, Defendants misrepresented the Company's underwriting

25   standards, risk management policies, and the adequacy of its loan loss reserves.

26   Later, however, when Defendants' misrepresentations and fraudulent conduct

27   began to be disclosed and became apparent to the market (or, in the alternative,

28

SIXTH AMENDED CLASS ACTION COMPLAINT

52

when the risks concealed by Defendants' misrepresentations materialized), IndyMac stock fell as the artificial inflation came out of the Company's stock price.

172.    Specifically, during the Class Period, Defendants misrepresented: (i) IndyMac's underwriting guidelines and controls and their compliance therewith; (ii) IndyMac's risk management policies; and (iii) the adequacy of IndyMac's loan loss reserves.  These misrepresentations concealed, *inter alia*, that the Company's loan portfolio was severely impaired as a result of Defendants' repeated violations of the Company's internal/operational controls over underwriting.  Defendants' false and misleading statements had their intended effect and caused IndyMac's common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $50.11 per share on May 8, 2006.

173.    Starting on January 16, 2007, and through March 1, 2007, investors began to learn the truth through a number of partial disclosures, including Defendants' own admissions.  The series of disclosures revealed, among other things that: (1) the Company faced a substantial earnings shortfall caused by credit losses and increases in provisions for loan loss reserves as a result of the Company's impaired loans; (2) the Company would not meet its forecasted results for the fourth quarter of 2006, primarily because the Company doubled its credit reserves from the previous quarter to cover the massive number of defaults on the loans it had underwritten; (3) several of the Company's business areas (*e.g.* its 80/20 loan portfolio) that Defendants had touted as its strongest virtues were, in actuality, profoundly weakened and impaired; (4) the Company experienced a substantial negative financial impact as a result of losses from bad/uncollectible loans held by the Company; and (5) the Company had "loosened its lending standards" during 2006, and that, going forward, the Company would correct this

by being "smart and prudent" in managing its underwriting guidelines and risk.

174.   As a direct result of these disclosures IndyMac's stock price dropped from a close of $43.55 per share on January 12, 2007 (the last trading day before Defendants' disclosures began) to $32.16 on March 1, 2007 (the day of Defendants' last corrective disclosure).  Together, these drops removed the inflation from IndyMac's stock price, causing real economic loss to Indymac investors.  In sum, as the truth was revealed, the Company's stock price plummeted, the artificial inflation came out of the stock, and Plaintiffs and other members of the Class were damaged.

175.   The decline in IndyMac's stock price during the Class Period was a direct result of Defendants' earlier misrepresentations finally being revealed to investors and the market. The timing and magnitude of IndyMac's stock price declines negate any inference that the loss suffered by Plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiffs and other members of the Class was a direct result of Defendants' fraudulent scheme to artificially inflate IndyMac's securities prices and the subsequent significant decline in the value of IndyMac's securities when the truth was revealed through a series of partial disclosures.

A.   **The Truth About the Company's True Condition Begins to Emerge as Defendants Disclose that Indymac had Saddled Itself with Toxic Loans as a Result of its Poor Underwriting Practices Thereby Causing Substantial Charges and Increased Loan Loss Reserves**

176.   On January 16, 2007, the Company issued a written press release to the public on its website and to various media outlets (the "January 16, 2007 Press

1773662.1

Release") in which it stated:

> Unfortunately, we are starting the year off with some bad news.
>
> Based on the earnings forecast we provided after the end of last quarter, we anticipated that our EPS for the fourth quarter would be $1.35 (in a range of $1.30 to $1.40). However, last week, as we began to complete our quarterly accounting "roll-up," it became clear that our Q4 earnings would be substantially below our forecast. While our internal quarterly accounting certification process is not yet complete and adjustments could still be made as we finalize our accounting, we now expect to report approximately $0.97 EPS for the quarter when we release earnings as scheduled on January 25th.
>
> …While we have not yet completed our detailed analysis of all of the variances, our assessment as of today is that the main differences between our prior forecast of $1.35 and what looks to be our earnings of $0.97 are the following:
>
> ***1. An increase in credit costs related to the loan loss provision, secondary market reserve, and marking-to-market delinquent loans held-for-sale and residuals and non-investment grade securities;***
>
> ***2. A reduction in net interest margin related to loans held-for-sale and the thrift investment portfolio due to yield curve inversion and the fact that our loan production mix shifted more toward fixed rate and intermediate term fixed rate loans …*** (Emphasis added).

177. The foregoing statements, while leaking portions of the truth concealed during the Class Period, were still knowingly or recklessly materially false and misleading because they failed to fully disclose weaknesses in IndyMac's internal/operational controls, which enabled Defendants *inter alia*, improperly to manipulate underwriting protocols, direct that unqualified loans be approved, violate rate lock protocols, direct that loans returned from the secondary market be rewritten to "work," and stifle/ignore reports of internal fraud (*see* ¶¶43-84).

178. The market quickly began keying in on the import of IndyMac's January 16, 2007 earnings miss warning, linking IndyMac's poor performance with the Company's shoddy loan portfolio.

1773662.1

179.   For example, Manuel Ramirez, an analyst at Keefe, Bruyette & Woods, wrote in his analyst report dated January 17, 2007 that "Where There's Smoke, There Might Be Fire" and **downgraded** IndyMac to "underperform." Citing "credit quality deterioration" as the "most significant factor," Ramirez noted the concern with IndyMac's "volume driven model."  Ramirez specifically attributed the Company's poor performance to, *inter alia*: (a) "the deterioration in the quality of production (more correspondent and conduit volumes)…"; and (b) inadequate reserves for losses related to rep and warranty losses for loans sold on the secondary market.

180.   In the same report, Ramirez also described how the Company's poor performance was related to its need to boost reserves as a result of shoddy loans. "Secondary Market Reserve: Relates to rep and warranty losses for loans sold into the capital markets.  Management had strongly defended the adequacy of the [secondary market] reserve on the past two quarterly conference calls **despite the fact** that the reserve had looked light at only $30.2 million, or 2.8 basis points of loans sold.  Questions had arisen due to the rash of early payment defaults in the subprime market.  We assume the secondary market reserve will be bolstered by $8 million in the quarter, which is a contra to gain on sale income."

181.   A Foxx-Pitt, Kelton analyst report dated January 17, 2007 corroborated as much, attributing much of the Company's announced decline to "elevated instances of early payment defaults and other rep and warranty breaches."

182.   Notwithstanding that Defendants' partial disclosure failed to fully disclose Defendants' fraud, the revelation of the Company's earnings miss – a direct result of Defendants' conduct – caused the price of the Company's common stock to fall to $40.50 at close, down from $43.55 at close on January 12, 2007 (the

1    prior trading day).

2        183.   Analysts also expressed skepticism with IndyMac's belated

3    recognition of impairments to its shoddy loan portfolio.  A Roth Capital Partners

4    report dated January 22, 2007 noted:

5            The issue, in our estimation, is the timing of the disclosures—or to be
             more precise, the timing of increases in loan loss provisions, valuation
6            allowances, repurchase provisions, and fair value adjustments, where
             we believe most of the hike in credit costs and decline in servicing
7            ROE will be reflected.

8

9    The report specifically questioned the timetable of the Company's

10   accounting for its toxic loan exposures:

11           The question that arises in our minds [sic] whether the increases in
             provisions and fair value adjustments we are anticipating were
12           necessitated by changes in actual loss experience and prepayment
             speeds in the fourth quarter—or change in expectations that formed in
13           the fourth quarter—*or should have been reflected in the company's
             financial statements earlier in the year.*  Many nonconforming
14           lenders started reporting spikes in EPDs and repurchase requirements
             in the middle of 2006.  They also reported sharp increases in
15           delinquencies and loans going into foreclosure in 2006 loan
             production vintages.
16

17   (Emphasis added.)

18   **B.    The Truth Continues to Emerge as the Market Learns that
            Indymac's Loosening of Underwriting Guidelines Caused
19          Indymac's Abysmal Performance**

20

21       184.   On January 25, 2007, Defendants publicly disclosed that the Company

22   had been financially impaired, and would be unable to achieve the forecasted

23   results for the fourth quarter of 2006.

24       185.   On January 25, 2007, the Company issued a written press release to

25   the public on its website and to various media outlets (the "January 25, 2007 Press

26   Release") in which it stated:

27

28           PASADENA, Calif.--(BUSINESS WIRE)--Jan. 25,
             2007--IndyMac Bancorp, Inc. (NYSE:NDE)

SIXTH AMENDED CLASS ACTION COMPLAINT

57

1773662.1

("IndyMac(R)" or the "Company"), the holding company for IndyMac Bank, F.S.B. ("IndyMac Bank(R)"), today reported net earnings of $72 million, or $0.97 per share, for the fourth quarter of 2006, compared with net earnings of $70 million, or $1.06 per share, in the fourth quarter of 2005, representing a 3 percent increase in net earnings and an 8 percent decrease in earnings per share (EPS). . .

                    *                    *                    *

"However, I and the rest of IndyMac's management team are clearly disappointed with these results because they were considerably below our normal earnings growth and ROE levels and fell far short of what we had forecasted for the quarter. In response, I want to assure our shareholders that we are redoubling our efforts to both improve our earnings and tighten up our forecasting processes.

                    *                    *                    *

"Tough times, like what we are now facing, are when companies like IndyMac can gain ground on the competition - and that is exactly what we are doing. We had a strong quarter for loan production, with $26 billion in total loans produced, up 8 percent over the prior quarter and 44 percent over Q4-05. With these production gains, we grew our estimated market share(1) to 4.51 percent in the fourth quarter versus 3.83 percent in the third quarter and 2.51 percent one year ago.

                    *                    *                    *

**Mortgage Production**

"While we achieved records for loan production and market share, we are not happy with the fact that earnings from the mortgage production segment did not grow this quarter versus last," commented Richard Wohl, IndyMac Bank's President. "Our mortgage banking revenue margin declined to 91 basis points during the fourth quarter from 103 basis points in the prior quarter and 110 basis points in Q4-05. Market conditions contributed to the margin erosion in the form of a shift in our production mix from higher margin ARM loans to lower margin fixed rate loans and increased credit costs related to marking-to-market delinquent loans held for sale and increasing our secondary marketing loan repurchase reserve.

                    *                    *                    *

SIXTH AMENDED CLASS ACTION COMPLAINT

1773662.1

Looking ahead, there will likely be further erosion in mortgage banking revenue margins and overall profitability before the current down cycle eventually turns up."

\*            \*            \*

## Residuals and Non-Investment Grade Securities

"We are clearly not satisfied with the performance of these portfolios during the quarter, but we feel that this quarter's performance was an aberration that will likely not recur in the future," continued Olinski. "Two main factors drove the earnings decline. First, we implemented a new, more refined prepayment model for our residual securities that resulted in a one-time downward valuation adjustment of $5 million. Going forward the new model will enable us to hedge these assets more effectively, improving our performance. Second, HELOC residual securities from 2004 incurred a $6.5 million write-down for credit impairment required by GAAP accounting that we feel does not reflect the true economics of these securities. These securities are callable over the next 4-24 months, and, accordingly, we expect to book gains during this time period more than offsetting the fourth quarter write-downs, such that we expect strong overall returns on our 2004 HELOC residual securities over their lives.

\*            \*            \*

## Thrift Portfolio

Net earnings for the thrift portfolio, which consists of single-family residential mortgage loans (whole loans), consumer and subdivision construction loans, and mortgage backed securities (MBS), were $25 million, down 30 percent from the third quarter and 23 percent from one year ago. "Even though we increased our average earning assets in the thrift investment portfolio, our net interest margin declined substantially to 1.64 percent in the fourth quarter from 2.02 percent both in the third quarter and one year ago," noted Blair Abernathy, IndyMac's Chief Investment Officer. "The compression in net interest margin was due primarily to an increased cost of funds for our whole loan and MBS portfolios. Longer term, fixed-rate funding for these portfolios of approximately $1.5 billion at roughly a 2.95 percent cost of funds matured during the quarter and was replaced at a significantly higher funding cost. This has resulted in a more permanent shift in our net interest margin, such that the 1.64 percent margin realized during the quarter is likely what we can expect going forward. In retrospect,

1773662.1

we should have more properly planned for this
happening.

"Net earnings for the fourth quarter were also negatively
impacted by a GAAP $6.5 million credit-related
valuation write-down on HELOC residual securities
(noted above) and an increase in the loan loss provision
to $9 million from $5 million in the prior quarter and
$1.6 million in Q4-05. As a result of the earnings decline,
the thrift portfolio produced an ROE of 14 percent, below
our expectations, versus 20 percent in the prior quarter
and 22 percent one year ago. Going forward, we believe
the ROE for this portfolio should be in a range of 15
percent to 20 percent. We are clearly not happy about the
fact that the fourth quarter's performance fell below this
range, and we will provide updates on steps we are taking
to improve performance as the year progresses."

Non-performing Assets and Charge-offs Increase from
Historic Low Levels

Non-performing assets to total assets increased to 63
basis points during the quarter from 51 basis points in the
third quarter and 34 basis points in Q4-05. Net charge-
offs increased to $7.6 million during the quarter from
$1.9 million both in the prior quarter and one year ago.
"We have previously noted that the historically low
NPAs and charge-offs we have experienced over the last
few years were unsustainable, and, indeed, we saw
erosion in our credit metrics during the fourth quarter. In
light of this, we are increasing our provision for loan
losses," commented Scott Keys, IndyMac's Chief
Financial Officer. "We expect current credit conditions to
worsen further in 2007 in connection with the housing
market cycle and therefore are planning for significant
increases in loan loss provisions and charge-offs in 2007
versus 2006.

186. Notably, the Company further revealed some of the details of the

financial problems caused by Defendants' fraud:

- increased credit costs related to marking-to-market delinquent loans
  held for sale;

- an increase in the Company's secondary marketing loan repurchase
  reserve;

- a nearly two-fold increase in the Company's loan loss provision to
  $9 million from $5 million in the prior quarter and $1.6 million in
  Q4-05; and

SIXTH AMENDED CLASS ACTION COMPLAINT

60

1773662.1

- Non-performing assets to total assets increased to 63 basis points during the quarter from 51 basis points in the third quarter and 34 basis points in Q4-05. Net charge-offs increased approximately four-fold to $7.6 million during the quarter from $1.9 million both in the prior quarter and one year ago.

187. While Defendants were careful not to specifically admit fraud or misconduct in the January 25, 2007 statements, the statements further disclosed the impact of their fraud. That is, *inter alia*, but for Defendants' violations of the Company's internal/operational controls over underwriting (which resulted in the issuance of bad and/or uncollectible loans that never should have been underwritten or purchased in the first place) the Company would not have experienced an increase in its credit costs and an increase non-performing assets on its books or been forced to increase its loan repurchase reserve, each of which negatively impacted the Company's financial results.

188. While Defendants' false and misleading statements during the Class Period were repeated (and not expressly repudiated) by Defendants, incident to and after the Company's January 17 & 25, 2007 disclosures, Defendants' partial revelations of the truth were sufficient for the market to discern the falsity of Defendants' prior misrepresentations. *See* ¶¶178-183 (discussing analyst statements).

189. IndyMac's loosening of underwriting standards resulted in the Company's increasing reliance on high-risk 80/20 piggyback loans. This was a direct cause of the Company's dramatic increase in credit losses for the fourth quarter of 2006 and the Company's need to significantly increase its provisions for loan loss and secondary market reserves. During the Class Period, IndyMac began suffering credit losses as a result of a rash of EPDs on piggyback loans. IndyMac was therefore forced to hold these defective loans, and was either unable to sell them in the secondary market or was subject to repurchase demands from the securitizations thereof.

SIXTH AMENDED CLASS ACTION COMPLAINT

1773662.1

190.   The underlying fraud, IndyMac's shoddy, camouflaged underwriting practices, directly caused the losses that the Company announced – and that investors suffered – at the end of the Class Period.  IndyMac's excuses for its abysmal performance – credit losses, increased provisions for loan loss reserves, and mark downs on its impaired loan portfolio – were the direct and natural consequences of the Company's loosening of underwriting standards.  As it began to rely precariously and heavily on high-risk 80/20 piggyback loans, the Company was doomed to face more loan delinquencies and defaults, and thus suffer greater credit losses, be required to increase its loan loss reserves and be forced to mark down its impaired loans.

191.   IndyMac's increased credit losses were, in part, the direct result of IndyMac's declining credit quality which was inextricably linked to the Company's reliance on piggyback loans.  Perry discussed these issues during an earnings conference call IndyMac held on January 25, 2007 (the "January 25, 2007 Earnings Conference Call").

192.   Perry admitted on the January 25, 2007 analyst Conference Call that in connection with "[t]he increase [in credit costs] from the third to fourth quarter, we are seeing some problems in certain pieces of 80/20 piggyback programs."  It was further admitted in IndyMac's Earnings Presentation filed January 25, 2007 that "Higher credit mark-to-market losses in Q4 06 were concentrated in the prime 80/20 and subprime products."

193.   Indeed, the disproportionately-high tendency for piggyback loans to default specifically manifested in the Company's credit losses recognized at the end of the Class Period.  While about 20% of IndyMac's loan production for the fourth quarter of 2006 – or $5 billion out of $25.9 billion – consisted of 80/20 piggyback loans, nearly *60%* of credit losses on loans held for sale during the

SIXTH AMENDED CLASS ACTION COMPLAINT

fourth quarter of 2006 – or $10.27 million out of $17.66 million – were attributable entirely to 80/20 piggyback loans.  As revealed in a press release issued by IndyMac on March 15, 2007:

```
                              Appendix A
                      Recent Guideline Cutbacks(a)

Product Group                 4th Quarter   Production   Percent of
($ in millions)                Production    Eliminated   4th
                                                          Quarter
                                                          Production
                                                          Eliminated
-----------------------------------------------------------------------
80/20 Piggybacks              $    4,990 $    2,689.5       53.9%
-----------------------------------------------------------------------
Subprime                      $    1,155 $      444.7       38.5%
-----------------------------------------------------------------------
Alt-A and Prime               $   11,205 $      586.5        5.2%
-----------------------------------------------------------------------
Option ARM                    $    5,201 $      211.3        4.1%
-----------------------------------------------------------------------
Second Liens (CES and HELOCs) $    1,169 $      201.7       17.3%
-----------------------------------------------------------------------
Consumer Construction         $      785 $        1.2        0.2 %
-----------------------------------------------------------------------
Reverse Mortgages             $    1,441 $        -          - %
-----------------------------------------------------------------------
Total                         $   25,946 $    4,134.9       15.9%
-----------------------------------------------------------------------

Product Group                 4th Quarter 4th Quarter Percent of
($ in millions)               Credit      Credit      4th
                              Losses on   Losses on   Quarter

------------------------------=============------------------------

                              Loans Held  LHFS        Credit
                              for Sale    Related To  Losses on
                              (LHFS)      Eliminated  LHFS
                                          Production  Eliminated
-----------------------------------------------------------------------
80/20 Piggybacks              $    10.27 $      9.06       88.2%
-----------------------------------------------------------------------
Subprime                      $     3.12 $      2.64       84.4%
-----------------------------------------------------------------------
Alt-A and Prime               $     2.10 $      0.01        0.3 %
-----------------------------------------------------------------------
Option ARM                    $     1.42 $      0.02        1.7%
-----------------------------------------------------------------------
Second Liens (CES and HELOCs) $     0.41 $      0.40       96.8%
-----------------------------------------------------------------------
Consumer Construction         $     0.34 $        -          - %
-----------------------------------------------------------------------
```

SIXTH AMENDED CLASS ACTION COMPLAINT

63

```
-----------------------------------------------------------------
Reverse Mortgages                $       – $        –        – %
-----------------------------------------------------------------
Total                            $   17.66  $   12.12     68.6%
-----------------------------------------------------------------
```

(a) Includes some guideline cutbacks that are scheduled to take place
on March 19, 2007.

194.   Indeed, the Company subsequently further **_admitted_** – beyond its

January 25, 2007 admissions – that its losses were heavily tied to its precarious

reliance on high-risk piggyback loans.  In the IndyMac Earnings Presentation dated

April 26, 2007 the Company stated that "The Credit M[ark to Market] Allowance

On Loans Held For Sale Has Increased Due To Poor Performance of 'Piggybacks'

And Subprime…"  (April 26, 2007 Presentation Slide at page 24.)  The

presentation further stated that "Credit Losses In Our H[eld For Sale] Portfolio

Were Due Primarily To Higher Early Payment Defaults In Our Piggyback And

Higher LTV Subprime Programs."  (April 26, 2007 Presentation Slide at page 25.)

195.   Furthermore, in a UBS Conference Presentation, dated May 15, 2007,

the Company admitted "Yes, We Expanded Guidelines Too Far On Piggyback

And Subprime Loans…" which impacted the Company's earnings with "Estimated

abnormal credit costs of $30-35 million from 2006-Q2 07."  (May 15, 2007

Presentation Slide at page 11.)

196.   Indeed, early or first payment defaults on piggyback loans plagued

entire loan pools.  As detailed above in the section elaborating on the Silver State,

Lancaster and Geneva toxic loan pools, there is no doubt that a material portion of

IndyMac's fourth quarter 2006 credit losses (and need to increase loan loss

reserves) were a direct result of its growing reliance on piggyback loans stemming

from its shoddy underwriting practices during the Class Period.

197.   During the January 25, 2007 Earnings Conference Call, Perry

disclosed flaws in the Company's internal/operational controls and forecasting.

SIXTH AMENDED CLASS ACTION COMPLAINT

64

For example, Perry admitted that "[o]ur provision for loan losses is increasing. . . Credit quality generally is deteriorating so I would say that's something we have to do a better job forecasting, and clearly we want to be a little more conservative as it relates to that… This is something we should have done a better job forecasting on. This is something that we probably could have seen better if we had more precise models . . ." *Id.* at 4.

198.   On the January 25, 2007 Conference Call, analysts also focused on the Company's need to substantially increase provisions for loan loss reserves. For example, one concerned analyst, Manuel Ramirez, asked: "I was kind of doing the math on the provision, given your charge-off guidance and your guidance for net-loan growth, and *it seems like the provision could be up pretty substantially year-over-year*." (*Id.* at 15) (emphasis added).

199.   IndyMac's January 25, 2007 partial disclosure caused its stock to tumble to $37.71 at close, down from $40.70 at close on January 24, 2007.

200.   The timing and magnitude of IndyMac's stock price decline negates any inference that the loss suffered by Plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.

201.   This fact was confirmed by financial analysts covering IndyMac, who, although aware of the tough real estate/mortgage market, were shocked by IndyMac's January disclosures and questioned management's credibility as a result. *See* January 26, 2007 Lehman Brothers IndyMac research report ("The challenging environment was not surprising, but the extent of NDE's struggles was"; January 26, 2007 FBR IndyMac research report ("With the disappointing 4Q06 earnings and significantly reduced FY07 outlook, we feel NDE's management team lost some credibility.").

### C.     The Market Learns the Truth About Indymac's Deficient Underwriting Guidelines and Risk Management

202.    On March 1, 2007, the Company issued a Press Release in which Perry admitted that the Company had loosened its underwriting guidelines during 2006, and promised to mend its ways.  Specifically, Perry stated that:

> 2006 was a challenging year in the mortgage banking industry. Industry loan volumes of $2.5 trillion were 34 percent below 2003's historic high level and 17 percent lower than in 2005.
>
> *          *          *
>
> Given that reality, here is what we will do to improve performance for our shareholders right now:
>
> ***1.  Manage our credit risks by being smart and prudent in adjusting our mortgage underwriting guidelines, setting our risk-based pricing, making decisions as to what assets go into our investment portfolio and/or distributing our risk into the secondary market, and executing on best in class loss prevention and loss mitigation practices.***
>
> *          *          *
>
> ***Given the robust housing market and highly liquid secondary markets (for even the "riskiest loans") - both of which persisted for years longer than anticipated - and given strong competition in a declining overall mortgage market, IndyMac, in order to compete and grow, also loosened its lending standards, though in a much more responsible way.*** [Emphasis added.]

203.    As a result of the March 1, 2007 disclosure, IndyMac's share price dropped even more, to $32.16 at close, down from $34.33 on February 28, 2007, on large trading volume.

## VII.     POST CLASS PERIOD DISCLOSURES: THE OFFICE OF THE INSPECTOR GENERAL'S AUDIT REPORT

204.    In the wake of IndyMac's failure and seizure by the FDIC, the Office of the Inspector General, Department of the Treasury (the "OIG") conducted an investigation to determine what went so wrong at the Company.

205.    On February 26, 2009, the OIG issued a report setting forth its

SIXTH AMENDED CLASS ACTION COMPLAINT

1773662.1

findings (the "Audit Report"), aptly summarized as follows: the "underlying cause
of [IndyMac's] failure was the unsafe and unsound manner in which the thrift was
operated."  Audit Report at 3.

206.   Consistent with Plaintiffs' allegations concerning the Company's
"anything goes" attitude concerning underwriting (*see* ¶¶43-84), the Audit Report
confirms that the Company engaged in "unsound underwriting practices," stating:

- "IndyMac encouraged the use of nontraditional loans.
  IndyMac's underwriting guidelines provided flexibility in
  determining whether, or how, loan applicants' employment,
  income, and assets were documented or verified. . . .  For the
  loans reviewed, we found little, if any, review of borrower
  qualifications, including income, assets, and employment. We
  also found weaknesses with property appraisals obtained to
  support the collateral on the loans. . . ." (*Id.* at 11); and

- "IndyMac's business model was to produce as many loans as
  possible and sell them on the secondary market.  To facilitate this
  level of production. . . IndyMac often did not perform adequate
  underwriting" (*Id.* at 21).

207.   The Audit Report also confirms Plaintiffs' allegations concerning the
Company's inadequate loan loss reserves, stating:

- As early as 2004, IndyMac senior management began observing the
  probability of a downward trend in real estate values, which could
  reduce the collateral supporting loans and result in possible loan
  losses. Regardless, IndyMac's ALLL [Allowance for Loan and
  Lease Losses] decreased as a percentage of the thrift's total loans
  until 2007 when it finally increased its ALLL because it began to
  experience losses in its loan portfolio.

208.   Additionally, the Audit Report criticized IndyMac's Conduit Division
which, as described at ¶¶84-110, was responsible for bulk purchases of loans from
brokers (such as Silver State and Lancaster), finding that:

- IndyMac's "internal audit group reported problems with the Conduit
  Division as early as 2005" relating to its "loan approval and
  underwriting process"  (*Id.* at 22);

SIXTH AMENDED CLASS ACTION COMPLAINT

67

1773662.1

- IndyMac's Conduit Division was reported as a "financial reporting control deficiency" by the Company's independent auditor in 2006 (*Id.*); and that

- Despite the above described warnings (over a period of two years), these "major weaknesses" continued until the Office of Thrift Supervision stepped in during 2007. *Id.* at 23. "Shortly after, IndyMac recognized losses were occurring from this division and closed it." *Id.*

209.   The above-cited statement from the Audit Report, along with others, corroborate the testimony of the CWs as follows:

| Audit Report Findings | Corroborates CW Testimony |
|---|---|
| "Appraisals obtained by IndyMac on underlying collateral were often questionable as well." (p.2)<br>"IndyMac often made loans without verification of the borrower's income or assets, and to borrowers with poor credit histories." (p.2)<br>"IndyMac engaged in very high-risk activities over many years" (p.3)<br>"Many of [IndyMac's] nontraditional mortgages, however, came with an increased risk of borrower default." (p.8)<br>"These [IndyMac] loans proved to be even riskier because for the most part they were originated with less than full documentation." (p.8)<br>"For the loans reviewed, we found little, if any, review of borrower qualifications, including income, assets, and employment." (p.11)<br>"We also found weaknesses with property appraisals obtained to support the collateral on the loans." (p.12)<br>"Loan 3" -- $1.475 million stated income 80/20 piggyback loan; no borrower income verification; a peculiar "exception" to IndyMac underwriting guidelines; questionable appraisal; first payment default (pp.72-73) | CW1 testimony (¶¶45-46)<br>CW2 testimony (¶53)<br>CW4 testimony (¶63)<br>CW5 testimony (¶65)<br>CW7 testimony (¶81) |
| "IndyMac embarked on a path of aggressive growth." (p.6)<br>IndyMac "generated about $10 billion in loans in 2000 to a high of $90 billion in 2006." (p.7)<br>"IndyMac's business model was to produce as many loans as possible and sell them in the secondary market.  To | CW1 testimony (¶¶44-45)<br>CW2 testimony (¶73)<br>CW3 testimony |

SIXTH AMENDED CLASS ACTION COMPLAINT

| | |
|---|---|
| facilitate this level of production, we found that IndyMac often did not perform adequate underwriting." (p.21) | (¶60) CW5 testimony (¶65) |
| "By May 2005, signs of borrower distress were evident." (p.9) "As early as 2004, IndyMac senior management began observing the probability of a downward trend in real estate values, which could reduced the collateral supporting loans and result in possible loan losses. Regardless, IndyMac's [Allowance for Loan and Lease Losses] decreased as a percentage of the thrift's total loans until 2007…" (p.10) | CW2 testimony (¶55) CW4 testimony (¶72) CW6 testimony (¶69) |

## VIII.   ADDITIONAL FACTS SUPPORTING DEFENDANTS' SCIENTER

### A.   Perry's Certifications

210.   Throughout the Class Period, Perry repeatedly certified that he had reviewed and approved of the Company's internal controls and financial reporting, both of which have been demonstrated above to be false and misleading.

211.   For example, attached to the 2005 10-K, as Exhibit 31.1 and 32.1 were certifications required by SOX, and executed by Perry.  In his certifications attached to the 2005 Form 10-K, Perry stated that he had:

> designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.[5]

212.   Perry further stated, again in his written certifications attached to the 2005 Form 10-K that:

> I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's

---

[5] Perry repeated this statement in each of the Company's filings with the SEC on Form 10-Q during the Class Period.

SIXTH AMENDED CLASS ACTION COMPLAINT

auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

213.   Perry's certification of the Company's internal/operational controls is probative of his scienter.

214.   This is so because the Company's controls over underwriting were wholly ineffective (and violated by or caused to be violated by Perry *see e.g.* ¶¶43-51), resulting in the Company underwriting hundreds of millions of dollars worth of loans for which it was "probable" and/or "reasonably possible" that the Company would experience default.  Given that the Company did not adequately reserve against these potential losses, the Company's presentation of its financial results violated Statements of Financial Accounting Standards No. 5, Accounting for Contingencies ("SFAS 5"), a core principle of Generally Accepted Accounting Principles, rendering any statement that the Company had "reasonable assurance regarding the reliability of financial reporting" utterly false.

215.   It is clear that defendant Perry knew or was reckless in not knowing of the violations of the Company's underwriting controls and standards (rendering the statements at ¶¶211-212 materially false and misleading) for the following reasons. First, Perry directed employees to (i) "push loans through" regardless of whether they satisfied the Company's underwriting guidelines; (ii) input false information into the Company's e-MITS underwriting control system, to cause the approval of loans that would normally be rejected; and (iii) engage in violations of the Company's "rate lock" protocols and controls.  *See* ¶¶43-49.  Second, Perry was

aware that rampant fraud and lying by loan sales representatives was taking place, yet he continued to push employees to close loans "at all costs."  *See* ¶50.  Third, the wide-ranging and management-directed violations of the Company's underwriting guidelines and controls evidences a culture of fraud at the Company. *See* ¶¶50-51.  Fourth, the number of fraudulent loans discovered at the Company increased by 1500% from 2003 to mid-2006, rendering the lack of control over underwriting facially obvious.  *See* ¶¶67-70.  Fifth, the massive increase in bad loan "kickbacks" requiring repurchase by the Company resulted in the initiation of a large "special project" initiated by management to rehabilitate those loans.  *See* ¶¶73-75.  Finally, the numerous lawsuits filed by the Company show that it knew that certain pools of loans that it had purchased and underwritten from certain sellers were defaulting at rates as high as 90% (in 2005), and 97% (in 2006), rendering the inadequacy of the Company's underwriting controls facially obvious to Perry and the Company.  *See, e.g.,* ¶84.

## B.   **Perry's Financial Incentive**

216.   In addition to the facts supporting the conclusion that Defendants made false statements knowingly or with deliberate recklessness, defendant Perry had a financial incentive to make such false statements.

217.   Defendant "Perry's 2006 Short-Term Cash Incentive was entirely performance based, determined by IndyMac's 2006 EPS and ROE."  2006 Proxy at 39.  The Proxy continued:

> Thresholds of 2005's EPS and a 14 percent ROE were specified on an award matrix, growing to a $1 million award when EPS grew 15 percent and ROE exceeded 19 percent.  Based on IndyMac's 2006 EPS of $4.82, and 8.8 percent growth, and a 19.1 percent ROE, the award matrix yielded a $791,300 payout.  The MDC ["IndyMac's Management Development and Compensation Committee"] retained the right to make a potential downward adjustment to this amount if

SIXTH AMENDED CLASS ACTION COMPLAINT

regulatory ratings worsened or if certain strategic criteria were not met.  Based on 2006 results, the MDC made no adjustments.

218.   Thus, defendant Perry had motive to inflate loan production during the Class Period by directing that internal/operational controls be overridden.

## IX.   APPLICABILITY OF THE PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

219.   At all relevant times, the market for IndyMac common stock was an efficient market for the following reasons, among others:

(a)   IndyMac stock met the requirement for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)   As a regulated issuer, IndyMac filed periodic public reports with the SEC and NYSE;

(c)   IndyMac regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)   IndyMac was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

220.   As a result of the foregoing, the market for IndyMac common stock promptly digested current information regarding IndyMac from all publicly-available sources and reflected such information in IndyMac's stock price.  Under these circumstances, all purchasers of IndyMac common stock during the Class

SIXTH AMENDED CLASS ACTION COMPLAINT

72

1   Period suffered similar injury, and a presumption of reliance applies.

2   **X.   NO STATUTORY SAFE HARBOR EXISTS FOR DEFENDANTS'
3        STATEMENTS**

4        221.   The statutory safe harbor provided for forward-looking statements

5   under certain circumstances does not apply to any of the false statements pleaded

6   in this complaint. The specific statements pleaded herein either were not identified

7   as "forward-looking statements" when made or were not accompanied by

8   meaningful cautionary statements identifying important factors that could cause

9   actual results to differ materially from those in the purportedly forward-looking

10  statements. To the extent that the statutory safe harbor does apply to any forward-

11  looking statements pleaded herein, Defendants are liable for those false forward-

12  looking statements because at the time each of those forward-looking statements

13  was made, the particular speaker knew that the particular forward-looking

14  statement was authorized and/or approved by an executive officer of IndyMac who

15  knew that those statements were false when made.

16

17  **XI.   CLASS ACTION ALLEGATIONS**

18       222.   Lead Plaintiffs bring this action as a class action pursuant to Federal

19  Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all

20  those who purchased or otherwise acquired the common stock of IndyMac from

21  January 26, 2006 through March 1, 2007, inclusive and who were damaged

22  thereby. Excluded from the Class are Defendants, the officers and directors of the

23  Company, at all relevant times, members of their immediate families and their

24  legal representatives, heirs, successors or assigns and any entity in which

25  Defendants have or had a controlling interest.

26       223.   The members of the Class are so numerous that joinder of all

27  members is impracticable.  Throughout the Class Period, IndyMac's common

28

1773662.1

stock was actively traded on the NYSE.  While the exact number of Class members
is unknown to Plaintiffs at this time and can only be ascertained through
appropriate discovery, Plaintiffs believe that there are hundreds or thousands of
members in the proposed Class.  Record owners and other members of the Class
may be identified from records maintained by IndyMac or its transfer agent and
may be notified of the pendency of this action by mail, using the form of notice
similar to that customarily used in securities class actions.

224.   Plaintiffs' claims are typical of the claims of the members of the Class
as all members of the Class are similarly affected by Defendants' wrongful
conduct in violation of federal law that is complained of herein.

225.   Plaintiffs will fairly and adequately protect the interests of the
members of the Class and they have retained counsel competent and experienced
in class and securities litigation.

226.   Common questions of law and fact exist as to all members of the
Class and predominate over any questions solely affecting individual members of
the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by
Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing
public during the Class Period misrepresented material facts about the
business, operations and management of IndyMac; and

(c)     to what extent the members of the Class have sustained
damages and the proper measure of damages.

227.   A class action is superior to all other available methods for the fair
and efficient adjudication of this controversy since joinder of all members is
impracticable. Furthermore, as the damages suffered by individual Class members

SIXTH AMENDED CLASS ACTION COMPLAINT

74

may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XII.     FIRST CLAIM: VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

228.   Plaintiffs repeat and reallege each and every allegation contained above.

229.   Each of the Defendants: (a) knew or recklessly disregarded material adverse nonpublic information about the Company's financial results and then existing business conditions, which were not disclosed; and (b) participated in drafting, reviewing and/or approving the misleading statements, releases, reports, and other public representations of and about the Company.

230.   Defendant Perry was privy to adverse non-public information concerning IndyMac's business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and via reports and other information provided to him in connection therewith.  Because of his possession of such information, Perry knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

231.   By virtue of his high-level positions with the Company, defendant Perry directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its

business, operations, growth, financial statements, and financial condition, as alleged herein.  Perry was involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, was aware, or recklessly disregarded, that the false and misleading statements was being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

232.   As an officer and director (as well as a controlling person) of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the New York Stock Exchange ("NYSE") and governed by the provisions of the federal securities laws, defendant Perry had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially false and/or misleading, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

233.   During the Class Period, Defendants, with knowledge of or reckless disregard for the truth, disseminated or approved the false statements specified above, which were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

234.   Defendants have violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material

1773662.1

facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon the purchasers of IndyMac stock during the Class Period.

235.   Plaintiffs and the Class have suffered damage in that, in reliance on the integrity of the market, they paid artificially inflated prices for IndyMac stock. Plaintiffs and the Class would not have purchased IndyMac stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' false and misleading statements.

236.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

## XIII.    SECOND CLAIM: VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST PERRY

237.   Plaintiffs repeat and reallege each and every allegation contained above.

238.   Perry acted as a controlling person of the Company within the meaning of § 20(a) of the Exchange Act. By reason of his senior executive positions, he had the power and authority to cause the Company to engage in the wrongful conduct complained of herein.

239.   By reason of such wrongful conduct, Perry is liable pursuant to § 20(a) of the Exchange Act. As a direct and proximate result of his wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of IndyMac stock during the Class Period.

## XIV.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

SIXTH AMENDED CLASS ACTION COMPLAINT

A.      Determining that this action is a proper class action and certifying
Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil
Procedure;

B.      Awarding compensatory damages in favor of Plaintiffs and the other
Class members against all Defendants, jointly and severally, for all damages
sustained as a result of Defendants' wrongdoing, in an amount to be proven at
trial, including interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and
expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

## XV.     **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.


Dated:  February 16, 2010              Respectfully submitted,


                                       BARROWAY TOPAZ KESSLER
                                       MELTZER & CHECK, LLP

                                       By: Ramzi Abadou by Erik Peterson
                                       Ramzi Abadou
                                       Erik D. Peterson
                                       580 California Street, Suite 1750
                                       San Francisco, California 94104
                                       Phone: (415) 400-3000
                                       Fax: (415) 400-3001
                                       -and-
                                       Christopher L. Nelson (*Pro Hac Vice*)
                                       Lauren Wagner Pederson (*Pro Hac Vice*)
                                       John J. Gross (*Pro Hac Vice*)
                                       280 King of Prussia Road
                                       Radnor, PA 19087
                                       (610) 667-7706

                                       ***Lead Counsel for Plaintiffs***

                                       GLANCY BINKOW & GOLDBERG, LLP
                                       Lionel Z. Glancy (Bar No. 134180)
                                       Peter A. Binkow (Bar No. 173848)

SIXTH AMENDED CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Neal A. Dublinsky (Bar No. 135712)
Andy Sohrn (Bar No. 241388)
1801 Avenue of the Stars
Suite 311
Los Angeles, CA 90067
(310) 201-9150
*-and-*
Frederick W. Gerkens, III
1430 Broadway, Suite 1603
New York, New York 10018
(212) 382-2221

**Liaison Counsel for Plaintiffs**

COHEN, MILSTEIN, SELLERS
 & TOLL, PLLC
Steven J. Toll
Andrew N. Friedman
Matthew B. Kaplan
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC 20005
(202) 408-4600

**Additional Counsel for Plaintiffs**

SIXTH AMENDED CLASS ACTION COMPLAINT

79

1773662.1

# EXHIBIT A

Ramzi Abadou (Bar No. 222567)
rabadou@btkmc.com
Erik D. Peterson (Bar No. 257098)
epeterson@btkmc.com
BARROWAY TOPAZ KESSLER
 MELTZER & CHECK, LLP
580 California Street, Suite 1750
San Francisco, CA 94104
Tel: (415) 400-3000
Fax: (415) 400-3001

*Lead Counsel for Plaintiffs*
*Additional counsel listed on signature page*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| WAYMAN TRIPP and SVEN MOSSBERG, Individually and on Behalf of all Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> INDYMAC BANCORP, INC. and MICHAEL W. PERRY, <br><br> Defendants. | Case No. 07-CV-1635-GW (VBK) <br><br> **SIXTH AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 10(b) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** <br><br> JURY TRIAL DEMANDED |

SIXTH AMENDED CLASS ACTION COMPLAINT

1773663.1

## TABLE OF CONTENTS

I.     NATURE OF THE ACTION ....................................................................... 3~~1~~

II.    JURISDICTION AND VENUE ..................................................................... 9~~7~~

III.   PARTIES ...................................................................................................... 9~~8~~

IV.    THE COMPANY'S UNDERWRITING CONTROLS WERE
       INADEQUATE OR UNDERMINED BY  DEFENDANT PERRY,
       RENDERING DEFENDANTS' PUBLIC  STATEMENTS FALSE......... ~~10~~8

       A.     Underwriting Background................................................................ ~~11~~9

       B.     Facts Supporting a Strong Inference that IndyMac Regularly  Overrode
              its Stated Underwriting Practices on a Companywide
              Basis During the Class Period and that Perry was Either Aware
              of, or Caused, the Same.................................................................. ~~13~~11

       C.     Examples of Conduit-Generated 80/20 Piggyback Loans
              that Suffered Early Payment Defaults and Contributed to
              IndyMac's 2006 Fourth Quarter Losses and Losses that Should
              Have Been Incurred Earlier in 2005 and 2006................................ ~~26~~24

       1.     Silver State Toxic Loan Pool ..................................................... ~~26~~24

       2.     Lancaster Toxic Loan Pool ......................................................... ~~31~~29

       3.     Geneva Toxic Loan Pool.............................................................. ~~35~~32

V.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING
       STATEMENTS ....................................................................................... ~~40~~37

       A.     2005 Annual Report on Form 10-K ............................................... ~~40~~37

       B.     2006 First Quarter Form 10-Q ...................................................... ~~42~~39

       C.     April 25, 2006 Conference Call .................................................... ~~43~~41

       D.     2006 Second Quarter Form 10-Q................................................... ~~45~~42

       E.     September 13, 2006 Lehman Brothers Presentation........................ ~~45~~43

       F.     September 21, 2006 RBC Financial Institutions Conference .......... ~~50~~49

G.      2006 Third Quarter Form 10-Q......................................~~51~~51

H.      November 2, 2006 Conference Call...............................~~45~~51

VI.   LOSS CAUSATION/ECONOMIC LOSS .....................................~~53~~52

A.      The Truth About the Company's True Condition Begins to Emerge as Defendants Disclose that IndyMac had Saddled Itself with Toxic Loans as a Result of its Poor Underwriting Practices Thereby Causing Substantial Charges and Increased Loan Loss Reserves ........................................................~~55~~54

B.      The Truth Continues to Emerge as the Market Learns that Indymac's Loosening of Underwriting Guidelines Caused Indymac's Abysmal Performance ........................................................57

C.      The Market Learns the Truth About Indymac's Deficient Underwriting Guidelines and Risk Management...............................66

VII.  POST CLASS PERIOD DISCLOSURES: THE OFFICE OF THE INSPECTOR GENERAL'S AUDIT REPORT ......................................~~68~~66

VIII. ADDITIONAL FACTS SUPPORTING DEFENDANTS' SCIENTER ......................................................~~71~~69

A.      Perry's Certifications ........................................~~71~~69

B.      Perry's Financial Incentive ...........................................~~74~~71

IX.   APPLICABILITY OF THE PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE........................~~75~~72

X.     NO STATUTORY SAFE HARBOR EXISTS FOR DEFENDANTS' STATEMENTS ........................................................~~76~~72

XI.   CLASS ACTION ALLEGATIONS.....................................~~76~~73

XII.  FIRST CLAIM~~78~~: Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants.............................75

XIII. SECOND CLAIM.........~~80~~: Violations of Section 20(a) of the Exchange Act Against Perry ........................................................77

XIV. PRAYER FOR RELIEF.....................................................~~80~~77

XV.   JURY TRIAL DEMANDED ................................................................. 8178

1773663.1

Lead Plaintiffs, Wayman Tripp and Sven Mossberg (collectively, "Plaintiffs" or "Lead Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following based upon personal knowledge as to themselves, and information and belief as to all other matters, including an investigation conducted by Plaintiffs' counsel.  This investigation included a review and analysis of all filings made with the Securities and Exchange Commission ("SEC") by IndyMac Bancorp, Inc. ("IndyMac" or the "Company") during the relevant time period, as well as securities analyst reports, press releases, media reports and other publications issued by and through the Company and interviews with numerous former employees of IndyMac.  <u>Attached as Exhibit "A" is a redlined version of the Fifth Amended Class Action Complaint for Violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 showing the substantive changes between it and the Sixth Amended Class Action Complaint for Violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934.</u>

## I.      **NATURE OF THE ACTION**

1.      This is a class action brought by Lead Plaintiffs on behalf of all persons and entities who purchased and/or otherwise acquired common stock of IndyMac from March 1, 2006 through March 1, 2007, inclusive (the "Class Period") and were damaged thereby (the "Class").  Lead Plaintiffs seek to pursue remedies under the Securities Exchange Act of 1934, 15 U.S.C.S. § 78 *et seq.* (the "Exchange Act").

2.      Defendant IndyMac is the holding company for IndyMac Bank F.S.B., which operates as a hybrid thrift/mortgage banker (collectively, "IndyMac" or the "Company").

3.      From 2001 until 2006, the United States experienced a "bubble" in the housing market resulting in inflated home valuations, and a related refinancing

1773663.1

boom.  This "bubble" was driven by ever-loosening underwriting standards by mortgage lenders and securitizers such as IndyMac.  During this period, IndyMac grew by focusing on utilizing Alt-A, negative/interest only amortizing loans, and other high risk loans. By the third quarter of 2006, IndyMac was a top Alt-A lender with over approximately $49 billion in Alt-A production which represented 77.5% of IndyMac's total origination volume.  *See* Zelman Credit Suisse Analyst Report, "Mortgage Liquidity du Jour: Underestimated No More," March 12, 2007.

4.     The booming real estate market opened up new opportunities for the Company to deal in higher-risk loans. IndyMac's mortgage production during this time was focused on the adjustable rate mortgage and 80/20 piggyback product mix.  Indeed, during the fourth quarter of 2006, IndyMac produced approximately $5 billion of 80/20 piggyback loans, despite the fact that these loans were becoming increasingly risky during this time period.  IndyMac was also generating a significant percentage of its loan production from low/no documentation loans (stated income Alt-A loans) now generically referred to as "liars' loans" because they were subject to widespread fraud during the real estate boom.

5.     By August, 2006, however, the median price of new homes had dropped by almost 3%, existing home inventories were 39% higher than one year before and sales were down by 10% from the prior year.  *See The No Money Down Disaster*, Barron's, August 21, 2006.  In addition, a significant number of subprime lenders began to close shop during 2006, causing dislocation in the housing market.

6.     Notwithstanding the downturn in the real estate market, Defendants portrayed IndyMac as a stable and growing company that would not only weather the bad times facing the mortgage industry, but would emerge from troubling times

even stronger.  Indeed, even given the negative news hammering the rest of the mortgage industry, IndyMac boldly touted its operating performance.

7.     Defendant Michael W. Perry ("Perry") recognized that in order for IndyMac to continue to grow in difficult times (which he thought 2006 would be), the Company would have to loosen underwriting standards and quickly dispose of risky mortgage loans before borrowers defaulted, by selling them outright or securitizing them and selling them.  The market, however, was unaware of the extent to which Perry had manipulated the Company's underwriting controls, and the exposure it faced from its obligations to buy back bad loans.  Perry's plan, for a time, worked, and by the beginning of the Class Period the Company had a new market share high of 2.5% in the fourth quarter of 2005, and its compound annual growth in mortgage production since the first quarter of 1999 was an astounding 44% compared to a mortgage industry average of 8% to 16% for the top five mortgage loan lenders.  Perry and the Company are, collectively, "Defendants."

8.     At the same time, Defendants issued numerous materially false and misleading statements concerning, *inter alia*, IndyMac's growth and stability, resulting from the quality and success of the Company's strong internal/operational controls and underwriting.

9.     In reality, however, IndyMac's internal/operational controls were grossly deficient.  According to several former IndyMac employees, the Company's management, including Perry, exploited internal/operational control weaknesses or simply overrode controls to drive loan originations and sales growth.  For example, a former IndyMac vice-president states Perry sought to make his short term goals for the Company "at all costs."  To this end, Perry put immense pressure on subordinates to "push loans through," even if it meant

1  consistently making "exceptions" to the Company's guidelines and policies (at the

2  expense of the Company's future).

3      10.    Other confidential witnesses ("CWs") – former employees of

4  IndyMac before and during the Class Period – report an atmosphere of "organized

5  chaos" at the Company where loan closings were done on an "anything goes"

6  basis. According to these witnesses, the following practices, which were contrary

7  to stated Company policies, were employed to close loans:  (a) intentionally

8  manipulating software used to compute loan eligibility; (b) violating stated rate

9  lock protocols and controls; and (c) disregarding underwriting guidelines

10  generally. Instead, the focus was on growing loans without the required

11  documentation, while reporting fraud or concerns with transactions was

12  ***discouraged***.  These witnesses, whose statements are detailed below, state that all

13  this occurred with the knowledge and direction of senior management.

14      11.    For a period of time, the Company was able to play "hot potato" with

15  these poor quality loans, selling them off quickly through the securitization market

16  before the borrowers defaulted. However, IndyMac's ability to pass off these "hot

17  potato" loans began to dramatically decline near the end of the Class Period as the

18  secondary market became less liquid and information about IndyMac's lax credit

19  quality practices began to seep into the marketplace. Many of the companies

20  IndyMac sold these loans to promptly returned them to IndyMac pursuant to

21  warranty provisions contained in the respective sale contracts.  Thus, IndyMac was

22  stuck with a substantial portion of loans that defaulted quickly and which IndyMac

23  was unable to resell to the secondary market.

24      12.    On January 16, 2007, news began to trickle out from the Company

25  about the adverse impact that Defendants' actions had on IndyMac.  On January

26  16, 2007, IndyMac issued a press release forewarning of a substantial earnings

27

28

shortfall caused by credit losses and increases in provisions for loss reserves as a result of the Company's impaired loans.  As a result, and for the first time, the public began to understand the precarious condition of IndyMac's operations as evidenced by, for example, an analyst downgrading IndyMac shortly after the January 16, 2007 Press Release.

13.    IndyMac's January 16, 2007 partial disclosure caused its stock to tumble to $40.50 at close, down from $43.55 at close on January 12, 2007 (the prior trading day).

14.    On January 25, 2007, Defendants issued a press release (the "January 25, 2007 Press Release"), which informed the market that the Company had not met its forecasted results for the fourth quarter of 2006, primarily because the Company doubled its credit reserves from the previous quarter to cover the massive number of defaults on the loans it had underwritten.

15.    Also on January 25, 2007, the Company revealed that several of the business areas Defendants had touted as its strongest virtues were, in actuality, profoundly weakened and impaired, and that the Company experienced a substantial negative financial impact as a result of losses from bad/uncollectible loans held by the Company.  Specifically, IndyMac admitted that "Higher credit mark-to-market losses in Q4 06 were concentrated in the prime 80/20 and subprime products."  As described fully below, IndyMac purchased a significant amount of 80/20 piggyback loans from third-party brokers through its Conduit Division that suffered a severe rate of early payment defaults before and during the Class Period (*see* discussion of Silver State-, Geneva- and Lancaster-originated loans, at ¶¶85-115).  In addition, the OIG Audit Report severely criticized IndyMac's reckless interactions with conduit lenders and underwriting of 80/20 piggyback loans.  (*See* ¶¶35-42, ~~193~~204-~~197~~208 below.)

16.     Perry added that IndyMac's supposedly superior internal/operational
controls were insufficient in a conference call with investors that coincided with
the January 25, 2007 disclosures.  For example, Perry admitted that, "[o]ur
provision for loan losses is increasing. . . Credit quality generally is deteriorating
so I would say that's something we have to do a better job forecasting, and clearly
we want to be a little more conservative as it relates to that… This is something we
should have done a better job forecasting on.  This is something that we probably
could have seen better if we had more precise models . . ."

17.     IndyMac's January 25, 2007 partial disclosure caused its stock to
tumble to $37.71 at close, down from $40.70 at close on January 24, 2007.

18.     The full truth regarding the Company's condition and Defendants'
Class Period statements was revealed on March 1, 2007, when Defendants issued a
press release entitled "IndyMac Issues 2006 Annual Shareholder Letter, Updating
2007 Forecast" (the "March 1, 2007 Press Release").  In the March 1, 2007 Press
Release, Perry *admitted that the Company had "loosened its lending standards"*
during 2006, and promised that the Company would be, going forward, "smart and
prudent" in managing its underwriting guidelines and risk.

19.     IndyMac's March 1, 2007 corrective disclosure, which disclosed the
Company's true condition, caused its stock price to fall to $32.16 at close, down
from $34.33 on February 28, 2007 and a far cry from the Class Period high of
$50.11 on May 8, 2006.

20.     On July 8, 2008, the FDIC seized IndyMac and subsequently fired
Perry and the Company's other senior management.  As a result, the FDIC will
have suffered losses of approximately $10.7 *billion* dollars.

21.     On February 26, 2009, the Office of Inspector General ("OIG"),
Department of the Treasury announced the results of its investigation of IndyMac's

demise in an Audit Report (the "Audit Report"),[1] finding, *inter alia*, that the "underlying cause of [the Company's] failure was the unsafe and unsound manner in which the thrift was operated" and that the Company was well aware of material deficiencies in the Company's underwriting controls before, during, and after the Class Period.

## II.        JURISDICTION AND VENUE

22.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78(j)(b) and 78(t)), and Rule 10b-5 promulgated there-under (17 C.F.R. § 240.10b-5).

23.    This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331(b).

24.    Venue is proper in this Judicial District pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District.  Additionally, the Company maintains its principal executive office in this Judicial District.

25.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

---

[1] Plaintiffs filed a true and correct copy of the Audit Report with the Court on March 3, 2009 as Exhibit A to the Declaration of Andy Sohrn in Support of Plaintiffs' Opposition to Defendant Perry's Supplemental Motion to Strike Allegations in the Third Amended Complaint.  (Dkt. Item No. 149)

## III.      PARTIES

**Plaintiffs**

26.      Lead Plaintiffs, as set forth in their certifications previously filed with the Court and incorporated by reference herein, purchased IndyMac stock at artificially inflated prices during the Class Period and have suffered damages as a result of the wrongful acts of Defendants as alleged herein.

**Defendants**

27.      IndyMac was, at all relevant times, the seventh largest savings and loan and the second largest independent mortgage lender in the nation, maintaining its principal executive offices at 888 East Walnut Street, Pasadena, California, 91101.  As of December 31, 2006, IndyMac reported total assets of over $29 billion and a market capitalization of $3.2 billion.

28.      Perry was, at all relevant times, Chairman of IndyMac's Board of Directors and Chief Executive Officer of IndyMac.  Perry is a Master Certified Mortgage Banker, as designated by the Mortgage Bankers Association, and is a Certified Public Accountant.  Prior to working in the mortgage industry, Perry spent four years as an auditor with KPMG Peat Marwick.  Perry reviewed, approved and signed IndyMac's false and misleading SEC filings, including the 2005 Form 10-K and all 2006 Form 10-Qs, and issued numerous other false and misleading public statements during the Class Period.

## IV.      THE COMPANY'S UNDERWRITING CONTROLS WERE INADEQUATE OR UNDERMINED BY DEFENDANT PERRY, RENDERING DEFENDANTS' PUBLIC STATEMENTS FALSE

29.      During the Class Period, the Company, directed by defendant Perry, engaged in a pattern and practice of overriding and abandoning its own loan underwriting guidelines, approving substantial numbers of high-risk loans for the purpose of increasing reported loan volume.  IndyMac's significant departure from

its own loan underwriting guidelines was facilitated by the Company's grossly deficient underwriting and auditing controls, exposing the Company to a vast amount of undisclosed risk – a risk further enhanced by IndyMac's practice of approving these loans with little or no documentation from borrowers ("stated loans" or "liars' loans").  Defendants failed to disclose the true condition of the Company's business, and misled the public with regard to the rigor of IndyMac's loan origination process and the quality of its loans.

30.     As a result of the foregoing problems, Plaintiffs allege that the Company's Class Period statements regarding internal/operational controls and underwriting practices were false when made.  Plaintiffs further allege that Perry either knew of, or was reckless in not knowing of, the foregoing problems *or* actually caused those problems, himself.

### A.     <u>Underwriting Background</u>

31.     Before discussing Perry's conduct and knowledge, it is first necessary to discuss underwriting in general, how/where IndyMac acquired the loans it underwrote, and how the Company underwrote those loans.

32.     Underwriting in the context of mortgage lending should consist of a detailed analysis of a borrower's creditworthiness.  When underwriting a mortgage loan, an issuer should analyze credit information furnished by the potential borrower (such as employment and salary information) in conjunction with information provided from outside sources (such as agency credit reports and scores).  IndyMac uses a software program called "e-MITS" to assist in this process, which computes interest rates based on information such as the above (as entered).

33.     Accurate underwriting is essential to the success of any business extending loans, including mortgage companies such as IndyMac because, without

1   accurate underwriting, a company cannot (i) evaluate how likely a loan is to be

2   repaid; (ii) attach a particular interest rate to a loan based on creditworthiness; or

3   (iii) accurately price the loan for sale in the secondary market.

4        34.   IndyMac acquired mortgages principally through four channels:

5   mortgage professionals, consumer direct, correspondents and conduits.

6        (a)   Mortgage professionals include mortgage brokers, mortgage

7   bankers, financial institutions, and homebuilders who have taken applications

8   from prospective borrowers and submitted them to IndyMac. Eighty-six percent

9   of IndyMac's loans were derived from mortgage professionals in 2006. IndyMac

10  2006 Form 10-K filed on March 1, 2007 (the "2006 10-K") at 7.

11       (b)   Correspondent channel loans are obtained through mortgage

12  brokers, mortgage bankers, financial institutions, and homebuilders who sell

13  previously funded mortgage loans to IndyMac. They are a sub-section of the

14  mortgage professional channel of loans, as disclosed in IndyMac's 2006 10-K.

15  Eleven percent of IndyMac's mortgage loan business came from this channel.

16  Derived from 2006 10-K at 40.

17

18       (c)   Conduit procurement is where IndyMac acquires pools of

19  mortgage loans in negotiated transactions either with the original mortgagee or an

20  intermediate owner of mortgage loans.[2] They are a sub-section of the mortgage

21  professional channel of loans, as disclosed in IndyMac's 2006 10-K. Thirty-three

22  percent of IndyMac's mortgage loan business came from this channel. Derived

23  from 2006 10-K at 40.

24  _____

25      [2] IndyMac approved each of the above-described mortgage loan sellers prior to
    the initial transaction on the basis of the seller's financial and management
26  strength, reputation and prior experience. According to IndyMac, sellers were
    periodically reviewed and if their performance, as measured by compliance with
27  the applicable loan sale agreement, was unsatisfactory, IndyMac would cease
    doing business with them.
28

FIFTH SIXTH AMENDED CLASS ACTION COMPLAINT
10

1773663.1

(d)     Consumer direct involves mortgage loans initiated through direct contact with the borrower.  This contact may arise from Internet advertising and IndyMac web site traffic, affinity relationships, company referral programs, realtors and retail banking branches, located mostly in Southern California. Only 2% of IndyMac's mortgage loan business was derived from this channel. Derived from 2006 10-K at 40.

**B.     Facts Supporting a Strong Inference that IndyMac Regularly Overrode its Stated Underwriting Practices on a Companywide Basis During the Class Period and that Perry was Either Aware of, or Caused, the Same**

35.     IndyMac's undisclosed loosening of its underwriting guidelines saddled the Company with substantial amounts of high-risk loans, such as 80/20 piggyback and conduit channel loans.

36.     As confirmed in the OIG Audit Report at page 2: "IndyMac's business model was to offer loan products to fit the borrower's needs, using an extensive array of risky...subprime loans, 80/20 loans, and other nontraditional products.  Ultimately, loans were made to many borrowers who simply could not afford to make their payments."  As detailed in the Audit Report at page 12, the risks associated with 80/20 piggyback loans were further compounded by IndyMac's deficient appraisal process by which IndyMac assigned inflated values to the underlying properties.

37.     Further, "[t]o increase loan production, IndyMac relied heavily on outside mortgage brokers to originate loans."  (Audit Report at 21)  "This became such a large part of IndyMac's operations that a separate unit, the Conduit Division, was set up to purchase loans in bulk from other loan originators"  (*Id.*)

FIFTHSIXTH AMENDED CLASS ACTION COMPLAINT
11

1773663.1

38.    IndyMac's Conduit Division grew significantly and quickly, from generating under $3 billion in loans in 2003, to generating ***nearly $30 billion*** in loans at its peak in 2006.  (Audit Report at 22)

39.    However, reliance on outside mortgage brokers carried with it higher credit risks as conduit channel loans were particularly prone to underwriting deficiencies.  IndyMac was aware of such problems as early as 2005, when IndyMac's internal audit group reported problems with the Conduit Division. [Audit Report at 22]  "Specifically, because of concerns the [audit] group had in the [conduit] division's loan approval and underwriting process, it recommended that the division increase investment in infrastructure and personnel."

40.    Indeed, in 2006, IndyMac's independent auditor also expressed concerns with the Conduit Division being "a financial reporting control deficiency."  The independent auditor also recommended that the conduit division "strengthen controls."

41.    Ultimately, IndyMac's problematic Conduit Division and the deficient loans originated thereby led to the Office of Thrift Supervision ("OTS") citing "major weaknesses" in its review on January 8, 2007.  (Audit Report at 23, 67-68)  The OTS specifically stated that IndyMac must, *inter alia*, "[e]nsure the Conduit Division corrects the internal audit findings…and ensure the Division is operating in a strong internal controls environment… [and have] the Division [] develop more robust, transparent management reports"; and "[e]stablish a policy and related procedures for the identification and classification of troubled collateral dependent loans."  (*Id.* at 67)

42.    Shortly after the OTS review, IndyMac belatedly recognized that losses were occurring from the Conduit Division and closed it.  (*Id.* at 23)

~~FIFTH~~ SIXTH AMENDED CLASS ACTION COMPLAINT
~~12~~

43.     Confidential Witness Number 1 ("CW 1") is a former Vice President of the Company's Central Banking Group.  CW 1 reported directly to Ashwin Adarkar ("Adarkar"), Executive Vice President, Chief Executive Officer, New Business Incubation, Organizational Effectiveness and Mergers and Acquisitions. As such, Adarkar's duties included "operating new or underperforming businesses."  March 23, 2007 Proxy at 6.  Adarkar reported directly to defendant Perry.  CW 1 was employed at IndyMac from October, 2004 through March, 2006. CW 1 was directly involved in supervising many aspects of the Company's underwriting activities, and had regular contact with the most senior managers and officers of the Company.  CW 1 described in detail the many problems in the Company's underwriting guidelines, policies, and controls.

44.     According to CW 1, Adarkar was directly pressured by his/her superiors, including Perry, to "push loans through" regardless of whether they satisfied the Company's underwriting guidelines.  Adarkar passed on these orders to CW 1, and his/her subordinates, who were actually instructed to abandon approval guidelines and "push all loans through for approval which came in the door."

45.     CW 1 explained that in pushing the loans through, the Company did not officially "change" the Company's underwriting guidelines and policies, but rather, institutionalized "exceptions to the rules" that allowed the Company to approve loans that should have been denied under the actual guidelines.  According to CW 1, the exceptions were made across the board, for all classes of loans (prime, Alt-A, and sub-prime, as discussed in detail, below).  CW 1 stated that most of the exceptions were made in reporting the borrower's stated income/assets.

46.     Confirming the statements of other CW's, CW 1 explained that many of the exceptions occurred despite the Company's much vaunted e-MITS system

FIFTHSIXTH AMENDED CLASS ACTION COMPLAINT
13

(described above at ¶32), which was supposed to prevent gaming of the Company's underwriting guidelines. The problem, however, was that e-MITS was a "junk-in, junk-out" system that was only as good as the information it was provided. That is, if underwriters wanted approval for a loan that did not satisfy the Company's underwriting guidelines, they would simply need to input information that was not reflective of the borrower's true characteristics and e-MITS would provide approval based on the false information entered by the underwriter. As noted, above, this conduct was engaged in at the direction of Adarkar, who passed along the orders of defendant Perry and other senior managers.

47.     In addition to violating the Company's underwriting guidelines, CW 1 stated that the Company's Central Banking Group regularly and as a matter of course violated the Company's controls over loan production by prematurely (and improperly) funding loans to meet production and revenue goals. CW 1 raised this issue with Adarkar, and the Central Banking Group was "written up" by the Company's Compliance Department, to no avail.

48.     Similarly, according to CW 1, defendant Perry directed Adarkar (and thus, the Central Banking Group) to engage in violations of the Company's "rate lock" protocols and controls. Essentially, a rate lock is a commitment by a lender guaranteeing a specified interest rate for a specified period of time. Here, once a rate-lock expired rather than re-pricing the terms of a loan to account for fluctuations in the credit market, the Company allowed the loans to proceed on the now-expired prior terms. As a result, the customer was able to capture the gains associated with the prior (lower) rate to the detriment of the Company. This was a problem because it drastically impacted the profitability of loans on the back-end *but appeared to have no impact on the front end*. Thus, the Company was able to

achieve revenue and volume targets in the short-run, while exposing itself to tremendous losses on the back end of the loan.

49.     According to CW 1, the Company engaged in these practices at the express behest of defendant Perry (again through Adarkar) so that the Company could make its short term goals "at all costs."

50.     Finally, CW 1 stated that direct fraud and "lying" by loan sales representatives was rampant at IndyMac. Specifically, loan sales representatives solicited "fraudulent" letters from CPAs in connection with the purported verification of customer income. CW 1 stated that it was obvious that the letters were fraudulent, and that he/she repeatedly reported the fraud to Adarkar and that though upper management, including defendant Perry, was aware of this fraud (and the other underwriting fraud), they nonetheless continued to pressure employees to "close loans at all costs."

51.     According to CW 1, every time he/she complained about the fraud, or attempted to institute a review committee to control the fraud, his/her efforts were rebuffed by upper management.

52.     Confidential Witness Two ("CW 2") was an underwriter for IndyMac from March, 2005 until June 30, 2007. In this position, CW 2 was responsible for writing and reviewing loan applications.

53.     According to CW 2, loan originations increased significantly during his/her tenure at the Company. CW 2 directly attributed this increase to relaxed underwriting guidelines and the closing of "questionable deals."

54.     CW 2 stated that when he/she first started at IndyMac, there was a very strict environment regarding loan originations; however, toward the end of his/her employment, this had evolved into "organized chaos" that was little more than a "free-for-all" where "anything goes" to get a loan closed.

FIFTH SIXTH AMENDED CLASS ACTION COMPLAINT

15

1773663.1

55.     These changes were expressly mandated by IndyMac's senior management to drive loan origination volume.  CW 2 stated underwriters were encouraged by management to "push through loans" that normally would not be closed.  During the origination process, all loans that were not closed and processed because of borrower qualification issues had to be reported to management.  Management was consistently giving the "green light" on loans that CW 2 would not have closed.  For example, if a loan was submitted based on income, and income could not be verified, managers would look to verify bank account balances.  Even if the source of funding for the balance in the bank account could not be verified, managers would try to use unsubstantiated bank account balances as verification of income.  CW 2 also noted that appraisal values were adjusted in order to "make the loan work."

56.     CW 2 stated that, in several instances, management overturned his/her decision to not approve a loan, which CW 2 documented in his/her "working notepad field" in e-MITS.

57.     According to CW 2, as a result of lax underwriting guidelines and bad loan push-throughs, loan delinquencies had increased significantly at IndyMac by mid-2006.

58.     Further according to CW 2, the increases in bad loans and push throughs is not surprising, as the Company directly rewarded underwriters and managers with bonuses for reaching loan origination targets.  That is, underwriters were issued bonuses one month after loan targets were reached without regard to whether the loans ultimately ended in default.  This Company policy incentivized the issuance of loans without regard to quality or the creditworthiness and encouraged "making deals work" that should not have worked, according to CW 2.

59.     Confidential Witness Number Three ("CW 3") is a former Vice President and Director of Financial Institutions, Correspondent Lending, in IndyMac's Mortgage Banking Segment.  CW 3 was employed by IndyMac from July, 2003 until January, 2006, and was directly responsible for (i) designing and implementing sales and marketing for IndyMac's business loan division; and (ii) overseeing loan production and acquisition for the Company's Correspondent Lending Department.  Although CW 3 left IndyMac at or about the beginning of the Class Period, his/her statements are particularly germane, in that they detail the many problems that were, by the beginning of the Class Period, already impairing the Company's ability to underwrite its loans effectively.

60.     According to CW 3, by the beginning of the Class Period, due to its desire to keep up with the rest of the players in the industry, IndyMac had been forced to become extremely aggressive with its underwriting guidelines. Specifically, to keep pace with competitors in terms of loan origination volume, by the time CW 3 left IndyMac in January 2006, the Company had greatly loosened its underwriting guidelines in order to drive volume and bring in more loan sales (as noted by the other CWs).

61.     Additional witnesses confirm the change in the Company's focus, explain how the Company "loosened" its underwriting quality guidelines, and expound on the impact thereof.

62.     Confidential Witness Four ("CW 4") is a former IndyMac Senior Auditor, Post Purchase Quality Control, Central Mortgage Operations, who worked for the Company from December 1, 2003, through July 19, 2007.  CW 4 was responsible for reviewing loan delinquencies for fraud or misrepresentations in the documents, and determining whether the loan's underwriting comported with IndyMac's guidelines, policies and procedures.  Prior to being promoted to Senior

FIFTH SIXTH AMENDED CLASS ACTION COMPLAINT

17

Auditor, CW 4 was a Senior Underwriter with IndyMac, and is intimately familiar with all aspects of the Company's loan underwriting.

63.     According to CW 4, throughout the Class Period, CW 4 saw an increasing number of loans that appeared to have been issued only through fraudulent or misrepresented documentation.  He/she also saw a substantial increase in the number of loan delinquencies.  CW 4 stated that this increase represented an increase in the number of defaults attributable to misrepresentations and fraud in the loan applications, not in the number of "straight default" cases (which are typically caused by a change in circumstance, such as divorce or change in employment status).  CW 4 stated that the increase of loans in default because of misrepresentations in the origination process was due to relaxed underwriting guidelines, and approvals of borderline loans on the front end.  That is, loans were being approved to individuals with insufficient or false documentation for the loans that they were seeking *because* the underwriting guidelines had been relaxed.

64.     This is confirmed by Confidential Witness Five ("CW 5"), who was an Investigator, Fraud Investigation Department, Post Purchase Quality Control, Central Mortgage Operations, at IndyMac from December 2004 until July 17, 2007.  In this position, CW 5 investigated loans suspected of being delinquent due to fraud and reported his/her findings to management.

65.     According to CW 5, during the Class Period, the quality of the loans originated became a running joke within the Company. In particular, certain loans with deficient documentation or that were issued to borrowers unable to pay them back became known as "Disneyland Loans."  These loans were called Disneyland Loans, referring to a loan issued to a Disneyland *cashier* who claimed in his/her application that he/she earned $90,000 per year – a proposition that, on its face, belies logic and even common sense given prevailing wage rates for retail cashier

operators.  As another example of a particularly egregious "Disneyland Loan," CW 5 related the story of a $500,000 loan that was issued for "swamp lands" in Florida, to a 26 year old first time home buyer with a reported income of $26,000 per year and $15.00 in a bank account.

66.    Stated income loans were the easiest to manipulate, and the easiest for IndyMac to follow through on due diligence had the Company so desired. IndyMac could have insisted on double-checking a client's stated income by utilizing IRS Form 4506T.  When asked by analysts during the November 2, 2006 Conference Call, as to what percentage of IndyMac's Alt-A customers provided the Company with IRS Form 4506T, Perry was evasive and non-responsive. Indeed, studies have confirmed that upwards of 90% of stated income loan buyers inflated their purported income by 5% or more, and as much as 60% of stated income buyers exaggerated their stated income by over 50%. *See* "Eighth Periodic Mortgage Fraud Case Report to Mortgage Bankers' Association," produced by Mortgage Asset Research Institute, Inc., April, 2006.

67.    As a result of the loosened underwriting guidelines, the Company's default rates skyrocketed during the Class Period.  Confidential Witness Six ("CW 6"), was a Senior Loan Processor, Investigation Unit, Post Purchase Quality Control, Central Mortgage Operations at IndyMac from August 10, 2003 until October, 2006, and responsible for researching loan transactions.

68.    According to CW 6, the number of loans being examined by the Company increased by 1500% from 2003 to mid-2006.  Specifically, according to CW 6, his/her department was responsible for reviewing 10% of the loans originated by IndyMac each month.  In 2003, this translated to approximately 60 loans per month.  By October, 2006, CW 6's department was reviewing approximately 900 loans per month.

69.     The drastic increase in defaulted loans was at its worst during the Class Period.  CW 6 stated the number of delinquent loans at IndyMac tripled by October, 2006.  According to CW 6, this increase was the result of misrepresentations and fraud that were occurring at the "front end" of the loan originations. Thus, had the Company's underwriting guidelines been stricter, this drastic increase would not have occurred.

70.     The above problems were exacerbated by IndyMac management.  In particular, the number of unqualified loans increased so drastically (as a direct result of management's direction) that underwriters began "pushing through" unqualified loans to maintain origination volume.  The Company's policy of "pushing through" unqualified loans evidences a Company-wide knowledge of IndyMac's underwriting problems.  *See supra* ¶¶44-45, 55.

71.     In addition to the above direct evidence of the origination of bad loans and loose underwriting guidelines, and defendant Perry's actual knowledge thereof, IndyMac (as discussed below) was forced, under warranty agreements, to repurchase substantially increased numbers of loans (now in default) that it had previously sold on the secondary market.  The repurchases resulted in a corresponding decrease in net income as the Company was, in effect, giving back revenue.

72.     By way of background, according to CW 4, once a loan was originated, it was immediately packaged with other loans and sold on the secondary market. For example, during the second quarter of 2006, IndyMac sold 97% of the mortgage loans it produced.  During that quarter, IndyMac had mortgage production of $20.06 billion and sold off $19.415 billion of those loans. By contrast, in the third quarter of 2006, IndyMac was suddenly only able to sell 81% of its mortgage production.  During that quarter, IndyMac had mortgage

FIFTHSIXTH AMENDED CLASS ACTION COMPLAINT
20

1773663.1

production of $23.968 billion and sold $19.508 billion of those loans. According to Perry, IndyMac makes representations and warranties on all loans sold into the secondary market, "just like a manufacturer of an automobile would make warranty reps on a car," *See* April 25, 2006 Conference Call at 11.  When a loan that it has sold is deficient, IndyMac repurchases it.  These repurchases are called "kickbacks."

73.   According to CW 2, during his/her employment, the number of "kickbacks" from the secondary market increased drastically.  In an effort to "cushion the blow" of these kickbacks, IndyMac initiated a "special project" on the weekends in 2006.  According to CW 2, underwriters would receive a list of loans that IndyMac had to repurchase after the loan had been previously sold on the secondary market. Underwriters would then have to rework the loan and "make it work" so that it could be bundled and sold again in the secondary market.  The underwriters involved in the "special project" aggressively did what they could to make the loans "work," according to CW 2.  For example, in instances where the loan had defaulted and been kicked back because of lack of income verification, underwriters would go to a website provided by IndyMac, such as www.salary.com, and try to obtain a more favorable "average national salary" for the borrower based on the data found on such websites for those positions.

74.   Further, underwriters were receiving loans that already had been closed by other underwriters at the Company; therefore, the underwriter trying to fix particular loans was not familiar with their details.  Additionally, when underwriters received loan data, they did not receive the entire loan application; only the portions that were deficient.  Therefore, there was no documentation pertaining to the other data provided by the borrower – eliminating underwriters' ability to cross-check borrower reported information.

1773663.1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

75.    CW 5 confirms the Company's "special projects."  According to CW 5, some of the loans rewritten by the underwriters were resold, and the remaining loans were channeled to his/her department, so those employees could also try to "make [them] work."

76.    Defendants knew or were deliberately reckless in not knowing about these problems. The implications on the company were devastating.  During 2005, IndyMac was forced to repurchase $106 million worth of kicked-back deficient loans from the secondary market.  In 2006, the value of kicked-back loans climbed to $167 million – an increase of over 50% in less than a year.  Most striking, however, is that during the *first quarter* of 2007 IndyMac repurchased $224 million worth of loans from the secondary market – clear evidence that the loans issued during the Class Period were grossly deficient as a result of the Company's decision to grossly loosen its underwriting guidelines and controls.

77.    In addition to the problems with the Company's underwriting controls, the Company's controls over the accuracy of financial reporting were also deeply flawed.

78.    For example, CW 5 states that even the Company's former Vice President of the Fraud Investigation Department, Michelle Leigh, was pressured by upper management not to report fraud.  According to CW 5, Leigh's superior, Michelle Minier, in one case, expressly requested that Leigh make changes to a monthly report that Leigh felt did not accurately depict the loan pipeline.  Despite Leigh's protest, the report was subsequently sanitized. Michelle Minier is Executive Vice President, Chief Executive Officer and Vice Chairman of Financial Freedom, wholly-owned by IndyMac.  As such, she reports to defendant Perry.

79.    As was the case with the bonus structure for managers and underwriting, IndyMac's auditors' bonus structure also dissuaded the detection of

fraud.  Auditor bonuses were based on the number of loans reviewed, not the number of fraudulent findings found.  Thus, according to CW 5, IndyMac rewarded more work, but not the detection of fraud.  This, of course, encouraged workers to simply review, in a cursory fashion, potentially fraudulent loans.

80.    Confidential Witness Number Seven ("CW 7") is a former Business Development Manager, Broker & Emerging Banker at IndyMac.  CW 7 was employed by IndyMac from 2004 through the beginning of 2008, and **had direct contact with Perry**.

81.    CW 7 confirms the statements of the other confidential witnesses regarding the problems with IndyMac's underwriting controls.  CW 7 also offered additional detail regarding the nature of the violations of the Company's underwriting guidelines.  In particular, CW 7 stated that the vast majority of IndyMac purportedly "Full Doc" loans were underwritten merely based on a Verification of Employment ("VOE"), not on W-2s and pay stubs.  This statement stands in stark contrast to those of defendant Perry who, as noted at ¶ ~~x,~~166, expressly and publicly stated during the Q3 2006 IndyMac Bancorp, Inc. Earnings Conference Call that "typically on full doc borrowers we ask them to provide W-2s and pay stubs."

82.    CW 7's statement demonstrating the falsity in Perry's statement that "typically on full doc borrowers we ask them to provide W-2s and pay stubs" is further confirmed by an internal Indymac document entitled "NonPrime Lending, Indymac Nonprime…Offering Unique Mortgage Solutions for Everyday Situations," last updated on February 13, 2006, which states: "**Indymac NonPrime will accept a Verification of Employment for a full documentation loan with no pay stubs or W2s needed!**" (Bold in original.)

83.     As described in ¶¶~~193~~204-~~198~~209 below, the 2009 Audit Report from the Office of Inspector General, Department of the Treasury, confirms the testimony of the CWs noted above.

84.     In addition to the statements of the confidential witnesses, a number of lawsuits filed by (and against) reveal the Company's knowledge that loans it had underwritten were defaulting at rates as high as 97% in 2006, and 90% in 2005.  In particular, shortly before, during and after the Class Period, IndyMac was involved in litigation with mortgage bankers, appraisers, and others that alerted Defendants to the weaknesses in the Company's loan underwriting practices and internal/operational controls.  This litigation and/or the underlying facts thereto were red flags to Defendants of IndyMac's vulnerability to widespread loan origination and appraisal fraud, as well as strong warnings that IndyMac needed to tighten its credit quality control practices.

**C.     Examples of Conduit-Generated 80/20 Piggyback Loans that Suffered Early Payment Defaults and Contributed to IndyMac's 2006 Fourth Quarter Losses and Losses that Should Have Been Incurred Earlier in 2005 and 2006**

**1.     Silver State Toxic Loan Pool**

85.     As one dramatic example, IndyMac Bank sued a mortgage broker, Silver State Mortgage ("Silver State"), alleging that Silver State breached its warranties and obligations to IndyMac concerning 35 out of a pool of 36 loans sold to IndyMac in 2005 and 2006.  This action is styled *IndyMac Bank, F.S.B. v. Silver State Mortgage*, No. 07-CV-00405 (D. Nev. Mar. 29, 2007)(complaint filed).

86.      Pursuant to the *Silver State* complaint, as alleged by IndyMac, thirty-five (35) of those borrowers either "***did not make their first payment*** after IndyMac's purchase of the loan, or failed to make a timely payment as to anyone of the first three months after" such purchase (the "early defaulting Silver State

loans"). *Id.*, at ¶12 (emphasis added).  As such, Silver State was obligated under its agreement with IndyMac to repurchase each such distressed loan within ***thirty*** (30) days of receiving IndyMac's notice of default.  *Id.* at ¶7.

87.    Mortgage companies typically use such early payment default ("EPD") by delinquent borrowers as a proxy for fraud.  Industry trade associations and regulators have examined early payment default statistics to ascertain the type and extent of mortgage fraud.  The Mortgage Bankers Association ("MBA") has utilized the Mortgage Asset Research Institute, Inc. ("MARI") to analyze and compile data regarding mortgage fraud.  For instance, the Sixth Periodic Report to the MBA noted that early payment default indicates possible fraud, and compiled statistical data on early payment default by state and metropolitan area (available at www.mari-inc.com/pdfs/mba/MBA6thCaseRpt.pdf).  William Matthews, MARI's vice president and general manager, reiterated this in his testimony before the United States House of Representatives Subcommittee on Housing and Community Opportunity (available at www.financialservices.house.gov/media/pdf/100704wm.pdf).

88.    Early payment defaults are telling indicators of double selling, equity skimming and/or straw borrowers.  One of the easiest mechanisms to track the performance and credibility of brokers is to monitor first payment and early payment default.  The presence of early payment defaults should be taken as a red flag that brokers/correspondents are not underwriting in a careful manner and may be potentially falsifying information themselves.

89.    Nonetheless, according to the *Silver State* complaint, it was not until August 30, 2006 – *i.e.*, well into Q3 2006 –  that IndyMac first demanded that Silver State make good on its repurchase obligations.  *Id.*, at ¶13.  Silver State,

1773663.1

however, breached its obligations and refused to repurchase the early defaulting Silver State loans.  *Id.*

90.    The available public data surrounding the early defaulting Silver State loans (the "Silver State public data") reflects that certain of these loans originated no later than November 2005.  Yet, IndyMac turned a "blind eye" to these "red flags" and, per the *Silver State* complaint, waited as much as one year, *i.e.*, until August 2006, till it posed its repurchase demand to Silver State (*id.*) and even longer, until late March 2007 until it commenced its lawsuit.

91.    Indeed, the Silver State public data reflects that a substantial number of other early defaulting loans originated in the months preceding August 30, 2006 – by which time IndyMac, upon its own judicial admission, had certainly become aware of the collectability problems besetting the distressed Silver State loan pool.

92.    Most strikingly, as reflected in the forthcoming chart, most of the EPD loans complained of in *Silver State* consisted of especially toxic "80-20 Piggyback loans" or other piggyback combinations.  A "piggyback loan" is a home financing option in which a property is purchased using more than one mortgage from two or more lenders. Piggyback mortgages are second mortgages that close simultaneously with the first mortgage and provide extended financing behind a first mortgage lien. Typically, this is effectuated with an 80/20 split where the borrower puts no money down:  80% financing through a first mortgage and 20% financing through a second mortgage.  However, 80/15/5 and 80/10/10 piggybacks (where the borrower finances 5% or 10% of the transaction) and other configurations are also available.[3]

---

[3]  As defined in the OIG Audit Report, an 80/20 piggyback loan "[r]equires no borrower down payment or mortgage insurance for this fully financed loan, which is written as two separate loans of 80 percent and 20 percent."  Audit Report at 46.

1773663.1

93.     Piggyback loans are of extremely high risk because they are the last to be repaid in the event of a foreclosure.  According to Standard & Poor's credit analyst Kyle Beauchamp, as described in a July 8, 2006 Washington Post article entitled "Piggybacking Onto Trouble," "an exhaustive study of piggyback loans found them anywhere from 43% to 50% more likely to go into default than comparable stand-alone first-lien purchase transactions" (available at www.Washingtonpost. com/wp-dyn/ content/article/2006/07/07/AR2006070700013.html).  Among the reasons for this dramatic spike, according to the article, is that "[s]ignificant numbers of piggybacks have been made to buyers who were financially stretched to begin with and had marginal credit scores."

94.     As reflected in the following chart, the Silver State public data reveals that at least 26 of the 35 EPDS complained of involved either 80/20 Piggybacks, or in four instances, other piggyback configurations.  The aggregated principal amount of these 26 loans comes to approximately $6.46 million.  Evidencing IndyMac's laggard conduct with respect to these especially toxic loans, 19 of these risky piggybacks involved Silver State itself as the lender for both the primary and piggyback loans.  Moreover, the data reflects that IndyMac would have been aware of its exposure to these loans before or by early into the fourth quarter of 2006.  Thus, 5 of these 26 Piggyback EPDs involve loans which Silver State originated as early as 2005, 20 of these 26 Piggyback EPDs involve loans which Silver State originated by the end of August 2006, and 25 of these 26 Piggyback EPDs involve loans which Silver State originated by the close of the third quarter of 2006.

**Chronological Chart of the 80/20 and Other Piggyback Configurations Resulting in Early Payment Defaults, Derived from the *Silver State* Complaint**

1773663.1

| | Mortgage Transaction or Recording Date | Paragraph Source from the Silver State Complaint ("SS."), Filed 3/29/07 | Last Name (Sourced from the S.S. Complaint) | Principal Amount of Delinquent Loan (Sourced from the S.S. Complaint) | First Mortgage Amount on Subject Property | Lender ID | Second Mortgage Amount on Subject Property | Lender ID | Total Sale Price of Subject Property | Type of Piggy-back |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 8/17/2005 | 13(k) | Datt | $340,000.00 | $340,000 | S.S. | $85,000 | S.S. | $425,000 | 80/20 |
| 2 | 9/23/2005 | 13(j) | Contreras | $235,200.00 | $235,200 | S.S. | $44,100 | S.S. | $294,036 | 80/10 |
| 3 | 9/28/2005 | 13(y) | Rhude | $776,000.00 | $776,000 | S.S. | $194,000 | S.S. | $970,000 | 80/20 |
| 4 | 10/24/2005 | 13(z) | Rivera | $315,900.00 | $315,900 | S.S. | $78,950 | S.S. | $395,000 | 80/20 |
| 5 | 11/7/2005 | 13(g) | Bower | $213,600.00 | $213,600 | S.S. | $53,400 | S.S. | $267,004 | 80/20 |
| 6 | 4/26/2006 | 13(a) | Ambartsumian | $59,200.00 | $236,800 | S.S. | $59,200 | S.S. | $296,000 | 80/20 |
| 7 | 6/9/2006 | 13(r) | Liuzza | $432,900.00 | $423,900 | S.S. | $105,950 | S.S. | $529,900 | 80/20 |
| 8 | 6/9/2006 | 13(v) | Oeurn | $650,000 | $650,000 | S.S. | $176,500 | n/a | $870,000 | 70/20 |
| 9 | 7/3/2006 | 13(gg) | Tibby | $196,000.00 | $196,000 | S.S. | $15,200 | n/a | $245,000 | 80/10 |
| 10 | 7/19/2006 | 13(i) | Caputo | $160,000.00 | $160,000 | S.S. | $20,000 | SS | $200,000 | 80/10 |
| 11 | 7/21/2006 | 13(m) | Dayao | $200,000.00 | $200,000 | S.S. | $50,000 | n/a | $250,000 | 80/20 |
| 12 | 7/21/2006 | 13(cc) | Sanders | $248,000.00 | $248,000 | S.S. | $62,000 | S.S. | $310,000 | 80/20 |
| 13 | 7/26/2006 | 13(h) | Caberto | $361,600.00 | $361,600 | S.S. | $90,400 | n/a | $452,000 | 80/20 |
| 14 | 7/28/2006 | 13(ii) | Vongchanh | $420,550.00 | $420,550 | S.S. | $105,100 | n/a | $526,000 | 80/20 |
| 15 | 7/29/2006 | 13(w) | Petersen | $308,000.00 | $308,000 | S.S. | $77,000 | S.S. | $385,000 | 80/20 |
| 16 | 8/1/2006 | 13(c) | Bautista | $162,700.00 | $162,700 | S.S. | $40,650 | S.S. | $203,400 | 80/20 |
| 17 | 8/2/2006 | 13(o) | Elumba | $352,000.00 | $352,000 | S.S. | $88,000 | S.S. | $440,000 | 80/20 |
| 18 | 8/14/2006 | 13(aa) | Ross | $130,000.00 | $520,000 | S.S. | $130,000 | n/a | $650,000 | 80/20 |
| 19 | 8/17/2006 | 13(e) | Blue | $190,200.00 | $760,800 | S.S. | $190,200 | S.S. | $951,000 | 80/20 |
| 20 | 8/31/2006 | 13(n) | Duran | $46,000.00 | $184,000 | S.S. | $46,000 | S.S. | $230,000 | 80/20 |
| 21 | 9/1/2006 | 13(c) | Bermudez | $83,000.00 | $332,000 | S.S. | $83,000 | S.S. | $415,000 | 80/20 |
| 22 | 9/5/2006 | 13(u) | McCall | $103,650.00 | $414,150 | S.S. | $103,650 | S.S. | $518,446 | 80/20 |
| 23 | 9/11/2006 | 13(t) | Madrigal | $40,600.00 | $162,400 | S.S. | $40,600 | S.S. | $203,000 | 80/20 |
| 24 | 9/13/2006 | 13(l) | Davenport | $65,800.00 | $263,200 | S.S. | $65,800 | S.S. | $329,000 | 80/20 |

~~FIFTH~~ SIXTH AMENDED CLASS ACTION COMPLAINT

28

1773663.1

| 25 | 9/27/2006 | 13(bb) | Ryan | $51,150.00 | $204,750 | S.S. | $51,150 | S.S. | $255,990 | 80/20 |
| 26 | 12/8/2006 | 13(jj) | Willis | $323,000.00 | $323,000 | S.S. | $80,750 | n/a | $403,770 | 80/20 |
| | | | Total: $6,465,050 | | | | | | | |

95.     Thus, overall, many of the loans originated by Silver State experienced early payment defaults by no later than the end of the third quarter or during the fourth quarter of 2006.  These recklessly underwritten loans contributed to the Company's fourth quarter 2006 losses.

96.     At the same time, the Silver State public data reflect that in the aftermath of IndyMac's August 2006 demand and despite its bad loss experience with Silver State, the Company continued to purchase a significant amount of the early defaulting loans from Silver State.

### 2.     **Lancaster Toxic Loan Pool**

97.     Confirmation of this *modus operandi* emerges from IndyMac's lawsuit against another mortgage broker, Lancaster Mortgage Bankers, LLC ("Lancaster"), alleging that Lancaster breached its warranties and obligations to IndyMac concerning a pool of forty-nine (49) loans.  This action is styled *IndyMac Bank, F.S.B. v. Lancaster Mortgage Bankers, LLC*, No. CV07-00270-DDP (C.D. Cal. Jan. 10, 2007) (complaint filed).

98.      Pursuant to the *Lancaster* complaint, as alleged by IndyMac, forty-four (44) of the borrowers on the distressed Lancaster loans either "***did not make their first payment*** after IndyMac's purchase of the loan, or failed to make a timely payment as to anyone of the first three months after" such purchase  (the "early defaulting Lancaster loans").  *Id.*, at ¶11 (emphasis added).

99.      Each of these borrower failures amounted to an "Early Payment Default" as defined by the Purchase Agreement governing the subject loans which

1773663.1

had been entered into by the parties, on or about June 24, 2004.  *Id.*, at ¶¶5-6.  As

such, Lancaster was obligated under its agreement with IndyMac to repurchase

each such distressed loan within ***thirty*** (30) days of receiving IndyMac's notice of

default.  *Id.*, at ¶6.

100.    According to the *Lancaster* complaint, IndyMac first demanded that

Lancaster make good on its repurchase obligations on some unspecified date in

2005.  *Id.*, at ¶17.  Lancaster, however, breached its obligations and refused to

repurchase the early defaulting Lancaster loans.  *Id.*

101.    The available public data surrounding the early defaulting Lancaster

loans (the "Lancaster public data") reflects that a substantial portion of the early

defaulting Lancaster loans originated in 2005 and that certain others originated in

the first third of the year 2006. Yet, despite the "red flags," IndyMac  held off on

commencing litigation against Lancaster until January 2007 – *i.e.*, at least one year

after it had made its year 2005 demand against Lancaster and well after the close of

its Q3 2006 reporting period.

102.    As reflected in the following chart, the Lancaster public data reveals

that at least 29 of the 44 EPDS complained of involved either 80/20 Piggybacks, or

in nine instances, other piggyback configurations.  The aggregated principal

amount of these 26 loans is approximately $7.9 million.  Evidencing IndyMac's

laggard conduct with respect to these especially toxic loans, 12 of these risky

piggybacks involved Lancaster itself as the lender for both the primary and

piggyback loans.  Moreover, the data reflect that IndyMac would have had to been

aware of its exposure to these loans well before the fourth quarter of 2006. Thus,

24 of these 29 Piggyback EPDS involve loans which Lancaster originated as early

as 2005 and all 29 of these Piggyback EPDS involve loans which Lancaster

originated by the first week of May 2006.

## Chronological Chart of the 80/20 and Other Piggyback Configurations Resulting in Early Payment Defaults, Derived From the *Lancaster* Complaint

| | Mortgage Transaction or Recording Date | Paragraph Source from the Lancaster Complaint ("L."), filed 1/10/07 | Last Name (Sourced from the L. Complaint) | Principal Amount of Delinquent Loan (Sourced from the L. Complaint) | First Mortgage Amount on the Subject Property | Lender ID | Second Mortgage Amount on the Subject Property | Lender ID | Total Sale Price of the Subject Property | Type of Piggyback |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 9/12/2005 | 12(q) | Lopez | $116,000 | $116,000 | L. | $29,000 | n/a | $145,000 | 80/20 |
| 2 | 9/16/2005 | 12(nn) | Williams | $424,800 | $424,800 | L. | $106,200 | L. | $531,000 | 80/20 |
| 3 | 9/21/2005 | 12(d) | Chacon | $416,000 | $416,000 | L. | $78,000 | L. | $520,000 | 80/15 |
| 4 | 9/23/2005 | 12(pp) | Philemond | $345,000 | $345,000 | L. | $115,000 | L. | $460,000 | 80/20 |
| 5 | 9/26/2005 | 12(h) | Godfrey | $195,200 | $195,200 | L. | $48,800 | L. | $244,000 | 80/20 |
| 6 | 9/29/2005 | 12(r) | Loyola | $284,000 | $284,000 | L. | $71,000 | n/a | $355,000 | 80/20 |
| 7 | 9/29/2005 | 12(ee) | Samuels | $140,000 | $140,000 | L. | $35,000 | L. | $175,000 | 80/20 |
| 8 | 10/11/2005 | 12(o) | Lester | $192,000 | $192,000 | L. | $48,000 | n/a | $240,000 | 75/25 |
| 9 | 10/14/2005 | 12(gg) | Sheikh | $61,500 | $61,500 | L. | $20,500 | L. | $82,000 | 80/20 |
| 10 | 10/17/2005 | 12(hh) | Tinglin | $240,000 | $240,000 | L. | $60,000 | n/a | $300,000 | 80/20 |
| 11 | 10/17/2005 | 12(jj) | Viotti | $384,000 | $384,000 | L. | $96,000 | L. | $480,000 | 75/25 |
| 12 | 10/21/2005 | 12(oo) | Fabunan | $127,495 | $127,495 | L. | $41,495 | n/a | $169,999 | 80/20 |
| 13 | 10/31/2005 | 12(e) | Charles | $358,400 | $358,400 | L. | $89,600 | L. | $450,000 | 80/20 |
| 14 | 11/2/2005 | 12(rr) | Weston | $236,000 | $236,000 | L. | $59,000 | n/a | $295,000 | 80/20 |
| 15 | 11/10/2005 | 12(ll) | Williams | $390,080 | $390,800 | L. | $97,520 | L. | $487,600 | 80/20 |
| 16 | 11/14/2005 | 12(mm) | Williams | $320,000 | $320,000 | L. | $80,000 | n/a | $400,000 | 70/30 |
| 17 | 11/17/2005 | 12(u) | Mattei | $337,400 | $337,400 | L. | $144,600 | L. | $482,000 | 80/20 |

~~FIFTH~~ SIXTH AMENDED CLASS ACTION COMPLAINT
31

| 18 | 11/30/2005 | 12(l) | James | $348,000 | $348,000 | L. | $87,000 | n/a | $435,000 | 75/25 |
| 19 | 12/7/2005 | 12(a) | Benita | $285,000 | $285,000 | L. | $95,000 | n/a | $380,000 | 75/25 |
| 20 | 12/12/2005 | 12(ff) | Sciacca Mendez | $262,500 | $262,500 | L. | $87,500 | n/a | $350,000 | 80/20 |
| 21 | 12/20/2005 | 12(ss) | Belthrop | $88,000 | $88,000 | L. | $22,000 | n/a | $110,000 | 70/30 |
| 22 | 12/20/2005 | 12(qq) | Smithward | $378,000 | $378,000 | L. | $162,000 | n/a | $540,000 | 70/30 |
| 23 | 12/22/2005 | 12(cc) | Pinder | $182,000 | $182,000 | L. | $78,000 | n/a | $260,000 | 80/20 |
| 24 | 12/28/2005 | 12(z) | Pettiford | $181,280 | $181,280 | L. | $45,320 | L. | $226,600 | 80/20 |
| 25 | 2/21/2006 | 12(g) | Del Socorro | $372,000 | $372,000 | L. | $93,000 | L. | $465,000 | 80/20 |
| 26 | 2/24/2006 | 12(y) | Palleija | $332,000 | $332,000 | L. | $83,000 | n/a | $415,000 | 80/20 |
| 27 | 4/7/2006 | 12(k) | Jackson | $511,200 | $511,200 | L. | $127,800 | n/a | $639,000 | 70/30 |
| 28 | 4/28/2006 | 12(aa) | Picardo | $265,930 | $265,930 | L. | $113,970 | L. | $379,900 | 80/20 |
| 29 | 5/5/2006 | 12(t) | Martins | $172,800 | $172,800 | L. | $43,200 | n/a | $217,000 | 80/20 |
| | | | Total: | $7,946,585 | | | | | | |

103.     As was the case with Silver State, IndyMac's lengthy delay in pursuing its rights against Lancaster with respect to these numerous distressed loans bespeak IndyMac's knowing or, at least, deliberately reckless desperation to maintain the facade of ever-increasing loan production growth during the Class Period.

### 3.     Geneva Toxic Loan Pool

104.     Further confirmation of this *modus operandi* emerges from IndyMac's lawsuit against yet another mortgage broker, Geneva Mortgage Corp. ("Geneva"), alleging that Geneva breached its warranties and obligations to IndyMac concerning a pool of eighteen (18) loans.  This action is styled *IndyMac Bank,*

~~FIFTH~~SIXTH AMENDED CLASS ACTION COMPLAINT

~~32~~

*F.S.B. v. Geneva Mortgage Bankers, LLC*, No. CV07-01914-ER (C.D. Cal., March 22, 2007) (complaint filed).

105.    Pursuant to the *Geneva* complaint, as alleged by IndyMac, sixteen (16) of the borrowers on these Geneva loans either "***did not make their first payment*** after IndyMac's purchase of the loan, or failed to make a timely payment as to anyone of the first three months after" such purchase (the "early defaulting Geneva loans"). *Id.*, at ¶12 (emphasis added).

106.   Each of these borrower failures amounted to an "Early Payment Default" as defined by the Purchase Agreement governing the subject loans which had been entered into by the parties, on or about April 9, 2003. *Id.*, at ¶¶5-6. As such, Geneva was obligated under that agreement to repurchase each such distressed loan within ***thirty*** (30) days of receiving IndyMac's notice of default. *Id.*, at ¶6.

107.   According to the *Geneva* complaint, "on or about December 2003," IndyMac first demanded that Geneva make good on its repurchase obligations as to two (2) of the early defaulting Geneva loans but to no avail. *Id.*, at ¶18. "Commencing on or about 2006," IndyMac made such demand on Geneva as to the remaining such loans. *Id.* Geneva, however, breached its obligations and refused to repurchase the early defaulting loans. *Id.*

108.   The available public data surrounding the early defaulting Geneva loans (the "Geneva public data") reflects that two of those loans originated in the year 2003, more than half originated in the year 2005 and the remaining ones originated in the year 2006. Yet, despite these "red flags," IndyMac held off on commencing litigation against Geneva until late March 2007 – *i.e.*, no earlier than approximately fifteen (15) months from the cutoff point by which the majority of the early defaulting Geneva loans had already originated.

~~FIFTH~~SIXTH AMENDED CLASS ACTION COMPLAINT
33

109.   As reflected in the following chart, the Geneva public data reveals that at least 9 of the 16 EPDS complained of involved either 80/20 Piggybacks, or in two instances, a virtual 80/20 configuration.  The aggregated principal amount of these 9 loans comes to approximately $2.62 million.  Evidencing IndyMac's laggard conduct with respect to these especially toxic loans, 8 of these risky piggybacks involved Geneva itself as the lender for both the primary and piggyback loans – and, in these instances, IndyMac was exposed to the very same borrowers on both loans.  Moreover, the data reflects that IndyMac would have had to been aware of its exposure to these loans well before the fourth quarter of 2006. Thus, 6 of these 9 Piggyback EPDS involve loans which Geneva originated as early as 2005 and all 9 of these Piggyback EPDS involve loans which Geneva originated by the end of July 2006.

**Chronological Chart of the 80/20 and Other Piggyback Configurations Resulting in Early Payment Defaults, Derived From the *Geneva* Complaint**

|  | Mortgage Transaction or Recording Date | Paragraph Source from the Geneva Complaint ("G."), Filed 3/22/07 | Last Name (Sourced from the G. Complaint) | Principal Amount of Delinquent Loan (Sourced from the G. Complaint) | First Mortgage Amount on the Subject Property | Lender ID | Second Mortgage Amount on the Subject Property | Lender ID | Total Sale Price of the Subject Property | Piggyback Type |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 9/16/2005 | 13(o) | Rivera | $368,000 | $368,000 | G. | $92,000 | G. | $465,000 | 80/20 |
| 2 | 9/16/2005 | 13(p) | Rivera | $92,000 | $368,000 | G. | $92,000 | G. | $465,000 | 80/20 |
| 3 | 11/3/2005 | 13(j) | Pratt | $327,200 | $327,200 | G. | $81,800 | G. | $409,000 | 80/20 |
| 4 | 11/3/2005 | 13(k) | Pratt | $81,800 | $327,200 | G. | $81,800 | G. | $409,000 | 80/20 |
| 5 | 12/16/2005 | 13© | Clarke | $240,000 | $240,000 | G. | $55,000 | G. | $300,000 | 80/18 |
| 6 | 12/16/2005 | 13(d) | Clarke | $55,000 | $240,000 | G. | $55,000 | G. | $300,000 | 80/18 |
| 7 | 5/25/2006 | 13(n) | Reyes | $344,000 | $344,000 | G. | $86,000 | n/a | $430,000 | 80/20 |

~~FIFTH~~ SIXTH AMENDED CLASS ACTION COMPLAINT
34

| 8 | 7/26/2006 | 13(l) | Puckett | $204,000 | $204,000 | G. | $51,000 | G. | $255,000 | 80/20 |
| 9 | 7/26/2006 | 13(m) | Puckett | $51,000 | $204,000 | G. | $51,000 | G. | $255,000 | 80/20 |
| | | | Total | $2,622,000 | | | | | | |

110.   As was the case with Silver State and Lancaster, IndyMac's lengthy delay in pursuing its rights against Geneva with respect to these numerous distressed loans bespeaks IndyMac's knowing or, at least, deliberately reckless desperation to maintain the facade of ever-growing loan production growth during the Class Period.[4]

111.   In addition to the foregoing lawsuits filed by IndyMac, a lawsuit filed against the Company confirms the allegations of CW 2, who stated that the Company violated its underwriting guidelines by artificially inflating the appraised values of properties.

112.   In *Cedeno v. IndyMac Bancorp, Inc., et al.*, No. 06-CV-6438 (JGK) (S.D.N.Y.), the plaintiff, a residential home mortgage borrower, sued IndyMac and

---

[4]   The *Silver State*, *Lancaster*, and *Geneva* actions are representative of the plethora of litigation IndyMac initiated in connection with distressed loans, many of which were 80/20 piggyback loans that suffered early payment defaults in 2005 and 2006.  For example, IndyMac has been involved in, *inter alia*:  *IndyMac Bank, F.S.B. v. Weststar Mortgage, Inc.*, No. 08-cv-00748 (C.D. Cal., complaint filed Feb. 4, 2008); *IndyMac Bank, F.S.B. v. Cameron Financial Group, Inc.*, No. BC376578 (Los Angeles Superior Court, complaint filed Aug. 27, 2007); *IndyMac Bank, F.S.B. v. Just Mortgage, Inc.*, No. BC384487 (Los Angeles Superior Court, complaint filed Jan. 28, 2008); *IndyMac Bank, F.S.B. v. Kay-Co Investments, Inc.*, No. BC375931 (Los Angeles Superior Court, complaint filed Aug. 14, 2007); *IndyMac Bank, F.S.B. v. Fidelity & Trust Mortgage, Inc.*, No. BC374417 (Los Angeles Superior Court, complaint filed July 18, 2007); and *IndyMac v. Solutions Funding, Inc.*, No. BC369971 (Los Angeles Superior Court, complaint filed Apr. 23, 2007).

alleged that it had improperly and systematically selected and coerced various appraisal professionals so as to generate greater loan volumes. These appraisers would perform faulty and defective appraisal services which inflated the value of residential properties and thereby allowed Defendants to complete more real estate transactions and obtain greater profits. ~~This action is styled *Cedeno v. IndyMac Bancorp, Inc., et al.*, No. 06-CV-6438 (JGK) (S.D.N.Y.).~~

113.   Cedeno, in her Amended Class Action Complaint (filed on July 20, 2007), alleged, based on confidential witnesses, that "IndyMac threatened and retaliated against appraisers and management firms that failed to give in to pressure to meet the target appraisal values by IndyMac and to inflate the appraisal values."

114.   The practice of encouraging inflated appraisal values resulted in borrowers incurring more mortgage debt than necessary and/or more mortgage debt than the borrower could afford. All this was to meet loan origination targets set by IndyMac's senior management.

115.    In order to accomplish this subterfuge, IndyMac had to override stated lending practices and internal/operational controls:

> . . . Specifically, Defendants allowed Production Personnel to improperly influence Credit\Valuation Personnel. Production Personnel threatened and intimidated Credit\Valuation Personnel to approve inflated appraisals received from outside appraisal companies or appraisal management firms. Contrary to Defendants' representations to Plaintiff and members of the Class, Defendants failed to provide the necessary insulation and separation between Production Personnel and Credit/Valuation Personnel;

> According to a confidential witness, IndyMac executives, including the Chief Appraiser, were aware and allowed the improper influence Production Personnel placed on their own Credit\Valuation Personnel to choose appraisers and to approve appraisers obtained from third party appraisal companies or appraisal management firms willing to supply IndyMac with inflated appraisals;

~~FIFTH~~SIXTH AMENDED CLASS ACTION COMPLAINT
~~36~~

1

2         Indeed according to this confidential witness, Credit/Valuation Personnel at IndyMac were told not to reject inflated or otherwise improper appraisals and were threatened or told by Production Personnel that they would be terminated if they failed to do so;

3

4         According to another confidential witness, IndyMac was in fact operating its appraisal review department under pressure to make the values that IndyMac's loan officers and processing department were pushing. This confidential witness further stated that employees of IndyMac exerted pressure to make sure loans would be approved regardless of accurate appraisal values.

5

6

7

8

## V.    DEFENDANTS' *MATERIALLY* FALSE AND MISLEADING STATEMENTS

9

10     116.   During the Class Period, Defendants issued numerous materially false

11  and misleading statements. Each of those statements is set forth below, including

12  detail regarding (i) the date of the statement; (ii) the speaker; (iii) the nature of the

13  statement (oral or written); (iv) to whom the statement was made; (v) the

14  location/context of the statement; (vi) why the statement was materially false and

15  misleading; and (vii) facts giving rise to a strong inference that the particular

16  defendant who made (or caused to be made) the statement had the requisite state of

17  mind. The facts that provide the basis for the foregoing allegations, including a

18  full recitation of the statements of numerous confidential witnesses and various

19  lawsuits in which the Company is engaged, are set forth at ¶¶ ~~120; 139; 158; 198,~~ 121, 144, 169, 209, *supra*.

20

21

22

23  ### A.    2005 Annual Report on Form 10-K

24     117.   On March 1, 2006, the Company filed its Annual Report for the year

25  ended December 31, 2005 with the SEC on Form 10-K (the "2005 10-K").

26  Because Perry signed the 2005 10-K, all statements contained therein were made

27  by him and the Company.

28     **Statement One:**

1773663.1

118.   The 2005 10-K stated:

***By closely monitoring key factors such as product type, origination channels, progress or "status" of transactions, as well as changes in market interest rates since IndyMac committed a rate to the borrower ("rate lock commitments"), the Company seeks to quantify the optional component of each rate lock***, and in turn, the aggregate rate lock pipeline. By accurately evaluating these factors, the Company has been able to minimize the purchase of options and also stabilize gain on sale margins over different rate environments.  [2005 10-K at p. 41-42].

119.   These statements are material because quantifying (and adhering to) rate locks and monitoring key factors related to loan underwriting drastically impact the bottom-line profitability (or not) of a lender, like IndyMac.  *See supra* at ¶¶32-34, 48.  A reasonable investor would therefore view IndyMac's monitoring of such "key" factors as important because loan quality (or the absence thereof) would have a serious impact on IndyMac's balance sheet.

120.   ~~119.~~ The foregoing statement was ~~materially~~ false and misleading because the Company's "rate lock commitments" were no commitments at all. This is so because the "rate lock commitments" were regularly violated by and at the direction of defendant Perry, which rendered them meaningless as a risk control device.

121.   ~~120.~~ Plaintiffs rely on the following facts in support of their allegation that the foregoing statement (at ¶118) was materially false and misleading and that Perry knew it: CW 1 stated that defendant Perry directed the Executive Vice President and CEO, Ashwin Adarkar (and thus, the Central Banking Group) to engage in violations of the Company's "rate lock" protocols and controls.  ¶¶43-49.

**Statement Two:**

122.   ~~121.~~ The 2005 10-K also stated:

***We hedge the risks associated with our mortgage commitments to purchase mortgage loans ("rate locks")*** and funded mortgage loans that will be sold in the secondary market.  The risk associated with the rate locks and funded mortgage loans is that interest rates will fluctuate between the time we commit to purchase a loan at a pre-determined price, or the customer locks in the interest rate on a loan, and the time we sell or commit to sell the mortgage loan. [2005 10-K at 78].  (Emphasis added)

123.   These statements are material because hedging risk associated with mortgage commitments to purchase mortgage loans correlates to overall loan quality (and hence, the underlying underwriting practices) which affects a mortgage lender's balance sheet and profitability.  *See supra* at ¶¶32-34.  There is a substantial likelihood that a reasonable investor would view such facts as important.

124.   ~~122.~~ The foregoing statement was ~~materially~~ false and misleading because the Company regularly violated, at the direction of defendant Perry, the "rate locks," rendering them meaningless as a risk control device.  This allowed the Company to achieve revenue and volume targets in the short-run, while exposing itself to losses on the back end of the loan.

125.   ~~123.~~ Plaintiffs rely on the following facts in support of their allegation that the foregoing statement (at ¶~~121~~122) was materially false and misleading and that Perry knew it: CW 1 stated that defendant Perry directed Adarkar (and thus, the Central Banking Group) to engage in violations of the Company's "rate lock" protocols and controls.  ¶¶43-49.

**B.   2006 First Quarter Form 10-Q**

126.   ~~124.~~ On April 25, 2006, the Company filed its Report on Form 10-Q for the quarter ended March 31, 2006 with the SEC (the "2006 First Quarter 10Q").  Because Perry signed the 2006 First Quarter 10-Q, all statements therein were made by him and the Company.

127.   ~~125.~~ The 2006 First Quarter 10-Q stated:

A component of the overall allowance for loan losses is not specifically allocated to the loan portfolios ("unallocated component"). The unallocated component reflects management's assessment of various factors that create inherent imprecision in the methods used to determine the specific portfolio allocations. Those factors include, but are not limited to levels of and trends in delinquencies and impaired loans, charge-offs and recoveries, volume and terms of the loans, ***effects of any changes in risk selection and underwriting standards***, other changes in lending policies, procedures, and practices, and national and local economic trends and conditions. *Id.* at 48. (Emphasis added)

128.   The statements regarding the Company's "risk selection" and "underwriting standards" are material.  As a mortgage lender, IndyMac's underwriting practices are among the most important information looked to by investors in exercising their investment judgment.  In addition, the frequency with which Perry emphasized the Company's underwriting policies in press releases and other public statements, as well as the fact that analysts frequently repeated and commented on Defendants' statements regarding the Company's standards, further supports the materiality of these statements.

129.   ~~126.~~ The ~~foregoing~~ statement set forth at ¶127 was ~~materially~~ false and misleading when made as IndyMac's loan loss reserves did not consider the "effects of any changes in risk selection and underwriting standards, other changes in lending policies, procedures, and practices, and national and local economic trends and conditions." This is so because the Company's "underwriting standards" were wholly ineffective (and violated by or caused to be violated by Perry, *see e.g.* ¶¶43-51), and thus, meaningless as a factor in the calculation of the Company's loan loss reserves.

~~127.   This is so because the Company's "underwriting standards" were wholly ineffective (and violated by or caused to be violated by Perry *see e.g.* ¶~~

1773663.1

111), and thus, meaningless as a factor in the calculation of the Company's loan loss reserves.

130. 128. It is clear that defendant Perry knew or was reckless in not knowing of the violations of the Company's underwriting controls and standards (rendering the statement at ¶125127 materially false and misleading) for the following reasons. First, Perry directed employees to (i) "push loans through" regardless of whether they satisfied the Company's underwriting guidelines; (ii) input false information into the Company's e-MITS underwriting control system, to cause the approval of loans that would normally be rejected; and (iii) engage in violations of the Company's "rate lock" protocols and controls. ¶¶10,48.43-49. Second, Perry was aware that rampant fraud and lying by loan sales representatives was taking place, yet he continued to push employees to close loans "at all costs." ¶50. Third, the wide-ranging and management-directed violations of the Company's underwriting guidelines and controls evidences a culture of fraud at the Company. ¶¶50-51. Fourth, the number of fraudulent loans discovered at the Company increased by 1500% from 2003 to mid-2006, rendering the lack of control over underwriting facially obvious. ¶¶68.67-70. Fifth, the massive increase in bad loan "kickbacks" requiring repurchase by the Company resulted in the initiation of a "special project" at the Company to rehabilitate those loans. ¶¶73;.75. Finally, the numerous lawsuits filed by the Company show that it knew that certain pools of loans that it had underwritten were defaulting at rates as high as 90% (in 2005), and 97% (in 2006), rendering the inadequacy of the Company's underwriting controls facially obvious to Perry and the Company. ¶¶72;*See* ¶84.

## C.   April 25, 2006 Conference Call

FIFTHSIXTH AMENDED CLASS ACTION COMPLAINT
41

1773663.1

131.   ~~129.~~ On April 25, 2006, defendant Perry spoke to analysts and the investing public on behalf of the Company during a public earnings conference telephone call (the "Q1 2006 IndyMac Bancorp, Inc. Earnings Conference Call").

132.   ~~130.~~ During this Q1 2006 IndyMac Bancorp, Inc. Earnings Conference Call, Perry stated:

> **[W]e have the best quality control function of any thrift out there** because we sell 95% of our production in the secondary market.  Who does their own due diligence and if we have problems with it, if we have mispricing like we did with the home equity business, right, **it immediately gets reflected in our numbers and we fix it**.  Do you see what I'm saying?  That's a big quality control function, the fact that we turn our loans on average, this quarter was about 50 days, 55 days and in 55 days we know if we priced them right and we know if the investor is willing to buy them…. Tr. at 13 (emphasis added).

133.   Defendants' statements regarding the Company's underwriting standards and quality controls are material.  As a mortgage lender, IndyMac's underwriting practices are among the most important information looked to by investors as illustrated by the frequency with which Perry emphasized the Company's underwriting policies in press releases and other public statements, as well as the fact that analysts frequently repeated and commented on Defendants' statements regarding the Company's standards.  Moreover, for a mortgage lender, like IndyMac, statements touting "the best quality control of **any** thrift out there" goes to the fundamentals of **any** mortgage company and corresponding ability to generate reliable streams of revenue.  There is a substantial likelihood that a reasonable investor would consider such facts important.

134.   ~~131.~~ The foregoing statements were false and misleading because IndyMac's quality control, both pre-purchase and post-purchase were so recklessly deficient that IndyMac was unable to monitor, let alone "fix," its early payment defaults and representations and warranties related to its loans.  Indeed, IndyMac

1773663.1

permitted intentionally and grossly exaggerated stated income loans to be processed without appropriate due diligence in the pre-funding quality control process. For instance, IndyMac should have and could have verified loan applicants' income as reported to the IRS by utilizing Form 4506T. IndyMac recklessly, if not willfully, turned a blind eye to false, inflated stated incomes. Incredibly, IndyMac actually marketed to brokers its willingness to ignore most stated income deficiencies. *See* IndyMac Presentation *Here We Grow* at 14 ("Required Form: 4506T (will not be pulled unless income is outrageous)."). Furthermore, IndyMac's post-funding quality control audits were conducted on an untimely basis as IndyMac's post-funding quality control department was significantly understaffed. The Solutions Funding post-funding quality control audits were performed months after the loans were in early payment default, significantly undermining their utility.

### D. 2006 Second Quarter Form 10-Q

135. 132. On July 27, 2006, the Company filed its Report on Form 10-Q for the quarter ended June 30, 2006 with the SEC (the "2006 Second Quarter 10Q"). Because Perry signed the 2006 Second Quarter 10-Q, all statements therein were made by him and the Company.

136. 133. The 2006 Second Quarter 10-Q stated:

A component of the overall allowance for loan losses is not specifically allocated to the loan portfolios ("unallocated component"). The unallocated component reflects management's assessment of various factors that create inherent imprecision in the methods used to determine the specific portfolio allocations. Those factors include, but are not limited to *levels of and trends in delinquencies and impaired loans, charge-offs and recoveries, volume and terms of the loans, effects of any changes in risk selection and underwriting standards*, other changes in lending policies, procedures, and practices, and national and local economic trends and conditions. *Id.* at 45. (Emphasis added)

FIFTH SIXTH AMENDED CLASS ACTION COMPLAINT

43

137.   ~~134.~~ The foregoing ~~statement was~~statements were material and knowingly or recklessly ~~materially~~ false and misleading for the same reasons that the ~~identical~~same statement, set forth in the Company's 2006 First Quarter 10-Q, was knowingly or recklessly materially false and misleading. *See* ~~¶153~~¶¶132-33 (discussing same).

### E.   September 13, 2006 Lehman Brothers Presentation

138.   ~~135.~~ On or about September 13, 2006, Michael Perry participated at Lehman Brothers' 2006 Financial Services Conference.  IndyMac's presentation was filed with the SEC in an 8-K on September 13, 2006.  A table entitled, "Risk Management Functions Are Also Performed at Business-Unit Level," catalogs the following systemic safeguards in place in connection with IndyMac's SFR Mortgage Production:

1. Thorough sellers/3rd party approval and monitoring;
2. Pre-funding quality control reviews;
3. Sound underwriting guidelines;
4. Rigorous in-house appraisal reviews;
5. Post-funding quality control audits; and
6. Loss mitigation/fraud recovery management.

Presentation at 23.

### Statement One:

139.   The statement regarding the systemic safeguard in place for the Company's underwriting practices is material because, as a mortgage lender, IndyMac's underwriting practices – including its purported "thorough" third party approval and monitoring – are among the most important information looked to by investors in exercising their investment judgment.  The frequency with which Perry emphasized the Company's underwriting policies in press releases and other public statements, as well as the fact that analysts frequently repeated and commented on Defendants' statements regarding the Company's standards, confirms the materiality of this statement.

140.   ~~136. IndyMac's~~Defendants' statement that ~~it~~they conducted "thorough sellers/3rd party approval and monitoring" was <u>materially</u> false and misleading. IndyMac's seller/3rd party approval and monitoring were severely deficient.  As reflected in the litigation between IndyMac and its various brokers, such as Lancaster, Silver State and Geneva, IndyMac recklessly continued to conduct business with sellers who experienced massive early payment defaults and significant representation and warranty deficiencies.

141.   ~~137.~~Plaintiffs allege that defendant Perry knew or was reckless in not knowing that the foregoing statement (at ¶¶~~135-136~~¶138) was materially false and misleading because IndyMac, by its own judicial admission, was aware, at least as early as 2005, of significant early payment defaults and representation and warranty deficiencies plaguing loans obtained through sellers.

**Statement Two:**

142.   The statement regarding the systemic safeguard in place for the Company's underwriting practices is material because, as a mortgage lender, IndyMac's underwriting practices – including "pre-funding quality control reviews" – are among the most important information looked to by investors.  The frequency with which Perry emphasized the Company's underwriting policies in press releases and other public statements, as well as the fact that analysts frequently repeated and commented on Defendants' statements regarding the Company's standards, confirms the importance of these statements to investors.

143.   ~~138.~~IndyMac's statement that it conducted "pre-funding quality control reviews" was false and misleading.  IndyMac's pre-funding quality control reviews were grossly inadequate.  Indeed, IndyMac permitted intentionally and grossly exaggerated stated income loans to be processed without appropriate due diligence in the pre-funding quality control process.  For instance, IndyMac should

have and could have verified loan applicants' income as reported to the IRS by utilizing Form 4506T.  IndyMac recklessly, if not willfully, turned a blind eye to false, inflated stated incomes.  Incredibly, IndyMac actually marketed to brokers its willingness to ignore most stated income deficiencies.  *See* IndyMac Presentation *Here We Grow* at 14 ("Required Form: 4506T (will not be pulled unless income is outrageous).").

144.   ~~139.~~ Plaintiffs allege that defendant Perry knew or was reckless in not knowing that the foregoing statement (at ¶138) was materially false and misleading because (i) Perry directed IndyMac employees to "push loans through" without regard to approval guidelines, as attested to by the CWs, evidenced in, *inter alia*, "Disneyland Loans"; (ii) Perry and other senior managers encouraged the manipulation of the e-MITS system; (iii) loan sales representatives solicited fraudulent letters in connection with purported verification of customer income, which was reported to upper management; (iv) as stated by CW4, during the Class Period IndyMac experienced and was aware of a substantial increase in defaults attributable to misrepresentations and fraud in the loan applications facilitated by the Company's relaxing of underwriting guidelines; and (v) IndyMac instituted auditor bonus structures that dissuaded the detection of fraud.

**Statement Three:**

145.   The statement regarding the Company's systemic safeguards in place for its underwriting guidelines is material because, for a mortgage lender, "sound underwriting guidelines" are among the most important information looked to by investors in exercising their investment judgment.  The frequency with which Perry emphasized the Company's "sound" underwriting policies in press releases and other public statements, as well as the fact that analysts frequently repeated

and commented on Defendants' statements regarding the Company's standards, confirms the importance of such statements to investors.

146.   ~~140.~~ IndyMac's statement that it had "sound underwriting guidelines" was false and misleading.  IndyMac routinely approved high-risk loans that departed significantly from the Company's established underwriting guidelines. As described fully at ¶¶~~29; 112~~43-51 herein, IndyMac, and defendant Perry in particular, created a company-wide culture and practice of ignoring and intentionally overriding the Company's underwriting guidelines for the singular, myopic goal of generating loan volume.  Combined with IndyMac's substantial reliance on high-risk loans, the actual practice at IndyMac to ignore and intentionally override the Company's stated underwriting guidelines placed the Company's business in the precarious condition of relying on a flimsy base of significantly risky loans – unbeknownst to the public.  In short, IndyMac had in place, and adhered to, anything but "sound underwriting guidelines."

147.   ~~141.~~ Plaintiffs allege that defendant Perry knew or was reckless in not knowing that the foregoing statement (at ¶~~135~~138) was materially false and misleading because Perry himself created a company-wide pattern of abandoning underwriting guidelines, directing IndyMac employees to "push loans through" without regard to approval guidelines.  As attested to by various confidential witnesses, the company-wide environment had become an "organized chaos" focused on the singular goal of increasing reported loan volume, regardless of loan quality.

**Statement Four:**

148.   The statement regarding the Company's "rigorous" in-house appraisal reviews is material because, as a mortgage lender, IndyMac's underwriting practices – including purportedly conducting "rigorous" appraisal reviews – are

among the most important information investors look to in deciding whether to invest in a mortgage lending company's stock.  The frequency with which Perry emphasized such underwriting policies in press releases and other public statements, as well as the fact that analysts frequently repeated and commented on Defendants' statements regarding the Company's standards, confirms the importance of such statements to investors.

149.   ~~142.~~ IndyMac's statement that it conducted "rigorous in-house appraisal reviews" was false and misleading.  IndyMac's appraisal reviews were limited and recklessly deficient.

150.   ~~143.~~ Plaintiffs allege that Perry and IndyMac knew or were reckless in not knowing that the foregoing statement (at ¶~~142~~138) was materially false and misleading because IndyMac's appraisal reviews were performed under only limited circumstances, as reflected in the deposition transcripts of Nicholas Nyland and Ignacio Gomez in the *Indymac Bank v. Chandler Appraisal Services* litigation.

**Statement Five:**

151.   The statement regarding the Company's underwriting quality control is material.  High quality loans could be expected by reasonable investors to generate reliable streams of revenue at IndyMac.  In contrast, loans that perform poorly would have a negative impact on IndyMac's balance sheet.  As a mortgage lender, IndyMac's underwriting practices – including "post-funding quality control audits" – are therefore among the most important information looked to by investors.  Moreover, the frequency with which Perry emphasized such underwriting practices in press releases and other public statements, as well as the fact that analysts frequently repeated and commented on Defendants' statements regarding the Company's standards, confirms the importance of such statements to investors.

1773663.1

152. ~~144.~~ IndyMac's statement that it conducted "post-funding quality control audits" was false and misleading. IndyMac's post-funding quality control audits were conducted on an untimely basis as IndyMac's post-funding quality control department was significantly understaffed. The Solutions Funding post-funding quality control audits were performed months after the loans were in early payment default, significantly undermining their utility.

153. ~~145.~~ Plaintiffs allege that defendant Perry knew or was reckless in not knowing that the foregoing statement (at ¶~~144~~138) was materially false and misleading because these audits were not being done on a timely basis, *i.e.*, quarterly. Instead, IndyMac and Perry recklessly permitted delays far in excess of a quarter before post-funding quality control audits were performed. Even after the post-funding quality control reports were completed, IndyMac's procedures permitted substantial delays before repurchase requests were even sent to sellers.

**Statement Six:**

154. The Company's "loss mitigation and fraud recovery management" statements are also material. For a mortgage lender, like IndyMac, such underwriting practices are among the most important information looked to by investors. The frequency with which Perry emphasized the Company's underwriting policies in press releases and other public statements, as well as the fact that analysts frequently repeated and commented on Defendants' statements regarding the Company's standards, further demonstrates materiality.

155. ~~146.~~ IndyMac's statement that it purportedly had adequate "loss mitigation/fraud recovery management" was false and misleading. IndyMac's seller pursuit department was patently ineffective as a result of its inadequate staffing and resources causing inordinate delay in its attempts to recover from

recidivist sellers. As such, IndyMac frequently only pursued litigation years after problems with a seller became apparent, with limited success.

156. ~~147.~~ Plaintiffs allege that defendant Perry knew or was reckless in not knowing that the foregoing statement (at ¶~~146~~138) was materially false and misleading because IndyMac failed to pursue delinquent loan sellers for excessive time periods. IndyMac's legal department was acutely aware of the inordinate delays that occurred with respect to seller pursuit litigation. Moreover, IndyMac recklessly purchased loans from sellers who had failed to cure repurchase requests.

## F. September 21, 2006 RBC Financial Institutions Conference

157. ~~148.~~ Scott Keys, Executive Vice President and Chief Financial Officer of IndyMac, on behalf of IndyMac, made the following statement at an RBC Financial Institutions Conference on September 21, 2006:

> I joke with Mike Perry, our CEO, that if we did a slide for every negative article that comes out in the mortgage -- kind of about mortgages, Jim, I'd need the rest of the day for the presentation. ***But we wanted to spend the bulk of the presentation trying to dispel some myths about the industry, and also some myths about the Company, where we think people are lumping us in with -- maybe with issues that don't really exist.*** So, I'm going to spend the bulk of time the time on enterprise risk management today.
>
> *     *     *
>
> One of the other things that we have the ability to do is we do a fair amount of our purchases in our conduit business. And there we're dealing with larger financial institutions, and we have a pretty high success rate. ***If we end up having to repurchase a loan, we are able to turn around and put that repurchase back to the seller. To us it's probably about a 90% effectiveness rate there. So, we -- so, a lot of the risk where we may repurchase (indiscernible) we can turn around and pass that back to the seller.***

(Emphasis added.)

158. The statements regarding the Company's ability to effectively defray potential repurchase losses are material because the inability to do so would have a

serious impact on IndyMac's balance sheet.  As a mortgage lender, IndyMac's ability (or not) to "put" *90%* of repurchases on sellers is the type of information looked to by investors in deciding whether to invest in the stock of a mortgage lender.  Facts that directly implicate the fundamentals of a company's core operations are important to reasonable investors in exercising their investment judgment.

159. ~~149.~~ The statement regarding the effectiveness of IndyMac's success rate in obtaining seller repurchases was false and misleading because IndyMac's routine practice of delaying repurchase requests limited IndyMac's ability to gauge this important metric.  As reflected in IndyMac's seller litigation (described above), IndyMac was frequently unable to successfully force recidivist sellers to repurchase the substantial quantity of early payment defaults and representation and warranty claims and knew or was reckless in not knowing this fact.

160. ~~150.~~ Defendant Perry is liable for this statement because, while it was actually uttered by Mr. Keys, Mr. Keys references defendant Perry as a joint participant in the preparation of the statement.  Accordingly, when Mr. Keys uttered this statement on behalf of the Company, defendant Perry had a duty to correct it as he knew, or was severely reckless in not knowing, of the statement's material falsity.

161. ~~151.~~ Scienter is attributable to the Company and defendant Perry because IndyMac, by its own judicial admission, was on notice as early as 2005 that IndyMac was frequently unable to successfully force recidivist sellers to repurchase the loans with early payment defaults and representation and warranty claims.

## G.   2006 Third Quarter Form 10-Q

1773663.1

162. ~~152.~~ On November 2, 2006, the Company filed its Report on Form 10-Q for the quarter ended September 30, 2006 with the SEC (the "2006 Third Quarter 10Q").  Because Perry signed the 2006 Third Quarter 10-Q, all statements therein were made by him and the Company.

163. ~~153.~~ The 2006 Third Quarter 10Q stated:

> A component of the overall allowance for loan losses is not specifically allocated to the loan portfolios ("unallocated component"). The unallocated component reflects management's assessment of various factors that create inherent imprecision in the methods used to determine the specific portfolio allocations. Those factors include, but are not limited to levels of and trends in delinquencies and impaired loans, charge-offs and recoveries, volume and terms of the loans, ***effects of any changes in risk selection and underwriting standards***, other changes in lending policies, procedures, and practices, and national and local economic trends and conditions. *Id.* at 52. (Emphasis added).

164. ~~154.~~ The information contained in the foregoing statement was material to investors when made for the reasons set forth at ¶128.  The foregoing statement was knowingly or recklessly ~~materially~~ false and misleading for the same reasons that the identical statement, set forth in the Company's 2006 First Quarter 10-Q, was knowingly or recklessly materially false and misleading.  *See* ~~¶153~~¶¶129-130 (discussing same).

## H.    November 2, 2006 Conference Call

165. ~~155.~~ On November 2, 2006, defendant Perry spoke to analysts and the investing public on behalf of the Company during a public earnings conference telephone call (the "Q3 2006 IndyMac Bancorp, Inc. Earnings Conference Call").

166. ~~156.~~ During the Q3 2006 IndyMac Bancorp, Inc. Earnings Conference Call Perry stated, regarding the documentation required before a Company underwrites a loan that "typically on full doc borrowers we ask them to provide W-2s and pay stubs."  Tr. at 14.

167.   The statement regarding certain of the Company's underwriting practices was material.  As a mortgage lender, IndyMac's underwriting practices – including the creditworthiness of its borrowers – is among the most important information looked to by investors for the same reasons set forth in ¶128.

168.   ~~157.~~ This statement was materially false and misleading because the Company's internal policies ***did not*** require W-2s and pay stubs as verification of income for "full doc" loans.

169.   ~~158.~~ Plaintiffs rely on the following facts in support of their allegation that the foregoing statement was materially false and misleading.  CW 7 states that the vast majority of IndyMac purportedly "Full Doc" loans were underwritten merely based on a Verification of Employment ("VOE"), not on W-2s and pay stubs.  CW 7 further provided documentation in the form of the "IndyMac Bank NonPrime Program Matrix" confirming the same.

170.   ~~159.~~ Plaintiffs allege that defendant Perry and the Company knew or were reckless in not knowing that the foregoing statement (at ¶~~156~~166) was materially false and misleading because Perry's statement facially contradicts the Company's official, written internal policies.

## VI.   LOSS CAUSATION/ECONOMIC LOSS

171.   ~~160.~~ As detailed herein, during the Class Period, Defendants engaged in a scheme to deceive the market and artificially inflate IndyMac's securities prices, which scheme operated as a fraud or deceit on Class Period purchasers of IndyMac securities.  In particular, Defendants misrepresented the Company's underwriting standards, risk management policies, and the adequacy of its loan loss reserves.  Later, however, when Defendants' misrepresentations and fraudulent conduct began to be disclosed and became apparent to the market (or, in the alternative, when the risks concealed by Defendants' misrepresentations

materialized), IndyMac stock fell as the artificial inflation came out of the Company's stock price.

172. ~~161.~~ Specifically, during the Class Period, Defendants misrepresented: (i) IndyMac's underwriting guidelines and controls and their compliance therewith; (ii) IndyMac's risk management policies; and (iii) the adequacy of IndyMac's loan loss reserves. These misrepresentations concealed, *inter alia*, that the Company's loan portfolio was severely impaired as a result of Defendants' repeated violations of the Company's internal/operational controls over underwriting. Defendants' false and misleading statements had their intended effect and caused IndyMac's common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $50.11 per share on May 8, 2006.

173. ~~162.~~ Starting on January 16, 2007, and through March 1, 2007, investors began to learn the truth through a number of partial disclosures, including Defendants' own admissions. The series of disclosures revealed, among other things that: (1) the Company faced a substantial earnings shortfall caused by credit losses and increases in provisions for loan loss reserves as a result of the Company's impaired loans; (2) the Company would not meet its forecasted results for the fourth quarter of 2006, primarily because the Company doubled its credit reserves from the previous quarter to cover the massive number of defaults on the loans it had underwritten; (3) several of the Company's business areas (*e.g.* its 80/20 loan portfolio) that Defendants had touted as its strongest virtues were, in actuality, profoundly weakened and impaired; (4) the Company experienced a substantial negative financial impact as a result of losses from bad/uncollectible loans held by the Company; and (5) the Company had "loosened its lending standards" during 2006, and that, going forward, the Company would correct this by being "smart and prudent" in managing its underwriting guidelines and risk.

174.   ~~163.~~ As a direct result of these disclosures IndyMac's stock price dropped from a close of $43.55 per share on January 12, 2007 (the last trading day before Defendants' disclosures began) to $32.16 on March 1, 2007 (the day of Defendants' last corrective disclosure).  Together, these drops removed the inflation from IndyMac's stock price, causing real economic loss to Indymac investors.  In sum, as the truth was revealed, the Company's stock price plummeted, the artificial inflation came out of the stock, and Plaintiffs and other members of the Class were damaged.

175.   ~~164.~~ The decline in IndyMac's stock price during the Class Period was a direct result of Defendants' earlier misrepresentations finally being revealed to investors and the market. The timing and magnitude of IndyMac's stock price declines negate any inference that the loss suffered by Plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiffs and other members of the Class was a direct result of Defendants' fraudulent scheme to artificially inflate IndyMac's securities prices and the subsequent significant decline in the value of IndyMac's securities when the truth was revealed through a series of partial disclosures.

> **A.   The Truth About the Company's True Condition Begins to Emerge as Defendants Disclose that Indymac had Saddled Itself with Toxic Loans as a Result of its Poor Underwriting Practices Thereby Causing Substantial Charges and Increased Loan Loss Reserves**

176.   ~~165.~~ On January 16, 2007, the Company issued a written press release to the public on its website and to various media outlets (the "January 16, 2007 Press Release") in which it stated:

Unfortunately, we are starting the year off with some bad news.

Based on the earnings forecast we provided after the end of last quarter, we anticipated that our EPS for the fourth quarter would be $1.35 (in a range of $1.30 to $1.40). However, last week, as we began to complete our quarterly accounting "roll-up," it became clear that our Q4 earnings would be substantially below our forecast. While our internal quarterly accounting certification process is not yet complete and adjustments could still be made as we finalize our accounting, we now expect to report approximately $0.97 EPS for the quarter when we release earnings as scheduled on January 25th.

…While we have not yet completed our detailed analysis of all of the variances, our assessment as of today is that the main differences between our prior forecast of $1.35 and what looks to be our earnings of $0.97 are the following:

***1. An increase in credit costs related to the loan loss provision, secondary market reserve, and marking-to-market delinquent loans held-for-sale and residuals and non-investment grade securities;***

***2. A reduction in net interest margin related to loans held-for-sale and the thrift investment portfolio due to yield curve inversion and the fact that our loan production mix shifted more toward fixed rate and intermediate term fixed rate loans …*** (Emphasis added).

177.   ~~166.~~ The foregoing statements, while leaking portions of the truth concealed during the Class Period, were still knowingly or recklessly materially false and misleading because they failed to fully disclose weaknesses in IndyMac's internal/operational controls, which enabled Defendants *inter alia*, improperly to manipulate underwriting protocols, direct that unqualified loans be approved, violate rate lock protocols, direct that loans returned from the secondary market be rewritten to "work," and stifle/ignore reports of internal fraud (*see* ¶¶~~10; 48; 70; 204~~43-84).

178.   ~~167.~~ The market quickly began keying in on the import of IndyMac's January 16, 2007 earnings miss warning, linking IndyMac's poor performance with the Company's shoddy loan portfolio.

179. ~~168.~~ For example, Manuel Ramirez, an analyst at Keefe, Bruyette & Woods, wrote in his analyst report dated January 17, 2007 that "Where There's Smoke, There Might Be Fire" and **downgraded** IndyMac to "underperform." Citing "credit quality deterioration" as the "most significant factor," Ramirez noted the concern with IndyMac's "volume driven model." Ramirez specifically attributed the Company's poor performance to, *inter alia*: (a) "the deterioration in the quality of production (more correspondent and conduit volumes)…"; and (b) inadequate reserves for losses related to rep and warranty losses for loans sold on the secondary market.

180. ~~169.~~ In the same report, Ramirez also described how the Company's poor performance was related to its need to boost reserves as a result of shoddy loans. "Secondary Market Reserve: Relates to rep and warranty losses for loans sold into the capital markets. Management had strongly defended the adequacy of the [secondary market] reserve on the past two quarterly conference calls **despite the fact** that the reserve had looked light at only $30.2 million, or 2.8 basis points of loans sold. Questions had arisen due to the rash of early payment defaults in the subprime market. We assume the secondary market reserve will be bolstered by $8 million in the quarter, which is a contra to gain on sale income."

181. ~~170.~~ A Foxx-Pitt, Kelton analyst report dated January 17, 2007 corroborated as much, attributing much of the Company's announced decline to "elevated instances of early payment defaults and other rep and warranty breaches."

182. ~~171.~~ Notwithstanding that Defendants' partial disclosure failed to fully disclose Defendants' fraud, the revelation of the Company's earnings miss – a direct result of Defendants' conduct – caused the price of the Company's common

stock to fall to $40.50 at close, down from $43.55 at close on January 12, 2007 (the prior trading day).

183. ~~172.~~ Analysts also expressed skepticism with IndyMac's belated recognition of impairments to its shoddy loan portfolio.  A Roth Capital Partners report dated January 22, 2007 noted:

> The issue, in our estimation, is the timing of the disclosures—or to be more precise, the timing of increases in loan loss provisions, valuation allowances, repurchase provisions, and fair value adjustments, where we believe most of the hike in credit costs and decline in servicing ROE will be reflected.

The report specifically questioned the timetable of the Company's accounting for its toxic loan exposures:

> The question that arises in our minds [sic] whether the increases in provisions and fair value adjustments we are anticipating were necessitated by changes in actual loss experience and prepayment speeds in the fourth quarter—or change in expectations that formed in the fourth quarter—***or should have been reflected in the company's financial statements earlier in the year.***  Many nonconforming lenders started reporting spikes in EPDs and repurchase requirements in the middle of 2006.  They also reported sharp increases in delinquencies and loans going into foreclosure in 2006 loan production vintages.

(Emphasis added.)

## B.    The Truth Continues to Emerge as the Market Learns that Indymac's Loosening of Underwriting Guidelines Caused Indymac's Abysmal Performance

184. ~~173.~~ On January 25, 2007, Defendants publicly disclosed that the Company had been financially impaired, and would be unable to achieve the forecasted results for the fourth quarter of 2006.

185. ~~174.~~ On January 25, 2007, the Company issued a written press release to the public on its website and to various media outlets (the "January 25, 2007 Press Release") in which it stated:

~~FIFTH~~SIXTH AMENDED CLASS ACTION COMPLAINT

~~58~~

PASADENA, Calif.--(BUSINESS WIRE)--Jan. 25, 2007--IndyMac Bancorp, Inc. (NYSE:NDE) ("IndyMac(R)" or the "Company"), the holding company for IndyMac Bank, F.S.B. ("IndyMac Bank(R)"), today reported net earnings of $72 million, or $0.97 per share, for the fourth quarter of 2006, compared with net earnings of $70 million, or $1.06 per share, in the fourth quarter of 2005, representing a 3 percent increase in net earnings and an 8 percent decrease in earnings per share (EPS). . .

*  *  *

"However, I and the rest of IndyMac's management team are clearly disappointed with these results because they were considerably below our normal earnings growth and ROE levels and fell far short of what we had forecasted for the quarter. In response, I want to assure our shareholders that we are redoubling our efforts to both improve our earnings and tighten up our forecasting processes.

*  *  *

"Tough times, like what we are now facing, are when companies like IndyMac can gain ground on the competition - and that is exactly what we are doing. We had a strong quarter for loan production, with $26 billion in total loans produced, up 8 percent over the prior quarter and 44 percent over Q4-05. With these production gains, we grew our estimated market share(1) to 4.51 percent in the fourth quarter versus 3.83 percent in the third quarter and 2.51 percent one year ago.

*  *  *

**Mortgage Production**

"While we achieved records for loan production and market share, we are not happy with the fact that earnings from the mortgage production segment did not grow this quarter versus last," commented Richard Wohl, IndyMac Bank's President. "Our mortgage banking revenue margin declined to 91 basis points during the fourth quarter from 103 basis points in the prior quarter and 110 basis points in Q4-05. Market conditions contributed to the margin erosion in the form of a shift in our production mix from higher margin ARM loans to lower margin fixed rate loans and increased credit costs related to marking-to-market delinquent loans held for sale and increasing our secondary marketing loan repurchase reserve.

*  *  *

~~FIFTH~~<u>SIXTH</u> AMENDED CLASS ACTION COMPLAINT

~~59~~

Looking ahead, there will likely be further erosion in mortgage banking revenue margins and overall profitability before the current down cycle eventually turns up."

\*　　　　　\*　　　　　\*

**Residuals and Non-Investment Grade Securities**

"We are clearly not satisfied with the performance of these portfolios during the quarter, but we feel that this quarter's performance was an aberration that will likely not recur in the future," continued Olinski. "Two main factors drove the earnings decline. First, we implemented a new, more refined prepayment model for our residual securities that resulted in a one-time downward valuation adjustment of $5 million. Going forward the new model will enable us to hedge these assets more effectively, improving our performance. Second, HELOC residual securities from 2004 incurred a $6.5 million write-down for credit impairment required by GAAP accounting that we feel does not reflect the true economics of these securities. These securities are callable over the next 4-24 months, and, accordingly, we expect to book gains during this time period more than offsetting the fourth quarter write-downs, such that we expect strong overall returns on our 2004 HELOC residual securities over their lives.

\*　　　　　\*　　　　　\*

**Thrift Portfolio**

Net earnings for the thrift portfolio, which consists of single-family residential mortgage loans (whole loans), consumer and subdivision construction loans, and mortgage backed securities (MBS), were $25 million, down 30 percent from the third quarter and 23 percent from one year ago. "Even though we increased our average earning assets in the thrift investment portfolio, our net interest margin declined substantially to 1.64 percent in the fourth quarter from 2.02 percent both in the third quarter and one year ago," noted Blair Abernathy, IndyMac's Chief Investment Officer. "The compression in net interest margin was due primarily to an increased cost of funds for our whole loan and MBS portfolios. Longer term, fixed-rate funding for these portfolios of approximately $1.5 billion at roughly a 2.95 percent cost of funds matured during the quarter and was replaced at a significantly higher funding cost. This has resulted in a more permanent shift in our net interest margin, such that the 1.64 percent margin realized during the quarter is likely what we can expect going forward. In retrospect,

~~FIFTH~~SIXTH AMENDED CLASS ACTION COMPLAINT

~~60~~

we should have more properly planned for this happening.

"Net earnings for the fourth quarter were also negatively impacted by a GAAP $6.5 million credit-related valuation write-down on HELOC residual securities (noted above) and an increase in the loan loss provision to $9 million from $5 million in the prior quarter and $1.6 million in Q4-05. As a result of the earnings decline, the thrift portfolio produced an ROE of 14 percent, below our expectations, versus 20 percent in the prior quarter and 22 percent one year ago. Going forward, we believe the ROE for this portfolio should be in a range of 15 percent to 20 percent. We are clearly not happy about the fact that the fourth quarter's performance fell below this range, and we will provide updates on steps we are taking to improve performance as the year progresses."

Non-performing Assets and Charge-offs Increase from Historic Low Levels

Non-performing assets to total assets increased to 63 basis points during the quarter from 51 basis points in the third quarter and 34 basis points in Q4-05. Net charge-offs increased to $7.6 million during the quarter from $1.9 million both in the prior quarter and one year ago. "We have previously noted that the historically low NPAs and charge-offs we have experienced over the last few years were unsustainable, and, indeed, we saw erosion in our credit metrics during the fourth quarter. In light of this, we are increasing our provision for loan losses," commented Scott Keys, IndyMac's Chief Financial Officer. "We expect current credit conditions to worsen further in 2007 in connection with the housing market cycle and therefore are planning for significant increases in loan loss provisions and charge-offs in 2007 versus 2006.

186. 175. Notably, the Company further revealed some of the details of the financial problems caused by Defendants' fraud:

- increased credit costs related to marking-to-market delinquent loans held for sale;

- an increase in the Company's secondary marketing loan repurchase reserve;

- a nearly two-fold increase in the Company's loan loss provision to $9 million from $5 million in the prior quarter and $1.6 million in Q4-05; and

FIFTHSIXTH AMENDED CLASS ACTION COMPLAINT
61

1773663.1

- Non-performing assets to total assets increased to 63 basis points during the quarter from 51 basis points in the third quarter and 34 basis points in Q4-05. Net charge-offs increased approximately four-fold to $7.6 million during the quarter from $1.9 million both in the prior quarter and one year ago.

187. ~~176.~~ While Defendants were careful not to specifically admit fraud or misconduct in the January 25, 2007 statements, the statements further disclosed the impact of their fraud. That is, *inter alia*, but for Defendants' violations of the Company's internal/operational controls over underwriting (which resulted in the issuance of bad and/or uncollectible loans that never should have been underwritten or purchased in the first place) the Company would not have experienced an increase in its credit costs and an increase non-performing assets on its books or been forced to increase its loan repurchase reserve, each of which negatively impacted the Company's financial results.

188. ~~177.~~ While Defendants' false and misleading statements during the Class Period were repeated (and not expressly repudiated) by Defendants, incident to and after the Company's January 17 & 25, 2007 disclosures, Defendants' partial revelations of the truth were sufficient for the market to discern the falsity of Defendants' prior misrepresentations. *See* ¶¶~~169-172~~178-183 (discussing analyst statements).

189. ~~178.~~ IndyMac's loosening of underwriting standards resulted in the Company's increasing reliance on high-risk 80/20 piggyback loans. This was a direct cause of the Company's dramatic increase in credit losses for the fourth quarter of 2006 and the Company's need to significantly increase its provisions for loan loss and secondary market reserves. During the Class Period, IndyMac began suffering credit losses as a result of a rash of EPDs on piggyback loans. IndyMac was therefore forced to hold these defective loans, and was either unable to sell

them in the secondary market or was subject to repurchase demands from the securitizations thereof.

190.   ~~179.~~ The underlying fraud, IndyMac's shoddy, camouflaged underwriting practices, directly caused the losses that the Company announced – and that investors suffered – at the end of the Class Period.  IndyMac's excuses for its abysmal performance – credit losses, increased provisions for loan loss reserves, and mark downs on its impaired loan portfolio – were the direct and natural consequences of the Company's loosening of underwriting standards.  As it began to rely precariously and heavily on high-risk 80/20 piggyback loans, the Company was doomed to face more loan delinquencies and defaults, and thus suffer greater credit losses, be required to increase its loan loss reserves and be forced to mark down its impaired loans.

191.   ~~180.~~ IndyMac's increased credit losses were, in part, the direct result of  IndyMac's declining credit quality which was inextricably linked to the Company's reliance on piggyback loans.  Perry discussed these issues during an earnings conference call IndyMac held on January 25, 2007 (the "January 25, 2007 Earnings Conference Call").

192.   ~~181.~~ Perry admitted on the January 25, 2007 analyst Conference Call that in connection with "[t]he increase [in credit costs] from the third to fourth quarter, we are seeing some problems in certain pieces of 80/20 piggyback programs."  It was further admitted in IndyMac's Earnings Presentation filed January 25, 2007 that "Higher credit mark-to-market losses in Q4 06 were concentrated in the prime 80/20 and subprime products."

193.   ~~182.~~ Indeed, the disproportionately-high tendency for piggyback loans to default specifically manifested in the Company's credit losses recognized at the end of the Class Period.  While about 20% of IndyMac's loan production for the

fourth quarter of 2006 – or $5 billion out of $25.9 billion – consisted of 80/20 piggyback loans, nearly **60%** of credit losses on loans held for sale during the fourth quarter of 2006 – or $10.27 million out of $17.66 million – were attributable entirely to 80/20 piggyback loans.  As revealed in a press release issued by IndyMac on March 15, 2007:

```
                            Appendix A
                   Recent Guideline Cutbacks(a)
```

| Product Group ($ in millions) | 4th Quarter Production | Production Eliminated | Percent of 4th Quarter Production Eliminated |
|---|---|---|---|
| 80/20 Piggybacks | $    4,990 | $  2,689.5 | 53.9% |
| Subprime | $    1,155 | $    444.7 | 38.5% |
| Alt-A and Prime | $   11,205 | $    586.5 | 5.2% |
| Option ARM | $    5,201 | $    211.3 | 4.1% |
| Second Liens (CES and HELOCs) | $    1,169 | $    201.7 | 17.3% |
| Consumer Construction | $      785 | $      1.2 | 0.2 % |
| Reverse Mortgages | $    1,441 | $      – | – % |
| Total | $   25,946 | $  4,134.9 | 15.9% |

| Product Group ($ in millions) | 4th Quarter Credit Losses on Loans Held for Sale (LHFS) | 4th Quarter Credit Losses on LHFS Related To Eliminated Production | Percent of 4th Quarter Credit Losses on LHFS Eliminated |
|---|---|---|---|
| 80/20 Piggybacks | $   10.27 | $   9.06 | 88.2% |
| Subprime | $    3.12 | $   2.64 | 84.4% |
| Alt-A and Prime | $    2.10 | $   0.01 | 0.3 % |

```
Option ARM                     $      1.42  $      0.02          1.7%
------------------------------------------------------------------------
Second Liens (CES and HELOCs)  $      0.41  $      0.40         96.8%
------------------------------------------------------------------------
Consumer Construction          $      0.34  $        -           - %
------------------------------------------------------------------------
Reverse Mortgages              $        -  $        -           - %
------------------------------------------------------------------------
Total                          $     17.66  $     12.12         68.6%
------------------------------------------------------------------------
```

(a) Includes some guideline cutbacks that are scheduled to take place on March 19, 2007.

194. ~~183.~~ Indeed, the Company subsequently further *admitted* – beyond its January 25, 2007 admissions – that its losses were heavily tied to its precarious reliance on high-risk piggyback loans.  In the IndyMac Earnings Presentation dated April 26, 2007 the Company stated that "The Credit M[ark to Market] Allowance On Loans Held For Sale Has Increased Due To Poor Performance of 'Piggybacks' And Subprime…"  (April 26, 2007 Presentation Slide at page 24.)  The presentation further stated that "Credit Losses In Our H[eld For Sale] Portfolio Were Due Primarily To Higher Early Payment Defaults In Our Piggyback And Higher LTV Subprime Programs."  (April 26, 2007 Presentation Slide at page 25.)

195. ~~184.~~ Furthermore, in a UBS Conference Presentation, dated May 15, 2007, the Company admitted "Yes, We Expanded Guidelines Too Far On Piggyback And Subprime Loans…" which impacted the Company's earnings with "Estimated abnormal credit costs of $30-35 million from 2006-Q2 07."  (May 15, 2007 Presentation Slide at page 11.)

196. ~~185.~~ Indeed, early or first payment defaults on piggyback loans plagued entire loan pools.  As detailed above in the section elaborating on the Silver State, Lancaster and Geneva toxic loan pools, there is no doubt that a material portion of IndyMac's fourth quarter 2006 credit losses (and need to increase loan loss reserves) were a direct result of its growing reliance on

1773663.1

piggyback loans stemming from its shoddy underwriting practices during the Class Period.

197. ~~186.~~ During the January 25, 2007 Earnings Conference Call, Perry disclosed flaws in the Company's internal/operational controls and forecasting. For example, Perry admitted that "[o]ur provision for loan losses is increasing. . . Credit quality generally is deteriorating so I would say that's something we have to do a better job forecasting, and clearly we want to be a little more conservative as it relates to that… This is something we should have done a better job forecasting on.  This is something that we probably could have seen better if we had more precise models . . ." *Id.* at 4.

198. ~~187.~~ On the January 25, 2007 Conference Call, analysts also focused on the Company's need to substantially increase provisions for loan loss reserves. For example, one concerned analyst, Manuel Ramirez, asked: "I was kind of doing the math on the provision, given your charge-off guidance and your guidance for net-loan growth, and ***it seems like the provision could be up pretty substantially year-over-year***." (*Id.* at 15) (emphasis added).

199. ~~188.~~ IndyMac's January 25, 2007 partial disclosure caused its stock to tumble to $37.71 at close, down from $40.70 at close on January 24, 2007.

200. ~~189.~~ The timing and magnitude of IndyMac's stock price decline negates any inference that the loss suffered by Plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.

201. ~~190.~~ This fact was confirmed by financial analysts covering IndyMac, who, although aware of the tough real estate/mortgage market, were shocked by IndyMac's January disclosures and questioned management's credibility as a result.  *See* January 26, 2007 Lehman Brothers IndyMac research report ("The

challenging environment was not surprising, but the extent of NDE's struggles was"; January 26, 2007 FBR IndyMac research report ("With the disappointing 4Q06 earnings and significantly reduced FY07 outlook, we feel NDE's management team lost some credibility.").

### C.   The Market Learns the Truth About Indymac's Deficient Underwriting Guidelines and Risk Management

202. ~~191.~~ On March 1, 2007, the Company issued a Press Release in which Perry admitted that the Company had loosened its underwriting guidelines during 2006, and promised to mend its ways.  Specifically, Perry stated that:

> 2006 was a challenging year in the mortgage banking industry. Industry loan volumes of $2.5 trillion were 34 percent below 2003's historic high level and 17 percent lower than in 2005.
>
> *                    *                    *
>
> Given that reality, here is what we will do to improve performance for our shareholders right now:
>
> ***1.  Manage our credit risks by being smart and prudent in adjusting our mortgage underwriting guidelines, setting our risk-based pricing, making decisions as to what assets go into our investment portfolio and/or distributing our risk into the secondary market, and executing on best in class loss prevention and loss mitigation practices.***
>
> *                    *                    *
>
> ***Given the robust housing market and highly liquid secondary markets (for even the "riskiest loans") - both of which persisted for years longer than anticipated - and given strong competition in a declining overall mortgage market, IndyMac, in order to compete and grow, also loosened its lending standards, though in a much more responsible way***.
> [Emphasis added.]

203. ~~192.~~ As a result of the March 1, 2007 disclosure, IndyMac's share price dropped even more, to $32.16 at close, down from $34.33 on February 28, 2007, on large trading volume.

## VII.   POST CLASS PERIOD DISCLOSURES: THE OFFICE OF THE INSPECTOR GENERAL'S AUDIT REPORT

204. ~~193.~~ In the wake of IndyMac's failure and seizure by the FDIC, the Office of the Inspector General, Department of the Treasury (the "OIG") conducted an investigation to determine what went so wrong at the Company.

205. ~~194.~~ On February 26, 2009, the OIG issued a report setting forth its findings (the "Audit Report"), aptly summarized as follows: the "underlying cause of [IndyMac's] failure was the unsafe and unsound manner in which the thrift was operated."  Audit Report at 3.

206. ~~195.~~ Consistent with Plaintiffs' allegations concerning the Company's "anything goes" attitude concerning underwriting (*see* ¶¶10; 54~~43-84~~), the Audit Report confirms that the Company engaged in "unsound underwriting practices," stating:

- "IndyMac encouraged the use of nontraditional loans. IndyMac's underwriting guidelines provided flexibility in determining whether, or how, loan applicants' employment, income, and assets were documented or verified. . . .  For the loans reviewed, we found little, if any, review of borrower qualifications, including income, assets, and employment. We also found weaknesses with property appraisals obtained to support the collateral on the loans. . . ." (*Id.* at 11); and

- "IndyMac's business model was to produce as many loans as possible and sell them on the secondary market.  To facilitate this level of production. . . IndyMac often did not perform adequate underwriting" (*Id.* at 21).

207. ~~196.~~ The Audit Report also confirms Plaintiffs' allegations concerning the Company's inadequate loan loss reserves, stating:

1773663.1

- As early as 2004, IndyMac senior management began observing the probability of a downward trend in real estate values, which could reduce the collateral supporting loans and result in possible loan losses. Regardless, IndyMac's ALLL [Allowance for Loan and Lease Losses] decreased as a percentage of the thrift's total loans until 2007 when it finally increased its ALLL because it began to experience losses in its loan portfolio.

208. ~~197.~~ Additionally, the Audit Report criticized IndyMac's Conduit Division which, as described at ¶¶~~15; 37-41,~~84-110, was responsible for bulk purchases of loans from brokers (such as Silver State and Lancaster), finding that:

- IndyMac's "internal audit group reported problems with the Conduit Division as early as 2005" relating to its "loan approval and underwriting process" (*Id.* at 22);

- IndyMac's Conduit Division was reported as a "financial reporting control deficiency" by the Company's independent auditor in 2006 (*Id.*); and that

- Despite the above described warnings (over a period of two years), these "major weaknesses" continued until the Office of Thrift Supervision stepped in during 2007. *Id.* at 23. "Shortly after, IndyMac recognized losses were occurring from this division and closed it." *Id.*

209. ~~198.~~ The above-cited statement from the Audit Report, along with others, corroborate the testimony of the CWs as follows:

| Audit Report Findings | Corroborates CW Testimony |
|---|---|
| "Appraisals obtained by IndyMac on underlying collateral were often questionable as well." (p.2) "IndyMac often made loans without verification of the borrower's income or assets, and to borrowers with poor credit histories." (p.2) "IndyMac engaged in very high-risk activities over many years" (p.3) "Many of [IndyMac's] nontraditional mortgages, however, came with an increased risk of borrower default." (p.8) "These [IndyMac] loans proved to be even riskier because for the most part they were originated with less than full documentation." (p.8) | CW1 testimony (¶¶45-46) CW2 testimony (¶53) CW4 testimony (¶63) CW5 testimony (¶65) CW7 testimony (¶81) |

1773663.1

| | |
|---|---|
| "For the loans reviewed, we found little, if any, review of borrower qualifications, including income, assets, and employment." (p.11)<br>"We also found weaknesses with property appraisals obtained to support the collateral on the loans." (p.12)<br>"Loan 3" -- $1.475 million stated income 80/20 piggyback loan; no borrower income verification; a peculiar "exception" to IndyMac underwriting guidelines; questionable appraisal; first payment default (pp.72-73) | |
| "IndyMac embarked on a path of aggressive growth." (p.6)<br>IndyMac "generated about $10 billion in loans in 2000 to a high of $90 billion in 2006." (p.7)<br>"IndyMac's business model was to produce as many loans as possible and sell them in the secondary market.  To facilitate this level of production, we found that IndyMac often did not perform adequate underwriting." (p.21) | CW1 testimony (¶¶44-45)<br>CW2 testimony (¶73)<br>CW3 testimony (¶60)<br>CW5 testimony (¶65) |
| "By May 2005, signs of borrower distress were evident." (p.9)<br>"As early as 2004, IndyMac senior management began observing the probability of a downward trend in real estate values, which could reduced the collateral supporting loans and result in possible loan losses.  Regardless, IndyMac's [Allowance for Loan and Lease Losses] decreased as a percentage of the thrift's total loans until 2007…" (p.10) | CW2 testimony (¶5355)<br>CW4 testimony (¶72)<br>CW6 testimony (¶69) |

## VIII.   ADDITIONAL FACTS SUPPORTING DEFENDANTS' SCIENTER

### A.   Perry's Certifications

210.   199. Throughout the Class Period, Perry repeatedly certified that he had reviewed and approved of the Company's internal controls and financial reporting, both of which have been demonstrated above to be false and misleading.

211.   200. For example, attached to the 2005 10-K, as Exhibit 31.1 and 32.1 were certifications required by SOX, and executed by Perry.  In his certifications attached to the 2005 Form 10-K, Perry stated that he had:

designed such internal control over financial reporting,
or caused such internal control over financial reporting
to be designed under our supervision, to provide
reasonable assurance regarding the reliability of
financial reporting and the preparation of financial
statements for external purposes in accordance with
generally accepted accounting principles.[5]

212. ~~201.~~ Perry further stated, again in his written certifications attached to

the 2005 Form 10-K that:

I have disclosed, based on our most recent evaluation of
internal control over financial reporting, to the registrant's
auditors and the audit committee of the registrant's board of
directors (or persons performing the equivalent functions):

(a) all significant deficiencies and material weaknesses in
the design or operation of internal control over financial
reporting which are reasonably likely to adversely affect
the registrant's ability to record, process, summarize and
report financial information; and

(b) any fraud, whether or not material, that involves
management or other employees who have a significant role in
the registrant's internal control over financial reporting.

213. ~~202.~~ Perry's certification of the Company's internal/operational

controls is probative of his scienter.

214. ~~203.~~ This is so because the Company's controls over underwriting

were wholly ineffective (and violated by or caused to be violated by Perry *see e.g.*

¶¶ ~~127; 128~~43-51), resulting in the Company underwriting hundreds of millions of

dollars worth of loans for which it was "probable" and/or "reasonably possible"

that the Company would experience default.  Given that the Company did not

adequately reserve against these potential losses, the Company's presentation of its

financial results violated Statements of Financial Accounting Standards No. 5,

Accounting for Contingencies ("SFAS 5"), a core principle of Generally Accepted

---

[5] Perry repeated this statement in each of the Company's filings with the SEC
on Form 10-Q during the Class Period.

~~FIFTH~~SIXTH AMENDED CLASS ACTION COMPLAINT
~~71~~

1773663.1

Accounting Principles, rendering any statement that the Company had "reasonable assurance regarding the reliability of financial reporting" utterly false.

215. ~~204.~~ It is clear that defendant Perry knew or was reckless in not knowing of the violations of the Company's underwriting controls and standards (rendering the statements at ¶¶~~200-201~~211-212 materially false and misleading) for the following reasons. First, Perry directed employees to (i) "push loans through" regardless of whether they satisfied the Company's underwriting guidelines; (ii) input false information into the Company's e-MITS underwriting control system, to cause the approval of loans that would normally be rejected; and (iii) engage in violations of the Company's "rate lock" protocols and controls. *See* ¶¶~~119, 120, 122, 123~~43-49. Second, Perry was aware that rampant fraud and lying by loan sales representatives was taking place, yet he continued to push employees to close loans "at all costs." *See* ~~id.~~¶50. Third, the wide-ranging and management-directed violations of the Company's underwriting guidelines and controls evidences a culture of fraud at the Company. *See* ¶¶~~128.~~50-51. Fourth, the number of fraudulent loans discovered at the Company increased by 1500% from 2003 to mid-2006, rendering the lack of control over underwriting facially obvious. *See* ¶~~68.~~¶¶67-70. Fifth, the massive increase in bad loan "kickbacks" requiring repurchase by the Company resulted in the initiation of a large "special project" initiated by management to rehabilitate those loans. *See* ¶¶~~73,~~ 73-75. Finally, the numerous lawsuits filed by the Company show that it knew that certain pools of loans that it had purchased and underwritten from certain sellers were defaulting at rates as high as 90% (in 2005), and 97% (in 2006), rendering the inadequacy of the Company's underwriting controls facially obvious to Perry and the Company. *See, e.g.,* ¶84.

**B.** **Perry's Financial Incentive**

216. ~~205.~~ In addition to the facts supporting the conclusion that Defendants made false statements knowingly or with deliberate recklessness, defendant Perry had a financial incentive to make such false statements.

217. ~~206.~~ Defendant "Perry's 2006 Short-Term Cash Incentive was entirely performance based, determined by IndyMac's 2006 EPS and ROE." 2006 Proxy at 39. The Proxy continued:

> Thresholds of 2005's EPS and a 14 percent ROE were specified on an award matrix, growing to a $1 million award when EPS grew 15 percent and ROE exceeded 19 percent. Based on IndyMac's 2006 EPS of $4.82, and 8.8 percent growth, and a 19.1 percent ROE, the award matrix yielded a $791,300 payout. The MDC ["IndyMac's Management Development and Compensation Committee"] retained the right to make a potential downward adjustment to this amount if regulatory ratings worsened or if certain strategic criteria were not met. Based on 2006 results, the MDC made no adjustments.

218. ~~207.~~ Thus, defendant Perry had motive to inflate loan production during the Class Period by directing that internal/operational controls be overridden.

## IX. APPLICABILITY OF THE PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

219. ~~208.~~ At all relevant times, the market for IndyMac common stock was an efficient market for the following reasons, among others:

(a) IndyMac stock met the requirement for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, IndyMac filed periodic public reports with the SEC and NYSE;

(c) IndyMac regularly communicated with public investors via established market communication mechanisms, including through regular

dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    IndyMac was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

220.   ~~209.~~ As a result of the foregoing, the market for IndyMac common stock promptly digested current information regarding IndyMac from all publicly-available sources and reflected such information in IndyMac's stock price.  Under these circumstances, all purchasers of IndyMac common stock during the Class Period suffered similar injury, and a presumption of reliance applies.

## X.    NO STATUTORY SAFE HARBOR EXISTS FOR DEFENDANTS' STATEMENTS

221.   ~~210.~~ The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this complaint. The specific statements pleaded herein either were not identified as "forward-looking statements" when made or were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-

looking statement was authorized and/or approved by an executive officer of IndyMac who knew that those statements were false when made.

## XI.    CLASS ACTION ALLEGATIONS

222. ~~211.~~ Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the common stock of IndyMac from January 26, 2006 through March 1, 2007, inclusive and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

223. ~~212.~~ The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, IndyMac's common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by IndyMac or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

224. ~~213.~~ Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

225. ~~214.~~ Plaintiffs will fairly and adequately protect the interests of the members of the Class and they have retained counsel competent and experienced in class and securities litigation.

226. ~~215.~~ Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of IndyMac; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

227. ~~216.~~ A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XII.     FIRST CLAIM: *VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS*

~~Violations of Section 10(b) of the Exchange Act~~
~~And Rule 10b-5 Promulgated Thereunder~~
~~Against All Defendants~~

228. ~~217.~~ Plaintiffs repeat and reallege each and every allegation contained above.

229. ~~218.~~ Each of the Defendants: (a) knew or recklessly disregarded material adverse nonpublic information about the Company's financial results and then existing business conditions, which were not disclosed; and (b) participated in

drafting, reviewing and/or approving the misleading statements, releases, reports, and other public representations of and about the Company.

230. ~~219.~~ Defendant Perry was privy to adverse non-public information concerning IndyMac's business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and via reports and other information provided to him in connection therewith.  Because of his possession of such information, Perry knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

231. ~~220.~~ By virtue of his high-level positions with the Company, defendant Perry directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein.  Perry was involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, was aware, or recklessly disregarded, that the false and misleading statements was being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

232. ~~221.~~ As an officer and director (as well as a controlling person) of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the New York Stock Exchange ("NYSE") and governed by the provisions of the federal securities laws, defendant Perry had a duty to disseminate promptly, accurate and truthful information with

respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially false and/or misleading, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

233. ~~222.~~ During the Class Period, Defendants, with knowledge of or reckless disregard for the truth, disseminated or approved the false statements specified above, which were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

234. ~~223.~~ Defendants have violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon the purchasers of IndyMac stock during the Class Period.

235. ~~224.~~ Plaintiffs and the Class have suffered damage in that, in reliance on the integrity of the market, they paid artificially inflated prices for IndyMac stock. Plaintiffs and the Class would not have purchased IndyMac stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' false and misleading statements.

~~FIFTH~~ SIXTH AMENDED CLASS ACTION COMPLAINT
~~78~~

236. ~~225.~~ As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

## XIII.   SECOND CLAIM: *VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST PERRY*

~~Violations of Section 20(a) of the Exchange Act~~
~~Against Perry~~

237. ~~226.~~ Plaintiffs repeat and reallege each and every allegation contained above.

238. ~~227.~~ Perry acted as a controlling person of the Company within the meaning of § 20(a) of the Exchange Act. By reason of his senior executive positions, he had the power and authority to cause the Company to engage in the wrongful conduct complained of herein.

239. ~~228.~~ By reason of such wrongful conduct, Perry is liable pursuant to § 20(a) of the Exchange Act. As a direct and proximate result of his wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of IndyMac stock during the Class Period.

## XIV.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.     Determining that this action is a proper class action and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

     C.     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

     D.     Such other and further relief as the Court may deem just and proper.

## XV.    **JURY TRIAL DEMANDED**

     Plaintiffs hereby demand a trial by jury.

Dated:  February 16, 2010          Respectfully submitted,

                          BARROWAY TOPAZ KESSLER
MELTZER & CHECK, LLP

                          By:  _____
Ramzi Abadou
Erik D. Peterson
580 California Street, Suite 1750
San Francisco, California 94104
Phone: (415) 400-3000
Fax: (415) 400-3001
*-and-*
Christopher L. Nelson (*Pro Hac Vice*)
Lauren Wagner Pederson (*Pro Hac Vice*)
John J. Gross (*Pro Hac Vice*)
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706

***Lead Counsel for Plaintiffs***

GLANCY BINKOW & GOLDBERG, LLP
Lionel Z. Glancy (Bar No. 134180)
Peter A. Binkow (Bar No. 173848)
Neal A. Dublinsky (Bar No. 135712)
Andy Sohrn (Bar No. 241388)
1801 Avenue of the Stars
Suite 311
Los Angeles, CA 90067
(310) 201-9150
*-and-*
Frederick W. Gerkens, III
1430 Broadway, Suite 1603
New York, New York 10018
(212) 382-2221

***Liaison Counsel for Plaintiffs***

~~FIFTH~~<u>SIXTH</u> AMENDED CLASS ACTION COMPLAINT
~~80~~

1773663.1

COHEN, MILSTEIN, SELLERS
& TOLL, PLLC
Steven J. Toll
Andrew N. Friedman
Matthew B. Kaplan
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC 20005
(202) 408-4600

***Additional Counsel for Plaintiffs***

~~FIFTH~~ SIXTH AMENDED CLASS ACTION COMPLAINT

81

1773663.1

1

## PROOF OF SERVICE BY ELECTRONIC MAIL AND US MAIL

2

3        I, the undersigned, say:

4

5        I am a citizen of the United States and am employed in the office of a member of the Bar of this Court.  I am over the age of 18 and not a party to the within action.

6   My business address is 1801 Avenue of the Stars, Suite 311, Los Angeles, California 90067.

7        On February 16, 2010, I served the following document:

8

9                    **SIXTH AMENDED CLASS ACTION COMPLAINT**

10   **FOR VIOLATIONS OF SECTIONS 10(b) AND 20(a) OF
THE SECURITIES EXCHANGE ACT OF 1934**

11

12   upon the following parties:

13   David B Bayless                          Christopher L Nelson

14   Tammy Albarran                          John J Gross
     Kelly Patrice Finley                     Katharine M Ryan

15   Covington and Burling LLP               Barroway Topaz Kessler Meltzer & Check,
     Email: dbayless@cov.com                 LLP

16   Email: talbarran@cov.com                Email: cnelson@btkmc.com
     Email: kfinley@cov.com                  Email: jgross@btkmc.com

17                                           Email: kryan@btkmc.com

18   Andrew N Friedman
     Matthew B Kaplan                        Frederick W Gerkens , III

19   Cohen Milstein Sellers and Toll         Email: fgerkens@glancylaw.com
     Email: afriedman@cmht.com

20   Email: mkaplan@cohenmilstein.com

21        **By Electronic Mail**: I sent the above-referenced document to the parties listed

22   above via electronic mail no later than 5:00 p.m. on February 16, 2010

23        **By Mail**: By placing true and correct copies thereof in individual sealed envelopes, with postage thereon fully prepaid, which I deposited with my employer

24   for collection and mailing by the United States Postal Service.

25        I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on February 16, 2010, at Los

26   Angeles, California.

27

28

                                            Sasha A. Radcliffe